Bijan Amini
Avery Samet
Jeffrey Chubak
Amini LLC
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
bamini@aminillc.com
asamet@aminillc.com
jchubak@aminillc.com
Special Litigation Counsel for Plaintiff

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CREDIVALORES - CREDISERVICIOS S.A.,<br><div align="right">Debtor</div> | Chapter 7<br><br>Case 24-10837 (DSJ) |
| SALVATORE LAMONICA solely in his capacity as Chapter 7 trustee of Credivalores - Crediservicios S.A.<br><div align="right">Plaintiff</div><br>v.<br>BANCIEN S.A. aka Ban100 S.A. fka Banco Credifinanciera S.A., FINANZA INVERSIONES S.A., GRAMERCY FUNDS MANAGEMENT LLC, GCS COLOMBIA FINANCE LLC, GRAMERCY COLOMBIA CONSUMER LENDING HOLDINGS LLC, GUSTAVO FERRARO, GDA LUMA CAPITAL MANAGEMENT, LP, DAVALIA GESTION DE ACTIVOS S.L, LUIS BLAQUIER, ACON INVESTMENTS MANAGEMENT, LLC, ACON COLOMBIA FINANCE II, LLC and JOSÉ MIGUEL KNOELL<br><div align="right">Defendants</div> | Adv. Proc.<br><br>**COMPLAINT** |

Plaintiff Salvatore LaMonica, solely in his capacity as Chapter 7 trustee of Credivalores -

Crediservicios S.A. ("Debtor"), as and for his complaint, hereby alleges:

**INTRODUCTION**

1.      By this action, the Trustee seeks to recover against Gramercy, GDA Luma and ACON, and those working in concert with them, for transferring tens of millions of dollars of the Debtor's assets to their proxies, both immediately before and during the pendency of the Debtor's bankruptcy case.  These three U.S. firms used their control of the Debtor to pay their affiliates $3 million in cash and over $40 million of the Debtor's assets.  As a result, the Trustee seeks (a) to avoid and recover the transferred property pursuant to Chapter 5 of the Bankruptcy Code and (b) damages from the insiders who caused the transactions in breach of the fiduciary obligations they owed to the Debtor's bankruptcy estate.

2.      On May 16, 2024, the Debtor commenced this case as a prepack, with the stated goal of restructuring its unsecured bonds (the "Bonds") issued under an indenture with The Bank of New York Mellon. In lieu of a disclosure statement the Debtor issued an Offering Memorandum (defined below) to its Bondholders on March 7, 2024. The Debtor explained that its business needed additional liquidity and requested its Bondholders to vote on a plan to exchange $210 million in unsecured Bonds for $165 million in new bonds ("New Bonds") secured by first and second liens on the Debtor's assets. The Debtor sought to confirm a Chapter 11 plan of reorganization ("Plan") consistent with the Offering Memorandum.  On July 2, 2024, less than two months later, this Court confirmed that Plan after holding several hearings.

3.      Yet, behind the scenes, the Debtor's U.S. controlling shareholders were working assiduously to shore up their own position, even to the extent of transferring property which had been promised to the Bondholders under the plan.

4.      On the same day the Debtor issued the Offering Memorandum—less than 60 days prior to the then-anticipated petition date—the Debtor's controlling shareholders secretly entered into a "forbearance agreement" on their own shareholder loan to the Debtor, which would require

the Debtor to pay $8.5 million to and for the benefit of the shareholders by April 2024. Despite counsel having advised against paying said amount, the shareholders paid themselves $3 million during the week prior to the petition date.

5. During the pendency of the bankruptcy, the shareholders caused the Debtor to transfer the Debtor's receivables consisting of payroll loan portfolios to Ban 100 oftentimes without cash consideration. These payroll loan portfolios were the same assets that undergirded the Offering Memorandum and the Plan. In other words, these were the same assets upon which the Debtor was promising to grant the Bondholders liens in exchange for restructuring their Bonds. In June and July 2024, the shareholders caused the Debtor to transfer over $40 million of payroll loan portfolios to Ban 100. None of these transactions were approved by the Bankruptcy Court.

6. Following these transactions, the shareholders placed the Debtor into a Colombian insolvency proceeding. They own and control Ban100 to this day.

**PARTIES**

**I. THE PLAINTIFF**

7. Plaintiff Salvatore LaMonica is the Chapter 7 trustee ("Trustee") of the Debtor. He was appointed on July 8, 2025.

8. The Debtor was a payroll lender and credit card issuer with its principal place of business in Bogota, Colombia. On May 16, 2024, the Debtor filed a voluntary petition for bankruptcy relief in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The basis for the Debtor's filing in the Bankruptcy Court was, among other things, the Debtor's dollar-denominated Bonds governed by New York law. On July 7, 2025, the Bankruptcy Court entered an order converting the case to one under Chapter 7 and directed the appointment of the Trustee.

## II. THE DEFENDANTS

9. The Defendants can be grouped into three categories: those related to the Debtor's U.S.-based controlling shareholders, namely, Gramercy, GDA Luma and ACON; the Colombian sister companies, owned by those same shareholders; and the Debtor's directors.

### A. Gramercy Related Defendants

10. Defendant Gramercy Funds Management LLC ("Gramercy") is an SEC-registered investment advisor which claims to have over $7 billion under management. Gramercy is organized under the laws of Delaware with its headquarters in West Palm Beach, Florida and with another office in Greenwich, Connecticut. As discussed in greater detail below, Gramercy owned over 40% of the Debtor and its sister companies Ban100/Finanza. Gramercy undertook its actions vis-à-vis the Debtor through several special purpose entities it controlled, and through directors it appointed to the Debtor's board of directors (the "Board").

11. Defendant GCS Colombia Finance LLC ("GCS") is a Gramercy-controlled entity formed to lend money to the Debtor under the Shareholder Loan (defined below). It is organized under the laws of Delaware.

12. Defendant Gramercy Colombia Consumer Lending Holdings LLC ("Gramercy Colombia") is a Gramercy-controlled entity formed to lend money to one the Debtor's portfolio asset trusts. It is organized under the laws of Delaware.

