**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>CREDIVALORES - CREDISERVICIOS S.A.,<br><br>Debtor. | Chapter 7<br><br>Case 24-10837 (DSJ) |
| SALVATORE LAMONICA solely in his capacity as Chapter 7 trustee of Credivalores - Crediservicios S.A.,<br><br>Plaintiff,<br><br>v.<br><br>BANCIEN S.A. aka Ban100 S.A. fka Banco Credifinanciera S.A., FINANZA INVERSIONES S.A., GRAMERCY FUNDS MANAGEMENT LLC, GCS COLOMBIA FINANCE LLC, GRAMERCY COLOMBIA CONSUMER LENDING HOLDINGS LLC, GUSTAVO FERRARO, GDA LUMA CAPITAL MANAGEMENT, LP, DAVALIA GESTION DE ACTIVOS S.L, LUIS BLAQUIER, ACON INVESTMENTS MANAGEMENT, LLC, ACON COLOMBIA FINANCE II, LLC and JOSÉ MIGUEL KNOELL,<br><br>Defendants. | Adv. Proc. 26-01063 (DSJ)<br><br>Hearing Date: December 8, 2026 |

**MEMORANDUM OF LAW IN SUPPORT OF BANCIEN S.A. AND FINANZA INVERSIONES S.A.'S MOTION TO DISMISS ADVERSARY COMPLAINT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

I. PRELIMINARY STATEMENT ........ 1

II. FACTUAL BACKGROUND ........ 2

A. Debtor, Ban100, and Finanza ........ 2

B. The Bonds and the Shareholder Loan ........ 2

C. Debtor's Business Relationship with Ban100 and the Challenged Transfers ........ 2

D. The Colombian Insolvency Proceedings ........ 4

III. ARGUMENT ........ 5

A. Legal Standards for Dismissal ........ 6

B. The Complaint Should Be Dismissed as Against Ban100 and Finanza Under Rule 12(b)(2) for Lack of Personal Jurisdiction. ........ 7

1. Debtor's and the Administrative Agent's U.S. Contacts Cannot Be Attributed to Ban100 or Finanza. ........ 7

2. The Trustee's "Single Economic Unit" Label Cannot Overcome the Colombian Defendants' Lack of Minimum Contacts with the United States. ........ 10

3. Even If Minimum Contacts Existed, Jurisdiction Would Be Unreasonable. ........ 12

C. The Trustee Has Failed to Plead Any Avoidable Preference. ........ 14

1. The Trustee Fails to Plead His Preference Claim with the Required Particularity. ........ 15

2. The Trustee Fails to Plead that the Alleged Preferences Sought to be Recovered from Finanza Were on Account of an Antecedent Debt of Debtor. ........ 16

3. The "Single Economic Unit" Theory Cannot Convert the Shareholder Loan into Debtor's Obligation. ........ 16

4. The Complaint Does Not Allege that the "Sales Premium" Transfer Enabled Finanza to Receive More Than it Would in a Hypothetical Chapter 7 Liquidation. ........ 18

D. The Trustee's Constructive Fraud Claim Under Section 548 Should Be Dismissed. ........ 19

E. The Trustee Fails to Plead Actual Fraud Against Ban100. ........ 21

F. Alternatively, Ban100 May Retain the Value It Gave Under Section 548(c). ........ 22

G. The Trustee Cannot Collapse the Sponsors and Their Affiliates into a Single Actor. ........ 23

H. The Trustee's Claim Under Section 549 Should Be Dismissed. .......................... 23
1. Ordinary-Course Sales Are Authorized and Cannot Be Avoided. ........... 24
2. The Trustee Admits That Debtor Regularly and Openly Sold Loan Portfolios to Ban100. ................................................................... 25
3. The Cash Management Orders Expressly Authorized Debtor's Transactions with Ban100.......................................................................... 27
4. The Trustee Cannot Avoid the February 9, 2024, Pre-Petition Sale Under Section 549......................................................................... 28
I. The Trustee's Claim Under Section 544(b)(1) Should Be Dismissed. ................ 29
1. Section 544(b)(1) Cannot Be Used to Reach Post-Petition Transfers. ..... 29
2. The Trustee Fails to Plead an Actual Triggering Creditor. ....................... 29
3. The Trustee Fails to Plead the Elements of the Colombian *Acción Pauliana*. ................................................................................. 30
4. Extraterritoriality Independently Bars the Claim. .................................... 32
J. The Trustee's Claim Under Section 542(b) Should Be Dismissed...................... 32
IV. CONCLUSION.............................................................................................. 34

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aeropostale, Inc.*,
555 B.R. 369 (Bankr. S.D.N.Y. 2016) ........ 18

*In re Allou Distribs., Inc.*,
392 B.R. 24 (Bankr. E.D.N.Y. 2008) ........ 29

*Am. Fuel Corp. v. Utah Energy Dev. Co.*,
122 F.3d 130 (2d Cir. 1997) ........ 17

*In re Arcapita Bank B.S.C.(c)*,
628 B.R. 414 (Bankr. S.D.N.Y. 2021), *aff'd sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022) ........ 33

*Asahi Metal Indus. Co. v. Superior Court*,
480 U.S. 102 (1987) ........ 12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 6

*Atuahene v. City of Hartford*,
10 F. App'x 33 (2d Cir. 2001) ........ 12

*In re Bankr. Est. of Norske Skogindustrier ASA*,
629 B.R. 717 (Bankr. S.D.N.Y. 2021) ........ 30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 6, 15

*Berdeaux v. OneCoin Ltd.*,
561 F. Supp. 3d 379 (S.D.N.Y. 2021) ........ 8

*In re Bernard L. Madoff Inv. Sec. LLC*,
418 B.R. 75 (Bankr. S.D.N.Y. 2009) ........ 7

*In re Bernard L. Madoff Inv. Sec. LLC*,
445 B.R. 206 (Bankr. S.D.N.Y. 2011) ........ 22

*Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*,
491 B.R. 335 (S.D.N.Y. 2013) ........ 18

*In re Caremerica, Inc.*,
409 B.R. 737 (Bankr. E.D.N.C. 2009) ........ 15

*In re Celsius Network LLC*,
671 B.R. 842 (Bankr. S.D.N.Y. 2025) .......... 6, 33

*In re Centennial Textiles, Inc.*,
227 B.R. 606 (Bankr. S.D.N.Y. 1998) .......... 29

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .......... 26

*In re Charter Co.*,
913 F.2d 1575 (11th Cir. 1990) .......... 33

*In re CIL Ltd.*,
582 B.R. 46 (Bankr. S.D.N.Y. 2018), amended on reconsideration, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) .......... 9, 32

*Curry v. Revolution Lab'ys, LLCs*,
949 F.3d 385 (7th Cir. 2020) .......... 6

*In re DA Liquidating Corp.*,
622 B.R. 172 (Bankr. D. Del. 2020) .......... 15

*Daimler AG v. Bauman*,
571 U.S. 117 (2014) .......... 9

*Daou v. BLC Bank, S.A.L.*,
42 F.4th 120 (2d Cir. 2022) .......... 8

*In re DSI Renal Holdings, LLC*,
574 B.R. 446 (Bankr. D. Del. 2017) .......... 11

*In re Elrod Holdings Corp.*,
421 B.R. 700 (Bankr. D. Del. 2010) .......... 20

*In re Fairfield Sentry Ltd.*,
539 B.R. 658 (Bankr. S.D.N.Y. 2015), *subsequently aff'd*, 690 F. App'x 761 (2d Cir. 2017) .......... 26

*In re Fairfield Sentry Ltd.*,
669 B.R. 690 (Bankr. S.D.N.Y. 2025) .......... 8

*In re FBI Wind Down, Inc.*,
581 B.R. 116 (Bankr. D. Del. 2018) .......... 20, 25

*In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*,
130 F.3d 52 (2d Cir. 1997) .......... 16

*In re First Prot., Inc.*,
440 B.R. 821 (B.A.P. 9th Cir. 2010)....................25

*In re Flashcom, Inc.*,
503 B.R. 99 (C.D. Cal. 2013), *aff'd*, 647 F. App'x 689 (9th Cir. 2016)....................20

*In re Forks Specialty Metals Inc.*,
No. AP 19-00028-MDC, 2023 WL 3239468 (Bankr. E.D. Pa. Apr. 30, 2023)....................10

*In re FTX Trading Ltd.*,
2024 WL 4562675 (Bankr. D. Del. Oct. 23, 2024) ....................22

*Fung Retailing Ltd. v. Toys "R" Us, Inc.*,
593 B.R. 724 (E.D. Va. 2018)....................7

*In re GBG USA Inc.*,
666 B.R. 115 (Bankr. S.D.N.Y. 2024)....................10

*In re GOL Linhas Aereas Inteligentes S.A.*,
661 B.R. 330 (Bankr. S.D.N.Y. 2024)....................26

*In re Gulf Fleet Holdings, Inc.*,
491 B.R. 747 (Bankr. W.D. La. 2013)....................17, 18, 23

*In re Huffy Corp.*,
358 B.R. 724 (Bankr. S.D. Ohio 2006)....................10

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*,
326 U.S. 310 (1945)....................12

*In re James A. Phillips, Inc.*,
29 B.R. 391 (S.D.N.Y. 1983)....................24

*Krol v. Crosby* (*In re Mason*),
386 B.R. 715 (Bankr. N.D. Ill. 2008) ....................33

*In re Lavigne*,
114 F.3d 379 (2d Cir. 1997)....................24

*In re Lehman Bros. Holdings Inc.*,
544 B.R. 16 (Bankr. S.D.N.Y. 2015)....................7

*In re Liberty Bridge Cap. Mgmt., GP, LLC*,
670 B.R. 676 (S.D.N.Y. 2025)....................17

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013)....................8

*In re Lyondell Chem. Co.*,
543 B.R. 127 (Bankr. S.D.N.Y. 2016)........................................................................11

*In re Madison Williams & Co., LLC*,
509 B.R. 791 (Bankr. S.D.N.Y. 2014)........................................................................33

*In re Maxwell Commc'n Corp.*
*plc (Maxwell I)*, 186 B.R. 807 (S.D.N.Y. 1995)........................................................32

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*,
945 F.2d 635 (3d Cir. 1991)......................................................................................20

*In re Metro. Cosm. Reconstructive Surgery P.A.*,
125 B.R. 556 (Bankr. D. Minn. 1991)........................................................................29

*In re Mirena IUD Prods. Liab. Litig.*,
29 F. Supp. 3d 345 (S.D.N.Y. 2014)..........................................................................26

*Moore v. Bay*,
284 U.S. 4 (1931)......................................................................................................31

*Morris Commc'ns NC, Inc. v. City of Bessemer City, N.C.*,
914 F.2d 458 (4th Cir. 1990)......................................................................................21

*Morris v. New York State Dep't of Tax'n & Fin.*,
82 N.Y.2d 135, 623 N.E.2d 1157 (1993)....................................................................17

*In re N. Merch., Inc.*,
371 F.3d 1058 (9th Cir. 2004)....................................................................................20

*In re Nat'l Enters., Inc.*,
128 B.R. 956 (E.D. Va. 1991)....................................................................................33

*Matter of Natchez Corp. of W. Va.*,
953 F.2d 184 (5th Cir. 1992)......................................................................................28

*Off. Comm. of Unsecured Creditors of Arcapita v. Bahr. Islamic Bank*,
549 B.R. 56 (S.D.N.Y. 2016)....................................................................................7, 8

*In re Operations NY LLC*,
490 B.R. 84 (Bankr. S.D.N.Y. 2013)..........................................................................19

*In re Pameco Corp.*,
356 B.R. 327 (Bankr. S.D.N.Y. 2006)........................................................................25

*Pani v. Empire Blue Cross Blue Shield*,
152 F.3d 67 (2d Cir. 1998)........................................................................................23

*In re Pantazelos*,
543 B.R. 864 (Bankr. N.D. Ill. 2016) ....................................................................33

*In re Platinum & Palladium Antitrust Litig.*,
61 F.4th 242 (2d Cir. 2023) ...............................................................................11

*Reed Int'l, Inc. v. Afg. Int'l Bank*,
657 F. Supp. 3d 287 (S.D.N.Y. 2023).....................................................................8

*In re Roth Am., Inc.*,
975 F.2d 949 (3d Cir. 1992).......................................................................24, 26

*Rubin v. Mfrs. Hanover Tr. Co.*,
661 F.2d 979 (2d Cir. 1981)...............................................................................20

*In re Samson Res. Corp.*,
No. 15-11934 (BLS), 2023 WL 4003815 (Bankr. D. Del. June 14, 2023),
*aff'd*, No. 15-11934 (BLS), 2025 WL 2947024 (D. Del. Oct. 17, 2025) ...............................21

*In re Satelco, Inc.*,
58 B.R. 781 (Bankr. N.D. Tex. 1986).....................................................33, 34

*In re Sattler's, Inc.*,
73 B.R. 780 (Bankr. S.D.N.Y. 1987) ....................................................................29

*In re Se. Hotel Props. Ltd. P'ship*,
99 F.3d 151 (4th Cir. 1996) ...............................................................................24

*Shaffer v. Heitner*,
433 U.S. 186 (1977)..............................................................................................9

*St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*,
745 F. Supp. 2d 303 (S.D.N.Y. 2010)...................................................................11

*Staehr v. Hartford Fin. Servs. Grp.*,
547 F.3d 406 (2d Cir. 2008)...............................................................................23

*In re Sun Valley Prods., Inc.*,
328 B.R. 147 (Bankr. D.N.D. 2005) ......................................................................20

*In re Teligent, Inc.*,
325 B.R. 134 (Bankr. S.D.N.Y. 2005) ...................................................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................26

*In re Terrorist Attacks on September 11, 2001*,
718 F. Supp. 2d 456 (S.D.N.Y. 2010).....................................................................9

*Tese-Milner v. De Beers Centenary A.G.*,
613 F. Supp. 2d 404 (S.D.N.Y. 2009)........................................................................10

*In re TransCare Corp.*,
592 B.R. 272 (Bankr. S.D.N.Y. 2018)......................................................................12

*In re Tribune Co. Fraudulent Conveyance Litig.*,
2017 WL 82391 (S.D.N.Y. Jan. 6, 2017) ...................................................................22

*In re Trinsum Grp., Inc.*,
466 B.R. 596 (Bankr. S.D.N.Y. 2012)......................................................................26

*United States v. Bestfoods*,
524 U.S. 51 (1998)....................................................................................................17

*United States v. Miller*,
604 U.S. 518 (2025)..................................................................................................29

*In re Veluchamy*,
879 F.3d 808 (7th Cir. 2018) ....................................................................................33

*In re Vision Metals, Inc.*,
325 B.R. 138 (Bankr. D. Del. 2005) .........................................................................24

*Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*,
751 F.2d 117 (2d Cir. 1984).......................................................................................11

*Walden v. Fiore*,
571 U.S. 277 (2014)................................................................................................6, 8

