James W. Stoll, Esq. (admitted *pro hac vice*)
Sharon I. Dwoskin, Esq.
BROWN RUDNICK LLP
One Financial Center
Boston, MA 02111
jstoll@brownrudnick.com
sdwoskin@brownrudnick.com
*Counsel for Luis Blaquier, Davalia Gestion de Activos S.L., GDA Luma Capital Management, LP*

**Hearing Date and Time**:
December 8, 2026 at 10:00 a.m.
**Opposition Deadline**:
October 30, 2026

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CREDIVALORES - CREDISERVICIOS S.A.,<br>Debtor | Chapter 7<br><br>Case 24-10837 (DSJ) |
| SALVATORE LAMONICA solely in his capacity as Chapter 7 trustee of Credivalores - Crediservicios S.A.<br>Plaintiff<br>v.<br><br>BANCIEN S.A. aka Ban100 S.A. fka Banco Credifinanciera S.A., FINANZA INVERSIONES S.A., GRAMERCY FUNDS MANAGEMENT LLC, GCS COLOMBIA FINANCE LLC, GRAMERCY COLOMBIA CONSUMER LENDING HOLDINGS LLC, GUSTAVO FERRARO, GDA LUMA CAPITAL MANAGEMENT, LP, DAVALIA GESTION DE ACTIVOS S.L, LUIS BLAQUIER, ACON INVESTMENTS MANAGEMENT, LLC, ACON COLOMBIA FINANCE II, LLC and JOSÉ MIGUEL KNOELL<br>Defendants | Adv. Proc. 26-01063 (DSJ) |

**MEMORANDUM OF LAW IN SUPPORT OF THE GDA LUMA DEFENDANTS' MOTION TO DISMISS THE TRUSTEE'S COMPLAINT**

## TABLE OF CONTENTS

**Page**


**PRELIMINARY STATEMENT** ....... 1

**FACTUAL BACKGROUND** ....... 2

a. Governance ....... 3

b. The Shareholder Loan ....... 3

c. Pre-Petition Restructuring and Sales Premium Payment ....... 4

d. The Bankruptcy ....... 6

e. Post-Petition Transactions ....... 8

f. The Adversary Proceeding ....... 10

**LEGAL STANDARD** ....... 10

**ARGUMENT** ....... 11

**I. THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST GDA LUMA AND MR. BLAQUIER ....... 11**

a. GDA Luma Owed No Fiduciary Duties to the Debtor ....... 11

i. The Alleged Control GDA Luma Exercised Through an Appointed Director is Not Actual Domination Sufficient to Create a Fiduciary Duty ....... 12

ii. The Complaint Fails to Allege a Control Group Theory of Fiduciary Duty ....... 15

b. The Complaint Fails to State a Claim for Breach of Fiduciary Duty against Mr. Blaquier ....... 17

i. The Complaint Fails to Plead that Mr. Blaquier Breached the Duty of Loyalty ....... 19

ii. The Complaint Fails to Plead that Mr. Blaquier Breached the Duty of Prudence/Care ....... 23

**II. THE COMPLAINT FAILS TO STATE AVOIDANCE CLAIMS AGAINST DAVALIA ....... 24**

a. The Preference Claim Fails to Plead the § 547(b) Elements ....... 24

b. The Complaint Fails to Adequately Plead a Fraudulent Transfer Claim Under § 548 Against Davalia ....... 26

i. Davalia is not a Proper Defendant Under § 548, as it Was Not a Party to the Initial Transfer ....... 26

ii. The Complaint Fails to Plead Actual Fraud Under the Requisite Pleading Standard for Intentional Fraud Claims....................................27

iii. The Complaint Fails to Plead Constructive Fraud..................................31

**III. THE COMPLAINT FAILS TO PLEAD A § 550 RECOVERY CLAIM AGAINST DAVALIA.......................................................................................33**

a. The § 550 Claim is Wholly Derivative of, and Fails with, the Avoidance Claims.....................................................................................................33

b. § 550 Does Not Permit Double Recovery...........................................................33

c. Davalia Took for Value in Good Faith Under § 550(b)(1).................................34

**CONCLUSION .......................................................................................................................35**

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................10, 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................10, 13

*In re Brown Publ'g Co.*,
492 B.R. 610 (Bankr. E.D.N.Y. 2013)....................34

*In re Center City Healthcare, LLC*,
641 B.R. 793 (Bankr. D. Del. 2022)....................29, 30

*In re Direct Access Partners, LLC*,
602 B.R. 495 (Bankr. S.D.N.Y. 2019)....................26

*In re DSI Renal Holdings, LLC*,
574 B.R. 446 (Bankr. D. Del. 2017)....................15, 16

*In re Essar Steel Minn. LLC*
Adv. Proc. No. 17-50001, 2019 WL 2246712 (Bankr. D. Del. May 23, 2019)....................19, 20

*In re FTX Trading Ltd.*,
Adv. No. 23-50380 (JTD), Adv. No. 23-50379 (JTD), 2024 WL 4562675
(Bankr. D. Del. Oct. 23, 2024)....................30

*In re Fun Bowl Vacations, Inc.*,
666 B.R. 867 (Bankr. S.D.N.Y. 2025)....................33, 34

*In re Garcia*
494 B.R. 799 (Bankr. E.D.N.Y. 2013)....................31

*Glob. Crossing Est. Representative v. Winnick*,
No. 04 Civ. 2558 (GEL), 2006 WL 2212776 (S.D.N.Y. Aug. 3, 2006)....................12, 13

*In re Grumman Olson Indus., Inc.*,
329 B.R. 411 (Bankr. S.D.N.Y. 2005)....................12, 14

*In re Hampton Hotel Invs., L.P.*,
270 B.R. 346 (Bankr. S.D.N.Y. 2001)....................18

*In re Hydrogen, L.L.C.*
431 B.R. 337 (Bankr. S.D.N.Y. 2010)....................31

*Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*,
363 F.3d 137 (2d Cir. 2004)....................17

*In re Integrity Graphics, Inc.*
623 B.R. 21 (Bankr. D. Conn. 2020). ....................32

*In re JMK Constr. Grp., Ltd.*,
502 B.R. 396 (Bankr. S.D.N.Y. 2013)....................10

*In re Old CarCo LLC*,
435 B.R. 169 (Bankr. S.D.N.Y. 2010)....................11, 27

*In re Operations NY LLC*,
490 B.R. 84 (Bankr. S.D.N.Y. 2013)....................24

*In re Picard*,
917 F.3d 85 (2d Cir. 2019)....................26, 32, 33

*In re Saba Enters., Inc.*,
421 B.R. 626 (Bankr. S.D.N.Y. 2009)....................10, 11, 27, 28

*In re Science, Language, and Arts Int'l Sch.*,
660 B.R. 21 (Bankr. E.D.N.Y. 2024)....................11

*In re Signature Apparel Grp.*,
577 B.R. 54 (Bankr. S.D.N.Y. 2017)....................18

*St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*,
745 F. Supp. 2d 303 (S.D.N.Y. 2010)....................15, 16

*Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*,
906 F. Supp. 2d 202 (S.D.N.Y. 2012)....................12, 13, 14

*In re Tops Holding II Corp.*,
646 B.R. 617 (Bankr. S.D.N.Y. 2022).................... *passim*

*In re TransCare Corp.*
592 B.R. 272 (Bankr. S.D.N.Y. 2018)....................16

*In re Tribune Co. Fraudulent Conveyance Litig.*,
No. 12-cv-2652 (RJS), 2017 WL 82391 (S.D.N.Y. Jan. 6, 2017)....................27, 28, 30

*In re Trinsum Grp., Inc.*,
460 B.R. 396 (Bankr. S.D.N.Y. 2011)....................30

*In re Trinsum Grp., Inc.*,
466 B.R. 596 (Bankr. S.D.N.Y. 2012)....................10

*Wolf v. Weinstein*,
372 U.S. 633 (1963)....................................................................................17

*In re WonderWork, Inc.*,
611 B.R.169 (Bankr. S.D.N.Y. 2020)....................................................22, 23, 24, 25

**Statutes**

11 U.S.C. § 547...................................................................................24, 29

11 U.S.C. § 547(b)...................................................................................24

11 U.S.C. § 548...................................................................................26, 27, 29

11 U.S.C. § 548(a)(1)(A)...................................................................................10, 26, 27

11 U.S.C. § 548(a)(1)(B)...................................................................................31

11 U.S.C. § 550...................................................................................26, 32, 33

11 U.S.C. § 550(a)...................................................................................33, 34

11 U.S.C. § 550(b)(1)...................................................................................34

**Other Authorities**

Fed. R. Bankr. P. 2004...................................................................................9, 11

Fed. R. Civ. P. 12(b)(6)...................................................................................1, 10

Defendants GDA Luma Capital Management, LP ("GDA Luma"), Davalia Gestion de Activos S.L. ("Davalia"), and Luis Blaquier ("Mr. Blaquier") submit this Memorandum of Law in support of their Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012(b).

## PRELIMINARY STATEMENT

The Chapter 7 Trustee asserts claims against GDA Luma, Davalia, and Mr. Blaquier based on alleged breaches of fiduciary-duty and purported avoidance claims but fails to properly plead a basis for either. Based on the face of the Complaint and its underlying documents, each should be dismissed.