13. Defendant Gustavo Ferraro is a partner at Gramercy who served as a director on the Board, and who was appointed to the Board by Gramercy. He resides in Greenwich, Connecticut and performed his duties vis-à-vis the Debtor from Gramercy's office in Greenwich.

14. Gramercy had also appointed another director to the Board, Juan Manuel Trujillo Sanchez, an attorney at Gramercy's Colombian law firm, Muñoz Aya, which firm advised Gramercy on tax matters in relation to the transaction whereby it and GDA Luma/Davalia acquired

4

equity interests in Ban100 and the Debtor in June 2023, and which firm also represented Finanza in connection with the Shareholder Loan.

**B.     GDA Luma Related Defendants**

15.     Defendant GDA Luma Capital Management, LP ("GDA Luma") is an SEC-registered investment adviser which claims to have $592 million under management and which had a pre-existing relationship with Gramercy before it extended loans to or became a shareholder of the Debtor.  GDA Luma is organized under the laws of Delaware with its headquarters in Miami, Florida and with another office in New York City.  As discussed in greater detail below, GDA Luma owned 20% of the Debtor and its sister companies Ban100/Finanza.  GDA Luma undertook its actions vis-à-vis the Debtor through several special purpose entities it controlled, and through directors it appointed to the Debtor's Board.

16.     Defendant Davalia Gestion de Activos S.L. ("Davalia") is a GDA Luma-controlled entity through which it owned its shares of the Debtor and held loans extended to the Debtor under the Shareholder Loan.  It is organized under the laws of Spain, with its principal office in Miami, Florida and a secondary office in New York City.

17.     Defendant Luis Blaquier is a senior associate at GDA Luma who served as director on the Debtor's Board, and who was appointed to the Board by GDA Luma.  He performed his duties vis-à-vis the Debtor from GDA Luma's office in New York City, where he resides.

18.     GDA Luma had also appointed another director to the Board, Martin Kontarovsky, the Head of Cards at ARQ (formerly DolarApp), which provides virtual dollar accounts to users in Mexico and Colombia.  Kontarovsky gave his voting proxy to a junior analyst at GDA Luma as described below.

**C. ACON Affiliated Defendants**

19. Defendant ACON Investments Management, LLC ("ACON") is an SEC-registered investment adviser which claims to have $192 million under management. It is organized under the laws of Delaware and headquartered in Washington, D.C. As discussed in greater detail below, ACON undertook its actions vis-à-vis the Debtor through a number of special purpose entities it controlled, and through directors it appointed to the Debtor's Board.

20. Defendant ACON Colombia Finance II, LLC ("ACON II") is an ACON-controlled entity formed to lend money to the Debtor under the Shareholder Loan. It is organized under the laws of Delaware.

21. Defendant José Miguel Knoell is a managing partner at ACON who served as a director on the Board, and who was appointed to the Board by ACON. Upon information and belief he resides in the Washington, D.C. metropolitan area and performed his duties vis-à-vis the Debtor from ACON's office in Washington, D.C.

22. ACON had also appointed another director to the Board, Carlos Eduardo Meza Guarnizo, who was a Vice President with the Colombian National Guarantee Fund, a government-backed financial guarantor (abbreviated as "FNG" in Spanish) through June 4, 2020.

**D. Affiliate Defendants**

23. Defendant Bancien S.A. aka Ban100 S.A. fka Banco Credifinanciera S.A. ("Ban100") is a Colombian bank whose principal office is in Bogota, Colombia.

24. Defendant Finanza Inversiones S.A. ("Finanza") is a Colombian company and the 95% owner of Ban100 whose principal office is also in Colombia.

**JURISDICTION AND VENUE**

25. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1334(b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(F), (H).

6

26. This action is properly venued in this district under 28 U.S.C. § 1409(a).

27. This Court has personal jurisdiction over defendants under FRBP 7004(f) because they each have minimum contacts with the U.S. More specifically:

- This Court has personal jurisdiction over all of the domestic entities and persons acting in the U.S. referenced herein.

- This Court has personal jurisdiction over Ban100 and Finanza based upon their intimate relationship and transactions with a U.S. debtor in possession and participation in the events described herein. Among other things, these entities have near identical ownership with the Debtor and their directors would attend the Debtor's board meetings (including post-petition). Moreover, as discussed herein, Gramercy, GDA Luma and ACON treated the Debtor, on the one hand, and Ban100/Finanza on the other, as a single economic unit. This Court also has personal jurisdiction over Ban100 and Finanza based on their participation in the pre-bankruptcy paydown of the Shareholder Loan with the Debtor's funds used to do so paid into a U.S. bank account at Citizens Bank controlled by the lenders' U.S. administrative agent under the Shareholder Loan, and from which said funds were disbursed to the lenders.

- This Court has personal jurisdiction over non-resident Board members, including those that authorized the Debtor's bankruptcy, because they were directors of a U.S. debtor in possession and were working at the direction of U.S. persons.

## BACKGROUND

### I. THE DEBTOR'S AND BAN100'S BUSINESSES AND HISTORIC OWNERSHIP

28. The Debtor had four shareholders: Gramercy (42%), GDA Luma (20%), Acon (15%) and Crediholding S.A.S. (20%).[1]

29. As is typical in private equity, the three U.S. firms held their interest through several wholly-owned entities but all decisions were controlled entirely by the firms from their U.S. offices. Thus, Gramercy held its equity interest through an entity named Lacrot Inversiones 2014 S.L.U. that was owned by Gramercy-managed funds, GDA Luma held through Davalia which is owned by GDA Luma-managed funds and ACON held through ACON Consumer S.L. and ACON Columbia Holdings S.L.

30. These four shareholders also managed a sister company named Ban100, which they owned 95% of through a holding company named Finanza.[2] They beneficially owned Finanza/Ban100 in a similar proportion to the Debtor: Gramercy (43%), GDA Luma (20%), ACON (around 13%) and Crediholdings (around 24%).

31. Historically, Credivalores offered payroll loans and a Debtor-branded Visa credit card to poor, primarily rural Colombians, while Ban100, registered as a bank, offered savings and investment products in the same markets.