*Walker v. THI of N.M. at Hobbs Ctr.*,
801 F. Supp. 2d 1128 (D.N.M. 2011) .......................................................................11

*In re Waterford Wedgwood USA, Inc.*,
500 B.R. 371 (Bankr. S.D.N.Y. 2013)..................................................................20, 21

*In re WonderWork, Inc.*,
611 B.R. 213 (Bankr. S.D.N.Y. 2020)......................................................................19

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980)..................................................................................................12

*Young v. New Haven Advocate*,
315 F.3d 256 (4th Cir. 2002) ......................................................................................7

**Rules**

Fed. R. Bankr. P. 7012(b) ......................................................................................1, 6

Fed. R. Civ. P. 8 .......... 6, 12
Fed. R. Civ. P. 9(b) .......... 6, 21, 22, 30, 31
Fed. R. Civ. P. 12(b)(2) .......... 1, 7
Fed. R. Civ. P. 12(b)(6) .......... 2, 6, 23

**Statutes**

11 U.S.C. § 345(b) .......... 27
11 U.S.C. § 363(c)(1) .......... 24
11 U.S.C. § 502 .......... 29
11 U.S.C. § 542(b) .......... 32, 33, 34
11 U.S.C. § 544(b) .......... 5, 29, 32
11 U.S.C. § 544(b)(1) .......... 29, 30, 32
11 U.S.C. § 547 .......... 5, 14, 15, 16, 18
11 U.S.C. § 547(b) .......... 15
11 U.S.C. § 547(b)(5) .......... 18, 19
11 U.S.C. § 548 .......... 19, 28
11 U.S.C. § 548(a)(1)(A) .......... 22
11 U.S.C. § 548(c) .......... 22, 23
11 U.S.C. § 548(d)(2)(A) .......... 22
11 U.S.C. § 549 .......... 23, 24, 25, 27, 28, 29
11 U.S.C. § 549(a)(2) .......... 24
11 U.S.C. § 1107 .......... 24
11 U.S.C. § 1108 .......... 24

Defendants Bancien S.A. aka Ban100 S.A. fka Banco Credifinanciera S.A. ("Ban100") and Finanza Inversiones S.A. ("Finanza," and together with Ban100, the "Colombian Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the adversary complaint (the "Complaint") filed by Salvatore LaMonica, solely in his capacity as chapter 7 trustee (the "Trustee") of Credivalores-Crediservicios S.A. ("Debtor"), pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure (the "Rules"), as made applicable to this proceeding by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## I. PRELIMINARY STATEMENT[1]

The Complaint should be dismissed as to the Colombian Defendants because the Court lacks personal jurisdiction and because the Trustee has failed to state any claim for which relief may be granted. The Trustee asks a United States bankruptcy court to unwind the sale of Colombian loan portfolios, by a Colombian lender, to a Colombian bank, paid for in Colombia with Colombian currency. Despite failing to allege even minimal contacts with the United States, the Trustee seeks to recover from the Colombian Defendants tens of millions of dollars of transfers that were made in good faith, for valuable consideration and in the ordinary course of business between Debtor and the Colombian Defendants.

The Complaint fails as to the Colombian Defendants because the Trustee has failed to plead that the Court has personal jurisdiction over the Colombian Defendants based on their lack of meaningful contacts with the United States. Personal jurisdiction (and potentially millions of dollars in liability) cannot be established over foreign defendants on the Trustee's scant

[1] Capitalized terms used but not defined in the Preliminary Statement have the meanings ascribed to them elsewhere in this memorandum.

allegations. Further, each cause of action asserted against the Colombian Defendants fails to state a claim under Rule 12(b)(6). As set forth below, the Complaint should be dismissed as against the Colombian Defendants in its entirety.

## II. FACTUAL BACKGROUND

### A. Debtor, Ban100, and Finanza

The Trustee alleges that Debtor was a payroll lender and credit card issuer to Colombian customers with a principal place of business in Bogotá, Colombia. Compl. ¶ 8. On May 16, 2024, Debtor filed a voluntary chapter 11 case in this Court. Compl. ¶ 8. The case was converted to chapter 7 on July 7, 2025, and the Trustee was appointed on July 8. Compl. ¶¶ 7, 8. The Trustee alleges (and Ban100 agrees) that Ban100 is a Colombian-registered bank whose principal office is in Bogotá, Colombia, and which offered savings and investment products in the same markets as Debtor. Compl. ¶¶ 23, 31. The Trustee alleges (and Finanza agrees) that Finanza is a Colombian company and the 95% owner of Ban100. Compl. ¶ 24.

### B. The Bonds and the Shareholder Loan

Debtor issued certain bonds (the "Bonds") under an indenture governed by New York law. Compl. ¶¶ 2, 8. On October 25, 2022, defendants Gramercy, ACON, and GDA Luma extended a $20 million term loan (the "Shareholder Loan"), structured through a credit agreement with Finanza as borrower, Acquiom Agency Services, LLC as administrative agent, and Debtor as guarantor. Compl. ¶ 43. Finanza simultaneously re-loaned the funds to Debtor. Compl. ¶ 44.

### C. Debtor's Business Relationship with Ban100 and the Challenged Transfers

The Complaint alleges that Debtor regularly sold payroll loan and credit card portfolios to Ban100. Compl. ¶¶ 40, 41. Indeed, Debtor's First Day Declaration stated that "the Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise)," and, within a list of the twenty largest unsecured creditors, named Debtor as owing Ban100

$8.7 million for commissions and the sale of a business segment. Compl. ¶ 76. Yet the Trustee challenges numerous transactions between Debtor and the Colombian Defendants despite their being admittedly an integral part of Debtor's business conducted on ordinary, market terms.

The Trustee challenges the following alleged pre-petition transfers to the Colombian Defendants:

| Date | Transferee | Nature of transfer | Value |
|---|---|---|---|
| Feb. 9, 2024 | Ban100 | Payroll loan portfolio | ~COP 12 billion (~USD 3.2 million) |
| Apr. 29, 2024 | Ban100 | Payroll loan portfolios from the Citibank Trust | Not alleged |
| May 3, 2024 | Finanza[2] | "Sales premium" allegedly related to April 29, 2024, payroll loan portfolio sale. Compl. ¶ 62. Allegedly paid to Shareholder Loan agent on May 3, 2024, and disbursed to ACON, GCS and Davalia. Compl. ¶¶ 65, 66. | $2,745,386.16 |

The Trustee also challenges the following alleged post-petition transfers to the Colombian Defendants:

| Date | Transferee | Nature of transfer | Value |
|---|---|---|---|
| June 27, 2024 | Ban100 | Payroll loan portfolio sale | ~COP 3.8 billion (~USD 1 million) |
| July 30, 2024 | Ban100 | Payroll loan portfolios from the Citibank Trust | ~COP 32 billion (~USD 7.8 million) |
| July 31, 2024 | Ban100 | Payroll loan portfolios not held in trust | ~COP 48.7 billion (~USD 12 million) |
| Aug. 28, 2024 | Ban100 | Board "ratification" of the Feb. 9, 2024 sale | ~COP 12 billion (~USD 3.2 million) |
| July 3, 2024 – June 16, 2025 | Ban100 | Recurring cash payments for "operating costs" | Numerous cash payments |

[2] Ban100 did not participate in the sales premium.

| | | | |
|---|---|---|---|
| Calendar year 2024 (aggregate) | Ban100 | Aggregate payroll loan transfers per Debtor's 2024 financial statements | ~COP 172 billion (~USD 42.3 million) |

The Trustee has little to say about the consideration paid for any of the challenged transfers. In the case of the May 3, 2024, "sales premium" transfer to Finanza (and, by implication, the April 29, 2024, related portfolio sale to Ban100) and the post-petition "operating costs" payments, the Trustee admits that cash was paid. Compl. ¶¶ 62, 65, 91-92, 97, 128. And the Trustee alleges that the purchase price for the July 30, 2024, transfer was set off against amounts owing to Ban100 by Debtor arising from the August 2023 sale of Debtor's credit card business. Compl. ¶¶ 83-84. Otherwise, the Trustee makes no allegations regarding the amount or form of consideration for the remaining challenged transfers. As set forth below, these omissions demonstrate the inherent flaws in the Trustee's efforts to unwind legitimate, ordinary and valuable transactions between Debtor and the Colombian Defendants.

**D. The Colombian Insolvency Proceedings**

Debtor is currently involved in parallel insolvency proceedings in Colombia, similar to the chapter 7 proceedings (the "Mandatory Liquidation Proceedings") before the Superintendency of Companies, which acts as the judicial authority with exclusive jurisdiction to make determinations as to claims and manage the Debtor's estate throughout the proceedings. Mandatory Liquidation Proceedings are ruled by the principle of universality—pursuant to which all of the Debtor's assets and all of its creditors become subject to and bound by the mandatory insolvency proceeding upon its commencement. Compl. ¶ 89; L. 1116, diciembre 26, 2006, D.O., Art. 4 (Colom.). Foreign insolvency proceedings may interact with the Colombian Mandatory Liquidation Proceeding in accordance with the cross-border insolvency regulations contained under articles 85-116 of Law 1116 of 2006 (adopting UNCITRAL Model Law on Cross-Border Insolvency).

## III. ARGUMENT

The Complaint should be dismissed as against the Colombian Defendants for two independent reasons. First, the Court lacks personal jurisdiction over each Colombian Defendant. Ban100 is a Colombian bank that purchased Colombian loan portfolios from a Colombian lender and paid for them in Colombia with Colombian currency. Finanza is its Colombian parent. The Trustee has alleged no contact whatsoever related to his claims with the United States by either Ban100 or Finanza giving rise to personal jurisdiction.

Second, the Trustee has failed to state any claim against the Colombian Defendants. The Trustee's preference claim fails, among other reasons, because the Trustee has not alleged any transfer on account of an antecedent debt as Section 547 facially requires. The Trustee's fraudulent transfer claims fail because the Complaint fails to allege that Debtor received less than reasonably equivalent value for the transferred portfolios, fails to plead actual fraudulent intent, and ignores Ban100's status as a good faith transferee for value. In challenging Debtor's post-petition transactions with Ban100, the Trustee ignores that these transactions were not only ordinary-course, and the very core of Debtor's operations, but also fully disclosed to the Court and authorized by cash management orders. And the Trustee's Section 544(b) claim fails because it is unavailable as a matter of law to recover post-petition transfers, identifies no creditor whose rights the Trustee could exercise under Colombian law, pleads none of the elements of the Colombian-law doctrine on which it rests, and is barred by extraterritoriality principles.

The Trustee's efforts to remedy these numerous pleading deficiencies with the unsubstantiated theory that Ban100, Finanza, Debtor, and Debtor's private-equity sponsors operated as a "single economic unit" also fail, because despite repeating that characterization throughout the Complaint, the Trustee does so without pleading any evidentiary basis or plugging

the Complaint's numerous other pleading holes. As it stands, the Complaint must be dismissed in its entirety as to the Colombian Defendants.

### A. Legal Standards for Dismissal

The Trustee bears the burden of establishing a prima facie showing of personal jurisdiction over the Colombian Defendants—that each purposefully availed itself of the privilege of conducting activities within the United States, that his claims arise out of or relate to those contacts, and that the exercise of jurisdiction is reasonable. *In re Celsius Network LLC*, 671 B.R. 842, 856-57 (Bankr. S.D.N.Y. 2025). The relationship supporting jurisdiction must arise from contacts that the defendant itself creates with the forum, and the plaintiff cannot be the only link between the defendant and the forum. *Curry v. Revolution Lab'ys, LLCs*, 949 F.3d 385, 392 (7th Cir. 2020); *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Here, the Trustee has failed to carry that burden.

To withstand a motion to dismiss under Rule 12(b)(6), made applicable to the instant matter by Bankruptcy Rule 7012(b), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts well-pleaded facts as true but disregards legal conclusions, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Where a claim sounds in fraud, the circumstances constituting the fraud must be pleaded with particularity under Rule 9(b). Again, the Trustee has failed to meet the standards imposed by Rules 8 and 9(b), *Twombly*, and *Iqbal*.

### B. The Complaint Should Be Dismissed as Against Ban100 and Finanza Under Rule 12(b)(2) for Lack of Personal Jurisdiction.

The Complaint fails to plead that either Ban100 or Finanza had sufficient minimum contacts with the United States arising from its own suit-related conduct to establish personal jurisdiction. Neither Ban100 nor Finanza has consented to this Court's jurisdiction by filing a proof of claim. Where a foreign defendant has not consented to jurisdiction, the plaintiff must demonstrate that the defendant has the requisite minimum contacts with the United States, at large, to satisfy Fifth Amendment due process. *In re Bernard L. Madoff Inv. Sec. LLC*, 418 B.R. 75, 80 (Bankr. S.D.N.Y. 2009).

Mere knowledge that a transaction has a connection to the United States, foreseeability that harm may be felt here, and passive receipt of funds are each insufficient to establish sufficient contact. *In re Lehman Bros. Holdings Inc.*, 544 B.R. 16, 24, 33-36 (Bankr. S.D.N.Y. 2015). In the bankruptcy context, the analysis focuses on whether the defendant's own conduct connects it to the forum in a meaningful way, and "[t]he defendant must expressly target the forum." *Fung Retailing Ltd. v. Toys "R" Us, Inc.*, 593 B.R. 724, 733 (E.D. Va. 2018) (citing *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002)).

#### 1. Debtor's and the Administrative Agent's U.S. Contacts Cannot Be Attributed to Ban100 or Finanza.

The Complaint does not allege that either Ban100 or Finanza designated, or directed funds into, any United States account, nor that either of the Colombian Defendants had any other meaningful relationship with the United States. Instead, the Trustee points to *Debtor's* contacts with the United States and to the Shareholder Loan's administrative agent. But jurisdiction attaches only where the challenged transfer was routed through, or connected to, the *defendant's* own United States contacts. For example, in *Arcapita*, jurisdiction reached Bahraini banks because they "designated New York correspondent bank accounts to receive the funds" and "actively directed

the funds at issue into those New York accounts"—"precisely the conduct targeted" by the claim. *Off. Comm. of Unsecured Creditors of Arcapita v. Bahr. Islamic Bank*, 549 B.R. 56, 69 (S.D.N.Y. 2016). The Trustee makes no comparable allegation here.

The Trustee concedes that Ban100 is a Colombian bank that purchased Colombian loan portfolios from Debtor, a Colombian lender, with payments executed in Colombia. Compl. ¶¶ 8, 23, 24, 40. While Debtor later became a debtor-in-possession in the United States, that is *Debtor's* contact with the forum, not the Colombian Defendants' contact. Under *Walden*, this contact cannot be imputed to Ban100, particularly when neither Colombian Defendant has consented to the bankruptcy court's jurisdiction by filing a proof of claim or otherwise.