First, GDA Luma did not owe any fiduciary duties to the Debtor or its estate. GDA Luma is not a shareholder of the Debtor, Credivalores-Crediservicios SA. GDA Luma is the owner of defendant Davalia Gestion De Activos S.L. ("Davalia"). Davalia, while a shareholder of Credivalores, was never in control of the Debtor, having only a limited, minority ownership interest of 20%. GDA was never more than an arms-length lender, and Davalia never more than a lender and minority shareholder. GDA does not become a fiduciary by appointing a single director or exercising a lender's contractual rights. The Complaint pleads no facts showing actual domination of the Debtor's board by GDA Luma, and it cannot create a duty by lumping three separate and distinct entities (that is, other independent entities that owned stock directly or indirectly and appointed directors) into a control group that it never properly alleges agreed to act together. For Mr. Blaquier, the Complaint fails to adequately plead that he breached any of his fiduciary duties to the Debtor or its estate.

Second, the avoidance and recovery claims against Davalia fail on the facts as pled. The Complaint fails to plead crucial elements of the avoidance claims. The preference claim pleads no facts showing Davalia received more than it would have in a Chapter 7 liquidation. The fraudulent

transfer claim does not adequately plead the requisite badges of fraud, or that the Debtor received less than reasonably equivalent value. Finally, the Section 550 recovery claim is wholly derivative and fails with the avoidance claims.

Both sets of claims are unsupported by the law and facts as stated in the Complaint and should be dismissed.

## FACTUAL BACKGROUND

The Debtor, Credivalores-Crediservicios S.A., was a payroll lender and credit-card issuer with its principal place of business in Bogota, Colombia. Compl. ¶ 8. According to the Complaint, its equity was held by four shareholders: Gramercy (42%), GDA Luma (20%), ACON (15%), and Crediholding (20%)[1]. *Id*. ¶ 28. None of these parties is alleged to be legally related to another; and they are not. The three moving defendants on this motion are: GDA Luma Capital Management, LP, an SEC-registered investment adviser that, through its ownership of Davalia, indirectly held a 20% minority interest in the Debtor (*Id*. ¶ 15); Davalia Gestion de Activos S.L., owner of 20% of the shares of the Debtor and an indirect lender that extended loans to Finanza Inversiones S.A. ("Finanza"), which, in turn, extended loans to the Debtor under the so-called Shareholder Loan (*Id*. ¶ 16); and Luis Blaquier, a GDA Luma senior associate who served as one of the Debtor's seven directors. *Id*. ¶ 17. The Trustee's claims against these defendants are pinioned on (i) a loan, characterized in the Complaint as the "Shareholder Loan" described below, and (ii) certain transfers to Ban100 that the Complaint alleges were made before and during the Debtor's bankruptcy.

[1] Crediholding has not been named as a defendant.

**a. Governance**

The only allegations in the Complaint against GDA Luma are that it exercised control of one of the Debtor's Board members, Mr. Blaquier, and used that control to agree to the challenged transactions. The Complaint alleges that GDA Luma "undertook its actions vis-à-vis the Debtor through several special purpose entities it controlled, and through [the single] director[] it appointed to the Debtor's Board." *Id.* ¶ 15. As examples of "control" the Complaint alleges that GDA Luma's founding partner, Gabriel de Alba, was "consulted on business decisions for the Debtor[,]" that other GDA Luma personnel regularly attended the Debtor's Board meetings, and that the collective directors, including Mr. Blaquier, "voted in the manner [the advisors] directed[.]" *Id.* ¶ 34.

On that basis, the Complaint alleges that the advisors (that is, GDA Luma, Gramercy and ACON) "together exercised actual control of the Debtor's business affairs" and "used that control to cause their appointed directors" to effectuate the challenged transactions. *Id.* ¶ 100. The Complaint does not allege the existence of any voting agreement among the defendant directors or advisors, just that the defendant directors voted in a like manner.

**b. The Shareholder Loan**

The so-called Shareholder Loan was an arm's-length financing between three of the shareholders of Credivalores (Davalia, Lacrot Inversiones 2014 S.L.U., and ACON) to Finanza, a Colombian company that owns 95% of the common stock of Ban100, a banking institution regulated under the laws of Colombia. Compl. ¶¶ 23, 24. Finanza loaned money directly to Credivalores, the shareholders did not. *Id.* ¶¶ 43, 44. On October 25, 2022, GDA Luma, Gramercy, and ACON as lenders entered into a Senior Secured Loan Agreement (the "Credit Agreement") with Finanza as the borrower, the Debtor as the guarantor, and Acquiom Agency Services, LLC ("Acquiom") as the administrative agent. *Id.* ¶ 44. Under the initial Credit Agreement, the lenders

extended a $20 million term loan to Finanza for the purpose of refinancing certain of the Debtor's obligations. *Id*. ¶ 43. The Trustee labels this the "Shareholder Loan." *Id*. The lenders were wholly-owned special-purpose entities of the three lending firms, and GDA Luma later assigned its position under the Credit Agreement to Davalia. *Id*. ¶¶ 29, 66.

The Shareholder Loan was subsequently amended twice as the Debtor's need increased. In February and March 2023, Gramercy and GDA Luma advanced additional funds of $5 million and then $3.33 million each, again routed through Finanza to the Debtor. *Id*. ¶¶ 47, 48. To secure the financing, the Debtor granted the Shareholder Lenders, through their collateral agent, security interests in its residual interests in the patrimonios autónomos trusts, including in the Citibank Trust that held its payroll-loan portfolios. *Id*. ¶ 49. The Trustee alleges that he has not seen any evidence that these security interests were perfected. *Id*. ¶ 51. The loan matured in November 2023, and in January 2024 the lenders granted a forbearance rather than enforcing. *Id*. ¶ 53.

**c. Pre-Petition Restructuring and Sales Premium Payment**

On February 7, 2024, the Debtor missed a $9.4 million interest payment due on its bonds. Compl. ¶ 54. On March 7, 2024, the Debtor solicited bondholder votes on an exchange offer, that ultimately became the prepackaged plan. The exchange offer was initiated with an offering memorandum (the "Offering Memorandum") proposing to exchange roughly $210 million in unsecured bonds for $165 million in new secured bonds. *Id*. ¶¶ 55, 2. Of relevance here, the Offering Memorandum contained a discussion of the "Sales and Transfer of Originated Portfolio," which informed the bondholders that "[t]o fund growth, [the Debtor] may sell a portion of [its] originated payroll loan portfolio." Offering Memorandum and Consent Solicitation at A-74, Main Case, ECF No. 18 ("Offering Memorandum").[2] It also disclosed that Ban100 is a purchaser of the

[2] Citations to docket entries from the main bankruptcy docket, *In re Credivalores-Crediservicios, S.A.*, No. 24-10837 (DSJ) (Bankr. S.D.N.Y.), will first appear as "Main Case, ECF No. __."

payroll loan portfolios. *Id*. The Offering Memorandum disclosed that Finanza was forbearing from exercising its rights to foreclose on the defaulted loan and waiving critical loan covenants in order to facilitate the exchange offer. Offering Memorandum at A-49. Contemporaneously with the launching of the exchange offer solicitation, and after Finanza entered into the forbearance agreement with the Shareholder Lenders, the Debtor entered into an amended and restated forbearance agreement with Finanza, under which Finanza agreed to pay down the full balance of the Shareholder Loan, including an $8.5 million payment in April 2024 and a $200,000 payment in May 2024. Compl. ¶ 56. The Debtor was the guarantor of these repayments pursuant to the Shareholder Loan. *Id*.

The Complaint asserts that the Debtor "admitted in the Offering Memorandum that it was insolvent by the end of 2022 at which point its equity value was negative." *Id*. ¶ 109. However, the Trustee conflates lack of liquidity with insolvency. The Offering Memorandum that the Trustee relies on does not admit insolvency. In fact, the capitalization table reports positive total shareholder equity of approximately USD$68 million as of September 30, 2023. Offering Memorandum at A-25. It then states that "[t]here has been no material change in our capitalization since September 30, 2023." *Id*. The First Day Declaration of Jaime Francisco Buritica Leal, which the Trustee extensively relies on in the Complaint, is also inconsistent with the assertion of insolvency. It states that the "Debtor's business remains strong" even while various factors have led to "tightening liquidity[.]" First Day Declaration of Jaime Francisco Buritica Leal ¶ 23, Main Case, ECF No. 4 (the "First Day Decl."). The first day filings make it clear that pursuant to the pre-pack plan, all claims other than those of the bondholders were "unimpaired" and would be paid in full. Offering Memorandum at 31. In short, this was a balance sheet restructuring bankruptcy filing and not one based on insolvency.