32. Historically, the Debtor raised capital by settling trusts with portfolios of its assets (the outstanding payroll loans and credit card obligations), which would then borrow funds from lenders secured by these assets. The Debtor would get the funds and would retain a residual

---

[1] Approximately 3% of the Debtor's shares are treasury shares.

[2] Approximately 5% is owned by other entities that are controlled by Finanza itself for regulatory purposes.

interest in the trust behind the lenders. The residual interest is sometimes referred to as the Debtor's "fiduciary rights." The trusts were known as *patrimonios autónomos*.

33. As discussed below, Gramercy, GDA Luma and ACON viewed their holdings in the Debtor and Ban 100 as a single investment.

34. Governance:

- Decisions were made at the investment advisor level and communicated to the employees and representatives designated to serve on the Board. For example, Mr. Ferraro would regularly confer with Robert Koenigsberger, the founder and Chief Investment Officer of Gramercy about material business decisions for the Debtor; and Gabriel de Alba the founder and managing partner of GDA Luma was similarly consulted on business decisions for the Debtor. The Debtor's directors regularly included other members of the investment team at Gramercy, GDA Luma and ACON on emails concerning Debtor decisions, including Ban100 directors Javier Ledesma (of Gramercy), Maite Stebelski (GDA Luma) and Alberto Hernandez (ACON). For the crucial August 28, 2024 Board meeting (discussed below), the putative GDA Luma-appointed "independent" board member Mr. Kontarovsky gave a power of attorney to a junior analyst at GDA Luma to among other things approve payroll loan portfolio sales to Ban100.

- The Gramercy, GDA Luma and ACON directors of Ban100/Finanza would regularly attend and participate in the Debtor's Board meetings and were from time to time also given power of attorney by the Debtor directors selected by them to among other things approve payroll loan portfolio sales to Ban100.

9

- Between the Gramercy, GDA Luma and ACON partners/employees on the Debtor's Board and the other directors which they selected and which voted in the manner they directed, whether because they are attorney/agent for one of them (Mr. Trujillo Sanchez) or because they gave power of attorney right back to them (Mr. Kontarovsky), Gramercy, GDA Luma and ACON directly controlled the Board of the Debtor.

- Using that control, Gramercy, GDA Luma and ACON caused their respective directors to vote for all of the Board decisions described herein.

35. As time went on, these firms began to view the Ban100 side as the more valuable portion. For example, in June 2023, less than one year prior to the Debtor's bankruptcy, GDA Luma and Gramercy executed a transaction whereby GDA Luma exchanged $57 million of the Bonds and it and Gramercy exchanged claims for outstanding interest due under the Shareholder Loan into equity positions in Ban100. It goes without saying that none of the other Bondholders could recover from Ban100.

36. However, as of the petition date, the Debtor had ceased originating any new business, whether credit card or otherwise. In August 2023, the Debtor sold its credit card business to Ban100. The Debtor stopped originating new payroll loans around the same time.

## II. THE BONDS

37. The indenture under which the Bonds were issued included a covenant prohibiting the Debtor from selling its assets to affiliates (defined by reference to common control) once either S&P or Fitch reduced the Bond credit rating below investment grade i.e. below BBB-, absent satisfaction of conditions specified in the indenture.

38. Under the covenant, an affiliate transaction or series of transactions with a value of $5 million or more required execution and delivery of an officers' certificate stating that such

transaction(s) was at least as favorable to the Debtor as that which could be obtained with a non-affiliate; if the value was $10 million or more a board resolution was required as to the foregoing; and if the value was $20 million or more a formal opinion was required from an internationally recognized investment bank or accounting firm as to the fairness of the transaction(s) to the Debtor from a financial point of view.

39. The Bonds were rated below investment grade from at least March 2022 onwards, and upon information and belief were below investment grade from their issuance.

40. The Debtor regularly sold payroll loan portfolios to Ban100, with individual transaction values often exceeding $10 million and the value of the series of transactions far exceeding $20 million.

41. The Debtor also sold credit card debt to Ban100 in transactions with values exceeding those specified in the covenant.

42. However, no officers' certificate was ever delivered certifying as to the fairness of any such sales transaction with Ban100; no board vote was taken and no board resolution was ever executed concerning the fairness of any such sales transaction with Ban100; and no written opinion from an internationally recognized investment bank or account firm was ever obtained let alone delivered concerning the fairness of any such sales transaction with Ban100.

## III.  SHAREHOLDER LOAN

43. On October 25, 2022, Gramercy, ACON and GDA Luma extended a $20 million term loan for the purpose of refinancing certain of the Debtor's obligations.  However, instead of extending the loan directly to the Debtor, they extended it through a transaction with Finanza/Ban100 as follows.

44. On October 25, 2022, Gramercy, Acon and GDA Luma entered into a credit agreement with Finanza as borrower, Acquiom Agency Services, LLC ("Acquiom") as

11

administrative agent and the Debtor as guarantor (as amended, the "Shareholder Loan"). Finanza simultaneously re-loaned the funds to the Debtor.

45. Initially, the lenders under the Shareholder Loan ("Shareholder Lenders") were three wholly-owned special-purpose entities of Gramercy, GDA Luma and ACON: GCS, GDA Luma Special Opportunities Warehouse, LLC and Acon II.

46. Contemporaneously with the execution of the Shareholder Loan, the Debtor's shareholders and Finanza entered into a side letter providing that proceeds from the sale of Ban100 would be applied, after payment of transaction costs, first to repayment of the Shareholder Loan, then to repayment of a $1.8 million loan that the Debtor's founder and Crediholdings' principal had extended to the Debtor and the remaining proceeds would be distributed 88% to Gramercy and 12% to ACON, on account of their preferred equity interests in Finanza (GDA Luma was later issued identical equity interests to Gramercy), with 0% going to the common holder Crediholdings.

47. On February 3, 2023, the parties entered into a first amendment to the Shareholder Loan pursuant to which Gramercy (via GCS) and GDA Luma (via an entity named GDA Luma Special Opportunities Fund LP) each loaned an additional $5 million to Finanza, again so that Finanza could cycle the funds to the Debtor.