The Trustee also cannot establish personal jurisdiction through Finanza's alleged May 3, 2024, payment of the "sales premium" to Acquiom's Citizens Bank account in the United States in connection with the alleged Shareholder Loan paydown. Compl. ¶ 27. A defendant's use of a United States account must be purposeful, deliberate, and recurring, and the claim must bear an articulable nexus to that specific use. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013); *In re Fairfield Sentry Ltd.*, 669 B.R. 690 (Bankr. S.D.N.Y. 2025) (foreign investor's use of United States correspondent accounts conferred jurisdiction where that use was deliberate, recurring, and related to the harm alleged, and where the investor chose United States accounts over available foreign alternatives). This standard is not met where the defendant did not control the routing of funds, where the challenged transfer did not pass through the account, or where any use was incidental rather than integral. *Reed Int'l, Inc. v. Afg. Int'l Bank*, 657 F. Supp. 3d 287, 303 (S.D.N.Y. 2023); *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 403 (S.D.N.Y. 2021); *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 132 (2d Cir. 2022). To the extent the Trustee relies on the Shareholder Loan paydown flowing through a United States account, the Trustee has failed

to allege that the Colombian Defendants directed or controlled that routing or that any United States connection is more than incidental. Compl. ¶¶ 27, 65, 66. A single, non-recurring payment through an account controlled by another party is not the "purposeful, deliberate, and recurring" use of a United States account.

Nor is general jurisdiction available. A Colombian bank headquartered in Colombia is not "at home" in the United States, and neither United States banking relationships nor correspondent accounts confer general jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117 (2014); *In re Terrorist Attacks on September 11, 2001*, 718 F. Supp. 2d 456 (S.D.N.Y. 2010).

The Trustee also cannot ground personal jurisdiction in the presence of individuals affiliated with the Colombian Defendants who sat on Debtor's board or attended Debtor's board meetings. Common or affiliated directorship and board attendance do not amount to purposeful availment of the privilege of conducting activities within the United States. *Shaffer v. Heitner*, 433 U.S. 186, 216 (1977); *In re CIL Ltd.*, 582 B.R. 46, 75 (Bankr. S.D.N.Y. 2018), amended on reconsideration, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018).

The Trustee's theory seems to rely on an unsupported assumption that the Debtor's administrators, management and/or equity somehow controlled Ban100. Compl. ¶ 30. Yet the Complaint pleads no facts supporting such an inference. It does not identify overlapping directors or officers, does not allege that the Debtor's administrators, management or equity held any ownership interest in Ban100, and does not contend that they possessed any contractual, voting, or governance rights enabling them to direct Ban100's affairs. Nor does the Complaint allege that any of the challenged transactions were undertaken at the direction of the Debtor's administrators. Without factual allegations showing common management, ownership, or actual control, the

Trustee cannot attribute the acts or contacts of one entity to the other for purposes of personal jurisdiction. Mere allegations of affiliation are insufficient as a matter of law.

Further, an individual's contacts cannot be imputed to an entity absent veil-piercing or the establishment of an agency relationship. *In re Huffy Corp.*, 358 B.R. 724, 741 (Bankr. S.D. Ohio 2006); *In re Forks Specialty Metals Inc.*, No. AP 19-00028-MDC, 2023 WL 3239468, at *11 (Bankr. E.D. Pa. Apr. 30, 2023). An individual's conduct likewise cannot be attributed to an entity absent allegations of control or agency. *In re GBG USA Inc.*, 666 B.R. 115, 136 (Bankr. S.D.N.Y. 2024) (dismissing for lack of personal jurisdiction where there were no allegations that the entity exercised control over the debtor, and no allegation that the director approving the challenged transfers acted as that entity's agent). Here, the Complaint's threadbare allegations that individuals affiliated with Ban100 or Finanza attended Debtor's board meetings fail to establish any control or agency relationship. Compl. ¶¶ 27, 34. These allegations of mere affiliation are insufficient to create personal jurisdiction.

**2. The Trustee's "Single Economic Unit" Label Cannot Overcome the Colombian Defendants' Lack of Minimum Contacts with the United States.**

The Trustee attempts to circumvent the Colombian Defendants' lack of relevant U.S. contacts by alleging without substantiation that the Colombian Defendants, Debtor and Debtor's private-equity sponsors operated as a "single economic unit," such that the contacts of one may be attributed to all. But "single economic unit," "common enterprise," and "integrated enterprise" are not freestanding jurisdictional theories. The Trustee must satisfy the substantive alter ego or agency standard, and must do so with non-conclusory facts, not legal conclusions asserted as allegations. *Tese-Milner v. De Beers Centenary A.G.*, 613 F. Supp. 2d 404 (S.D.N.Y. 2009) (rejecting attribution of contacts based on an "integrated enterprise" label where the plaintiff's allegations "merely restate, with slight changes, the legal standard" for agency or alter ego, since

"the Court has not encountered ... any legal support for the contention that 'integrated enterprise' has any legal meaning for the purposes of the relevant personal jurisdiction law"); *Walker v. THI of N.M. at Hobbs Ctr.*, 801 F. Supp. 2d 1128, 1153 (D.N.M. 2011) (holding that a "single-employer" or "integrated enterprise" theory cannot substitute for the constitutional minimum-contacts inquiry, because "liability and jurisdiction are different inquiries that focus on different principles and frequently on different bodies of law"). Alter ego jurisdiction requires a showing that the parent exercised such complete control over the subsidiary that the two effectively operated as a single entity. *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 274 (2d Cir. 2023). Here the Trustee makes no such showing.

The Trustee pleads only parallel ownership and shared directors between Debtor and the Colombian Defendants. Compl. ¶¶ 27, 28, 34. This ordinary affiliation does not collapse separate entities for jurisdictional purposes. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984). These threadbare allegations of mere ownership and overlapping management are insufficient to establish personal jurisdiction over a foreign shareholder as the alter ego of a related entity, absent allegations of financial dependency, undercapitalization, or disregard of corporate form—none of which are present in the Complaint. *In re Lyondell Chem. Co.*, 543 B.R. 127, 144-146 (Bankr. S.D.N.Y. 2016).

Further, treating a shareholder group as one controlling actor requires a legally significant connection—such as common ownership coupled with a contract, voting agreement, or other arrangement to pursue a shared goal—not merely parallel voting. *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 473 (Bankr. D. Del. 2017); *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 745 F. Supp. 2d 303, 312 (S.D.N.Y. 2010). The Complaint concedes that the sponsors were independent parties with different ownership interests. Compl. ¶¶ 10, 15, 19. It alleges no voting agreement or

"blood pact," and its undifferentiated allegations also violate Rule 8's requirement that each defendant receive fair notice of the conduct attributed to it. *Id*; *In re TransCare Corp.*, 592 B.R. 272, 288 (Bankr. S.D.N.Y. 2018); *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001).

**3. Even If Minimum Contacts Existed, Jurisdiction Would Be Unreasonable.**

Even if the Trustee had established sufficient minimum contacts between the Colombian Defendants and the United States, his claims would fail because jurisdiction must also comport with "traditional notions of fair play and substantial justice." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (quoting *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945)). Courts weigh five factors: (1) the "burden on the defendant"; (2) the forum's "interest in adjudicating the dispute"; (3) "the plaintiff's interest in obtaining convenient and effective relief"; (4) "the interstate judicial system's interest in…efficient resolution"; and (5) "the shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen*, 444 U.S. at 292. The Supreme Court has emphasized that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi Metal Indus. Co. v. Superior Court*, 480 U.S. 102, 114 (1987). Where, as in *Asahi*, the plaintiff is foreign and the underlying transactions occurred entirely abroad, both the forum's interest and the plaintiff's interest in a domestic forum are correspondingly diminished.

The Colombian Defendants are Colombian entities, the loan portfolio purchases and related payments occurred entirely in Colombia, and Colombia has a strong sovereign interest in regulating banking transactions conducted within its own borders. Likewise, the witnesses and evidence that the Colombian Defendants must marshal for their defense are all located in Colombia. Furthermore, Debtor maintains its center of main interests in Colombia. As a result, the

Colombian Mandatory Liquidation Proceeding qualifies as the main proceeding, while the present proceeding is a foreign non-main proceeding. L. 1116, diciembre 26, 2006, D.O., Art. 87 (Colom.) (adopting UNCITRAL Model Law on Cross-Border Insolvency).

The Trustee, moreover, has not shown that equivalent relief is unavailable in Colombia. Compl. ¶¶ 89, 128 (alleging that Debtor commenced Colombian insolvency proceedings on December 12, 2024). Indeed, adequate relief is available *only* in Colombia, before the Superintendency of Companies, through the mechanisms provided by Colombia's cross-border insolvency regime. In the Colombian proceeding, the Trustee—as foreign representative—is entitled to seek recognition of the foreign proceeding as a non-main proceeding and, upon recognition of the foreign proceeding, the Trustee has the right of direct access in accordance with the Colombian insolvency law. *See* L. 1116, diciembre 26, 2006, D.O., Arts. 94, 100, 108 (Colom.).

The Colombian insolvency proceedings are adequate to the extent that Bank of New York—invoking its alleged capacity as legal representative of the bondholders—sought a declaration from the Superintendency of Companies stating that it "has the exclusive right to receive the amounts corresponding to the claims whose recognition and payment are requested herein, in order to distribute them to the bondholders pursuant to the applicable indenture." *See* Exh. 1, Objeción al Proyecto de Calificación y Graduación de Créditos, File 42564, May 7, 2026 (filed by the bondholders in the Mandatory Liquidation Proceedings). Two consequences stem from the above: on the one hand, the bondholders will only be entitled to pursue their credits as and if recognized by the Superintendency of Companies, and on the other hand, under Colombian legal proceedings any creditor is entitled to initiate avoidance actions before the Superintendency

of Companies, and pursuant to the universality principles governing the Mandatory Liquidation Proceedings, such actions take precedence.

Furthermore, any decision rendered by this Court would require recognition from the Colombian Supreme Court of Justice through *exequatur* proceedings before it could have any effect in Colombia. Such recognition should be dismissed or denied by the Supreme Court of Justice taking into account that: (i) the avoidance claims at issue fall within the exclusive jurisdiction of the Colombian Superintendency of Companies, which is administering the Debtor's main insolvency proceeding; and (ii) enforcement of a judgment issued in this action would contravene Colombian public policy, including the foregoing foundational insolvency principles. L. 1564, julio 12, 2012, D.O., Art. 606 (Colom.).

Subjecting the Colombian Defendants to suit in New York over wholly Colombian transactions would not comport with fair play and substantial justice. Because the Complaint pleads no suit-related contact between the Colombian Defendants and the United States, and because subjecting two Colombian entities to suit here, over wholly Colombian transactions, would be unreasonable, the Complaint should be dismissed as to the Colombian Defendants for lack of personal jurisdiction.

**C. The Trustee Has Failed to Plead Any Avoidable Preference.**

The Trustee's claim under Section 547 should be dismissed because the Complaint fails to plead an avoidable preference. To avoid a transfer under Section 547, the Trustee must plead a transfer of Debtor's own property, made on account of an identified antecedent debt, within the 90-day pre-petition period, or within one year for insiders, that enabled the transferee to receive more than it would otherwise receive in a chapter 7 liquidation. The Complaint fails to fully plead these elements. Rather, it groups together four unrelated payments without identifying the antecedent debt of Debtor that any one of them satisfied. Moreover, the sole transfer challenged

as to Finanza was admittedly not on account of an antecedent debt owing to Finanza, a pleading failure which the Trustee's "single economic unit" argument does not overcome. Further, the Trustee fails to demonstrate that the "sales premium" transfer improved Finanza's position. As a result, the Section 547 claim must be dismissed as to Finanza.

**1. The Trustee Fails to Plead His Preference Claim with the Required Particularity.**

To avoid a transfer pursuant to Section 547(b), the Trustee must demonstrate that each challenged transfer was of an interest of the debtor in property (1) to or for a creditor, (2) for or on account of an antecedent debt, (3) made while the debtor was insolvent, (4) within 90 days before the petition (or one year for insiders), and (5) enabling the creditor to receive more than it would in a hypothetical chapter 7. These elements must be pleaded with factual specificity; a preference complaint must identify the nature and amount of each antecedent debt and describe each transfer by date, transferor, transferee, and amount. *In re DA Liquidating Corp.*, 622 B.R. 172 (Bankr. D. Del. 2020); *In re Caremerica, Inc.*, 409 B.R. 737 (Bankr. E.D.N.C. 2009); *Twombly*, 550 U.S. at 544.

The Complaint fails to meet this standard. It improperly lumps together four distinct transfers—Ban100's alleged payment to Finanza of the "sales premium", Finanza's payment to the Shareholder Loan administrative agent on May 3, 2024, the Schedule IV legal fees, and the $50,000 Latham & Watkins payment on March 15, 2024—without pleading, transfer by transfer, which antecedent debt each alleged preferential transfer satisfied or how each depleted Debtor's estate. Compl. ¶¶ 103, 112. Having pleaded no antecedent debt of Debtor as to any, let alone each, individual transfer, the Trustee has not stated a preference claim.

### 2. The Trustee Fails to Plead that the Alleged Preferences Sought to be Recovered from Finanza Were on Account of an Antecedent Debt of Debtor.

As to the Colombian Defendants the Trustee only seeks recovery of the "sales premium" from Finanza. The Complaint avers that the $2,745,386.16 payment at issue was ultimately a repayment of the Shareholder Loan that within a week of its receipt passed through Finanza to Acquiom as administrative agent for the Shareholder Loan. Compl. ¶¶ 62, 65-66. But the Complaint also avers that the Shareholder Loan was between Finanza and the Shareholder Loan lenders, and not Debtor. Compl. ¶¶ 44-45.

While Debtor is alleged to have been a guarantor of the Shareholder Loan, the Complaint does not allege that any liability of Debtor as guarantor had been triggered. And while the Trustee alleges that there was a separate lending relationship between Finanza and Debtor, the Complaint does *not* contend that any of the $2,745,386.16 payment went to discharge any of Debtor's alleged obligations to Finanza. At most, Finanza appears to have been a "mere conduit" for the "sales premium", which is insufficient to make the transfer avoidable. *See, e.g.*, *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 130 F.3d 52, 58 (2d Cir. 1997) (holding that an entity acting "consistent with its contractual undertaking," with "no discretion or authority to do anything else but transmit the money," is a mere conduit rather than a transferee). ***Indeed, the Trustee admits that "Finanza had no entitlement, contractual or otherwise, to the sales premium."*** Compl. ¶ 63. The Complaint therefore fails on its face to state a claim against Finanza under Section 547.

### 3. The "Single Economic Unit" Theory Cannot Convert the Shareholder Loan into Debtor's Obligation.

The Trustee attempts to salvage his Section 547 claim by conclusorily treating Debtor, Ban100, Finanza, and the Shareholder Loan lenders as interchangeable, such that the Shareholder Loan may be recharacterized as Debtor's obligation, despite the Complaint's admissions that

Finanza, not Debtor, was the borrower under the Shareholder Loan, and that Finanza made separate loans to Debtor. *See* Compl. ¶¶ 44, 47-48.