The bondholders voted to accept the plan, and the tabulation agent certified their acceptance. Compl. ¶ 60. On April 5, 2024, the Board authorized the Debtor to commence a Chapter 11 case. *Id*. ¶ 61. According to the Complaint, at an April 29, 2024 Board meeting, the Debtor agreed, by unanimous vote of all present directors, to transfer Citibank Trust payroll-loan portfolios to Ban100 in exchange for a $2,745,386.16 "sales premium." *Id*. ¶ 62. The Complaint alleges that rather than paying that premium to the Debtor, the shareholders agreed that Ban100 would pay it to Finanza, which would apply it to the Shareholder Loan. Compl. ¶ 62. The Debtor disclosed that the Citibank Trust held $46 million in assets against only $26 million in secured debt. *Id*. ¶ 64. Although the Complaint fails to mention it, the $46 million asset value was a "book value" balance sheet entry, not a statement or representation as to its then-current market value. First Day Decl., at Schedule II.

According to the Complaint, on May 3, 2024, Finanza, not the Debtor, paid $2,745,386.16 to the Shareholder Loan administrative agent to be applied to the loan. *Id*. ¶ 65. On May 8, 2024, the Complaint alleges that the administrative agent distributed that amount to the lenders as follows: ACON II ($187,185.42), GCS ($1,185,507.66), and Davalia ($1,372,693.08). *Id*. ¶ 66. The Debtor guaranteed the Shareholder Loan, and the lenders were creditors of the Debtor on account of that guaranty. *Id*. ¶ 106.

**d. The Bankruptcy**

On May 16, 2024, the Debtor filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code as a prepack (the "Plan") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). *Id*. ¶ 8. The hearing on confirmation of the Plan was held on July 2, 2024, and the confirmation order was entered on July 3, 2024. *Id*. ¶¶ 80, 81. The Debtor then filed an application for relief to the Colombian Superintendent of Companies on August 30, 2024 and eventually entered bankruptcy in Colombia on December 12,

2024. *Id.* ¶ 89, n. 4. The Debtor's case in the Bankruptcy Court was converted to Chapter 7 on July 7, 2025, and the Trustee was appointed on July 8, 2025. *Id.* ¶¶ 7, 8.

In its first-day motions filed at the outset of the Chapter 11 case, the Debtor disclosed the existence and nature of the related-party transactions that the Trustee now challenges. In its motion to continue using its cash management system and the supporting First Day Declaration, the Debtor disclosed that it "is also borrower on several loans originated between 2022 and 2023 with Finanza Inversiones totaling approximately US$42.6 million," and disclosed the related-party nature of that relationship in a footnote stating that "77.0% of the Debtor's shareholders have 100% ownership of Finanza Inversiones." Cash Management Motion at ¶ 40, n. 3, Main Case, ECF No. 6 (the "Cash Mgmt. Mot."); First Day Decl. at ¶ 50(b).

The Debtor also disclosed that "[i]n November 2023, the Debtor sold to Ban100 some of its payroll loan portfolio and Credit Card Business," that it continued to receive and transfer the related collections to Ban100, and that it "continues to sell some of its payroll loan portfolio to Ban100[.]" Cash Mgmt. Mot. at ¶ 41; First Day Decl. at ¶ 50(c)). The related-party nature of this transaction was also disclosed: "Finanza Inversiones owns approximately 94.5% of Ban100." Cash Mgmt. Mot. at ¶ 41, n. 4; First Day Decl. at ¶ 50(c), n.6. The Debtor categorized these transactions as "Related Party Transactions" and sought authorization to continue performing under them "in the ordinary course of business." Cash Mgmt. Mot. at ¶¶ 56-58. This Court entered an interim and final order granting the motion and authorizing the Debtor to continue performing under these transactions. Interim Order on Cash Management Motion, Main Case, ECF No. 38 ("Cash Mgmt. Interim Order"); Final Order on Cash Management Motion, Main Case, ECF No. 70 ("Cash Mgmt. Final Order").

The First Day filings also made it clear that the bankruptcy was filed not because the Debtor was insolvent, but rather because of tightening credit markets that were creating a short-term liquidity crisis. First Day Decl. ¶ 23. In short, the filing was to allow for a balance sheet restructuring only. To that end all claims, other than those of the bondholders, whether secured or unsecured, were deemed unimpaired and expected to be paid in full. *Id.* at ¶¶ 20, 21. Moreover, the Debtor listed its assets at over $480 million against debts of approximately $430 million. *Id.* at Schedule III.

**e. Post-Petition Transactions**

The Complaint alleges that on June 27, 2024 the Debtor transferred payroll loans to Ban100 with a value of USD $1 million. Compl. ¶ 79. According to the Complaint, the Trustee could not find any consideration paid for these assets. *Id.* The Complaint alleges that the Debtor then, on July 30, 2024, transferred payroll loan portfolio assets from the Citibank Trust to Ban100. *Id.* ¶ 83. However, rather than paying the value of the portfolio in cash, the Complaint alleges that Ban100 employed its setoff rights to set off the value of the portfolio against the amount owed from the 2023 sale of the Debtor's credit card business segment. *Id.* ¶¶ 83, 84. As such, the Complaint alleges that the USD $7.8 million value of the portfolio transferred by the Debtor from the Citibank Trust to Ban100 was set off against the amount owed from the sale of the business segment, with no cash transferred during the transaction. *Id.* ¶¶ 83, 84. According to the Complaint, this transaction liquidated the Citibank Trust. *Id.* ¶ 86.

The Complaint then alleges that the next day, on July 31, 2024, the Debtor transferred payroll loan portfolios with a value of USD $12 million that were not held in trust to Ban100. *Id.* ¶ 87. According to the Complaint, the Debtor's Board minutes do not describe consideration given for this transfer. *Id.* Then, on August 28, 2024, the Debtor's Board ratified the July 31 transfer

and the February 9, 2024, payroll loan portfolio sale from the Debtor to Ban100 for USD $ 3.2 million. *Id.* ¶ 88.

Davalia was not a transferee of any of these post-petition transfers, and neither GDA Luma nor Mr. Blaquier are alleged to have received anything from them. The only payment the Complaint alleges Davalia received is the pre-petition $1,372,693.08 payment on the Shareholder Loan. *Id.* ¶ 66.

The Complaint further alleges that "from and after confirmation the Debtor made recurring undisclosed payments to Ban100 purportedly for 'operating costs,'" and sets them out in a date-by-date chart of individual transfers made on numerous dates between July 3, 2024 and June 16, 2025. *Id.* ¶ 91. The Trustee alleges that "[t]hese were not ordinary course payments," that "[n]o Bankruptcy Court authorization had been granted let alone sought to pay same," and that "[t]hey were not disclosed in the Debtor's monthly reporting." *Id.* ¶ 92. The Complaint separately alleges that the Debtor's 2024 financial statements reflect the transfer of payroll loans valued at "COP$172 billion (around USD$42.3 million)" to Ban100 during 2024. *Id.* ¶ 90. These allegations are contradicted by the First Day Motions the Court approved. The Debtor's first-day filings and its 2024 financial statements disclose recurring, ordinary-course payment arrangements between the Debtor and Ban100. The Cash Management Motion discloses that the Debtor "ha[d] in place an agreement with Ban100 related to commissions for the right to use the Visa brand until the Credit Card Business is fully offloaded to Ban100," which included a commission of "approximately US$5,000 which is due and paid on a monthly basis." Cash Mgmt. Mot. ¶ 42. The First Day Declaration discloses the same arrangement. First Day Decl. ¶ 50(c). The Debtor's 2024 financial statements, attached to the Offering Memorandum, reflect similar transactions. The statements

identify Ban100 as a related party (Offering Memorandum at F-37), and report payments pursuant to "Visa C1 disbursement agreement." *Id.* at F-51.

**f. The Adversary Proceeding**

In January 2026, the Trustee sought and the Court granted an application for an order authorizing the Trustee to issue Fed. R. Bankr. P. 2004 document and deposition subpoenas to ACON Investments Management LLC, Gramercy Funds Management LLC, and GDA Luma Capital Management LP. Pursuant to that subpoena, GDA Luma produced documents related to the challenged transactions, and Mr. Blaquier was deposed by the Trustee's counsel.

The Trustee now asserts seven claims, four of which are directed at the GDA Luma defendants: breach of fiduciary duty against GDA Luma and Mr. Blaquier (Count I) (Compl. ¶ 101), and avoidance and recovery under 11 U.S.C. §§ 547, 548, and 550 against the Shareholder Lenders, including Davalia (Counts II, III, and VI), *Id.* ¶¶ 112, 118, 135.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. "Meeting the plausibility standard requires a complaint to plead facts that show 'more than a sheer possibility that a defendant has acted unlawfully.'" *In re JMK Constr. Grp., Ltd.*, 502 B.R. 396, 409 (Bankr. S.D.N.Y. 2013) (quoting *Twombly*, 550 U.S. at 556).[3]

[3] "In reviewing a Rule 12(b)(6) motion, a court may consider the allegations in the complaint, exhibits attached to the complaint or incorporated therein by reference, and matters of which

Because Count III includes an actual-fraud theory, it carries a heightened pleading burden. An actual-fraud claim under § 548(a)(1)(A) sounds in fraud and "must be pleaded with particularity" under Rule 9(b). *In re Saba Enters., Inc.*, 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009). A plaintiff must ordinarily allege the property subject to transfer and the timing and details of the transfers, though courts take a more liberal view when a trustee pleads from "second-hand knowledge." *Id.* However, application of a more relaxed pleading standard is not supported where, prior to filing the Complaint, there was a Rule 2004 discovery period that allowed the trustee to access documents, depose witnesses, and investigate potential claims. *In re Old CarCo LLC*, 435 B.R. 169, 192 (Bankr. S.D.N.Y. 2010). In cases like this, the trustee is no longer a stranger to the transactions at issue and must plead their claims with particularity. *See id*.