48. On March 15, 2023, the parties entered into a second amendment to the Shareholder Loan whereby Gramercy and GDA Luma (through the same entities as before) each loaned an additional $3.33 million to Finanza, again, for Finanza to provide to the Debtor.

49. Pursuant to both amendments, the Debtor granted the Shareholder Lenders through their collateral agent a security interest in certain of the Debtor's residual interests in *patrimonios autónomos* trusts as collateral. These security interests were therefore junior to the trust lenders' liens and senior to the Debtor's residual interest in the trusts. The Debtor granted these security

interests in two trusts: one to which Citibank Colombia was lender (the "Citibank Trust"), which held portfolios of payroll loans that the Debtor had originated, and another to which affiliates of UBS O'Connor and Gramercy Colombia were lenders (the "UBS Gramercy Trust") which had funded credit card debt.

50. In addition, through both amendments, the Shareholder Lenders required the Debtor to sell its credit card business (for at least $20 million) and required Finanza to sell Ban100.

51. The Trustee has seen no evidence that these security interests were ever perfected as provided for in the amendments. Further, as discussed below, the Debtor listed the Shareholder Loan as an unsecured claim on its list of its twenty largest unsecured creditors.

52. Throughout the life of the Shareholder Loan, the Debtor made just three interest payments totaling $1.9 million, all in calendar year 2023. Finanza never paid interest on the Shareholder Loan, whether to the lenders thereunder or the administrative agent.

53. The Shareholder Loan purportedly matured in November 2023. No enforcement action was taken. In January 2024, the Shareholder Lenders caused the Debtor to enter into 16 day "forbearance agreement," following which again no enforcement action was taken.

IV.    THE OFFERING MEMORANDUM

54. On February 7, 2024, the Debtor missed its $9.4 million interest payment due on the Bonds.

55. On March 7, 2024, the Debtor commenced solicitation of votes on its Plan and distributed the accompanying offering memorandum to Bondholders ("Offering Memorandum").[3] The Offering Memorandum proposed to restructure the Bonds as follows: capitalizing the missed

---

[3] The Offering Memorandum also proposed a substantively equivalent alternative of restructuring the Bonds outside of bankruptcy.

interest payment and reducing the principal balance by one-quarter, to $165 million, extending the maturity date by four years to February 2029, reducing the interest rate for two years and giving security for the New Bonds in the form of a first lien on payroll loan portfolios held outside of a *patrimonio autónomo* trust and a second lien on one such trust. The Debtor represented that from their issuance the New Bonds would be fully secured. The Offering Memorandum failed to disclose any asserted junior lien on the assets by insider lenders under the Shareholder Loan, or that the Debtor had sold its credit card business and had ceased originating payroll loans.

56. Also on March 7, 2024, but undisclosed in the Offering Memorandum, the Debtor entered into "an amended and restated forbearance agreement" on the Shareholder Loan. Pursuant to this agreement, Finanza purported to agree to pay down the full amount of the Shareholder Loan over time, with $8.5 million due in April 2024 plus $200,000 due in May 2024, and the Debtor guaranteed all such repayments.

57. Also, pursuant to the March 7, 2024 forbearance agreement, Finanza and the Debtor purportedly agreed to pay over $1 million in legal fees identified in Schedule IV which the Shareholder Lenders had purportedly incurred to their counsel, primarily Milbank (counsel for GDA Luma, $500,000) and Simpson Thatcher (counsel for Gramercy and Acquiom, $137,336.25), with the balance purportedly incurred ($369,989) to Latin American law firms.

58. The Debtor also entered into a forbearance agreement in respect of the loan extended to the UBS Gramercy Trust, whereby the Debtor agreed to pay legal fees of the lenders including Gramercy Colombia; and on March 15, 2024, the Debtor paid Latham & Watkin's fees for services rendered in relation to said agreement in the amount of $50,000.

59. Over the next four weeks, the Bondholders voted on the Plan put forward in the Offering Memorandum.

60. The tabulation agent Epiq subsequently certified that the Bondholders had voted to accept the Plan.

61. On April 5, 2024, two days after the voting deadline passed and the Debtor confirmed from its tabulation agent that Bondholders had approved the Plan, the Debtor's Board authorized the commencement of the Chapter 11 bankruptcy.

62. The shareholders did not cause the Debtor to file for bankruptcy immediately after confirming they had the votes to confirm the Plan. Instead, at an Board meeting held April 29, 2024, roughly a month after the Board authorized the bankruptcy filing, the shareholders caused the Debtor to enter into a transaction whereby (a) the Debtor would transfer payroll loan portfolios from the Citibank Trust to Ban100 and (b) in exchange for this transfer, Ban100 would pay the Debtor a "sales premium" of $2,745,386.16. However, instead of paying this "sales premium" directly to the Debtor in exchange for the Debtor's assets, the shareholders agreed that Ban100 would pay the funds to Finanza, which in turn, would use the monies to pay down the Shareholder Loan.

63. Finanza had no entitlement, contractual or otherwise, to the sales premium.

64. The Debtor's Board minutes do not reveal the value of the payroll loan portfolios transferred to Ban100 on April 26, 2024. Nor was this transfer disclosed to the Bankruptcy Court. None of the Debtor's shareholders were able to produce the documentation surrounding this payroll loan portfolio transfer in FRBP 2004 discovery. Nevertheless, the Debtor disclosed that the Citibank Trust held $46 million in assets with secured debt of only $26 million.

65. On May 3, 2024, Finanza paid the $2,745,386.16 to the Shareholder Loan administrative agent for it to be applied to the Shareholder Loan.

66. On May 8, 2024, the administrative agent paid said amount to ACON II ($187,185.42), GCS ($1,185,507.66) and Davalia ($1,372,693.08) which had been assigned the GDA Luma loans two months prior.

67. Said payment was not even required by the transaction documents, as at the same April 29, 2024 meeting the Board approved an amendment to the forbearance agreement that deferred the $8.7 million in payment obligations due April-May 2024 until after the Chapter 11 case concluded.