The Trustee's "single economic unit" theory rests on speculation rather than sufficient factual allegations, based on some degree of common ownership, overlapping directors, affiliated-investor relationships, and intercompany transactions. Compl. ¶¶ 27, 28, 33, 34. These features, whether taken individually or collectively, are insufficient to pierce the corporate veil. The controlling test is not majority stock control, but domination so complete that the controlled corporation becomes a mere instrumentality or shell of the controlling entity. *See, e.g., United States v. Bestfoods*, 524 U.S. 51 (1998). No such domination or control exists here. Indeed, the Trustee alleges no facts showing that any of Debtor's administrators, management or equity exercised control over Ban100.

The Second Circuit applies substantially the same framework as in *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747 (Bankr. W.D. La. 2013), requiring a showing that (1) the owner or dominant entity exercised complete domination of the corporation with respect to the transaction attacked, such that the dominated entity was a mere instrumentality; (2) such domination was used to commit a fraud or wrong; and (3) that fraud or wrong resulted in unjust loss or injury to the plaintiff. *In re Liberty Bridge Cap. Mgmt., GP, LLC*, 670 B.R. 676 (S.D.N.Y. 2025); *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). As under *Gulf Fleet*, domination alone does not suffice: "such domination, standing alone, is not enough; some showing of a wrongful or unjust act toward [the party seeking piercing] is required." *Morris v. New York State Dep't of Tax'n & Fin.*, 82 N.Y.2d 135, 142, 623 N.E.2d 1157, 1161 (1993).

Under *Gulf Fleet*, the inference the Trustee draws—that Debtor's sponsors' employees used their board roles to benefit the sponsor—does not create a single economic entity. The

features the Trustee invokes are those *Gulf Fleet* held insufficient, and all of the Trustee's claims fail to the extent they rely on this consolidation. The Trustee's pleading utterly fails to show the complete domination alter ego law requires, regardless of any pre-existing common investment in Ban100 separately alleged in the Complaint. Compl. ¶¶ 30, 35. Accordingly, the Trustee cannot collapse or merge the Colombian Defendants, Debtor, and Debtor's sponsors, and he could not have done so as of the time of the transfers he challenges.

Moreover, the factors the Trustee points to—overlapping officers, common ownership, and coordination among affiliated entities—are common characteristics of a corporate family and, without more, do not establish alter ego. *In re Aeropostale, Inc.*, 555 B.R. 369 (Bankr. S.D.N.Y. 2016); *Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 349 (S.D.N.Y. 2013) (complaint that alleges only common ownership, overlapping directors, and other conclusory indicia of control, without factual allegations demonstrating disregard of corporate separateness, fails to raise a veil-piercing claim).

The Trustee pleads neither domination nor its abuse. The Shareholder Loan may not, therefore, be recharacterized as Debtor's obligation such that the "sales premium" payment may be construed as payment on account of Debtor's antecedent debt. Because the Complaint pleads neither the antecedent debt each challenged transfer satisfied, nor any transfer of an interest of Debtor in property to Finanza, and because the "single economic unit" label cannot supply what those allegations lack, the Trustee's claim under Section 547 should be dismissed.

**4. The Complaint Does Not Allege that the "Sales Premium" Transfer Enabled Finanza to Receive More Than it Would in a Hypothetical Chapter 7 Liquidation.**

The Trustee's preference claim also fails because he has failed to plead that Finanza's position was improved. Section 547(b)(5) requires Finanza to have received more than it would have in a hypothetical chapter 7 case. The starting point is Debtor's assets and liabilities on the

petition date. *In re Operations NY LLC*, 490 B.R. 84, 102 (Bankr. S.D.N.Y. 2013); *In re WonderWork, Inc.*, 611 B.R. 213, 213-14 (Bankr. S.D.N.Y. 2020).

First, the Complaint fails to allege that the "sales premium" satisfied any antecedent debt owing by Debtor to Finanza; indeed, the Trustee's own allegations concede that the alleged "sales premium" passed through Finanza to pay down Finanza's own liability on the Shareholder Loan. But even assuming *arguendo* that the Complaint had alleged that the "sales premium" transfer reduced any obligation of Debtor to Finanza, the Trustee fails to state a claim under Section 547(b)(5) and *WonderWork*. Notably, the Complaint fails to allege anything about Debtor's finances from which to abstract a hypothetical liquidation analysis—a fatal omission. *See WonderWork*, 611 B.R. at 213-14. The Trustee can only skip this step by showing that the allegedly preferred creditor received payment in full in conjunction with Debtor's insolvency, but here, the alleged "sales premium" would have only constituted 6.45% of the Shareholder Loan (if the Shareholder Loan qualified as an antecedent debt owing to Finanza, which it does not). *Id.* at 214.

**D. The Trustee's Constructive Fraud Claim Under Section 548 Should Be Dismissed.**

The Trustee's claim under Section 548 targets the alleged February 9, 2024, portfolio sale to Ban100 as constructively fraudulent. This claim should be dismissed because the Complaint fails to plausibly plead that Debtor received less than reasonably equivalent value for that sale. The Trustee's own allegations that the price "was not negotiated," that the portfolios "were not market tested," and that Ban100 "is an insider" describe process, as opposed to value, and none pleads a fact from which a shortfall in consideration can be inferred.

Section 548 measures what the estate surrendered against what it received, and the Trustee bears the burden of establishing a shortfall. There is no fixed formula for reasonably equivalent value. Section 548 imposes no minimum-sale-price requirement, and courts weigh the totality of the circumstances: the market value of what was given and received, the arm's-length nature of

the transaction, and the parties' good faith. *In re FBI Wind Down, Inc.*, 581 B.R. 116, 147 (Bankr. D. Del. 2018). The proper focus of the reasonably equivalent value inquiry is the net effect of the transfer on the estate and the funds available to unsecured creditors. *See In re Flashcom, Inc.*, 503 B.R. 99, 118 (C.D. Cal. 2013), *aff'd*, 647 F. App'x 689 (9th Cir. 2016) (applying the net-effect test of *In re N. Merch., Inc.*, 371 F.3d 1058 (9th Cir. 2004)); *Rubin v. Mfrs. Hanover Tr. Co.*, 661 F.2d 979, 991 (2d Cir. 1981). A transfer that confers "realizable commercial value on the debtor reasonably equivalent" to what it gave up is not constructively fraudulent. *In re Elrod Holdings Corp.*, 421 B.R. 700 (Bankr. D. Del. 2010) (citing *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991)).

The Complaint pleads no facts placing the February 9, 2024, portfolio sale on the deficient side of that line. The Complaint makes no allegations regarding the portfolios' fair market value or any other benchmark against which the price paid could be measured; it alleges only that the price "was not negotiated," that the portfolios "were not market tested or even offered for sale to anyone else," and that Ban100 "is an insider." Compl. ¶ 115. Standing alone, these insinuations are insufficient to plead a lack of reasonably equivalent value.

Courts in this district give "significant deference to marketplace values and to values reached in the context of an arm's-length transaction between a willing buyer and a willing seller." *See, e.g., In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 378 (Bankr. S.D.N.Y. 2013). A private, negotiated sale between sophisticated parties satisfies reasonably equivalent value, especially for financial-asset and receivables transactions, where value turns on the relationship between price and realizable collections rather than on the process by which the price was set. *In re Sun Valley Prods., Inc.*, 328 B.R. 147, 158 (Bankr. D.N.D. 2005). Moreover, heightened deference is appropriate because Ban100 is a regulated financial institution under the supervision

of the Colombian Financial Superintendency, which is empowered to require independent external audits to examine transactions such as those at issue in the present proceedings. *See* L. 1328, julio 15, 2009, D.O., Art. 86 (Colom.); D. 2555, julio 15, 2009, D.O., Art. 11.2.6.1.1 (Colom.).

A competitive bidding process is one method of proving value, but it is not a prerequisite to reasonably equivalent value. *Morris Commc'ns NC, Inc. v. City of Bessemer City, N.C.*, 914 F.2d 458, 467 (4th Cir. 1990); *In re Samson Res. Corp.*, No. 15-11934 (BLS), 2023 WL 4003815, at *24 (Bankr. D. Del. June 14, 2023), *aff'd*, No. 15-11934 (BLS), 2025 WL 2947024 (D. Del. Oct. 17, 2025). Indeed, courts in this District have rejected as insufficient a plaintiff's unsubstantiated speculation that a different or more extensive sales process might have yielded a higher price, absent specific evidence that the price actually received was less than reasonably equivalent value. Measured against this standard, the Trustee's purely process-based allegations each fail to plead a shortfall in value. Under *Morris Commc'ns* and *Samson*, the absence of negotiation does not itself establish inadequate consideration. And the absence of market testing is the process-based deficiency that *Waterford Wedgwood*, *Morris Commc'ns* and *Samson* each held insufficient to plead a shortfall in reasonably equivalent value. Further, the allegation that the transferee "is an insider" is a red herring that does not shift the Trustee's burden or create a presumption of inadequate consideration. Thus, the Trustee's constructive fraudulent transfer claim should be dismissed.

**E. The Trustee Fails to Plead Actual Fraud Against Ban100.**

It is unclear from the Trustee's pleading whether he intends to plead an actual fraudulent transfer claim against Ban100 in respect of the "sales premium" transaction. In any event, the Complaint's allegations are deficient as to Ban100. Actual fraud requires that the debtor made a transfer of an interest in its property with actual intent to hinder, delay, or defraud its creditors. While the debtor's intent may be alleged generally, Rule 9(b) requires the circumstances

constituting the fraud to be pleaded with particularity, and there must be an avoidable transfer of the debtor's property to which that intent attaches. *In re Bernard L. Madoff Inv. Sec. LLC*, 445 B.R. 206, 219 (Bankr. S.D.N.Y. 2011) (Section 548(a)(1)(A) claims subject to Rule 9(b)). The Trustee completely fails to meet that pleading burden here.

By the Trustee's own allegations, Ban100 was not a transferee of the "premium". Compl. ¶¶ 62, 65, 66. The alleged premium payment is not attributable to Ban100 because it arose from a transaction in which Ban100 did not participate and from which it received no benefit. Accordingly, the Trustee has failed to plead any "transfer of an interest of the debtor in property" to Ban100 to which Section 548(a)(1)(A) could apply. Moreover, actual fraudulent intent focuses on the transferor's intent. Merely alleging insolvency and lack of reasonably equivalent value as evidence of actual intent with nothing more is inadequate; recycling these elements of constructive fraud as badges of actual intent, with nothing more, would "turn every constructive fraudulent conveyance claim into an actual" one. *In re Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *5, *14 (S.D.N.Y. Jan. 6, 2017); *In re FTX Trading Ltd.*, 2024 WL 4562675, at *10 (Bankr. D. Del. Oct. 23, 2024). The insider, non-disclosure, and insolvency allegations in Compl. ¶ 117 therefore cannot cure the missing allegation that Debtor transferred property to Ban100.

**F. Alternatively, Ban100 May Retain the Value It Gave Under Section 548(c).**

Even if the Trustee had adequately pleaded a constructive or actual fraudulent transfer as to Ban100, the Complaint itself establishes that Ban100 was a good-faith transferee for value under Section 548(c). A transferee that takes for value and in good faith may retain the transferred property to the extent of the value given, including satisfaction or securing of a present or antecedent debt of the debtor. 11 U.S.C. §§ 548(c), (d)(2)(A). The Complaint contains no allegations that Ban100 took any challenged pre-petition transfer for *no* value, nor does it allege any bad faith on the part of Ban100. And because the defense is apparent on the face of the

Complaint, it may be properly applied on a Rule 12(b)(6) motion. *See Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998); *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008). Thus, to the extent the Trustee has properly pleaded any fraudulent transfer as to Ban100, such claim should be dismissed under Section 548(c).

### G. The Trustee Cannot Collapse the Sponsors and Their Affiliates into a Single Actor.

The Trustee's fraudulent transfer theory fails for a second, independent reason: to the extent it depends on treating Ban100, Finanza, and Debtor's private-equity sponsors as a single actor, whose conduct or knowledge may be imputed across entities, no such consolidation exists. That theory is the same alter ego "single economic unit" label addressed above, and it fares no better here. The Trustee's allegations in support of his "single economic unit" theory fail under *Gulf Fleet* and the other applicable tests and cannot be used to make out a fraudulent transfer claim against Ban100.

### H. The Trustee's Claim Under Section 549 Should Be Dismissed.

The Trustee's claim under Section 549 should be dismissed because the transfers he challenges are not avoidable post-petition transfers. The June and July 2024 portfolio sales were disclosed ordinary-course transactions the Code authorizes without notice or a hearing, and the February 9, 2024, sale occurred before the petition date, placing it outside Section 549's reach despite the Trustee's efforts. The Complaint concedes that Debtor routinely sold loan portfolios to Ban100, and other third parties, pre-petition, and Debtor advised this Court in its First Day Declaration, and repeatedly throughout the chapter 11 case, that it would continue doing so in the ordinary course of its business. As for the February 9, 2024, sale, it closed three months before Debtor filed, and the alleged post-petition board resolution regarding that transaction does not

convert it into a post-petition transfer—which the Trustee presumably attempts in order to circumvent the deficiencies of his 547 claim.

**1. Ordinary-Course Sales Are Authorized and Cannot Be Avoided.**

The Bankruptcy Code authorizes ordinary course transactions by a debtor-in-possession, and Section 549 cannot be used *post facto* to undo the debtor's ordinary course of business. Although Section 549 contains no express ordinary-course exception, Sections 1107, 1108, and 363(c)(1) permit a debtor-in-possession to enter into ordinary-course transactions "without notice or a hearing," and such transactions cannot be avoided under Section 549(a)(2). *In re Roth Am., Inc.*, 975 F.2d 949, 952 n.3 (3d Cir. 1992); *In re Se. Hotel Props. Ltd. P'ship*, 99 F.3d 151 (4th Cir. 1996); *In re Lavigne*, 114 F.3d 379 (2d Cir. 1997).

The ordinary-course test has two dimensions: horizontal (whether the transaction is of a type similar businesses in the industry commonly undertake) and vertical (whether it subjects creditors to economic risks different from those they accepted when extending credit), and its crux is "the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter." *Roth Am.*, 975 F.2d at 952 (quoting *In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983)). Courts dismiss Section 549 claims at the pleading stage where the complaint's own allegations establish that the challenged transfers occurred in the ordinary course of the debtor's business. *In re Vision Metals, Inc.*, 325 B.R. 138 (Bankr. D. Del. 2005).

Neither of the Trustee's answers to the ordinary-course defense—market distress and breach of a bond covenant—is relevant. The Trustee alleges, with no support, that the "secondary market for Colombian payroll loan portfolios was frozen" during the relevant period, and that Debtor's own witness testified the sales were driven by adverse "market sentiment and pricing" from other purchasers following the Mexican non-bank financial institution crisis. Compl. ¶ 122. However, market distress does not make the type of transaction extraordinary; the horizontal test

considers whether portfolio sales are ordinary in the industry, which they are, and the withdrawal of other buyers makes it more reasonable to continue selling to the established counterparty. *In re First Prot., Inc.*, 440 B.R. 821 (B.A.P. 9th Cir. 2010). The Trustee separately alleges that bondholders had no reason to expect sales to Ban100 because such sales were purportedly exclusive to Ban100 as the only available purchaser during the frozen market. Compl. ¶ 123. This exclusivity premise is likewise contradicted by Debtor's own First Day Declaration, which disclosed that "the Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise)." Compl. ¶ 76.