## ARGUMENT

### I. THE COMPLAINT FAILS TO STATE A CLAIM FOR BREACH OF FIDUCIARY DUTY AGAINST GDA LUMA AND MR. BLAQUIER

"Under New York law, the elements of a claim for a breach of fiduciary duty are: (1) the existence of a fiduciary duty; (2) a knowing breach of that duty; and (3) damages resulting therefrom." *In re Science, Language, and Arts Int'l Sch.*, 660 B.R. 21, 42 (Bankr. E.D.N.Y. 2024) (citation omitted). The Complaint fails to adequately allege these elements against either GDA Luma or Mr. Blaquier.

#### a. GDA Luma Owed No Fiduciary Duties to the Debtor

The threshold element of a breach of fiduciary duty claim is the existence of a fiduciary relationship. The Complaint relies on a two-step control theory: GDA Luma, together with the other investment advisors, appointed and thus controlled the respective individual directors; and

judicial notice may be taken." *In re Trinsum Grp., Inc.*, 466 B.R. 596, 606 (Bankr. S.D.N.Y. 2012). Additionally, "a court may consider a document of which plaintiff has notice and relied upon in bringing the claim or that is integral to the claim." *Id*.

those individual directors acted in concert such that they controlled the Debtor. This argument fails as a matter of law and is unsupported by relevant factual allegations.

**i. The Alleged Control GDA Luma Exercised Through an Appointed Director is Not Actual Domination Sufficient to Create a Fiduciary Duty**

The Trustee alleges that GDA Luma owed fiduciary duties to the Estate despite the fact that GDA Luma was not a direct shareholder of the Debtor, and, to the extent Davalia was, Davalia was always a minority shareholder owning only 20% of the common shares. The attempt by plaintiffs to reach through individual outside directors to the companies that employ them is often tried but rarely successful, as to find otherwise would upend the investment market. *Glob. Crossing Est. Representative v. Winnick*, No. 04 Civ. 2558 (GEL), 2006 WL 2212776, at *21 (S.D.N.Y. Aug. 3, 2006) (quoting *USAirways Grp., Inc. v. British Airways PLC*, 989 F. Supp. 482, 494 (S.D.N.Y. 1997) ("[t]he notion that a stockholder could become a fiduciary by attribution [] would work an unprecedented, revolutionary change in Delaware law, and would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors.").

"[A]bsent special circumstances, a lender does not incur fiduciary obligations toward its debtor." *Starr Int'l Co. v. Fed. Rsrv. Bank of N.Y.*, 906 F. Supp. 2d 202, 221 (S.D.N.Y. 2012) (citation omitted). In the rare instances in which such a duty is imposed on third parties, the controlling entity must exercise "*de facto* control of the corporation during the relevant times." *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 427 (Bankr. S.D.N.Y. 2005) (citation omitted). The "test of whether a non-majority shareholder has assumed *de facto* control over the board 'is not an easy one to satisfy and stockholders with very potent clout have been deemed, in thoughtful decisions, to fall short of the mark.'" *Starr*, 906 F. Supp. 2d at 221 (quoting *Zimmerman v.*

*Crothall, C.A.*, No. 6001-VCP, 2012 WL 707238, *11 (Del. Ch. Mar. 5, 2012). To impose fiduciary obligations on a minority holder, let alone a third party like GDA that does not own any shares of the company, a complaint must show, through well-pled, non-conclusory facts, that there was "actual, participatory, ***total control*** of the debtor." *In re Grumman Olson Indus.*, 329 B.R. at 427 (emphasis added) (citation omitted).

The Southern District's decision in *Global Crossing Estate Representative v. Winnick* held that a shareholder does not become a fiduciary through the conduct of the directors it designates. There, an estate representative sued minority shareholders that held substantial stakes and had designated members of the debtor's board. *Winnick*, 2006 WL 2212776, at *19. The court rejected the theory that a shareholder becomes a fiduciary by attribution for its designees' conduct, noting that "the courts that have addressed the application of respondeat superior liability in this context, save for one, have rejected it," and that such a rule "would give investors in a corporation reason for second thoughts about seeking representation on the corporation's board of directors." *Id*. at *20–21. The Complaint's theory that GDA Luma's alleged influence over Mr. Blaquier's conduct on the board independently creates a fiduciary duty (Compl. ¶ 100) is foreclosed for the same reason. Although the court in *Winnick* allowed the estate representative's separate "control" allegation to proceed, reasoning that "it is enough that the complaint alleges that such control existed," that ruling applied the notice-pleading regime that *Twombly* and *Iqbal* later displaced. *Winnick*, 2006 WL 2212776, at *20.

Under the governing plausibility standard, a conclusory allegation that "control existed" no longer states a claim and the plaintiff must plead facts of actual domination. Federal and Bankruptcy courts applying this standard routinely dismiss control-based fiduciary duty claims on facts materially stronger than those alleged by the Trustee. In *Starr Int'l Co. v. Fed. Rsrv. Bank of*

*N.Y.*, a Court in this District dismissed a control-based theory even where the lender defendant had extended $85 billion in credit, with an on-site monitoring team and contractual consent rights inside the debtor, holding that those facts only show a "potential ability to exercise control, not the actual *exercise* of that ability." 906 F. Supp. 2d at 224 (citation omitted). The Court explicitly noted that the complaint contained no allegations that the lender exploited its relationship with the debtor, specifically pointing out that it did not demand immediate repayment of its loan. *Id*.

The allegations against GDA Luma are weaker. GDA Luma is alleged to have indirectly owned 20% of the Debtor, through Davalia. Compl. ¶ 15. It is also alleged to own 20% in Ban100 and Finanza, lenders to the Debtor.[4] *Id*. The Complaint alleges that Gramercy, GDA Luma, and ACON caused their appointed directors to vote for the challenged decisions. *Id*. ¶ 34. To show control, the Trustee relies on vague allegations that Gabriel de Alba, the founder and managing partner of GDA Luma, consulted with Mr. Blaquier on *unspecified* business decisions of the Debtor, and that other individuals associated with GDA Luma were generally included in emails regarding the Debtor's business. Compl. ¶ 34. These allegations are plainly insufficient, as "[m]erely taking an active part in the management of the debtor corporation does not automatically constitute control." *In re Grumman Olson Indus.*, 329 B.R. at 427 (citation omitted). The Complaint is devoid of any allegation that GDA Luma took advantage of its position as a lender and specifically admits, as was crucial in *Starr*, that the Shareholder Lenders undertook no enforcement action on the loan. Compl. ¶ 53. Because a bare allegation of board control, unsupported by well-pleaded facts of actual domination, does not establish a controlling-

[4] This is a conclusory allegation, as there is no documentary evidence to support GDA Luma's alleged 20% ownership in Ban100 and Finanza. In fact, and as an offer of proof, GDA Luma's ownership in Ban100 and Finanza at all relevant times was 9.9%.

shareholder duty, Count I fails against GDA Luma. *See In re Grumman Olson Indus.*, 329 B.R. at 427.

**ii. The Complaint Fails to Allege a Control Group Theory of Fiduciary Duty**

Tacitly recognizing that the investment advisors owe no fiduciary duties independently, the Complaint relies on a group control theory to allege that GDA Luma, Gramercy, and ACON owe fiduciary duties to the Debtor. Compl. ¶ 100 ("Gramercy, GDA Luma and ACON, the investment advisors that controlled the Board, also owed fiduciaries to the estate, as they ***together exercised actual control*** of the Debtor's business affairs through their majority control of the nominal shareholders of the Debtor[.]") (emphasis added). The Complaint fails on this theory.

For a court to treat a group of shareholders as a single controlling shareholder, the group must be "connected in some legally significant way — e.g., by contract, common ownership, agreement or other arrangement — to work together toward a shared goal." *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 473 (Bankr. D. Del. 2017) (citation omitted). It is not enough to aggregate holdings "absent 'a voting agreement among the group or a 'blood pact' to act together,'" and under Delaware law a court "will not presume that directors are acting together for purposes of establishing a controlling shareholder simply as a consequence of performing their duties as directors." *St. Clair Shores Gen. Emps. Ret. Sys. v. Eibeler*, 745 F. Supp. 2d 303, 312-13 (S.D.N.Y. 2010) (quoting *Feldman v. Cutaia*, 956 A.2d 644, 657 (Del. Ch. 2007).

The contrast with a control group that was adequately pleaded confirms the Complaint's deficiencies. In *DSI Renal*, the Chapter 7 trustee alleged that thirteen *affiliated* entities "worked together as one entity and exercised control over the Debtors" controlling "four out of five seats on the board," directing the termination of an active sale process, and developing the restructuring that stripped the debtor's assets. 574 B.R. at 473. Although the court recognized that "controlling

a majority of board seats may indicate board domination" but "is insufficient by itself", the control allegations were also supported by emails, obtained by the Trustee through a 2004 discovery process, showing defendants admitting that the primary goal of the restructuring was to satisfy the goals of the defendants. *Id*. at 473-74. The defendant's insider board members also saw emails and documents showing a restructuring plan that would hinder, delay, or defraud creditors. *Id*.