68. On May 15, 2024, the Debtor, the Shareholder Lenders and their administrative agent executed that amendment.

69. On May 16, 2024, the Debtor commenced this bankruptcy case.

## V. DEBTOR'S BANKRUPTCY PETITION

70. With voting having already taken place, together with the filing of its petition the Debtor moved for a combined hearing to consider confirmation, approval of the Offering Memorandum as the disclosure statement and the prebankruptcy solicitation procedures.

71. Accompanying the petition, the Debtor submitted the first day declaration of Jaime Francisco Buritica Leal, the Debtor's CEO (the "First Day Declaration").

72. Gramercy, GDA Luma and ACON were aware of this declaration.

73. The First Day Declaration described the Debtor's business, the prepackaged plan, and the Debtor's assets and liabilities.

74. The First Day Declaration did not disclose the transfer of payroll loan portfolios to Ban100 on or about April 29, 2024 nor the $2,745,386.16 paid down to the Shareholder Loan. Instead, the First Day Declaration made several cryptic disclosures about the Shareholder Loan and Ban100, which in hindsight, and after considering the underlying records, likely refer to these

transactions; but when read in context are highly misleading at best and seemed designed to obfuscate the underlying facts.

75. <u>The Shareholder Loan</u>: In ¶24, the First Day Declaration disclosed that the Debtor had executed a forbearance agreement with the Gramercy, GDA Luma and ACON lenders. Other than the date, the First Day Declaration contained no information about the transaction, other than that it was one of three forbearance agreements that the Debtor had executed, and that the lender-parties to all three forbearance agreements agreed to forbear their rights. Then, in ¶50(b), in a paragraph describing "related party transactions" in the ordinary course of business, the First Day Declaration described several loans "with" Finanza. The declaration gave no indication that the shareholders (Gramercy, GDA Luma and ACON) were the lenders on these loans, nor that the loans were in forbearance. Finally, on the list of the twenty largest unsecured creditors, the declaration lists the nature of Finanza's claim as "Shareholder Loans."

76. <u>Ban100</u>: In the same section on related party transactions, the First Day Declaration disclosed (in ¶50(c)) a single transaction with Ban100 in November 2023, which had "not been fully completed as the Debtor still receives some of the collections related to the portfolio sold to Ban100." After describing these collections, the First Day Declaration cryptically stated "[t]he Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise)." It also stated that the Debtor could be required to repurchase some of the sold loans back in the future. On the list of the twenty largest unsecured creditors, the Debtor described owing Ban100 $8.7 million for commissions and sale of a business segment.

77. The First Day Declaration disclosed certain information about the Debtor's assets. Particularly, it disclosed five trusts holding payroll loan and credit card portfolios with a collective book value of $278 million and secured debt of $87 million. In particular, the Debtor listed the Citibank Trust as having a book value of $46 million with a secured claim of $27 million.

17

## VI. POSTPETITION THE DEBTOR TRANSFERRED ASSETS TO BAN100 WHILE IT SOUGHT PLAN CONFIRMATION AND THEREAFTER

78. On June 18, 2024, the Debtor threatened the FNG that if it did not agree to restructure the Debtor's local bonds that were scheduled to mature in August 2024, then the Debtor would commence a Colombian bankruptcy.

79. On June 27, 2024, the Debtor transferred to Ban100 payroll loans having a value of COP$3.8 billion (around USD$1 million). The Trustee has uncovered no consideration paid for these assets. The Debtor's June monthly operating statement reveals a loss of approximately $273,000 from payroll loan portfolio sales.

80. The hearing on confirmation of the Plan was held July 2, 2024.

81. The confirmation order was entered the next day. Pursuant to its terms, the Plan would go effective when, among other things, professional fees were funded and the New Bonds were issued.

82. On July 11, 2024, the FNG informed the Debtor that it would not agree to restructure the local bonds.

83. On July 30, 2024, the Debtor transferred payroll loan portfolio assets from the Citibank Trust to Ban100 for COP$32 billion (around USD$7.8 million). No cash was transferred to the Debtor in exchange for the same. Instead, Ban100 purported to satisfy its payment obligations by exercising setoff rights.

84. The purported setoff was for supposed amounts owed in relation to the sale of the Debtor's credit card business segment. That business segment had been sold for COP$60 billion (around $15 million) in August 2023; however, two months later after the consideration was paid the purchase price was retroactively reduced to COP$10 billion (around USD$2.7 million). The

list of the twenty largest unsecured creditors identify Ban100 as the fifth largest creditor for "sale of business segment (related parties)".

85. Even if the purported debt to Ban100 were somehow legitimate, such a setoff would violate the automatic stay and lack mutuality as Ban100's supposed claim was a prepetition one relating to the sale of the Debtor's credit card business whereas the payroll loan portfolio sale was a post-petition transaction and no stay relief to effectuate the setoff was ever obtained.

86. The Debtor's records indicate that this loan portfolio sale liquidated the Citibank Trust entirely. As noted above, the Debtor had represented to the Bankruptcy Court that as of April 30, 2024 (two weeks before the petition date) the book value of the trust was $46 million with secured debt of $26 million.

87. The next day, July 31, 2024, the Debtor transferred additional payroll loan portfolios not held in any *patrimonios autónomos* trust for a value of COP$48.7 billion (approximately USD$12 million) to Ban100. The Debtor's Board minutes do not reference consideration being given for this transfer whether in the form of setoff or otherwise. The Debtor's monthly operating report indicates portfolio sale income of just $1.2 million during this time period.

88. On August 28, 2024, the Debtor's Board purported to ratify the July 31st transfer. In addition, the Board also purported to ratify a February 9, 2024 payroll loan portfolio sale transaction to Ban100 for around COP$12 billion (around USD$3.2 million).

89.     Two days later, on August 30, 2024, the Debtor filed an application for an order for relief before the Superintendent of Companies which functions as the Colombian bankruptcy court.[4]

90.     Further, the Debtor's 2024 financial statements reveal that it transferred payroll loans having a value of COP$172 billion (around USD$42.3 million) to Ban100 in calendar year 2024, considerably more than the transactions identified in the Debtor's Board minutes, the documents reviewed by the Trustee and the disclosures made to the Bankruptcy Court.