The Trustee also nonsensically conflates Debtor's alleged breach of an indenture covenant with avoidability under Section 549. At most, Debtor's alleged covenant breach gave rise to contractual liability to its bondholders. It does not render a transfer avoidable, nor does it displace the ordinary-course analysis, which measures the debtor's actual practice and its creditors' expectations of ordinary operation. *FBI Wind Down*, 581 B.R. at 147. The Trustee's characterization of these transfers as made "without cash consideration" does not, without more, establish that the transactions fell outside the ordinary course; ordinary-course sales frequently involve deferred payment, setoff, or netting arrangements consistent with an established course of dealing between the same counterparties. *See In re Pameco Corp.*, 356 B.R. 327, 340 (Bankr. S.D.N.Y. 2006) (identifying "changes in the means of payment" as only one of six factors relevant to the ordinary-course inquiry, rather than a dispositive bar).

**2. The Trustee Admits That Debtor Regularly and Openly Sold Loan Portfolios to Ban100.**

The Trustee's own pleading establishes that the challenged portfolio sales satisfy both dimensions of the ordinary-course test. When a debtor's pre-petition business regularly included a particular type of transaction, its post-petition continuation is within the ordinary course under

both the horizontal dimension, because the transaction is of a type commonly undertaken in the debtor's industry, and the vertical dimension, because creditors who dealt with the debtor expect that established practice to continue. *Roth Am.*, 975 F.2d at 949. The inquiry looks to the debtor's actual pre-petition business and disregards its later financial condition or liquidation posture. *In re Fairfield Sentry Ltd.*, 539 B.R. 658, 675 (Bankr. S.D.N.Y. 2015), *subsequently aff'd*, 690 F. App'x 761 (2d Cir. 2017). The vertical test is satisfied, in particular, where the practice was disclosed and known to creditors. *In re GOL Linhas Aereas Inteligentes S.A.*, 661 B.R. 330, 342 (Bankr. S.D.N.Y. 2024) ("any creditor who chose to contract with the Debtors was aware that they regularly made the [transfers], and would reasonably expect them to continue doing so.").

Both dimensions are satisfied here, in fact, and as admitted by the Complaint. Debtor was a payroll lender whose pre-petition business included the recurring sale of payroll loan portfolios. The Complaint itself alleges that "[t]he Debtor regularly sold payroll loan portfolios to Ban100" and also sold credit card receivables. Compl. ¶¶ 40, 41. Those sales were disclosed to the Court and to creditors in Debtor's First Day Declaration, which stated that "the Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise)." Compl. ¶ 76; First Day Decl. ¶ 50(c).[3] Debtor's creditors were thus aware of, and would reasonably expect the continuation of, these transactions (indeed, they appear to have been a critical component of Debtor's operations). The Trustee has failed to plead that Debtor's post-petition portfolio sales

[3] The Complaint quotes and relies on the First Day Declaration for the disclosure of continuing Ban100 sales. That document may therefore be considered as incorporated by reference or integral to the ordinary-course allegations, and the Court may take judicial notice of the filed record. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *In re Trinsum Grp., Inc.*, 466 B.R. 596, 606 (Bankr. S.D.N.Y. 2012); *In re Mirena IUD Prods. Liab. Litig.*, 29 F. Supp. 3d 345, 350 (S.D.N.Y. 2014).

were anything other than a continuation of Debtor's established, disclosed pre-petition practice, and were therefore ordinary-course under both the horizontal and vertical tests.

### 3. The Cash Management Orders Expressly Authorized Debtor's Transactions with Ban100.

In addition to disclosing portfolio sales in the First Day Declaration, and the inherent authorization and protection from avoidance those transfers are entitled to under the Bankruptcy Code, Debtor specifically sought and obtained authorization for the transactions the Trustee now challenges under Section 549. Debtor's *Motion of the Debtor for Entry of Interim and Final Orders (A) Authorizing (I) Continued Use of Existing Cash Management System, (II) Maintenance of Existing Bank Accounts, and (III) Continued Use of Existing Business Forms, (B) Authorizing Continued Performance Under Related Party Transactions and Historical Practices, and (C) Waiving the Requirements of Section 345(b) of the Bankruptcy Code* [Bankr. Dkt.[4] No. 6] (the "Cash Management Motion"), stated, among other things, that

> the Debtor, in the ordinary course of its business, has entered into certain Related Party Transactions with certain identified parties in which the Debtor's shareholders have a substantial ownership interest. These Related Party Transactions allow the Debtor, among other things, to meet the needs of their customers efficiently in a cost-effective manner through the centralization of key administrative functions (in the case of Asficredito), ***as well as ensure liquidity and cash flow (in the case of Finanza Inversiones and Ban100)***. If these Related Party Transactions are discontinued or the Debtor is prohibited from continuing to comply with its obligations under such Related Party Transactions, the Debtor's cash management process and business operations would be disrupted causing irreparable harm to the Debtor.

Cash Mgmt. Mot. ¶ 56 (emphasis added). The Cash Management Motion went on to request authorization to continue engaging in these Related Party Transactions and also specifically requested:

> that this Court clarify that this relief will not limit the Debtor's ability to reconcile amounts owed between and among the Debtor and any Related Party, including

[4] References to "Bankr. Dkt." refer to the docket in case number 24-10837 (Bankr. S.D.N.Y.).

> netting and setting off obligations arising from Related Party Transactions, whether arising prepetition or post-petition, in the ordinary course of business.

Cash Mgmt. Mot. ¶¶ 57, 58. Interim and final orders granting the Cash Management Motion, including its requests for relief related to Related Party Transactions, were entered on May 21, 2024, and June 12, 2024. *See* Bankr. Dkt. Nos. 38, 70 (collectively, the "Cash Management Orders").

The Trustee cannot now ignore the Cash Management Orders in pursuit of his Section 549 claims. Each of the post-petition transactions challenged by the Trustee—as well as the consideration for those transactions, expressly including setoff of pre- and post-petition claims—was not only fully disclosed but expressly authorized. These authorized transactions also include by the terms of the Cash Management Orders themselves each of the "operating cost" payments challenged by the Trustee. The Complaint's complete silence as to the Cash Management Orders is damning in this regard and indicative that the Trustee's entire Section 549 claim must be dismissed.

**4. The Trustee Cannot Avoid the February 9, 2024, Pre-Petition Sale Under Section 549.**

The February 9, 2024, portfolio sale—also the subject of the Trustee's Section 548 claim—occurred pre-petition and is therefore outside the scope of Section 549. *See* Compl. ¶¶ 69, 88. The Trustee's reliance on a post-petition board resolution to convert this transaction into a post-petition transfer is unsupported and inaccurate. A later act converts a pre-petition transaction into a post-petition transfer only if that act was necessary to complete the transfer. *Matter of Natchez Corp. of W. Va.*, 953 F.2d 184, 187 (5th Cir. 1992). There is no dispute, nor has the Trustee alleged otherwise, that title in the portfolio in question had already vested in Ban100 prior to the petition date. And moreover, even if the Trustee's Section 549 claim reached the February 9 transaction, it was in the ordinary course and approved under the Cash Management Orders as discussed above.

### I. The Trustee's Claim Under Section 544(b)(1) Should Be Dismissed.

The Trustee also seeks to avoid post-petition transfers to Ban100 using Section 544(b)(1) and Colombia's *Acción Pauliana* law. As an initial matter, these claims are also absolutely barred by the Cash Management Orders. Moreover, Section 544(b) cannot be used to supplant Section 549 to reach post-petition transfers. The Trustee also fails to plead that he is exercising rights that belong to an identifiable creditor and fails to plead any of the necessary elements of a Colombian *Acción Pauliana* claim. Finally, the Trustee's Section 544(b)(1) claim is barred by extraterritoriality principles.

#### 1. Section 544(b)(1) Cannot Be Used to Reach Post-Petition Transfers.

Courts in the Second Circuit have consistently held that Section 544(b) cannot substitute for Section 549 to avoid post-petition transfers. *See, e.g., In re Centennial Textiles, Inc.*, 227 B.R. 606, 609 (Bankr. S.D.N.Y. 1998) ("Section 544(b) . . . applies solely to prepetition transfers") (citing *In re Metro. Cosm. Reconstructive Surgery P.A.*, 125 B.R. 556, 557 (Bankr. D. Minn. 1991)); *In re Sattler's, Inc.*, 73 B.R. 780, 791 (Bankr. S.D.N.Y. 1987). As such, the Trustee's claims against Ban100 under Section 544(b)(1), which solely involve post-petition transfers, must be dismissed as a matter of law.

#### 2. The Trustee Fails to Plead an Actual Triggering Creditor.

The Section 544(b)(1) claim also fails because the Trustee, whose standing is derivative of an actual creditor, fails to identify an unsecured creditor holding an allowable claim under Section 502 whose avoidance rights the Trustee exercises. *In re Allou Distribs., Inc.*, 392 B.R. 24, 31 (Bankr. E.D.N.Y. 2008). The Supreme Court acknowledged this as "an important check"; the Trustee has "no greater rights of avoidance than the actual creditor would have," and inherits every defense that could be raised against it. *United States v. Miller*, 604 U.S. 518, 525 (2025). The Trustee must therefore plausibly allege a creditor who was a creditor on each transfer date, holds

an allowable unsecured claim on the petition date, and could avoid the transfer under the applicable Colombian law.

The Complaint references only Debtor's bondholders, alleging that the transferred portfolios were "the same collateral that the Debtor had promised Bondholders would serve as collateral for their New Bonds." Compl. ¶ 130. However, the bondholders cannot supply the triggering creditor Section 544(b)(1) requires, for two reasons. First, the Trustee never ties the bondholders, or any creditor, to each challenged transfer; he does not allege that a bondholder held a claim on each transfer date and an allowable unsecured claim on the petition date and could itself avoid that transfer under Colombian law. Second, the bondholders' claims are governed by a New York-law indenture, and the Complaint pleads no basis for a New York Bondholder to invoke the Colombian *acción pauliana*. Compl. ¶¶ 2, 8. Without identifying a creditor who could itself have avoided these transfers under Colombian law, the Trustee has no derivative rights to exercise, and the claim fails.

**3. The Trustee Fails to Plead the Elements of the Colombian *Acción Pauliana*.**

The claim also fails because the Trustee asserts the wrong cause of action under Colombian law and then fails to plead any of the three elements required to state that claim. A trustee invoking foreign law through Section 544(b)(1) must identify the specific foreign statute or doctrine and plausibly plead each element. Further, where the foreign law sounds in actual fraud, the heightened particularity of Rule 9(b) applies. *In re Bankr. Est. of Norske Skogindustrier ASA*, 629 B.R. 717 (Bankr. S.D.N.Y. 2021).

Colombian law provides two distinct avoidance remedies. The first is the insolvency avoidance action, which may be brought before the insolvency court during the pendency of an insolvency proceeding. The second is the *Acción Pauliana*, which is available outside the insolvency context when the debtor is not subject to insolvency proceedings.

In any case, the Colombian *Acción Pauliana* is an extraordinary remedy of limited application and requires three elements: *eventus damni* (real harm through impairment of the debtor's estate), *consilium fraudis* (a design to prejudice creditors), and, for onerous acts, the transferee's *scientia fraudis* (knowledge of the fraud). *See* C.C. Art. 2491 (Colom.); *Moore v. Bay*, 284 U.S. 4 (1931); Corte Suprema de Justicia [C.S.J.] [Supreme Court], Sala Civ., marzo 14, 2008, M.P.: J. Arrubla, Expediente C-1100131030272001-00601-01(Colom.). The absence of any one element defeats the action, and because the doctrine turns on fraudulent knowledge and design, it is subject to Rule 9(b). The Complaint pleads none of these elements with the required particularity.

The Complaint does not plead *eventus damni*—harm to the estate—for the post-petition transfers this claim challenges. The Colombian doctrine requires that the estate be made worse off by the transfer; a transaction that leaves the estate no smaller than before is not harm the doctrine reaches. The Complaint pleads no facts establishing that these transfers impaired Debtor's estate; it does not allege the portfolios' face value, fair market value, or any other benchmark against which the consideration received could be measured to demonstrate impairment. Debtor's admission that it was insolvent by the end of 2022 does not supply this missing element, as the doctrine looks to whether the specific transfer under attack impoverished the estate, not to the debtor's general financial condition at an earlier date. Whatever harm the Complaint describes arose from the shareholders' diversion of the sales premium to their own loan; this is distinct from the post-petition transfers challenged here. Compl. ¶ 109.

The Complaint's failure to plead *scientia fraudis* is independently fatal. That element requires that the transferee itself knew the transfer would prejudice creditors; the transferee's mere affiliation with Debtor is insufficient. The Complaint alleges only that Ban100 "clearly knew of

the poor state of the Debtor's financial affairs on account of their common ownership" and that Ban100's directors attended Debtor's board meetings. Compl. ¶ 129. Common ownership and board attendance do not evidence knowledge of an intent to defraud, and the Complaint provides no proof that Ban100 knew these transfers were designed to prejudice creditors rather than ordinary post-petition business.

Nor can the Trustee impute, without any evidentiary allegation, to Ban100 the knowledge of Debtor or others. That argument depends entirely on the "single economic unit" theory, which fails for the reasons described above. Accordingly, the Section 544(b) claim fails insofar as it rests on the portfolio sales, and to the extent it reaches any other transfers, it fails for the independent extraterritoriality reasons set forth below. It is important to note that none of the elements of Colombian insolvency avoidance actions have been pleaded by the Plaintiff and any such claim would be inadmissible under Colombian provisions in the present case.

**4. Extraterritoriality Independently Bars the Claim.**

Further, Section 544(b)'s voidable under "applicable law" language is "broad, boilerplate language" that cannot overcome the presumption against extraterritoriality. *In re CIL Ltd.*, 582 B.R. at 46, quoting *In re Maxwell Commc'n Corp. plc (Maxwell I),* 186 B.R. 807, 819 (S.D.N.Y. 1995). The challenged transactions were admittedly purchases of Colombian loan portfolios, from a Colombian debtor, with payments made in Colombia. The presumption against extraterritoriality bars the claim, regardless of how the Trustee's Colombian-law allegations are read, and the Trustee's claim under Section 544(b)(1) should be dismissed.

**J. The Trustee's Claim Under Section 542(b) Should Be Dismissed.**

The Trustee's claim under Section 542(b) should be dismissed because the alleged debts arising from the Complaint are neither matured nor undisputed. Section 542(b) requires an entity that owes a debt that is "matured, payable on demand, or payable on order" to pay it to the trustee.