The Complaint here contains no factual allegations that GDA Luma, Gramercy, and ACON were related parties or bound themselves by contract or "blood" such that they can be said to have acted in concert. The Complaint points to no communication among the parties showing that they agreed to act in furtherance of their own interests rather than the interests of the Debtor. Further, the Complaint contains no mention of an actual contract or agreement among the parties to act together.

The only allegation in the Complaint that, if construed generously, could be viewed as describing group control states that "[b]etween the Gramercy, GDA Luma and ACON partners/employees on the Debtor's Board and the other directors which they selected and which voted in the manner they directed, whether because they are attorney/agent for one of them (Mr. Trujillo Sanchez) or because they gave power of attorney right back to them (Mr. Kontarovsky), Gramercy, GDA Luma and ACON directly controlled the Board of the Debtor." Compl. ¶ 34. These conclusory allegations impermissibly "lump together the holdings of the director" without any mention of a "legally significant" connection, communication, or collaboration at all among these minority shareholders. *See Eibeler*, 745 F. Supp. 2d at 312; *In re DSI Renal Holdings, LLC*, 574 B.R. at 473.

The Bankruptcy Court for this District rejected precisely this pleading approach in *In re TransCare Corp.*, where the trustee sought to plead claims against a group of *affiliated* entities

collectively on the theory that they "operated in concert with each other as an integrated whole." 592 B.R. 272, 288 (Bankr. S.D.N.Y. 2018). The court refused, holding that "[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct," a complaint "fails to satisfy the minimum pleading standard required by Rule 8," and it dismissed the fiduciary-duty and related counts as to every affiliate whose individual conduct the complaint failed to specify. *Id.* (citation omitted). The Trustee's control-group theory fails for the same reason. The Complaint asserts only that Gramercy, GDA Luma, and ACON "together" controlled the Board (Compl. ¶ 100), without distinguishing GDA Luma's conduct, and without alleging any binding agreement to act in concert. Indeed, the Complaint concedes that GDA, Gramercy and ACON were at all relevant times independent parties with different ownership interests. Compl. ¶¶ 10, 15, 19.

As such, the Complaint fails to state a claim for breach of fiduciary duty against GDA Luma, as it does not even meet the threshold requirement of establishing that GDA Luma owed fiduciary duties to the Debtor at all.

**b. The Complaint Fails to State a Claim for Breach of Fiduciary Duty against Mr. Blaquier**

The Trustee alleges that Mr. Blaquier breached his post-petition fiduciary duties under federal common law and pre-petition fiduciary duties under Colombian law[5]. Under federal law,

[5] Mr. Blaquier does not concede that Colombian law applies to the breach of fiduciary duty claims made against him. For the purpose of this motion, however, "[w]here no significant policy calling for the imposition of federal choice of law rules exist, bankruptcy courts must apply the choice of law rules of the forum state." *In re Tops Holding II Corp.*, 646 B.R. 617, 692 (Bankr. S.D.N.Y. 2022). New York applies the "internal affairs doctrine" to fiduciary duty claims, under which "the law of the state of incorporation generally controls the substantive aspects of breach of fiduciary duty claims related to corporate governance." *Id*. Although the Debtor was incorporated in Colombia, the Court need not decide whether Colombian law applies, because choice of law "does not matter … unless the laws of the competing jurisdictions are actually in conflict." *Int'l Bus. Machs. Corp. v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004). The Trustee has alleged

directors of a debtor-in-possession owe "essentially the same fiduciary obligation[s] to the creditors as does the trustee for the Debtor out of possession." *Wolf v. Weinstein*, 372 U.S. 633, 649 (1963). This includes the "obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate." *In re Hampton Hotel Invs., L.P.*, 270 B.R. 346, 361–62 (Bankr. S.D.N.Y. 2001) (quoting Lawrence P. King et al., *Collier on Bankruptcy* ¶ 1112.04[6] (15th ed. revised 2000)). These duties, which the Trustee cites as the duties owed by Mr. Blaquier to the estate, are part of the director's duty of loyalty and should be analyzed under that framework. *See id.* at 362; *In re Signature Apparel Grp.*, 577 B.R. 54, 98 (Bankr. S.D.N.Y. 2017) ("The fiduciary obligations of a debtor in possession include, among others, the duty of loyalty, which includes an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate.") (citation omitted).

Under Colombian law, directors of a company owe fiduciary duties of good faith, loyalty, and care to the corporation, as set out in Article 23 of Law 222 of the Commercial Code. *See* Colombian Law 222 of 1995, Art. 23. The duty of loyalty requires directors to act in the best interest of the company and avoid conflicts of interest. *Id*. The duty of care requires the director to act with the care and prudence of a competent director under similar circumstances, including informing themselves before making decisions. *Id*. The Complaint fails to allege sufficient facts establishing that Mr. Blaquier breached his fiduciary duties. The Complaint alleges that Mr. Blaquier, along with the other director-defendants:

- "[B]reached [his] fiduciary duties, including [his] fiduciary duty to preserve estate property under Federal law, to the extent that they approved payroll loan portfolio sales to Ban100 without adequate consideration, or without consideration at all, and

---

no material conflict between Colombian law and the law of the forum, so this Court should apply the law of the forum.

by ratifying the February 9, 2024 payroll loan portfolio sale without consideration." Compl. ¶ 96,

- "[V]iolated [his] fiduciary duty of loyalty in voting to approve all postpetition transactions including the postpetition transfer of payroll loan portfolios to Ban100; and to the extent that [he] authorized any cash payments to Ban100 during the bankruptcy" including the payments that the Trustee described as "operating costs" *Id*. ¶¶ 91, 97,

- "[B]reached their fiduciary duty of care/prudence under Colombian law in authorizing the eve-of-bankruptcy transfer of $2,745,386.16 in Debtor sales premium by Ban100 to Finanza so it can pay down the Shareholder Loan at the April 29, 2024 Board meeting" *Id*. ¶ 98,

- "[B]reached their fiduciary duty of loyalty under Colombian law in approving [the $2,745,386.16] transfer. *Id*. ¶ 99.

**i. The Complaint Fails to Plead that Mr. Blaquier Breached the Duty of Loyalty**

"One pleads a breach of the duty of loyalty by showing the fiduciary (1) harbored material self-interest, (2) acted to advance the self-interest of an interested party from whom she could not be presumed to act independently, or (3) acted in bad faith." *In re Tops Holding II Corp.*, 646 B.R. 617, 701 (Bankr. S.D.N.Y. 2022).

First, the Complaint offers plainly conclusory allegations that Mr. Blaquier was self-interested in any of the transactions he was alleged to have approved. It alleges only (i) that he and the other directors were "conflicted" because their employers earn management and advisory fees from Ban100; (ii) that the performance of their employer's investment in Ban100 has a material effect on their personal compensation (Compl. ¶ 97); and (iii) that their employers manage the Shareholder Lenders, "whose recoveries on the Shareholder Loan have a material effect on their respective personal compensation." *Id*. ¶ 99. Courts have rejected claims of self-interest on significantly stronger facts.

In *In re Essar Steel Minn. LLC*, the Court dismissed a claim for breach of the duty of loyalty where a CEO received a multi-million dollar payment around the time that they directed a series of loan transactions that the trustee alleged were diverted to affiliates and never intended to be repaid. Adv. Proc. No. 17-50001, 2019 WL 2246712, at *6-7 (Bankr. D. Del. May 23, 2019). The Court held that the trustee failed to plead sufficient facts that the CEO had a personal interest in the transactions rising to a breach of the duty of loyalty because they did not link the multi-million-dollar payment to the alleged transfers and failed to plead that the payment was "over and above the salary he … would have been entitled to anyway." *Id.* at *7. By contrast, in *In re Tops Holding II Corp.*, the Court acknowledged that materiality of a personal interest must be "assessed in relation to the director-defendant's specific economic circumstances[,]" and held that the complaint sufficiently pled that the defendant-directors received bonuses for approving the challenged dividend payments because the sums were so significant as to incentivize the directors to approve the transactions. 646 B.R. at 705-08.

The Complaint here is devoid of any allegations regarding the director's compensation structure and how it may have been impacted by the alleged transactions. It makes no mention of any specific payment or benefit to the directors linked to their alleged approval of the transactions, and it certainly includes no specific facts about the materiality of any interest that the directors may have received based on their specific economic circumstances. Rather, it includes vague assertions that the director's compensation is impacted by their employer's investment performance and recovery on their loan. Compl. ¶¶ 97, 99. These allegations are quintessentially conclusory and cannot support a claim that Mr. Blaquier breached his duty of loyalty.