91.     Finally, from and after confirmation the Debtor made recurring undisclosed payments to Ban100 purportedly for "operating costs", as described in the following chart:

| Date | Amount |
| --- | --- |
| 07/03/2024 | COP$18,580,418 (USD$4,602.76) |
| 07/04/2024 | COP$2,271,998 (USD$562.82) |
| 07/11/2024 | COP$2,954,655,864 (USD$731,929.88) |
| 07/11/2024 | COP$265,518,466.26 (USD$65,774.46) |
| 07/23/2024 | COP$328,037,356.11 (USD$81,261.69) |
| 08/08/2024 | COP$25,059,727.00 |
| 08/12/2024 | COP$236,282,835.07 |
| 08/13/2024 | COP$1,468,039,072.00 |
| 08/15/2024 | COP$212,204,819.00 |
| 08/16/2024 | COP$1,565,500.00 |
| 09/13/2024 | COP$184,778,947.00 |
| 09/19/2024 | COP$545,325,373.00 |
| 09/19/2024 | COP$305,000.00 |
| 09/26/2024 | COP$5,956,835,857.34 |
| 09/27/2024 | COP$20,981,982.38 |
| 10/15/2024 | COP$178,251,229.00 |
| 10/16/2024 | COP$3,386,050.471 |
| 11/15/2024 | COP$2,334,821,519.00 |
| 11/15/2024 | COP$137,581,807.00 |
| 12/06/2024 | COP$1,000,000.00 |
| 12/12/2024 | COP$2,001,839,725.00 |
| 12/16/2024 | COP$126,426,641.00 |
| 01/14/2025 | COP$1,815,960,813.00 |

---

[4] That application was denied in November 2024 because the Debtor had neglected to file any of the required schedules.  Upon reapplication, the Debtor entered bankruptcy protection in Colombia on December 12, 2024.

| Date | Amount |
|---|---|
| 01/23/2025 | COP$122,596,554.00 |
| 03/14/2025 | COP$103,260,179.00 |
| 03/14/2025 | COP$1,662,254,288,000.00 |
| 03/19/2025 | COP$1,615,064,861,000.00 |
| 04/11/2025 | COP$94,900,267.00 |
| 04/14/2025 | COP$1,539,075,267.00 |
| 05/09/2025 | COP$89,570,832.00 |
| 05/14/2025 | COP$1,588,479,109.00 |
| 06/10/2025 | COP$1,256,706,467.00 |
| 06/16/2025 | COP$84,224,323.00 |

92. These were not ordinary course payments. No Bankruptcy Court authorization had been granted let alone sought to pay same. They were not disclosed in the Debtor's monthly reporting which had omitted any schedule of payments to insiders and did not attach bank statements.

**FIRST CLAIM FOR RELIEF**
**Fiduciary Duty**
**(against Gramercy, GDA Luma, ACON, Ferraro, Knoell, Blaquier)**

93. The Trustee repeats and realleges each and every allegation made in ¶¶1-92 as if set forth fully herein.

94. The Debtor's postpetition directors as estate fiduciaries have duties of loyalty and good faith under Federal common law, which include an obligation to refrain from self-dealing, to avoid conflicts of interest and the appearance of impropriety, to treat all parties to the case fairly and to maximize the value of the estate.

95. The Debtor's directors also have duties to act in good faith, with loyalty and with the diligence of a good businessperson under Colombian law. The duty of loyalty includes an obligation to avoid conflicts which might allow directors to benefit at the expense of the Debtor, and the good businessperson standard requires prudence a reasonable businessperson would exercise under similar circumstances.

21

96. Messrs. Knoell, Ferraro and Blaquier breached their fiduciary duties, including their fiduciary duty to preserve estate property under Federal law, to the extent that they approved payroll loan portfolio sales to Ban100 without adequate consideration, or without consideration at all, and by ratifying the February 9, 2024 payroll loan portfolio sale without consideration.

97. They also violated their fiduciary duty of loyalty in voting to approve all postpetition transactions including the postpetition transfer of payroll loan portfolios to Ban100; and to the extent that they authorized any cash payments to Ban100 during the bankruptcy including the above-described payments for purported operating costs. They were conflicted with respect to same as the entities that appointed them as directors owned and continue to own equity interests in Ban100; their respective employers, Gramercy, GDA Luma and ACON, earn management/advisory fees on account of their funds' investments in Ban100; and the performance of their firms' investments in Ban100 has a material effect on their personal compensation.

98. They also breached their fiduciary duty of care/prudence under Colombian law in authorizing the eve-of-bankruptcy transfer of $2,745,386.16 in Debtor sales premium by Ban100 to Finanza so it can pay down the Shareholder Loan at the April 29, 2024 Board meeting. There was no valid business reason or need to approve this transfer as at the same meeting the Board approved an amendment deferring the purported payment obligation until after the Debtor emerged from bankruptcy.

99. They also breached their fiduciary duty of loyalty under Colombian law in approving said transfer. They were conflicted with respect to same as their respective employers Gramercy, GDA Luma and ACON manage the Shareholder Lenders whose recoveries on the Shareholder Loan have a material effect on their respective personal compensation.

100. Gramercy, GDA Luma and ACON, the investment advisors that controlled the Board, also owed fiduciaries to the estate, as they together exercised actual control of the Debtor's

business affairs through their majority control of the nominal shareholders of the Debtor, and used that control to cause their appointed directors to transfer estate property to their affiliate against which Bondholders had no recourse, Ban100, during a period when Bondholders were stayed from taking enforcement action against the Debtor on account of the bankruptcy.

101. Judgment should be entered against each of Messrs. Ferraro, Blaquier and Knoell, and against Gramercy, GDA Luma and ACON, in an amount to be determined at trial.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**11 U.S.C. § 547**
**(against Finanza, Davalia, GCS, Gramercy Colombia, ACON II)**

</div>

102. The Trustee repeats and realleges each and every allegation made in ¶¶1-101 as if set forth fully herein.

103. Each of Ban100's payment to Finanza of $2,745,386.16 in Debtor sales premium, Finanza's payment of same to the Shareholder Lenders, the Debtor's payment of Schedule IV legal fees under the forbearance agreement relating to the Shareholder loan, and the Debtor's payment of $50,000 to Latham & Watkins pursuant to the other forbearance agreement, is voidable as a preference.