This is a mechanism for collecting what is already acknowledged to be estate property—concerned with "the collection rather than creation of, recognition or liquidation of a matured debt"—and the statute's text yields "a strong textual inference that an action should be regarded as a turnover only when there is no legitimate dispute over what is owed." *In re Nat'l Enters., Inc.*, 128 B.R. 956, 959 (E.D. Va. 1991); *In re Arcapita Bank B.S.C.(c)*, 628 B.R. 414, 478 (Bankr. S.D.N.Y. 2021), *aff'd sub nom. In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604 (S.D.N.Y. 2022).

"Turnover proceedings are not to be used to liquidate disputed contract claims," and in this District "§ 542(b) cannot be used to recover a disputed pre-petition debt." *In re Charter Co.*, 913 F.2d 1575, 1579 (11th Cir. 1990); *In re Madison Williams & Co., LLC*, 509 B.R. 791, 799 (Bankr. S.D.N.Y. 2014). A debt is not "matured" or "presently payable" if it is contingent on a judgment establishing liability. *In re Celsius Network LLC*, 668 B.R. 722, 752 (Bankr. S.D.N.Y. 2025). Turnover of a state-law claim does not lie "absent a final judgment...a stipulation, or some other binding determination of liability." *In re Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986). And turnover cannot resolve a contract dispute, or recover property whose transfer has not yet been avoided, because such property is not yet estate property. *In re Teligent, Inc.*, 325 B.R. 134, 137 (Bankr. S.D.N.Y. 2005); *In re Veluchamy*, 879 F.3d 808, 813 (7th Cir. 2018).

In light of these standards, the Trustee's turnover claim fails on three independent grounds. First, the debt runs the other way. Turnover is "intended as a remedy to obtain what is acknowledged to be property of the bankruptcy estate," and it is unavailable where the debtor's own books and filings show the obligation running in the defendant's favor. *In re Pantazelos*, 543 B.R. 864, 876 (Bankr. N.D. Ill. 2016) (quoting *Krol v. Crosby* (*In re Mason*), 386 B.R. 715, 721 (Bankr. N.D. Ill. 2008)). Debtor's own First Day Declaration lists Debtor as owing Ban100 $8.7 million "for commissions and sale of a business segment," placing Ban100 among the twenty

largest unsecured creditors. Compl. ¶ 76. If any debt exists, Debtor owes it to Ban100, and there is nothing for Ban100 to turn over.

Second, no matured debt arises from the purchases themselves; Ban100 paid the price and received the portfolios in return. Third, the claim is a disguised setoff and stay dispute. The Trustee premises turnover on the theory that, "to the extent Ban100 paid . . . through exercise of setoff rights as opposed to cash, the debt remains due" because the setoff was allegedly nonmutual and violated the stay. Compl. ¶ 137. Whether any setoff was valid, mutual, and stay-compliant is a contested question that must be adjudicated before any obligation can be deemed "matured" — precisely what turnover exists to avoid. *Satelco, Inc.*, 58 B.R. at 789 (turnover of a state-law claim does not lie absent a final judgment or other binding determination of liability). Each ground independently requires dismissal. The Trustee seeks to use Section 542(b) to establish a disputed liability rather than collect an acknowledged one, and the Trustee's claim under Section 542(b) should be dismissed.

## IV. CONCLUSION

For the foregoing reasons, the Complaint should be dismissed as against Ban100 and Finanza. The Court lacks personal jurisdiction over the Colombian Defendants, and each claim asserted against them fails to state a claim upon which relief may be granted. Ban100 and Finanza respectfully request that the Court dismiss the Complaint as to the Colombian Defendants, together with such other and further relief as the Court deems just and proper.

Dated: September 15, 2026.


**NELSON MULLINS RILEY & SCARBOROUGH LLP**

*/s/ Adam D. Herring*
Adam D. Herring (admitted *pro hac vice*)
201 17th Street NW, Suite 1700
Atlanta, Georgia 30363

Tel: (404) 322-6143
Fax: (404) 322-6050
Email: Adam.Herring@nelsonmullins.com

-and-

Paige L. Epstein
330 Madison Avenue, 27th Floor
New York, New York 10017
Tel: (212) 413-9077
Email: Paige.Epstein@nelsonmullins.com

*Attorneys for Defendants Bancien S.A. and Finanza Inversiones S.A.*

# EXHIBIT 1

Holland & Knight
Carrera 7 # 71-21, Torre A, Piso 8 | Bogotá, DC. Colombia
T +57.601.745.5720 | Holland & Knight Colombia SAS | www.hklaw.com

Bogotá D.C., 7 de mayo de 2026

Doctor
**Santiago Londoño Correa**
Superintendente Delegado para Procedimientos de Insolvencia
Superintendencia de Sociedades

Referencia: Credivalores Crediservicios S.A., en liquidación judicial ("Credivalores o la "Deudora")

Expediente: 42564

Asunto: Objeción al Proyecto de Calificación y Graduación de Créditos.

Respetado doctor:

**Gustavo Cuberos Gómez**, mayor de edad, de nacionalidad colombiana, domiciliado y residente en Bogotá, identificado con la Cédula de Ciudadanía No. 17.134.155 y con Tarjeta Profesional de Abogado No. 14.024 del Consejo Superior de la Judicatura, abogado inscrito en el Certificado de Existencia y Representación legal de Holland & Knight Colombia S.A.S., a la cual le fue conferido poder por parte de The Bank of New York ("BNY") concurro a su Despacho con el fin de presentar **objeción frente al Proyecto de Calificación y Graduación de Créditos**, en los siguientes términos:

Destaco que el presente documento va a doble columna, con textos idénticos en español y en inglés, bajo la consideración de ser este último el idioma del cliente en cuya representación actúo, sin perjuicio de que el que tiene validez legal para los efectos de este proceso es el escrito en idioma español, en los términos del artículo 104 del Estatuto Procesal.

## I. Oportunidad

Los artículos 29 y 53 de la Ley 1116 de 2006 disponen que del Proyecto de Calificación y Graduación de créditos allegado por el liquidador se correrá traslado por el término de cinco (5) días.

En el caso concreto, con consecutivo 2026-01-328994 de 4 de mayo de 2026 se corrió nuevamente traslado del Proyecto de Calificación y Graduación de créditos dentro del proceso de Credivalores Crediservicios S.A., en liquidación, del 5 al 11 de mayo de 2026, estando en término para la presentación de esta objeción.

Bogotá D.C., May 7th, 2026

Mr.
**Santiago Londoño Correa**
Deputy Superintendent for Insolvency Proceedings
Superintendency of Companies

Reference: Credivalores Crediservicios S.A. in judicial liquidation ("Credivalores" or the "Debtor")

File: 42564

Subject: Objection to the Project for Qualification and Graduation of Credits.

Dear Sir:

**Gustavo Cuberos Gómez**, of legal age, Colombian national, domiciled and resident in Bogotá, identified with Citizenship Card No. 17.134.155 and Professional Attorney Card No. 14.024 of the Superior Council of the Judiciary, attorney registered in the Certificate of Existence and Legal Representation of Holland & Knight Colombia S.A.S., to whom power of attorney has been granted by The Bank of New York ("BNY"), hereby appears before you to present an **objection to the Project for Qualification and Graduation of Credits,** as set forth below:

This document is presented in double column, with identical texts in English and Spanish, considering that the latter is the language of the client whom I represent, without prejudice to the fact that the legally valid language for the purposes of this proceeding is Spanish, pursuant to Article 104 of the Procedural Statute.

## I. Timeliness

Articles 29 and 53 of Law 1116 of 2006 provide that the Project for Qualification and Graduation of Credits submitted by the liquidator shall be made available for comments for a term of five (5) days.

In this particular case, with consecutive 2026-01-328994 of May 4, 2026, the Project for Qualification and Graduation of Credits was transferred again within the process of Credivalores Crediservicios S.A., in liquidation, from May 5 to 19, 2026, for which I am in time for the presentation of this objection.

Initial
GC

| | |
|---|---|
| **II. Del Proyecto de Calificación y Graduación de créditos presentado** | **II. The Submitted Project for Qualification and Graduation of Credits** |
| Con memoriales 2025-01-830369 y 2026-01-049041 la liquidadora del proceso presentó los documentos respectivos al Proyecto de Calificación y Graduación de créditos. Dentro del último radicado referido se encuentra relacionado el crédito reclamado por **BNY** en una pestaña señalada como "créditos rechazados". | Through filings 2025-01-830369 and 2026-01-049041, the liquidator submitted the documents corresponding to Project for Qualification and Graduation of Credits. In the latter filing, the credit claimed by **BNY** is listed under a tab identified as "rejected credits." |
| La Deudora indica que el crédito de **BNY** por $210.000.000.000 USD se rechaza *en el sentido que se solicita la exclusión de activos que no hacen parte del activo liquidable de la compañía, de igual manera se solicita el total de la deuda, pero el fondo nacional de garantías hizo cancelación del 70% de la misma.* | The Debtor indicates that **BNY's** claim in the amount of USD $210,000,000,000 is rejected on the grounds that it seeks the exclusion of assets that are not part of the company's liquidable estate; likewise, it states that full payment of the debt is requested, although the National Guarantee Fund allegedly paid 70% thereof. |
| **III. Objeción** | **III. Objection** |
| 3.1 En primer lugar, cabe mencionar que, con memorial 2025-01-758900, **BNY** presentó su crédito por doscientos diez millones ochocientos mil Dólares Americanos $210.800.000 USD (suma equivalente a novecientos veintidós mil setenta y dos mil pesos: COP $922.743.272.000, según la TRM de la fecha de corte, 11 de diciembre de 2024: $4.377,34), dentro del proceso de liquidación de la Deudora. | 3.1. First, it should be noted that, by filing 2025-01-758900, **BNY** submitted its claim in the amount of two hundred ten million eight hundred thousand United States dollars (USD $210,800,000) (equivalent to nine hundred twenty-two billion seventy-two million seven hundred forty-three thousand two hundred seventy-two Colombian pesos: COP $922,743,272,000, according to the exchange rate as of the cut-off date, December 11, 2024: COP $4,377.34), within the Debtor's liquidation proceeding. |
| 3.2 En el mismo memorial se solicitó la exclusión del crédito del proceso liquidatorio, o el pago prioritario del mismo, ya que éste se deriva de una operación del Mercado Público de Valores, en los términos previstos en el parágrafo del artículo 50 de la Ley 1116 de 2006. | 3.2. In the same filing, **BNY** requested the exclusion of its claim from the liquidation proceeding, or alternatively, its preferential payment, since it derives from a Public Securities Market transaction, pursuant to the sole paragraph of Article 50 of Law 1116 of 2006. |
| Por lo anterior, encontramos que: | Accordingly, we state as follows: |
| **i. Sobre el valor:** | **i. Regarding the amount:** |
| La suma presentada por la liquidadora en el Proyecto de Calificación y Graduación de Créditos, la cual es $210.000.000.000 USD no corresponde a la suma reclamada por **BNY**. Desconocemos el origen de la diferencia en el Proyecto. | The amount stated by the liquidator in the Project for Qualification and Graduation of Credits, namely USD $210,000,000,000, does not correspond to the amount claimed by **BNY**. We are unaware of the origin of the discrepancy in the Project. |
| **ii. Sobre la exclusión:** | **ii. Regarding the exclusion:** |
| La liquidadora hace referencia a una solicitud de *exclusión de activos que no hacen parte del activo liquidable de la compañía,* lo cual no ha sido solicitado por **BNY.** Por el | The liquidator refers to an alleged request to *exclude assets that are not part of the company's liquidable estate*, which has not been requested by BNY. On the |

Initial
GL

| | |
|---|---|
| contrario, lo que se requiere es que se excluya, o se pague de forma prioritaria el crédito presentado, conforme lo dispuesto en el artículo 50 de la Ley 1116 de 2006, en razón a: | contrary, what is requested is the exclusion—or preferential payment—of the submitted claim, pursuant to Article 50 of Law 1116 of 2006, based on the following: |
| **1) Antecedentes Especiales – Emisión de Bonos 8.875%** | **1) Special Background – 8.875% Bond Issuance** |
| a. Credivalores es una sociedad comercial especialmente dedicada a proveer crédito de consumo y microseguros a los segmentos de la población con limitado acceso al crédito, *"con recursos propios y aquellos obtenidos a través de mecanismos de financiamiento autorizados por la ley",* a través de un portafolio de productos diseñados para minimizar pérdidas crediticias. | a. Credivalores is a commercial company especially dedicated to providing consumer credit and microinsurance to segments of the population with limited access to credit, *"with its own resources and those obtained through financing mechanisms authorized by law,"* through a portfolio of products designed to minimize credit losses. |
| b. Credivalores realizó una emisión de bonos con calificación B+ (Fitch) en la Bolsa de Valores de Singapur. La ley aplicable a esta emisión es la de Nueva York, específicamente la "Rule 144A" y la "Regulation S". El monto autorizado para dicha emisión fue de USD$ 300.000.000. | b. Credivalores carried out a bond issuance rated B+ (Fitch) on the Singapore Stock Exchange. The law applicable to this issuance is that of New York, specifically "Rule 144A" and "Regulation S." The authorized amount for said issuance was USD$300,000,000. |
| c. Según la información contenida al respecto en el propio sitio web de Credivalores, *"los recursos de la emisión fueron usados para pagar a Credit Suisse por el intercambio de las notas con vencimiento en 2022 compradas por Credit Suisse en conexión con el Tender Offer. Los recursos remanentes fueron usados para refinanciar deuda y para usos generales de la compañía."* | c. According to information on Credivalores' own website, *"the proceeds of the issuance were used to pay Credit Suisse for the exchange of the notes maturing in 2022 purchased by Credit Suisse in connection with the Tender Offer. The remaining proceeds were used to refinance debt and for general corporate purposes"* |
| d. El 7 de febrero de 2020, se firmó el Indenture correspondiente a los bonos preferentes al 8,875% con vencimiento del 7 de febrero de 2025. Dicho documento establece, entre otras cosas, lo siguiente: | d. On February 7, 2020, the corresponding Indenture for the 8.875% senior notes due February 7, 2025, was signed. Said document establishes, among other things, the following: |
| - Que la "Ley Concursal" en caso de insolvencia será, entre otras, la Ley 1116 de 2006.<br>- Que los "Bonos Adicionales" son los Bonos Preferentes al 8.875% con vencimiento en 2025.<br>- Que la "Reestructuración Colombiana" significa cualquier caso u otro procedimiento contra Credivalores o cualquiera de sus filiales con respecto a sus deudas bajo quiebra, reorganización empresarial, liquidación judicial, insolvencia u otra ley similar vigente en la actualidad o en el futuro o que busque el nombramiento de un promotor, liquidador, custodio u otro funcionario similar de la misma o de una parte sustancial de sus propiedades.<br>- Que el "DTC" significa "The Depository Trust Company", sus representantes y sus respectivos | - That the "Insolvency Law" in case of insolvency will include, among others, Law 1116 of 2006.<br>- That the "Additional Notes" are the 8.875% Senior Notes due 2025.<br>- That "Colombian Restructuring" means any case or other proceeding against Credivalores or any of its subsidiaries regarding its debts under bankruptcy, business reorganization, judicial liquidation, insolvency, or other similar law in force now or in the future, or seeking the appointment of a promoter, liquidator, custodian, or other similar official of it or a substantial part of its assets.<br>- That "DTC" means "The Depository Trust Company," its representatives and respective |