Second, the Complaint fails to plead lack of independence. The Complaint contains insufficient facts to support an allegation that Mr. Blaquier acted in the best interest of a third party

from whom he could not act independently. "[T]he Court begins with the presumption that all directors are independent, such that the allegations must be sufficient to demonstrate a *substantial reason* to find that a director cannot make a decision with only the best interests of the corporation in mind." *In re Tops Holding II Corp.*, 646 B.R. at 710 (citation omitted). "To establish a lack of independence, the plaintiff must allege facts raising sufficient doubt that a director's decision was based on extraneous considerations or influences, and not on the corporate merits of the transaction." *Id*. at 708. In *In re Tops Holding II Corp.*, the bankruptcy court in this District held that allegations that an investor "placed all of the Director Defendants" on the board with "sole and absolute direction to remove them if they failed to follow [its] directives" was insufficient to establish a lack of independence because "[c]onclusory references to dominated and controlled directors … are insufficient." *Id*. (citations omitted). Here, the Complaint pleads no facts alleging that Mr. Blaquier's decisions were based on extraneous considerations aside from the conclusory allegations about his personal compensation, which, as previously described, are unfounded and insufficient.

Finally, the Trustee does not even attempt to allege bad faith by Mr. Blaquier. Pleading bad faith requires a party to allege that a director (i) "intentionally acts with a purpose other than that of advancing the best interests of the corporation," (ii) "acts with intent to violate applicable positive law," and (iii) "intentionally fails to act in the face of a known duty to act[.]" *Id*. at 711. The Complaint includes no facts about Mr. Blaquier's intent as it relates to any challenged transaction, and any bad faith allegations would be undermined by the very structure of the Chapter 11 pre-pack and the related disclosures. The Chapter 11 bankruptcy was structured as a pre-pack, under which the Debtor disclosed its intent to pay all unimpaired claims in full, aside from the bondholders. Offering Memorandum at 24. This plan was consented to by the bondholders and

confirmed by this Bankruptcy Court. Compl. ¶¶ 61, 81. Under this plan, the Debtor disclosed to the bondholders that "[t]o fund growth, [the Debtor] may sell a portion of [its] originated payroll loan portfolio" and that Ban100 is a purchaser of the portfolios. Offering Memorandum at A-74. The Offering Memorandum also describes Ban100 and Finanza Inversiones as "economically related parties." *Id*. at 279. Additionally, the Cash Management Motion disclosed that "[t]he Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise)." Cash Mgmt. Mot. at ¶ 41. The First Day Declaration disclosed the same ongoing transfers. First Day Decl. at ¶ 50(c). Pursuant to the expectations and disclosures set out in the pre-pack and the Debtor's first day filings, the Board continued to conduct the Debtor's business in the ordinary course, including ongoing payroll loan portfolio sales that had been previously disclosed. Such transparent, court-supervised, ordinary course transactions are antithetical to any allegation that the directors acted with bad faith intent.

The claim against Mr. Blaquier for breach of the duty of loyalty as it relates to the post-petition "payments for purported operating costs" fails for the further reasons that they are recurring payments of the type that were disclosed by the Debtor and approved by the Court, and the Complaint never identifies what Mr. Blaquier individually did regarding these payments. First, recurring payments between the Debtor and Ban100 were included in the Cash Management Motion, which disclosed that the Debtor "ha[d] in place an agreement with Ban100 related to commissions for the right to use the Visa brand until the Credit Card Business is fully offloaded to Ban100," which included a commission of "approximately US$5,000 which is due and paid on a monthly basis." Cash Mgmt. Mot. ¶ 42. The First Day Declaration discloses the same arrangement. First Day Decl. ¶ 50(c). The financial statements attached to the Debtor's Offering

Memorandum also show this type of recurring, ordinary course payment pursuant to a "Visa C1 disbursement agreement." Offering Memorandum at F-51.

Second, a breach of fiduciary duty claim against multiple directors may not rely on group pleading. As the court held in *WonderWork*, "a plaintiff may not rely on group pleading to assert a breach of fiduciary duty claim." *In re WonderWork, Inc.*, 611 B.R. 169, 199 (Bankr. S.D.N.Y. 2020) (quoting *Steinberg v. Sherman*, 2008 WL 2156726, at *5 (S.D.N.Y. May 8, 2008)). A complaint that names the directors sued but does not identify "which Directors did what," instead lumping them together as "the Board," is deficient, because the claims must be examined director-by-director. *Id.* at 199-200. Here, the Complaint alleges collectively that the directors "violated their fiduciary duty of loyalty … ***to the extent that*** they authorized any cash payments to Ban100 during the bankruptcy including the above-described payments for purported operating costs[,]" but it offers no facts supporting the speculative assertion that Mr. Blaquier ever approved any of the listed payments. Compl. ¶ 97 (emphasis added). It alleges no meeting that Mr. Blaquier attended, no vote he cast, no act he personally took in relation to these payments, which fails to give Mr. Blaquier fair notice of the basis for the breach of fiduciary duty claim and Count I must be dismissed as to him. *In re WonderWork, Inc.*, 611 B.R. at 199.

#### ii. The Complaint Fails to Plead that Mr. Blaquier Breached the Duty of Prudence/Care

The Trustee also failed to plead a breach of the duty of care as it relates to the April 29, 2024, approval of the loan portfolio transfer that ultimately generated the alleged "sales premium." Compl. ¶ 98. The Complaint alleges that there was "no valid business reason" to approve this transaction. *Id*. To plead that Mr. Blaquier breached the duty of care, the Trustee must allege that he acted with "gross negligence." *In re Tops Holding II Corp.*, 646 B.R. at 697 (citation omitted). The Trustee has not provided sufficient facts to support that Mr. Blaquier and the other defendant

directors acted with "gross negligence" in simply approving the types of loan portfolio sales that the Debtor regularly conducted in the ordinary course of business. This type of transaction was crucial to the Debtor's business model, so much so that it disclosed these "Related Party Transactions" to the Bankruptcy Court in its First Day Declaration, (First Day Decl. at ¶ 50(c)), and its Cash Management Motion, (Cash Mgmt. Mot. at ¶ 41), where the Debtor sought authority to continue performing under these related party transactions "in the ordinary course of its business," (*Id*. at ¶¶ 56-58). The Court granted that Motion. *See* Cash Mgmt. Interim Order; Cash Mgmt. Final Order. Accordingly, far from "gross negligence," Mr. Blaquier joined a unanimous vote to approve the type of loan portfolio transaction that the Debtor regularly participated in and would later be disclosed to and approved by the Court.

Because a breach-of-fiduciary-duty claim cannot survive without a well-pleaded breach, and the Complaint alleges neither a disloyal nor an imprudent act particular to Mr. Blaquier, Count I fails to state a claim against him and should be dismissed.

## II. THE COMPLAINT FAILS TO STATE AVOIDANCE CLAIMS AGAINST DAVALIA

### a. The Preference Claim Fails to Plead the § 547(b) Elements

The Complaint is deficient in pleading the required elements under § 547(b). To avoid a transfer as a preference, the Trustee must plead the elements of § 547(b): a "transfer of an interest of the debtor in property" that was made "(1) to or for the benefit of a creditor; (2) for or on account of an antecedent debt owed by the debtor before such transfer was made; (3) [] while the debtor was insolvent; (4) [] within ninety days before the … petition" (or within one year, if the creditor is an insider); and (5) so as to enable the creditor to receive more than it would in a Chapter 7 liquidation. 11 U.S.C. § 547. The Trustee bears the burden of proving each of those elements. *Id.*

The Complaint fails to plead facts showing that Davalia received more than it would have in a Chapter 7 liquidation. Section 547(b)(5) "imposes an improvement of position test," and to survive a motion to dismiss the trustee must plead facts showing that "there are creditors in the same class that would receive less than 100% of their claims from the bankruptcy estate." *In re Operations NY LLC*, 490 B.R. 84, 102 (Bankr. S.D.N.Y. 2013). The "starting point" of that inquiry is "the Debtor's assets and liabilities on the petition date," and the absence of such allegations requires dismissal of the preference count. *Id*. A trustee "[o]rdinarily … satisfies this prong … by showing that the debtor was insolvent on the petition date," but that "assumes that the defendant received 100% of his claim as a result of the preference." *In re WonderWork, Inc.*, 611 B.R. at 213-14. Where the creditor did not receive payment in full, as is the case here, the complaint must plead more. In *In re WonderWork, Inc.*, the complaint survived a motion to dismiss because it alleged specific financial information about the debtor. In particular, the complaint measured the roughly $27 million in unsecured debt against $3.9 million in unrestricted cash, showing that "the available, unrestricted cash represented roughly 14% of the unsecured debt[.]" *Id*. at 214. The complaint then compared the potential distribution the creditor would have received under a hypothetical liquidation to what he actually received. *Id*.

The Complaint here pleads none of those facts, despite the fact that the transfer did not come close to paying the Shareholder Loan in full. As of the Petition Date, the Debtor's schedules listed an unsecured related-party claim in the amount of US$42,600,551.78 described as "Shareholders Loans (Related Parties)" owed to Finanza (First Day Decl. at Schedule I), and the First Day Declaration likewise describes loans from Finanza totaling approximately US$42.6 million including capitalized interest. First Day Decl. at ¶ 50(b). This outstanding amount includes approximately $36.67 million in principal plus accrued interest. As such, the alleged

$2,745,386.16 "sales premium" used to "pay down" the Shareholder Loan constituted only 6.45% of the total outstanding loan. This is far from the type of payment in full that would allow the Trustee to merely plead insolvency to show that the creditor received more than members of its class would have in a chapter 7 liquidation. *See In re WonderWork, Inc.*, 611 B.R. at 214. As such, the Complaint pled no specific financial information about the Debtor showing the comparisons laid out in *In re WonderWork, Inc.*, rather it relied on the conclusory allegations that "[e]ach such transfer was made while the Debtor was insolvent[,]" and "[e]ach such transfer enabled the creditor to receive more than it would receive had it not been made and the creditor instead received payment of such debt in Chapter 7." Compl. ¶¶ 109, 110.