104. To the extent that the security interest of the Shareholder Lenders or their collateral agent in the Citibank Trust, the UBS Gramercy Trust or the Debtor's fiduciary rights was perfected during the year before the bankruptcy, said transfer is also voidable as a preference.

105. Finanza was a creditor of the Debtor at the time Ban100 transferred the sales premium to it, on account of its loan of Shareholder Loan proceeds to the Debtor.

106. The Shareholder Lenders and their administrative agent were each creditors of the Debtor on account of the Debtor's guaranty of the Shareholder Loan.

107. Gramercy Colombia is a creditor of the Debtor because the Debtor had guaranteed its loan to the UBS Gramercy Trust.

<div align="center">23</div>

108. Each such transfer was made for or on account of an antecedent debt owed by the Debtor before the transfer was made.

109. Each such transfer was made while the Debtor was insolvent. Indeed, the Debtor admitted in the Offering Memorandum that it was insolvent by the end of 2022 at which point its equity value was negative.

110. Each such transfer enabled the creditor to receive more than it would receive had it not been made and the creditor instead received payment of such debt in Chapter 7.

111. Prior to making this claim, the Trustee investigated potential preference defenses and concluded none exist.

112. Judgment should be entered against Ban100, Finanza and the Shareholder Lenders avoiding said transfers and any lien as a preference under 11 U.S.C. § 547.

### THIRD CLAIM FOR RELIEF
**11 U.S.C. § 548**
**(against Ban100, Davalia, GCS, ACON II)**

113. The Trustee repeats and realleges each and every allegation made in ¶¶1-112 as if set forth fully herein.

114. The February 9, 2024 payroll loan portfolio sale transaction with Ban100 that was purportedly ratified at the August 28, 2024 Board meeting and the eve-of-bankruptcy payment of $2,745,386.16 in Debtor sales premium to Shareholder Lenders are both voidable as fraudulent transfers.

115. The former was made without reasonably equivalent value, in that the purchase price for that transaction was not negotiated, the payroll loan portfolios transferred were not market tested or even offered for sale to anyone else before they were sold to Ban100 and the transferee is an insider.

116. In addition, at the time of or as a result of the transfer the Debtor was balance sheet insolvent, engaged in business for which its remaining property was an unreasonably small capital and intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured.

117. The latter transaction was done with intent to hinder, delay and defraud Bondholders and multiple badges of fraud are present, including that the transfer was to an insider, it was not disclosed in the Debtor's bankruptcy filings and the Debtor was insolvent on a balance sheet and cash flow basis at the time of the transfer.

118. Judgment should be entered against Ban100 and the Shareholder Lenders avoiding said transfers as fraudulent 11 U.S.C. § 548.

<div align="center">

**FOURTH CLAIM FOR RELIEF**
**11 U.S.C. § 549**
**(against Ban100)**

</div>

119. The Trustee repeats and realleges each and every allegation made in ¶¶1-118 as if set forth fully herein.

120. All postpetition payroll loan portfolio transfers to Ban100 are voidable under 11 U.S.C. § 549, including the June 27, 2024, COP$3.8 billion (around USD$1 million) payroll loan portfolio sale, and the July 30, 2024 COP$32 billion (around USD$7.8 million) payroll loan portfolio transfer and the July 31, 2024 COP$48.7 billion (approximately USD$12 million) payroll loan portfolio transfer and February 9, 2024 COP$12 billion (around USD$3.2 million) payroll loan portfolio transfer ratified at the August 28, 2024 Board meeting.

121. None of these transactions pass the horizontal or the vertical dimension test let alone both.

122. As to the horizontal dimension test, the postpetition payroll loan portfolio sales were not ordinary for the industry because during that period the secondary market for Colombian

payroll loan portfolios was frozen. Mr. Blaquier testified the reason the Debtor only sold payroll loan portfolios to Ban100 during this period was driven by "market sentiment and pricing" that could be obtained from other purchasers; and during this period the market was "in a much worse position" than previously purportedly on account of fallout from the Mexican NBFI (nonbank financial institution) crisis.

123. As to the vertical dimension test, neither the indenture trustee nor the Bondholders had any reason to expect, at the time credit was extended or thereafter, the Debtor to have been selling payroll loan portfolios to Ban100 in the years leading up to the petition date, let alone postpetition, as such sales were in violation of the indenture's covenant prohibiting such sales. They also had no reason to expect postpetition sales to be occurring because they were promised liens on the very assets the Debtor was selling and certainly had no reason to expect any such sales would be made without cash consideration.

124. The above-described post-confirmation payments to Ban100 for "operating costs" likewise fail the horizontal and vertical dimension test.

125. Putting aside whether it is abnormal within the Latin American consumer finance industry to pay related parties for operating costs, said payments fail the vertical dimension test because they were purposely hidden both from Bondholders and from the Bankruptcy Court. The Debtor also knew said payments were wrongful. Indeed, per its April 29, 2024 Board minutes the entire rationale for the eve-of-bankruptcy amendment to the forbearance agreement was that payments to related parties were prohibited in bankruptcy.

126. Judgment should be entered against Ban100 avoiding all postpetition transfers of payroll loan portfolios by the Debtor and all postpetition payments the Debtor made to Ban100 including purportedly for operating costs, pursuant to 11 U.S.C. § 549.

## FIFTH CLAIM FOR RELIEF
## 11 U.S.C. § 544(b)(1)
## (against Ban100)

127. The Trustee repeats and realleges each and every allegation made in ¶¶1-126 as if set forth fully herein.

128. All transfers the Debtor made to Ban100 between the petition date and the commencement of Colombian insolvency proceedings on December 12, 2024, including postpetition payroll loan portfolio transfers and cash payments made to Ban100 purportedly for operating costs, are voidable under Article 2491 of the Colombian Civil Code Colombian law, made applicable by 11 U.S.C. § 544(b)(1), which provides that as to transfers made before commencement of Colombian insolvency proceedings, creditors shall have the right to obtain rescission of onerous contracts, and of mortgages and pledges, where both parties acted in bad faith—that is, where both knew of the poor state of the debtor's business or financial affairs; and also, acts and contracts not covered by the foregoing are subject to rescission on proof of the debtor's bad faith and prejudice to creditors.