Initial

| | |
|---|---|
| sucesores y cesionarios, o cualquier otra institución depositaria designada en lo sucesivo por la Deudora que sea una agencia de compensación registrada en virtud de la Ley de Intercambio. | successors and assigns, or any other depositary institution subsequently designated by the Debtor that is a clearing agency registered under the Exchange Act. |
| - Que "Bono Global" significa cualquier Bono emitido en forma certificada totalmente registrada a favor de DTC (o su representante). | - That "Global Note" means any Note issued in fully registered form in favor of DTC (or its representative). |
| - Que "Fecha de Emisión" significa 7 de febrero de 2020. | - That "Issue Date" means February 7, 2020. |
| - Que "Fecha de Vencimiento" es el 7 de febrero de 2025. | - That "Maturity Date" is February 7, 2025. |
| - Que "Custodio de Bonos" significa el custodio con respecto a cualquier Bono Global designado por DTC, o cualquier persona sucesora del mismo, e inicialmente el Fiduciario. | - That "Note Custodian" means the custodian with respect to any Global Note designated by DTC, or any successor thereof, and initially the Trustee. |
| - Que "Registro de Bonos" significa la Entidad Encargada del Registro que llevará un registro de los Bonos y de su transferencia e intercambio. | - That "Note Register" means the Entity Responsible for Registration that will keep a record of the Notes and their transfer and exchange. |
| - Que "Bonos" significa cualquiera de los Bonos Preferentes al 8.875% de la Compañía con vencimiento en 2025 emitidos y autenticados de conformidad con el Indenture. | - That "Notes" means any of the Company's 8.875% Senior Notes due 2025 issued and authenticated pursuant to the Indenture. |
| - Que "En Circulación" significa, a la fecha de determinación, todos los Bonos, incluidos los Bonos Adicionales, que se hayan autenticado o entregado en virtud del Indenture. | - That "Outstanding" means, as of the determination date, all Notes, including Additional Notes, that have been authenticated and delivered under the Indenture. |
| - Que "Fiduciario" significa la parte nombrada como tal en el párrafo introductorio del Contrato Fiduciario hasta que un sucesor lo sustituya de conformidad con los términos de este Contrato Fiduciario y a partir de entonces, significa sucesor. | - That "Trustee" means the party named as such in the introductory paragraph of the Trust Agreement until a successor replaces it pursuant to the terms of this Trust Agreement and, thereafter, means the successor. |
| e. El monto total de la emisión corresponde a $300.000.000 USD que se discriminaron de la siguiente manera: | e. The total amount of the issuance corresponds to USD $300,000,000, broken down as follows: |
| - Los Bonos que se rigen bajo la "Regulation 144ª" corresponden a $200.000 USD y que se dirigen específicamente a inversionistas institucionales calificados. | - The Notes governed under "Regulation 144A" correspond to USD $200.000 and are specifically directed to qualified institutional investors. |
| - Los Bonos que se rigen bajo la "Regulation S" corresponden a $210.600.000 USD. En ese sentido, no es necesario que el emisor se registre en la Comisión de Bolsa y Valores de Estados Unidos y se encuentran cubiertos todos los territorios externos a los Estados Unidos. | - The Notes governed under "Regulation S" correspond to USD $210.600.000. In this regard, it is not necessary for the issuer to register with the United States Securities and Exchange Commission and all territories outside the United States are covered. |
| f. Según la información suministrada, a la fecha de admisión, se habían emitido bonos por $210.800.000 USD, que es precisamente el monto del crédito cuyo reconocimiento y pago preferente se solicita. | f. According to the information provided, as of the admission date, notes had been issued for two hundred ten million eight hundred thousand US dollars (USD $210,800,000), which is precisely the amount of the credit whose recognition and preferential payment is requested. |

Initial

g. Adicionalmente, se adeudan $30.401.117,62 USD en intereses y $247.355,08 USD por concepto de honorarios legales, según se evidencia en las pruebas adjuntas a esta objeción.

**2) Antecedentes Generales – Proceso de Liquidación Judicial**

a. Mediante Auto 2024-01-945497 de 12 de diciembre de 2024 Credivalores fue admitida a un proceso de reorganización, en los términos de la Ley 1116 de 2006.

b. Con radicado 2025-01-106834, el Promotor de la reorganización presentó Proyecto de Calificación y Graduación de créditos donde calificó a **BNY** en Quinta Clase por COP $919.345.176.000, equivalente a una participación del 56.5141% en el Proyecto. Dicho reconocimiento corresponde a $210.023.707,55 USD.

c. Con memorial 2025-01-165076, **BNY** presentó objeción al Proyecto dentro del proceso de reorganización en los términos señalados, reclamando la suma de $210.800.000 USD.

d. Con memorial 2025-01-480345 de 1º de julio de 2025 el representante legal de la concursada solicitó la apertura del proceso de liquidación judicial de Credivalores.

e. Mediante Auto 2025-01-508266 del 15 de julio de 2025 la Superintedencia de Sociedades dio apertura al proceso de liquidación judicial de Credivalores.

**3) Cumplimiento del supuesto de exclusión y pago preferente**

a. Según el artículo 2 de la Ley 964 de 2005, se considerará valor "*todo derecho de naturaleza negociable que haga parte de una emisión, cuando tenga por objeto o efecto la captación de recursos del público,* incluyendo *[…] b) los bonos […]".*

b. Credivalores realizó una emisión de bonos en la Bolsa de Valores de Singapur ("Bolsa de Singapur") por el monto antes mencionado, es decir, $210.800.000 USD.

c. Dicha emisión comprende cualquier acto o contrato que tenga por objeto o como efecto la emisión de valores en el mercado público de

g. To this date, the interests owed are USD $30.401.117,62 and USD $247.355,08 that correspond to legal fees, as demonstrated with the evidence attached to this document.

**2) General Background – Judicial Liquidation Process**

a. By memorial 2024-01-787663 dated August 30th, 2024, Credivalores requested admission to the Reorganization process, pursuant to Law 1116 of 2006.

b. In the Project, under File 2025-01-106834, the Promoter of the Credivalores reorganization classified BNY in Fifth Class for a total of COP$919.345.176.000 and a participation of 56.5141% in the Project. Said recognition corresponds to USD$210,023,707.55.

c. By memorial with file No. 2025-01-165076, BNY filed an objection regarding the Project for Qualification and Graduation of Credits requesting recognition of USD$210,800,000.

d. By memorial 2025-01-480345 dated July 1st, 2025, the legal representative of the debtor requested the opening of the judicial liquidation process.

e. By Order 2025-01-508266 dated July 15, 2025, the Superintendency of Companies opened the judicial liquidation process of Credivalores.

**3) Accomplishment of Exclusion and Preferential Payment Scenario**

a. According to Article 2 of Law 964 of 2005, a security shall be considered *"any negotiable right that is part of an issuance, when its purpose or effect is the raising of funds from the public, including […] b) bonds […]".*

b. Credivalores carried out a bond issuance on the Singapore Stock Exchange ("Singapore Exchange") for the aforementioned amount, i.e., USD$210,800,000.

c. Such issuance comprises any act or contract whose purpose or effect is the issuance of securities in the foreign public securities market. This is clearly

Initial
GC

valores del exterior. Esto se evidencia en el Memorial de la Oferta ("Supplement to Offering Memorandum") del 23 de abril de 2021, en donde se aclaró que:

Actualmente no existe un mercado público para los bonos. Se ha presentado solicitud ante Singapore Exchange Securities Trading Limited (la "SGX-ST") para que los bonos sean admitidos a cotización y negociación en la Lista Oficial de la SGX-ST.

**La inversión en los bonos implica riesgos. Véase "Factores de riesgo" a partir de la página 21 del memorando de oferta.**

**Precio de emisión: 99,505% más los intereses devengados, si los hubiere, desde el 7 de febrero de 2020.**

d. Esa aplicación conlleva una serie de trámites y el cumplimiento de obligaciones propias de la Bolsa de Singapur, por lo que el objeto de ésta es la emisión de dichos valores en ese mercado, lo cual se encuentra soportado de la siguiente forma:

Descripción (Proporcione una descripción detallada del evento en el recuadro a continuación)

1. Los bonos serán admitidos a cotización y negociación en el Mercado de Bonos con efectos a partir de las 9:00 A.M. del miércoles 5 de mayo de 2021.

2. (I) El nombre corto de los bonos es Credivalo n8.875%250207A y el código ISIN es US22555LAB27.

TRADUCCIÓN OFICIAL Y COMPLETA de un documento original en INGLÉS, lleva mi firma y sello oficial según Certificado de Idoneidad No. 0369 de 04/02/2013 Fecha: octubre 9 de 2025

(II) El nombre corto de los bonos es Credivalo n8.875%250207R y el código ISIN es USP32086AR44.

La letra "R" indica que los bonos se negocian conforme al Reglamento S. La letra "A" indica que los bonos se negocian conforme a la Regla 144A.

3. Los bonos se cotizarán y negociarán en dólares de los Estados Unidos (US$). Tendrán una denominación de US$200.000 y múltiplos enteros de US$1.000. El tamaño mínimo de lote negociable será de US$200.000.

4. La fecha de emisión de los bonos es el 7 de febrero de 2020.

5. El nombre y dirección del Agente Principal de pago es:

The Bank of New York Mellon
240 Greenwich Street, Floor 7 East
Nueva York
Estados Unidos de América
10286

6. Los Gestores líderes / Colocadores de la emisión son Credit Suisse, Morgan Stanley y BCP Securities.

7. Los bonos mencionados no serán títulos valores elegibles para CDP y no se liquidarán a través de CDP.

8. Antes de negociar, consulte los documentos de oferta del Emisor para obtener los detalles completos.

e. Así, el objeto de la emisión fue transar dichos valores en la Bolsa de Singapur, de tal forma que, al tener la vocación de que circulen en dicho mercado, se da cumplimiento al parágrafo del artículo 50 de la Ley 1116 de 2006, pues el objeto de la emisión es que, efectivamente, se transen en un mercado público.

evidenced in the Supplement to Offering Memorandum dated April 23, 2021, where it was clarified that:

No public market currently exists for the notes. Application has been made to the Singapore Exchange Securities Trading Limited (the "SGX-ST") for the notes to be listed and quoted on the Official List of the SGX-ST.

**Investing in the notes involves risks. See "Risk Factors" beginning on page 21 of the offering memorandum.**

**Issue Price: 99.505% plus accrued interest, if any, from February 7, 2020.**

d. Such application entails a series of procedures and compliance with obligations specific to the Singapore Exchange, so its purpose is the issuance of such securities in this market, which is supported as follows:

Description (Please provide a detailed description of the event in the box below)

1. The Notes will be listed and quoted in the Bond Market with effect from 9.00 a.m., Wednesday, 5 May 2021.

2. (I) The short name of the Notes is Credivalo n8.875%250207A and the ISIN Code is US22555LAB27.

(II) The short name of the Notes is Credivalo n8.875%250207R and the ISIN Code is USP32086AR44.

The letter 'R' denotes that trading of the Notes issued under Regulation S. The letter 'A' denotes that trading of the Notes issued under Rule 144A.

3. The Notes will be quoted and traded in United States Dollars (US$). The Notes will be in denomination of US$200,000 and in integral multiples of US$1,000. The Notes will be traded in a minimum board lot size of US$200,000.

4. The issue date of the Notes is 7 February 2020.

5. The name and address of the Principal Paying Agent is as follows:

The Bank of New York Mellon
240 Greenwich Street, Floor 7 East
New York
United States of America
10286

6. The Lead Manager(s)/ Bookrunner(s) of the Notes are Credit Suisse, Morgan Stanley and BCP Securities.

7. The above Notes will not be CDP eligible securities and will not be settled through CDP.

8. Please refer to the Issuer's offering documents for complete details before trading.

e. Thus, the purpose of said issuance was to trade such securities on the Singapore Exchange, so, having the vocation to circulate in said market, the requirement of the paragraph of Article 50 of the Insolvency Statute is met, since the purpose of this issuance is that they are effectively traded in a public market.

Initial
GC

| | |
|---|---|
| f. Al respecto, se trae a colación el precedente del caso del "Grupo Transtel S.A.", en el cual se planteó el supuesto en donde, al no realizarse una emisión en un mercado público de valores en el exterior, no se podía dar aplicación al parágrafo del artículo 50 del Estatuto Concursal. Así, desde esa interpretación, se podría afirmar que en los escenarios donde se acredite la emisión de valores en el extranjero, dicho parágrafo sería aplicable, como sucede en el presente caso. | f. Considering the precedent of "Grupo Transtel S.A." case, said decision established a scenario where, if an issuance is not made in a foreign public securities market, the application of the paragraph of Article 50 of the Insolvency Statute could not be given. Thus, through an interpretation of said decision, it could be said that in the scenario where an issuance of securities abroad is proven, said paragraph could apply. Therefore, upon publication of the issuance on the Singapore Exchange, this requirement is met. |
| g. Igualmente, en el caso "Interbolsa", la Superintendencia de Sociedades estableció los escenarios donde podrían excluirse y exceptuarse de las normas concursales lo correspondiente a las emisiones de valores en el mercado extranjero. De tal forma que "[…] *si la sociedad colombiana emite valores en un mercado público del exterior, también se excluirá de los efectos, incluyendo no solo la emisión, sino los actos y contratos vinculados […]".* Por esto, al tratarse de una emisión en un mercado público del exterior, se deberán excluir dichos recursos y, por ende, proceder con el pago prioritario de los créditos correspondientes. | g. Additionally, this Superintendency was clear in the "Interbolsa" case, where it established the scenarios in which the rules of insolvency could be excluded and excepted regarding foreign market securities issuances. Thus, *"[…] if the Colombian company issues securities in a foreign public market, it will also be excluded from the effects, including not only the issuance, but also the related acts and contracts […]"*. Therefore, as this is an issuance in a foreign public market, such resources must be excluded and, consequently, the preferential payment of the corresponding credits must proceed. |
| h. Por lo anterior, se encuentra procedente la aplicación del parágrafo del artículo 50 de la Ley 1116 de 2006 donde se dispone: *Lo previsto en el presente artículo **no se aplicará** respecto de cualquier tipo de acto o contrato que tenga por objeto o como efecto la emisión de valores u otros derechos de naturaleza negociable en el mercado público de valores de Colombia o del exterior […]".* (Subrayado fuera de texto) | h. Therefore, the sole paragraph of Article 50 of Law 1116 of 2006 applies, which provides that *"the provisions of this article **shall not apply to any** act or contract whose purpose or effect is the issuance of securities in the public securities market of Colombia or abroad." (Emphasis added)* |
| i. Además, se fundamenta en el precedente de los casos antes señalados (Interbolsa y Transtel)[1] | i. Furthermore, it is based on the precedent set by the cases (Interbolsa and Transtel) where is established |