**b. The Complaint Fails to Adequately Plead a Fraudulent Transfer Claim Under § 548 Against Davalia**

The § 548 count identifies two transactions: the February 9, 2024 payroll-loan-portfolio sale and the $2,745,386 "sales premium" payment. Compl. ¶ 114. The former is pled as a constructive fraudulent transfer, and the latter as an actual fraudulent transfer. Neither is adequately pled under the requisite pleading standards.

**i. Davalia is not a Proper Defendant Under § 548, as it Was Not a Party to the Initial Transfer**

The Trustee cannot plead a § 548 claim against Davalia because Davalia was not a party to the initial $2,745,386 transfer, which is the only relevant transfer under § 548. The Second Circuit has made clear that, in actions involving both § 548 and § 550 claims, "[o]nly the initial transfer involves fraudulent conduct, or any conduct, by the debtor." *In re Picard*, 917 F.3d 85, 98 (2d Cir. 2019). This is clear from the statutory language under § 548(a)(1)(A), which "allows a trustee to avoid certain transfers 'the debtor voluntarily or involuntarily ... *made*.'" *Id*. (quoting 11 U.S.C. § 548(a)(1)(A)). "This can mean only the initial transfer, because the debtor has not *made* the subsequent transfer." *Id*. The Complaint alleges that (i) the Debtor transferred

payroll loan portfolios from the Citibank Trust to Ban100 at a "premium," (ii) then Ban100 paid the $2,745,386 "sales premium" to Finanza, (iii) Finanza then paid the $2,745,386 to Acquiom, the administrative agent for the Shareholder Loan, and finally (iv) Acquiom applied the $2,745,386 to the Shareholder Loan, including $1,372,693.08 to Davalia. Compl. ¶¶ 62, 65. Under this framework, at most, Davalia is alleged to be a remote subsequent transferee of the $2,745,386 and not a party to the initial transfer between the Debtor and Ban100, which is insufficient to state a claim under § 548 against Davalia. *See In re Picard*, 917 F.3d at 98. As such, even if the Trustee could recover from Davalia as an alleged subsequent transferee of the $2,745,386 transfer, an action against Davalia must be pled under § 550, not § 548. *In re Direct Access Partners, LLC*, 602 B.R. 495, 518 (Bankr. S.D.N.Y. 2019) ("Section 550 provides a potential remedy against subsequent transferees, but the wrong for which that remedy is provided "is the initial transfer that fraudulently depletes the estate.") (citation omitted).

**ii. The Complaint Fails to Plead Actual Fraud Under the Requisite Pleading Standard for Intentional Fraud Claims**

Even if Davalia was a proper defendant under § 548 (which it is not), it fails on the pleading standard. To avoid an actual fraudulent transfer, the Trustee must allege: (i) a transfer of an interest of the debtor in property, (ii) made within two years before the petition date, and (iii) made with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted. 11 U.S.C. § 548(a)(1)(A). An actual-fraud claim sounds in fraud and "must be pleaded with particularity" under Rule 9(b). *In re Saba Enters., Inc.*, 421 B.R. at 640. Although courts typically afford a Chapter 7 trustee with a more relaxed pleading standard when they are strangers to the transactions at issue, that is not the case here. *See Old CarCo LLC*, 435 B.R. 192. The Trustee in this case conducted an extensive 2004 examination in the months prior to filing this Complaint, during which time he had access to documents, deposed witnesses, and could investigate the claims

prior to filing. As such, he is not a stranger to the challenged transactions and "[t]here is no justification to relax the particularized standard required for intentional fraud claims" under Rule 9(b). *See id*.

Under these heightened pleading standards, the Trustee has failed to properly allege that the $2.75M transfer was made by the Debtor with "an actual intent to hinder, delay, or defraud the debtor's creditors." *In re Tribune Co. Fraudulent Conveyance Litig.*, No. 12-cv-2652 (RJS), 2017 WL 82391, at *5 (S.D.N.Y. Jan. 6, 2017) (citation omitted). Courts within the Second Circuit hold that the Trustee must allege either direct proof of actual intent or the existence of "badges of fraud[.]" *Id*. at *12 (citation omitted). The Trustee fails to do either.

Having not pled actual fraudulent intent, the Trustee must plead badges of fraud sufficient "to raise a strong inference that the [transferor] possessed an intent to hinder, delay, or defraud [the Debtor's] creditors." *Id* at *13. "When considering whether a debtor had an actual intent to hinder, delay, or defraud its creditors, courts focus on the intent of the transferor, not the intent of the transferee." *Id*. at *5. In assessing badges of fraud, courts consider:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction.

*In re Saba Enters., Inc.*, 421 B.R. at 643.

Each badge of fraud that the Trustee alleges is either unsupported by the facts, unsupported by the law, or insufficient to raise a strong inference of actual intent. The Trustee alleges "multiple badges of fraud are present," namely that: (i) "the transfer was to an insider," (ii) "it was not

disclosed in the Debtor's bankruptcy filings" and (iii) "the Debtor was insolvent on a balance sheet and cash flow basis at the time of the transfer." Compl. ¶ 117.

The Trustee's assertion that the transfer "was not disclosed in the Debtor's bankruptcy filings" does not amount to an allegation that there was secrecy or haste in the transaction itself. *Id*. However, even if it was, it is undermined by the first day filings and Offering Memorandum. The Offering Memorandum disclosed the relevant information to set the expectation of the parties that each claim, except for the bondholders' who consented otherwise, would be paid in full in the ordinary course. Offering Memorandum at 24 ("Other than the restructuring of the Old Notes, the Plan proposes to render all other claims against us unimpaired. Specifically, under the Plan, we intend to have all other claims against us ride through the Chapter 11 Case and Plan unaffected and/or satisfied in the ordinary course of business."). As to the Shareholder Loan, the Cash Management Motion disclosed that "[t]he Debtor is also borrower on several loans originated between 2022 and 2023 with Finanza Inversiones totaling approximately US$42.6 million[.]" Cash Mgmt. Mot. at ¶ 40. The Declaration disclosed the same. First Day Decl. at ¶ 50(b). And both filings disclosed the insider relationship in a footnote: "77.0% of the Debtor's shareholders have 100% ownership of Finanza Inversiones." Cash Mgmt. Mot. at ¶ 40, n.3; First Day Decl. at ¶ 50(b), n.5.

The filings also established party expectations regarding the type of ongoing transactions that ultimately generated the "sales premium." The Cash Management Motion disclosed that "[t]he Debtor continues to sell some of its payroll loan portfolio to Ban100 (or any other interested party as may arise)." Cash Mgmt. Mot. at ¶ 41. The First Day Declaration disclosed the same ongoing transfers. First Day Decl. at ¶ 50(c). Further, both disclosed that "Finanza Inversiones owns approximately 94.5% of Ban100." Cash Mgmt. Mot. at ¶ 41, n. 4; First Day Decl. at ¶ 50(c),

n.6. The Debtor grouped these as “Related Party Transactions” and sought authority to continue performing under them “in the ordinary course of its business,” (Cash Mgmt. Mot. at ¶¶ 56-58) and the Court entered an interim and final order granting that motion. Cash Mgmt. Interim Order; Cash Mgmt. Final Order.

The Trustee also failed to plead sufficient facts about the financial condition of the Debtor. The Complaint only alleges that “the Debtor was insolvent on a balance sheet and cash flow basis at the time of the transfer.” Compl. ¶ 117. However, the Complaint has not adequately pled insolvency in the context of a fraudulent transfer. “There is no presumption of insolvency under Section 548 as there is in section 547.” *In re Center City Healthcare, LLC*, 641 B.R. 793, 804 (Bankr. D. Del. 2022). As such, the Trustee must “allege facts sufficient to support a finding that the debtor was insolvent at the time of the transfers or that the transfers rendered it insolvent.” *Id.* Pleading insolvency requires the Trustee to plead information from which the Court can infer that the corporation’s liabilities exceed their assets at the time of the challenged transfer. *In re Trinsum Grp., Inc.*, 460 B.R. 396, 392-93 (Bankr. S.D.N.Y. 2011).

The Complaint does not adequately plead insolvency. Schedule III of the First Day Declaration shows the Debtor’s assets had a value of over $480 million and exceeded the Debtor’s liabilities by approximately $55 million (First Day Decl. at Schedule III), the pre-packaged Plan dictated that all unimpaired claims would be paid in full (*Id.* ¶ 23), and the Monthly Operating Statements show that the Debtor received significant cash receipts generated from credit card and payroll portfolios. Monthly Operating Report (June 30, 2024) at 15, Main Case, ECF No. 142, Monthly Operating Report (July 31, 2024) at 15, Main Case, ECF No. 145.