129. Payroll loan portfolio sales during this period were not consummated in good faith, in that Ban100 clearly knew of the poor state of the Debtor's financial affairs on account of their common ownership, and also because Ban100 directors such as Mr. Ledesma (of Gramercy), Mrs. Stebelski (GDA Luma) and Mr. Hernandez (ACON) regularly attended Debtor Board and shareholder meetings, and Mr. Hernandez was from time to time granted voting proxies permitting him to vote on behalf of Mr. Knoell.

130. Creditors are prejudiced by the subject transfers. These payroll loan portfolio transfers were of the same collateral that the Debtor had promised Bondholders would serve as collateral for their New Bonds and otherwise would have been available to pay unsecured debts of the Debtor.

27

131. The Debtor's postpetition, pre-December 12, 2024 payment of purported operating costs are likewise acts made with bad faith under Colombian law and prejudicial to creditors such as bondholders.

132. Judgment should be entered against Ban100 avoiding all transfers of payroll loan portfolios by the Debtor to Ban100 from the period May 16, 2024-December 12, 2024, pursuant to Colombian law made applicable by 11 U.S.C. § 544(b)(1).

<u>**SIXTH CLAIM FOR RELIEF**</u>
**11 U.S.C. § 550**
**(against Ban100, Finanza, Davalia, GCS, Gramercy Colombia, ACON II)**

133. The Trustee repeats and realleges each and every allegation made in ¶¶1-132 as if set forth fully herein.

134. The above-described transfers the Trustee seeks to avoid under 11 U.S.C. §§ 544, 547, 548 and 549 are recoverable from Ban 100 and Finanza as initial transferees and from the Shareholder Lenders as subsequent transferees under 11 U.S.C. § 550(a).

135. Judgment should be entered, pursuant to 11 U.S.C. § 550, against Ban100 for the value of payroll loan portfolios transferred to it postpetition, and prepetition in relation to the February 9, 2024 payroll loan portfolio transaction that was ratified by the Debtor's Board on August 28, 2024, and for postpetition payments the Debtor made to Ban100 including for purported operating costs in an amount to be determined at trial; against Finanza for the $2,745,386.16 in Debtor sales premium that Ban100 advanced to it for the purpose of paying down the Shareholder Loan; against the Shareholder Lenders for the $2,745,386.16 Finanza advanced to them through the administrative agent plus Schedule IV legal fees the Debtor paid for their benefit; and against Gramercy Colombia for the $50,000 in Latham & Watkins legal fees that the Debtor paid for its benefit pursuant to its forbearance agreement with the Debtor.

**SEVENTH CLAIM FOR RELIEF**
**11 U.S.C. § 542(b)**
**(against Ban100)**

136.    The Trustee repeats and realleges each and every allegation made in ¶¶1-135 as if set forth fully herein.

137.    To the extent Ban100 paid for payroll loan portfolios through exercise of setoff rights as opposed to cash, the debt remains due and owing as the setoff was nonmutual and violated the automatic stay.

138.    Judgment should be entered against Ban100 under 11 U.S.C. § 542(b) to recover all indebtedness of Ban100 to the Debtor including for the value of payroll loan portfolios the Debtor transferred to Ban100 without cash consideration.

**FRCP 44.1 NOTICE**

139.    The Trustee gives notice of his intent to raise issues of Colombian law, including Article 2491 of the Colombian Civil Code.

WHEREFORE, judgment should be entered:

(a)    on the first cause of action (fiduciary duty) against Messrs. Ferraro, Blaquier and Knoell, and against Gramercy, GDA Luma and ACON, for breaches of their duties under Federal law and under Colombian law as directors, estate fiduciaries and control persons of the Debtor;

(b)    on the second cause of action (11 U.S.C. § 547) avoiding Ban100's payment to Finanza of $2,745,386.16 in Debtor sales premium, Finanza's payment of same to the Shareholder Lenders, the Debtor's payment of Schedule IV legal fees under the forbearance agreement relating to the Shareholder Loan, and the Debtor's payment of $50,000 to Latham & Watkins pursuant to the other forbearance agreement;

(c)    on the third cause of action (11 U.S.C. § 548) avoiding the February 9, 2024 payroll loan portfolio sale transaction with Ban100 purportedly ratified at the August 28, 2024 Board meeting and the payment of $2,745,386.16 in Debtor sales premium to Shareholder Lenders;

(d)    on the fourth cause of action (11 U.S.C. § 549) avoiding all postpetition payroll loan portfolio transfers to Ban100 including the February 9, 2024 payroll loan portfolio sale transaction with Ban100 purportedly ratified at the August 28, 2024 Board meeting and all postpetition payments made to Ban100 including post-confirmation cash payments purportedly for operating costs.

29

(e)     on the fifth cause of action (11 U.S.C. § 544(b)(1)) avoiding all transfers the Debtor made to Ban100 between the petition date and December 12, 2024, including postpetition payroll loan portfolio transfers and cash payments purportedly for operating costs;

(f)     on the sixth cause of action (11 U.S.C. § 550) recovering all transfers avoided under 11 U.S.C. §§ 544, 547, 548 and 549;

(g)     on the seventh cause of action (11 U.S.C. § 542(b)) recovering all indebtedness of Ban100 to the Debtor including for the value of payroll loan portfolios the Debtor transferred to Ban100 without cash consideration; and

(h)     awarding prejudgment interest from the date of accrual of the foregoing claims, attorneys' fees to the extent permitted by law and granting such other and further relief as the Court deems just and proper.

Dated: New York, NY
       June 25, 2026

Amini LLC

/s/ Avery Samet
Bijan Amini
Avery Samet
Jeffrey Chubak
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
bamini@aminillc.com
asamet@aminillc.com
jchubak@aminillc.com
Special Litigation Counsel for Plaintiff