Initial

[1] Interbolsa. Acta No. 405-001770 de 2 de septiembre de 2013:
*"En el primero de ellos, si quien emite es la sociedad en liquidación judicial y la emisión se hace en el mercado público de valores, dicha operación debe ser excluida. En el segundo, si la sociedad colombiana emite valores en un mercado público del exterior, también se excluirá de los efectos, incluyendo no solo la emisión, sino los actos y contratos vinculados. En el tercer escenario, una sociedad extranjera que emita valores bajo el mercado público de valores de Colombia y los negocie aquí o en exterior, también se encuentra sujeta a la excepción de la norma y a aquellas relacionadas con el Decreto 2555 de 2010 y en virtud de ellas, tal como lo mencionó uno de los acreedores en la sesión anterior, debe cumplir los requisitos que se exijan, como son estar inscrito en el Registro Nacional de Valores y Emisores, contar con autorización de la Superintendencia Financiera, entre otros.*
*… Así las cosas, es innegable que esta norma está garantizando estas operaciones en Colombia y en exterior independientemente de que el emisor sea la sociedad en liquidación, por lo que es claro para el Despacho que la norma aplica a todos acto o contrato que se enmarque en las circunstancias señaladas."* (Subrayado fuera del texto)

Grupo Transtel S.A.:
*"En primer lugar, no se encuentra probado por parte del objetante HSBC que se trata de una emisión en el mercado público de valores del exterior, ya que las pruebas aportadas, en especial de la traducción de los Indenture, todo apunta a que se trata de una colocación privada, ya que el texto del Indenture así como lo manifestado en cada una de las notas vendidas a compradores institucionales: «las notas no se han registrado bajo Security Exchange Act, Ley de Valores de 1993 y no pueden ser ofrecidas, vendidas, ni prendadas o de otra forma transferidas, efecto según lo dispuesto en el siguiente párrafo». Hasta ahí la norma."* (Subrayado fuera de texto)
*"En el caso particular de la sección 4.03, Informes del Indenture, que obra como documento, en el expediente se menciona que los bonos se cotizan en Euro MTF: «Mientras los bonos se coticen en euros MTF, el mercado alternativo de la Bolsa de Valores de Luxemburgo», así como esta sección, las partes han regulado*

| | |
|---|---|
| donde se estableció que, para la aplicación del artículo en cuestión, y el pago prioritario de los créditos correspondientes, se deberá probar que éstos corresponden a una emisión realizada en el mercado público de Colombia o del exterior. | that, for the application of the article 50 and the priority payment of the credits, it must be proven that these correspond to an offer made on the Colombian or foreign market. |
| j. Por último, en concordancia con lo anterior, la Superintendencia de Sociedades en Oficio 220-166852 del 21 de noviembre de 2013 estableció: | j. Finally, in Official Letter No. 200-166852 dated November 21, 2013, the Superintendency established the following: |
| *"…3. Sin embargo, es de advertir que **el artículo 50 de la Ley 1116 de 2006**, que trata de los efectos de la apertura del proceso de liquidación judicial, preceptúa en su parágrafo que "Lo previsto en el presente artículo **no se aplicará** respecto de cualquier tipo de acto o contrato que tenga por objeto o como efecto la emisión de valores u otros derechos de naturaleza negociable en el mercado público de valores de Colombia o exterior, ni respecto de patrimonios autónomos constituidos para adelantar procesos de titularización a través del mercado público de valores, ni de aquellos patrimonios autónomos que tengan fines de garantía que formen parte de la estructura de la emisión". (El llamado es nuestro).* | *3. However, it should be noted **that Article 50 of Law 1116 of 2006,** which deals with the effects of the opening of the judicial liquidation process, provides in its paragraph that "The provisions of this article **shall not apply** with respect to any type of act or contract whose purpose or effect is the issuance of securities or other negotiable rights in the public securities market of Colombia or abroad, nor with respect to autonomous estates established to carry out securitization processes through the public securities market, nor to those autonomous estates that have guarantee purposes that are part of the structure of the issuance." (Emphasis added).* |
| *Del estudio de este parágrafo antes transcrito, se desprende que los efectos previstos en la norma en mención, no se aplican, de una parte, a los actos o contratos que tengan por objeto la emisión de bonos u otros derechos negociables en el mercado público de valores, y de otra, a los patrimonios autónomos constituidos para adelantar procesos de titularización o servir de garantía a través de dicho mercado, lo cual significa que la inversión que se haga a través de estos mecanismos, está debidamente protegida."* (Subrayado fuera de texto). | *From the study of this paragraph transcribed above, it follows that the effects provided for in the aforementioned rule do not apply, on the one hand, to acts or contracts whose purpose is the issuance of bonds or other negotiable rights in the public securities market, and on the other, to autonomous estates established to carry out securitization processes or serve as a guarantee through said market, which means that investments made through these mechanisms are duly protected."* (Emphasis added). |
| **iii. Sobre el supuesto pago por el Fondo Nacional de Garantias:** | **iii. Regarding the alleged payment by the "Fondo Nacional de Garantías"** |
| La liquidadora indica que el Fondo Nacional de Garantías pagó el 70% de la acreencia reclamada. No obstante, **BNY** no ha recibido dicho pago ni ha tenido relación comercial o contable con el Fondo Nacional de Garantías de Colombia. Al respecto, el artículo 167 del Código General del Proceso dispone que: | The liquidator states that "Fondo Nacional de Garantías" paid 70% of the claimed debt. However, BNY has not received such payment, nor has it had any commercial or accounting relationship with the "Fondo Nacional de Garantías" of Colombia. Article 167 of the General Code |

*contractualmente el suministro de información, lo cual ocurre en escenarios de colocación privada, además, el Sistema de Euro MTF, creado bajo la Bolsa de Luxemburgo, corresponde a un sistema de negociación donde se listan valores que no se ofrecieron siguiendo las directivas europeas sobre oferta pública.*
*Por lo anterior, este despacho encuentra que las notas no fueron emitidas ni registradas en el mercado público de valores del exterior, en tanto las notas allegadas indican expresamente que no se han registrado bajo la Ley de Valores de Estados Unidos. Esto quiere decir que, si no tiene como referencia la oferta pública de valores, corresponde a una privada."* (Subrayado fuera de texto)

| | |
|---|---|
| "*Los hechos notorios y las afirmaciones o negaciones indefinidas no requieren prueba*" | of Procedure provides that *notorious facts and indefinite affirmations or denials do not require proof.* |
| Por lo anterior, **BNY** se atiene a la negación antes mencionada, la cual guarda relación con el crédito reclamado, el cual sigue sin ser cancelado por parte de la Deudora. | Therefore, BNY stands by the aforementioned denial, which is related to the claimed credit, which remains unpaid by the Debtor. |
| Igualmente, es importante mencionar que el artículo 29 de la Ley 1116 de 2006 establece que la única prueba admisible dentro del proceso de insolvencia será la documental y corresponderá a la parte interesada probar el supuesto de hecho que alega. Así, deberá la Deudora presentar la documentación correspondiente para probar el pago referido por parte del Fondo Nacional de Garantías, situación que no ha ocurrido hasta ahora. | Furthermore, it is also important to mention that Article 29 of Law 1116 of 2006 establishes that the only admissible evidence in the insolvency proceedings shall be documentary evidence, and it shall be incumbent Upon the interested party to prove the alleged factual circumstances. Thus, the Debtor must submit the corresponding documentation to prove the aforementioned payment by the Fondo Nacional de Garantías, which has not occurred to date. |
| **iv. Sobre la acreencia reconocida en el Proyecto de Calificación y Graduación de créditos (2025-01-106834)** | **iv. Regarding the claim recognized the Project of Qualification and Graduation of Credits (2025-01-106834)** |
| Por último, es relevante anotar que, en el Proyecto de Calificación y Graduación de créditos presentado por el Promotor de la reorganización, con radicado 2025-01-106834, se relacionaron los bonos objeto de la presente objeción, como deudas a cargo de la Deudora. | Finally, it is relevant to note that, in the Project of Qualification and Graduation of Credits submitted by the Reorganization Promoter under filing No. 2025-01-106834, the bonds subject to this objection were duly listed. |
| Lo anterior, evidencia la aceptación de ésta de la acreencia de BNY desde el momento de inicio del proceso de insolvencia. Por lo anterior, no se entiende por qué en esta etapa del proceso la liquidadora la desconoce. | This evidence shows that the Debtor had knowledge of BNY's claim from the beginning of the insolvency proceeding. Accordingly, it is unclear why, at this stage of the proceeding, the liquidator now fails to recognize such claim. |
| **IV. Peticiones** | **IV. Requests** |
| Solicito que se estime la objeción presentada en el sentido que: | I request that the objection be upheld on the grounds that: |
| 4.1. Se reconozca el crédito a favor de BNY por $210.800.000 USD (equivalente a COP $922.743.272.000, según la TRM de la fecha de corte, 11 de diciembre de 2024: $4.377,34). | 4.1. Recognized the credit of BNY in the amount of USD $210,800,000 (equivalent to COP $922,743,272,000 at the exchange rate of December 11, 2024: COP $4,377.34) |
| 4.2. Se declare que dicho crédito se deriva de actos y contratos que tienen por objeto la emisión de valores y derechos de naturaleza negociable en el mercado público de valores. | 4.2. It be declared that such claim derives from acts and contracts whose purpose is the issuance of securities and negotiable rights in the public securities market. |
| 4.3. Se tenga como excluido el crédito en cuestión de la liquidación de Credivalores, o de pago prioritario, por derivarse de una operación del Mercado Público de Valores, en los términos previstos en el parágrafo del artículo 50 de la Ley 1116 de 2006. | 4.3. The claim be declared excluded from the liquidation of Credivalores, or entitled to preferential payment, as it derives from a Public Securities Market transaction pursuant to the sole paragraph of Article 50 of Law 1116 of 2006. |

Initial

Carrera 7 # 71-21, Torre A, Piso 8 | Bogotá, DC. Colombia
T +57.601.745.5720 | Holland & Knight Colombia SAS | www.hklaw.com

| | |
|---|---|
| 4.4. A pesar de que el reconocimiento pueda llegar a producirse en pesos colombianos, la exclusión solicitada está orientada a que el pago se haga en dólares americanos, moneda de la contratación del crédito. | 4.4. Notwithstanding that recognition may be made in Colombian pesos, the requested exclusion is intended to ensure payment in United States dollars, the currency of the original transaction. |
| 4.5. Se declare que **BNY**, como Trustee o representante legal de los tenedores de bonos, tiene el derecho exclusivo de recibir el valor de los créditos cuyo reconocimiento y pago se solicita en el presente escrito, para a su turno hacer los pagos que corresponda a los tenedores de bonos, en los términos del reglamento respectivo. | 4.5. It be declared that BNY, as Trustee or legal representative of the bondholders, has the exclusive right to receive the amounts corresponding to the claims whose recognition and payment are requested herein, in order to distribute them to the bondholders pursuant to the applicable indenture. |
| **V. Pruebas** | **V. Evidence** |
| De acuerdo con lo expuesto en los artículos 30 y 48 del Estatuto Concursal, y en los artículos 243 y siguientes del CGP, pretendo hacer valer como pruebas de las peticiones de mi representada las siguientes, que fueron aportadas con la presentación del crédito y que se pueden descargar en el link https://highq.in/1r61akyao3h: | In accordance with the provisions of Articles 30 and 48 of Law 1116 of 2006, and Articles 243 and following of the General Procedural Code, I intend to submit as evidence for the requests of my client the following documents, which were filed together with the proof of claim and may be downloaded at the link https://highq.in/1r61akyao3h: |
| 5.1. Indenture Credivalores – Crediservicios S.A., and The Bank of New York Mellon, as Trustee. 8,875% Senior Notes due 2025. Dated as February 7, 2020 con su correspondiente traducción oficial al español. | 5.1. Indenture Credivalores – Crediservicios S.A., and The Bank of New York Mellon, as Trustee. 8.875% Senior Notes due 2025. Dated as February 7, 2020, with its official translation into Spanish. |
| 5.2. Copia del libro de tenedores de bonos CREDIV2025. | 5.2. Copy of the bondholders' register CREDIV2025. |
| 5.3. Documento "Supplement to Offering Memorandum" del 23 de abril de 2021, con su correspondiente traducción al español. | 5.3. Document "Supplement to Offering Memorandum" dated April 23, 2021, with its official translation into Spanish. |
| 5.4. Certificado de Inscripción de los bonos en la Bolsa de Singapur, con su correspondiente traducción al español. | 5.4. Inscription certificate of the notes in Singapore Exchange with its official translation into Spanish. |
| 5.5. Regla 114A bono global, con su correspondiente traducción al español. | 5.5. Rule 144A global note with its official translation into Spanish. |
| 5.6. Regulación S bono global, con su correspondiente traducción al español. | 5.6. Regulation S global note with its official translation into Spanish. |
| 5.7. Facturas por honorarios correspondientes a $234.589,60 USD, con su correspondiente traducción al español. | 5.7. Invoice of legal fees for USD $234.589,60 with its official translation into Spanish. |
| 5.8. Facturas de honorarios correspondientes a $12.765,48 USD, con su correspondiente traducción al español. | 5.8. Invoice of legal fees for USD $12.765,48 with its official translation into Spanish. |
| **VI. Notificaciones** | **VI. Notifications** |
| Apoderado especial, Gustavo.cuberos@hklaw.com, bog-insolvencia@hklaw.com, Carrera 7 #71-21 Piso 8, Bogotá, D.C. | Attorney, Gustavo.cuberos@hklaw.com, bog-insolvencia@hklaw.com, Carrera 7 #71-21 Piso 8, Bogotá, D.C. |

Initial
GC

Holland & Knight
Carrera 7 # 71-21, Torre A, Piso 8 | Bogotá, DC. Colombia
T +57.601.745.5720 | Holland & Knight Colombia SAS | www.hklaw.com

| | |
|---|---|
| Con la debida consideración y respeto,<br>Signed by:<br>Gustavo Cuberos<br>C0F25EEB107B4DC...<br>**GUSTAVO CUBEROS GÓMEZ**<br>C.C. No. 17.154.155<br>T.P. No. 14.024 of the C.S.J. | With due consideration and respect,<br>Signed by:<br>Gustavo Cuberos<br>C0F25EEB107B4DC...<br>**GUSTAVO CUBEROS GÓMEZ**<br>C.C. No. 17.154.155<br>T.P. No. 14.024 of the C.S.J. |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 15, 2026, a true and correct copy of the foregoing *Memorandum of Law In Support of Bancien S.A. And Finanza Inversiones S.A.'s Motion To Dismiss Adversary Complaint* was served via CM/ECF on all parties registered to received electronic notices.

*/s/ Adam D. Herring*
Adam D. Herring