Even if the Complaint adequately pled insolvency, that, standing alone, is insufficient to raise a strong inference of intent to hinder, defraud, or delay because it merely restates a required

element of a constructive fraudulent transfer claim. *In re Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *14. "To hold otherwise would turn every constructive fraudulent conveyance claim into an actual fraudulent conveyance claim and thereby undermine the distinction between the two claims." *Id.*; *see also In re FTX Trading Ltd.*, Adv. No. 23-50380 (JTD), Adv. No. 23-50379 (JTD), 2024 WL 4562675, at *10 (Bankr. D. Del. Oct. 23, 2024). The allegations that the Debtor was insolvent and that the transfer was made for the benefit of an insider are elements of a constructive fraudulent transfer claim and finding that they are sufficient "badges of fraud" to show actual fraudulent intent would "undermine the distinction between the two claims." *In re Tribune Co. Fraudulent Conveyance Litig.*, 2017 WL 82391, at *14; *In re FTX Trading Ltd.*, 2024 WL 4562675, at *10.

**iii. The Complaint Fails to Plead Constructive Fraud**

The constructive-fraud theory is directed at the alleged February 9, 2024, loan portfolio sale to Ban100, which the Complaint alleges was made without reasonably equivalent value. Compl. ¶ 115. To the extent that this claim is made against Davalia, it fails on its face. Nowhere in the Complaint does the Trustee allege that Davalia is a transferee of that transaction, or received any payment based on that transaction. Given Davalia's complete lack of involvement in the February 9, 2024 loan portfolio sale, the Complaint cannot state a constructive fraud claim against Davalia. However, even if Davalia was a proper defendant, the constructive fraud claim is inadequately pled. To avoid a constructive fraudulent transfer, the Trustee must plead: (i) a transfer of an interest of the debtor in property, (ii) made within two years before the petition date, (iii) for which the debtor received less than reasonably equivalent value, (iv) while the debtor was insolvent, left with unreasonably small capital, intended to incur debts beyond its ability to pay, or made the transfer to an insider. 11 U.S.C. § 548(a)(1)(B).

The constructive-fraud theory is not adequately pled because the Complaint alleges no facts showing that the February 9 sale was for less than reasonably equivalent value. Courts regularly dismiss § 548(a)(1)(B) claims that are entirely unsupported by facts pled in the Complaint. In *In re Hydrogen, L.L.C.*, the Court dismissed a constructive fraudulent transfer claim where the subject amended complaint contained no more than a "formulaic recitation of the elements," with a complete absence of facts supporting the allegation that the Debtor received less than reasonably equivalent value in exchange for the payments made by the Defendants. 431 B.R. 337, 353 (Bankr. S.D.N.Y. 2010) (citation omitted). Similarly, in *In re Garcia*, the Court dismissed a constructive fraudulent transfer claim because it failed to plead any facts concerning the value the plaintiff's membership interest as compared to the consideration received in exchange for them. 494 B.R. 799, 815 (Bankr. E.D.N.Y. 2013).

Even where a trustee pleads some facts, courts within the Second Circuit have still dismissed constructive fraudulent transfer claims. In *In re Integrity Graphics, Inc.*, the court held that the Trustee's conclusory statement that the purchased assets were worth significantly more than both the purchase price and the loan balance failed to plead sufficient facts regarding the value of the transferred assets or facts showing that the Debtor received less than reasonably equivalent value. 623 B.R. 21, 27-29 (Bankr. D. Conn. 2020). The court noted that, although the trustee's objection to the motion to dismiss identified specific assets and their values based on the debtor's books and records, the complaint itself did not include these valuations. *Id*. at 29.

The Complaint here alleges in a conclusory fashion only that "the purchase price for that transaction was not negotiated," that the portfolios "were not market tested or even offered for sale to anyone else," and that "the transferee is an insider." Compl. ¶ 115. None of that speaks to value of the portfolios or any shortfall between the value and what the Debtor received. The Trustee has

thus pleaded a legal conclusion, not a plausible claim. Further, allegations that the fair market value of the assets was never determined are insufficient. In *In re Integrity Graphics, Inc.*, the Trustee argued that the allegations in the complaint supported the inference that the fair market value of the assets were never properly determined, and as a result the purchase price should not be presumed to represent fair market value, concluding that "the Trustee failed to plead any particularized facts regarding the value of the transferred assets or facts that show that the Debtor received less than equivalent value[.]" *Integrity Graphics, Inc.,* 623 B.R. at 28.

## III. THE COMPLAINT FAILS TO PLEAD A § 550 RECOVERY CLAIM AGAINST DAVALIA

### a. The § 550 Claim is Wholly Derivative of, and Fails with, the Avoidance Claims

Section 550 is not an independent claim, but a "utility provision, helping execute the policy of [an avoidance provision]." *In re Picard*, 917 F.3d 85, 98 (2d Cir. 2019) (citation omitted). The Second Circuit and statutory language make it clear that a § 550 claim is dependent on the avoidance claim, stating that § 550 applies only "to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a)," and the Bankruptcy Code's "avoidance and recovery provisions work in tandem,'" *Id.* at 97 (quoting 11 U.S.C. § 550(a)). As such, "a trustee cannot use § 550(a) to recover property unless the trustee has first avoided a transfer under one of these provisions." *Id*. A § 550 recovery claim therefore rises and falls with the avoidance claims on which it depends, and this claim should fall with the avoidance claims.

### b. § 550 Does Not Permit Double Recovery

Even if any transfer to Davalia were avoidable, § 550 caps what the Trustee may recover from it. Section 550 is a remedies provision, so once a transfer is avoided, the trustee "may recover … the property transferred, or . . . the value of such property, from . . . any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). However, the trustee "is entitled to only

a single satisfaction[.]" § 550(d). As the bankruptcy court in this District recently held, "fraudulent transfer law requires each transfer to be evaluated as a separate transaction," so "the Trustee must look to the specific transferee of the avoided transfer for recovery." *In re Fun Bowl Vacations, Inc.*, 666 B.R. 867, 882 (Bankr. S.D.N.Y. 2025) (citation omitted). The court denied the trustee's request for joint-and-several liability outright, recognizing only three narrow circumstances in which it might attach, none of which apply here. *Id*.

Despite these statutory limitations, the Trustee seeks to recover "against the Shareholder Lenders for the $2,745,386.16 Finanza advanced to them[.]" Compl. ¶ 135. This impermissibly lumps Davalia together with the other Shareholder Lenders, despite the fact that Davalia is at most a subsequent transferee of a specified portion of the "premium[.]" *Id*. The Trustee has also not alleged any of the narrow exceptions supplied in *In re Fun Bowl Vacations, Inc.* Even if the Trustee were to have pled that the alleged actual fraud shows that the parties were "involved in a scheme to defraud creditors," those allegations are inadequately pled as shown above. *Fun Bowl Vacations, Inc.*, 666 B.R. at 881.

**c. Davalia Took for Value in Good Faith Under § 550(b)(1)**

Even if the Section 550(a) claim does not fail with the avoidance claims, the Trustee cannot recover from Davalia because it took for value in good faith under Section 550(b)(1). Under this section, "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided" is not liable for recovery of the transfer. 11 U.S.C. § 550(b)(1). The statute itself contemplates that the $1,372,693.08 to Davalia would be considered "value" because it was a partial satisfaction of the antecedent Shareholder Loan debt. Compl. ¶ 66. Further, the Complaint contains no allegations that Davalia acted in bad faith or with knowledge of the alleged avoidability of the transfers. See *In re Brown Publ'g Co.*, 492 B.R. 610, 619-20 (Bankr. E.D.N.Y. 2013) (finding that

the trustee could not recover under Section 550 because there were no allegations in the complaint that the transferee had knowledge of the avoidability of the transfers). Implicitly, the Complaint concedes the opposite. At the time of the transfer, the exchange offer had already been approved, and a pre-pack bankruptcy was planned that included the payment of all creditors, other than the bondholders, in full. Given those uncontested facts, the complaint cannot simply rest on the bald assertion or implication of "knowledge of avoidability." As such, Section 550(b)(1) precludes any claim against Davalia because it took the $1,372,693.08 for the value of partially paying down the Shareholder Loan, which the Debtor guaranteed, in good faith and without knowledge of any alleged avoidability of the transfers.

## CONCLUSION

For the foregoing reasons, GDA Luma, Mr. Blaquier, and Davalia respectfully request that the Court dismiss the Complaint as against them in its entirety.

Dated: September 15, 2026
Boston, Massachusetts

Respectfully submitted,

**BROWN RUDNICK LLP**

By: *<u>/s/ James W. Stoll</u>*

James W. Stoll, Esq.
Sharon I. Dwoskin, Esq.
One Financial Center
Boston, MA 02111
jstoll@brownrudnick.com
sdwoskin@brownrudnick.com
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

*Counsel for Luis Blaquier, Davalia Gestion de Activos S.L, GDA Luma Capital Management, LP*

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2026 the foregoing Motion to Dismiss was filed electronically using the Court's Electronic Case Filing System. Notice of this filing will be sent to all parties through the Court's Electronic Case Filing System.

*/s/ James W. Stoll*
James W. Stoll