**Acta No. 261**
**Reunión Ordinaria de Junta Directiva**
**CREDIVALORES – CREDISERVICIOS S.A.**

Siendo las dos de la tarde (02:00 P.M.) del día 28 de febrero de 2024, se reunió, en sesión ordinaria, la Junta Directiva de la sociedad CREDIVALORES – CREDISERVICIOS S.A. (la "Sociedad) de manera virtual (teleconferencia) a través del aplicativo TEAMS de Microsoft, en la ciudad de Bogotá D.C., previa convocatoria hecha por el Representante Legal de la Sociedad, mediante comunicación escrita enviada a los miembros principales de la Junta Directiva el 15 de febrero de 2024.

Se encontraban presentes los siguientes miembros de la Junta Directiva:

1. José Miguel Knoell Ferrada
2. David Seinjet Neirus
3. Gustavo Adrián Ferraro
4. Luis María Blaquier
5. Juan Manuel Trujillo Sánchez
6. Carlos Eduardo Meza
7. Martín Kontarovsky

## I. CONSTANCIAS INICIALES

a. Se encuentran participando, a través de teleconferencia siete (7) de los siete (7) miembros de la Junta Directiva, (los "Directores"), de acuerdo y en cumplimiento de lo dispuesto en el Artículo 34 y 35 de los estatutos de la Sociedad (los "Estatutos"), conformando así, quórum suficiente para deliberar y decidir válidamente los puntos a tratar.

b. Asistieron como invitados Ricardo Valdes Rueda el en calidad de asesor financiero de la compañía, Hector Augusto Chaves en calidad de asesor financiero de la compañía, la doctora Catalina Kempowsky en calidad de asesora, el doctor Edgar Muñoz en calidad de asesor legal de la compañía, el doctor Javier Ledesma en representación del accionista Lacrot Inversiones 2014 S.L.U., la doctora Maite De Alba De Gandiaga en representación del accionista Davalia Gestion de Activos S.L. Juan Carlos Estupiñan en calidad de director de planeación financiera de la compañía, Jaime Francisco Buritica Leal en su calidad de representante legal principal y la Doctora Liliana Arango Salazar en su calidad de representante legal suplente y secretaria general.

c. Asistió Alberto Hernandez en calidad de apoderado del doctor José Miguel Knoell, cuyo poder fue debidamente allegado a la secretaria de la compañía previo a la reunión.

Se puso a consideración el siguiente orden del día, el cual fue aprobado por unanimidad de los miembros de la Junta Directiva presentes en la reunión:

## ORDEN DEL DÍA*

1. Verificación del quórum.
2. Elección del Presidente y Secretario de la Reunión
3. Introducción a la Junta Directiva
4. Presentación de la Nueva Junta Directiva
5. Nombramiento de Presidente de la Junta Directiva.
6. Elección del Comité De Auditoria, así como su Presidente y Secretario
7. Presentación y Elección del Oficial de Cumplimiento Principal del SAGRILAFT y del PTEE
8. Cierre de agencias – Establecimientos De Comercio.
9. Presentación y Aprobación Estados Financieros Correspondientes al Cierre De Ejercicio a 31 de Diciembre de 2023 para Presentación a la Asamblea de Accionistas. (Autorizar al RL para aprobación de cambios no relevantes).
10. Proyecciones
11. Autorizaciones y Ratificaciones al Representante Legal
    - Ratificaciones Compraventa de Cartera con UBS
    - Ratificaciones Compraventa de Cartera con B100

- Antecedentes Contratos de Garantía /Ratificaciones
- Autorización Firma Contrato de *Fiducia de Remanentes*, así como sus Modificaciones
- Autorización Cartera para Entregar en Garantía.
- Autorizaciones y Ratificaciones *Forbearance Agreement* así como sus Modificaciones Y Anexos

12. Proposiciones y Varios.
13. Designación comité redactor y aprobador del acta

*El orden del día fue enviado con la convocatoria del 15 de febrero de 2024, no obstante, sufrió cambios en la presente reunión los cuales fueron aceptados unánimemente por los miembros de junta presentes.

En seguida, se dio inicio a la reunión y se desarrolló el orden del día de la siguiente manera:

**1. VERIFICACIÓN DEL QUÓRUM**

Procedió la doctora Liliana Arango a verificar el quorum e informó que se hallaban presentes siete (7) de los siete (7) miembros de la Junta Directiva, habiendo por lo tanto quórum necesario para deliberar y decidir válidamente, conforme a los Estatutos de la Sociedad.

De la conformación del quorum, la doctora Arango destacó que había asistido Alberto Hernandez en calidad de apoderado del doctor José Miguel Knoell, cuyo poder fue debidamente allegado a la secretaria de la compañía previo a la reunión.

**2. NOMBRAMIENTO DE PRESIDENTE Y SECRETARIO DE LA REUNIÓN**

La doctora Arango procedió a indicar que ella funge como secretaria general de la junta directiva, y preguntó a los directores si deseaban que ella continuara en esta calidad en la reunión. Por unanimidad, esto es con el voto favorable de la totalidad de los Directores presentes en la reunión, se eligió como como Secretaria a Liliana Arango Salazar quien estando presente aceptó dicha dignidad.

Procedió proponiendo a el doctor Luis Maria Blaquier, para el cargo de presidente de esta reunión, para lo cual, por unanimidad, esto es con el voto favorable de la totalidad de los Directores presentes en la reunión, eligieron al doctor Blaquier quien estando presente aceptó dicha designación.

**3. INTRODUCCIÓN A LA JUNTA DIRECTIVA**

La secretaria de la reunión procedió sobre este punto indicando la importancia que tenía la junta directiva para la compañía, y cuáles eran las reglas que se iban a establecer de manera general para el buen y normal desarrollo de estas reuniones.

Señaló entonces estas reglas, y las explicó, que fueron las siguientes:

a. Se tomará asistencia todas las reuniones, para efectos de calcular el quorum deliberativo, y determinar si puede o no haber reunión el cual será de 5 de los 7 miembros. En cualquier momento de la reunión, se verificará el quorum para efectos de la continuación de la reunión, y que exista quorum decisorio, el cual es de mayoría simple.

b. En caso de no poder asistir, se recomienda dar aviso con al menos 1 día hábil de anticipación a la reunión. Se puede asistir mediante apoderado, debidamente documentado. El poder debe ser remitido al menos con 1 día hábil de anterioridad a la reunión. La compañía suministrará un modelo de poder en caso de que sea solicitado.

c. Pueden asistir invitados cuando los miembros de junta directiva estén de acuerdo y tienen la posibilidad de participar a través del uso de la palabra para expresar opiniones o conceptos, pero no tendrían derecho a votar.

d. Los asistentes por parte de la Gerencia General estarán para apoyar las presentaciones de información a la Junta Directiva, y los miembros podrán solicitarlas dirigiéndose a la

secretaria general de la compañía vía correo electrónico.

Ante lo anterior, la Junta Directiva por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, estuvieron de acuerdo con estas reglas y aprobaron este punto.

## 4. PRESENTACIÓN DE LA NUEVA JUNTA DIRECTIVA

Seguidamente la secretaria de la reunión procedió a hacer una breve presentación de la junta directiva, indicando las principales funciones que existían dentro de este órgano, así como los miembros que estaban actualmente elegidos.

Dentro de las funciones resaltó:

- Establecer políticas generales de la compañía. (Procesos, reglamentos etc)
- Convocar a la asamblea de accionistas a sesiones extraordinarias.
- Presentar a la asamblea de accionistas en reunión ordinaria informe de situación económica y financiera de la sociedad, innovaciones convenientes, proyecto de distribución de utilidades o sobre cancelación de pérdidas y formación de reservas ocasionales. El informe debe cumplir lo que dice el numeral 3 del art 446 del C.Co.
- Decretar establecimiento de sucursales y agencias.
- Cuidar estricto cumplimiento de disposiciones estatutarias, y ejecutar los decretos de la asamblea y la junta.
- Nombrar al Gerente de la Sociedad y fijar su remuneración
- Autorizar al Gerente para que a nombre de la Sociedad ejecute o celebre actos o contratos cuya cuantía sea superior a 4.000 SMLVM
- Proponer candidatos para Revisor Fiscal
- Proponer a la Asamblea General de Accionistas el monto del dividendo, así como la forma y plazo en que se pagará en concordancia con las normas legales y estatutarias.
- Dirigir la marcha y la orientación general de los negocios sociales en interés de los mismos y ejercer las demás funciones que le señalen la ley y estos estatutos.
- Expedir los reglamentos de emisión y colocación de acciones distintas a las acciones privilegiadas
- Nombrar a los ejecutivos de cargos directivos de la Sociedad
- Ejercer las demás atribuciones que le encomiendan estos estatutos o que por naturaleza le corresponden.
- Nombrar al comité de auditoria

Y dentro de los miembros que actualmente conformaban la junta directiva indicó quienes la conformaban actualmente:

| Renglón | Miembro principal | Calidad | Representa A: |
|---|---|---|---|
| 1 | Jose Miguel Knoell Ferrada | Patrimonial | Acon Colombia Consumer Finance Holdings, S.L. y Acon Consumer Finance Holdings II, S.L. |
| 2 | David Seinjet Neirus | Patrimonial | Crediholding S.A.S. |
| 3 | Gustavo Adrián Ferraro | Patrimonial | Lacrot Inversiones 2014, S.L.U. |
| 4 | Luis María Blaquier | Patrimonial | Davalia Gestión de Activos S.L. |
| 5 | Juan Manuel Trujillo Sánchez | Independiente | Independiente |
| 6 | Carlos Eduardo Meza | Independiente | Independiente |
| 7 | Martin Kontarovsky | Independiente | Independiente |

Oído lo expuesto, la Junta Directiva por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, aprueba este punto sobre la presentación de la junta directiva.

## 5. NOMBRAMIENTO DE PRESIDENTE DE LA JUNTA DIRECTIVA

A continuación, la secretaria de la reunión procedió a exponer este punto.

Sobre este particular hizo hincapié en que estatuariamente, se tiene que el presidente de la junta directiva es la persona que ocupa el cargo del gerente general, sin embargo, existe una prohibición expresa en la ley 964 de 2005, que es la ley del mercado de valores, que indica que cuando una empresa tenga la calidad de emisor, su representante legal no puede fungir como presidente de la junta directiva, por lo tanto, Jaime no podría ejercer esta función.

Por lo anterior, la secretaria de la reunión propuso a los miembros presentes la posibilidad de nombrar a una persona que pudiera ocupar este cargo o que en cada reunión se nombre a un presidente.

[illegible]

[illegible]

Sobre este particular hizo hincapié en que estatuariamente, se tiene que el presidente de la junta directiva es la persona que ocupa el cargo del gerente general, sin embargo, existe una prohibición expresa en la ley 964 de 2005, que es la ley del mercado de valores, que indica que cuando una empresa tenga la calidad de emisor, su representante legal no puede fungir como presidente de la junta directiva, por lo tanto, Jaime no podría ejercer esta función.

Por lo anterior, la secretaria de la reunión propuso a los miembros presentes la posibilidad de nombrar a una persona que pudiera ocupar este cargo o que en cada reunión se nombre a un presidente.

Ante lo anterior, el doctor Gustavo Ferraro preguntó cuáles eran los roles que tenía que desempeñar un presidente, a lo cual la secretaria le respondió cuales eran los roles, entre los cuales estaba la dirección de la respectiva reunión, remisión de información, la convocatoria etc.

El doctor Luis Blaquier propuso que, como no siempre estaban presentes todos los miembros, lo mejor era que se definiera independientemente en cada reunión de junta directiva quien era el presidente para cada reunión y que podían ir rotando esta posición.

Ante la anterior propuesta todos los miembros presentes, de manera unánime, es decir el 100% de ellos, decidieron aceptarla y determinar que en cada reunión se nombre a una persona y no dejar uno fijo.

Este punto, de la manera expuesta, lo aprobó la Junta Directiva por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión.

6. **ELECCIÓN DEL COMITÉ DE AUDITORÍA, ASÍ COMO SU PRESIDENTE Y SECRETARIO**

La secretaria de la reunión prosiguió con este punto, aclarando que, es un requisito que tenemos en virtud la ley 964 de 2005 como emisores de valores y adicionalmente en los estatutos, en el artículo 49 se estableció que tendríamos un comité de auditoria. Resaltó que, según la ley, el comité de auditoria debe estar conformado por todos los miembros independientes de la junta directiva.

Anotó también que como se hizo una nueva composición de junta directiva se debe realizar la elección nuevamente de estos miembros.

Prosiguió diciendo que era necesario, a raíz de la entrada de Martin Kontarovsky como miembro de Junta Directiva, que el también fuera nombrado, para lo cual propuso la siguiente plancha o composición.:

| COMPOSICIÓN COMITÉ DE AUDITORIA | | |
|---|---|---|
| **Renglón** | **Miembro principal** | **CALIDAD** |
| 1 | Martín Kontarovsky | Independiente |
| 2 | Juan Manuel Trujillo Sánchez | Independiente |
| 3 | Carlos Eduardo Meza | Independiente |

La secretaria de la reunión procedió a preguntar a los miembros que, si estaban de acuerdo con esta composición, podían ratificar las calidades de presidente y secretario que ostentaban Juan Manuel Trujillo y Carlos Meza respectivamente, o si querían podían hacer una nueva elección.

Todos los miembros de manera unánime, es decir con el voto positivo de los miembros presentes, aceptaron esta composición de comité de auditoría incluida la ratificación los cargos de presidente y secretario del comité.

7. **PRESENTACIÓN Y ELECCIÓN DEL OFICIAL DE CUMPLIMIENTO PRINCIPAL DEL SAGRILAFT Y DEL PTEE**

La secretaria de la reunión pone a consideración de los miembros de la Junta Directiva la necesidad inminente de contar con un Oficial de Cumplimiento Principal y de nombrar, igualmente, un Oficial de Cumplimiento para efectos del Programa De Transparencia Y Ética Empresarial (PTEE), pues de

acuerdo con lo establecido en la Circular Externa No.100-000016 del 24 de diciembre de 2020 y Circular Externa número 100-000011 del 9 de agosto de 2021 expedida por la Superintendencia de Sociedades, se hace obligatorio. Recordó también a los miembros presentes que tenemos esta posición vacante ya que la antigua oficial, Yael Cristina Velázquez había renunciado en fechas pasadas.

Resaltó que la persona que se había contratado para estos temas era Julieth Stefanny Cadena Palencia identificada con Cedula de Ciudadanía No. 1.012.393.022, y que tenia amplia experiencia para poder ocupar el cargo oficialmente. También indicó que todos los informes relacionados con estas temáticas, directamente o a través del representante legal, iban a ser compartidos a la junta directiva, así como sus funciones directas ante la Superintendencia de Sociedades.

Para esto, el presidente de la reunión solicita:

- Ante Circular Externa No.100-000016 del 24 de diciembre de 2020, se hace obligatorio la designación de un Oficial de Cumplimiento Principal para todos los temas relacionados con el SAGRILAFT, para lo cual se propone la designación como como Oficial De Cumplimiento del programa para temas de SAGRILAFT de Credivalores a la señora Julieth Stefanny Cadena Palencia identificada con Cedula de Ciudadanía No. 1.012.393.022.

  Los miembros de la Junta Directiva, una vez verificada la hoja de vida e idoneidad para ocupar este cargo, decidieron por unanimidad aceptar su nombramiento en calidad de Oficial de Cumplimiento de temas de SAGRILAFT a Julieth Stefanny Cadena Palencia.

- Ante Circular Externa número 100-000011 del 9 de agosto de 2021, se hace obligatorio la designación de un Oficial de Cumplimiento del PTEE, para lo cual se propone la designación como como Oficial De Cumplimiento del programa del PTEE de Credivalores a la señora Julieth Stefanny Cadena Palencia identificada con Cedula de Ciudadanía No. 1.012.393.022. Se aclara a los miembros de la Junta Directiva, que el cargo de oficial de cumplimiento de SAGRILAFT y de PTEE son compatibles, por lo cual la misma persona puede ocupar los dos cargos en una misma empresa.

  Los miembros de la Junta Directiva, una vez verificada la hoja de vida e idoneidad para ocupar este cargo, decidieron por unanimidad aceptar su nombramiento en calidad de Oficial de Cumplimiento del PTEE a Julieth Stefanny Cadena Palencia.

El anterior punto sobre designación del oficial de cumplimiento para el SAGRILAFT y el PTEE, fue aprobado de manera unánime por todos los miembros de la Junta Directiva, es decir por el 100% de los directores presentes en la reunión.

## 8. CIERRE DE AGENCIAS – ESTABLECIMIENTOS DE COMERCIO

La secretaria dio continuidad al orden del día sobre la necesidad de darle cierre a ciertas agencias que tiene la compañía.

La secretaria dio continuidad al orden del día, para lo cual recordó a los miembros de la junta directiva que en la junta pasada se había comentado que había una estrategia de cierre de oficinas dado el fortalecimiento de los procesos digitales de la compañía, y que estos procesos de cerramiento necesitan un trámite formal ante la cámara de comercio, mediante orden dada por los miembros de la junta directiva.

Continuó diciendo que se tienen 2 cierres de agencias/establecimientos de comercio que deben quedar formalizados y aprobados en la junta directiva

- **CANCELACIÓN DE AGENCIAS/ESTABLECIMIENTOS DE COMERCIO**

La secretaria de la reunión expone que las siguientes son las oficinas, agencias y/o establecimientos de comercio que necesitan aprobación consistente en decretar el cierre y cancelación por parte de los miembros de la junta directiva:

| DEPARTAMENTO | MUNICIPIO | NOMBRE ESTABLECIMIENTO | MATRICULA | DIRECCIÓN |
|---|---|---|---|---|
| HUILA | NEIVA | CREDIVALORES AGENCIA NEIVA | 198845 | Calle 21 N° 13 - 43 Local 1 |
| RISARALDA | PEREIRA | CREDIVALORES CREDISERVICIOS PEREIRA EXITO VICTORIA | 18180772 | Cra. 10 #14-71 |

La secretaria de la reunión procedió a preguntar si alguno de los miembros tenía algún comentario o pregunta que hacer, a lo cual el doctor Seinjet, se pronunció sobre el tema de la atención a los clientes de estas regiones. Ante esto Jaime respondió que se están trabajando en estrategias de coworking y otros canales de atención. El doctor Seinjet sugirió que por favor se les dejara muy claro a los clientes la información de los cierres de estas oficinas y los canales de atención.

Oído lo expuesto, la Junta Directiva por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, aprueba el cierre y/o cancelación de las mencionadas agencias/establecimientos de comercio. En consecuencia, se encarga al representante legal para adelantar las labores de registro del cierre o la orden de no apertura de la agencia si es del caso.

**9. PRESENTACIÓN Y APROBACIÓN ESTADOS FINANCIEROS CORRESPONDIENTES AL CIERRE DE EJERCICIO A 31 DE DICIEMBRE DE 2023 PARA PRESENTACIÓN A LA ASAMBLEA DE ACCIONISTAS. (AUTORIZAR AL RL PARA APROBACIÓN DE CAMBIOS NO RELEVANTES).**

Continuando con el orden del día, sobre este punto, la secretaria cedió la palabra a Juan Carlos Estupiñan para que explicara este punto.

Juan Carlos procedió explicando el siguiente cuadro:

COPS MM

| BALANCE GENERAL | dic-22 | dic-23 | Δ % | Δ $ |
|---|---|---|---|---|
| **ACTIVOS** | | | | |
| Efectivo y equivalentes al efectivo | 273.052 | 59.794 | (78,1%) | - 213.258 |
| Total de activos financieros a valor razonable | 104.940 | 19.440 | (81,5%) | - 85.499 |
| Créditos de consumo | 2.005.440 | 1.858.276 | (7,3%) | - 147.164 |
| Deterioro | -372.608 | -455.798 | 22,3% | - 83.190 |
| **Cartera total de préstamos, neto** | 1.632.831 | 1.402.478 | (14,1%) | -230.354 |
| Cuentas por cobrar, neto | 320.129 | 257.284 | (19,6%) | - 62.845 |
| **Total Activos financieros a costo amortizado** | 1.952.961 | 1.659.762 | (15,0%) | -293.199 |
| Inversiones en asociados y afiliados | 14.945 | 11.895 | (20,4%) | - 3.050 |
| Activos fiscales corrientes | 32.012 | 41.476 | 29,6% | 9.463 |
| Activos por impuestos diferidos netos | 157.736 | 128.756 | (18,4%) | - 28.979 |
| Propiedad y equipo Total | 2.194 | 9.590 | 337,1% | 7.396 |
| Activos intangibles distintos de plusvalía, netos | 39.852 | 12.841 | (67,8%) | - 27.011 |
| **Total Activo** | 2.577.692 | 1.943.554 | (24,6%) | -634.138 |
| | | | | |
| **PASIVOS Y PATRIMONIO** | | | | |
| **Pasivos** | | | | |
| **Total de pasivos financieros a costo amortizado** | 2.536.407 | 1.547.566 | (39,0%) | -988.840 |
| Provisiones por beneficios a los empleados | 1.053 | 1.054 | 0,0% | 0 |
| Otras provisiones | 3.028 | 2.932 | (3,2%) | - 96 |
| Cuentas por pagar | 51.892 | 91.120 | 75,6% | 39.229 |
| Pasivos por impuestos corrientes | 1.698 | 1.616 | (4,8%) | - 82 |
| Otros pasivos | 40.057 | 25.560 | (36,2%) | - 14.497 |
| **Total de los Pasivos** | 2.634.134 | 1.669.848 | (36,6%) | -964.287 |
| | | | | |
| **Patrimonio** | | | | |
| **Total de Patrimonio** | -56.443 | 273.706 | -584,9% | 330.149 |
| **Total de Pasivos y Patrimonio** | 2.577.691 | 1.943.554 | (24,6%) | -634.137 |

Sobre el anterior cuadro del balance general se pronunció con los siguientes comentarios:

**Activo:**

- Durante 2023 se ha venido presentando una disminución en Efectivo y equivalentes (COP $213.258 MM) debido a los pagos que se vienen presentando a las diferentes obligaciones vigentes de la compañía
- De igual manera, la cartera ha presentado una disminución del 7.3% (COP $147.164 MM), efecto de la reducción de la colocación de nuevos créditos, las ventas de cartera que la compañía ha realizado en lo corrido del año y la amortización natural del portafolio

**Pasivo:**

En cuanto al pasivo, se ha registrado una reducción de COP $964.287 MM debido a una diferencia en cambio por valor de COP $204.808 MM y al pago de obligaciones financieras en especial la recompra del bono efectuada durante el primer semestre del año por valor de COP $267.067 MM y los pagos a capital realizados a estructuras entre las cuales se destacan:

- **PA UBS:** por USD $63,3 / MM COP $241.977 MM
- **PA Sindicado:** por USD $22,8 MM / COP $87.278 MM
- **PA Citibank:** por USD $15,4 MM / COP $58.692 MM
- **Notas ECP Program:** por USD $7,5 MM / COP $28.649 MM

**Patrimonio:**

El Patrimonio creció en COP $330.149 MM debido a la capitalización recibida durante el primer semestre del año y a su vez, por los resultados positivos que ha registrado la compañía durante el periodo reportado

Seguidamente Juan Carlos explicó el siguiente cuadro de estado de resultados:

COP$ MM

| ESTADO DE RESULTADOS | dic-22 | dic-23 | Δ % | Δ $ |
|---|---|---|---|---|
| Ingresos de actividades ordinarias | 399.895 | 337.935 | (15,5%) | (61.960) |
| Costos financieros intereses | (613.025) | (99.188) | (83,8%) | 513.837 |
| Intereses | (270.634) | (251.027) | (7,2%) | 19.607 |
| Derivados | (310.516) | 204.808 | -166,0% | 515.324 |
| CT Pasivos | (31.875) | (52.969) | 66,2% | (21.094) |
| Intereses netos | (213.130) | 238.747 | -212,0% | 451.877 |
| Gastos por provisiones Totales | (95.036) | (135.912) | 43,0% | (40.876) |
| Ganancia (pérdida) por actividades de operación | (308.166) | 102.835 | -133,4% | 411.001 |
| Gastos de Empleados, Administrativos y Operativos | | | | |
| Gastos por beneficios a los empleados | (14.358) | (12.922) | (10,0%) | 1.436 |
| Gasto por depreciación y amortización | (6.222) | (6.916) | 11,2% | (694) |
| Gasto por depreciación de activos de derecho de uso | (2.056) | (2.239) | 8,9% | (183) |
| Gastos Administrativos y Operativos | (88.881) | (80.002) | (10,0%) | 8.879 |
| Total Otros Gastos | (111.516) | (102.079) | (8,5%) | 9.438 |
| (Pérdida) utilidad neta operacional | (419.683) | 756 | -100,2% | 420.439 |
| Rendimientos Financieros | | | | |
| Otros ingresos | 2.122 | 1.421 | (33,1%) | (702) |
| Rendimientos financieros | 7.565 | 6.985 | (7,7%) | (580) |
| Total Rendimientos Financieros | 9.688 | 8.406 | (13,2%) | (1.282) |
| (Costos) Financieros | (9) | (3) | (66,1%) | 6 |
| Rendimientos financieros netos | 9.678 | 8.403 | (13,2%) | (1.276) |
| Ganancia, antes de impuestos | (410.004) | 9.159 | -102,2% | 419.163 |
| Gasto por impuestos | 107.545 | (2.300) | -102,1% | (109.845) |
| Utilidad neta | (302.459) | 6.859 | -102,3% | 309.318 |

Sobre esto hizo los siguientes comentarios importantes:

**Utilidad del Ejercicio:**

La compañía muestra un resultado positivo al corte de diciembre de 2023 por valor de **COP $6.859 MM**, recuperándose de la perdida que venia presentando en el mismo periodo de 2022. Este resultado ha sido generado por:

- **Intereses Netos:**

Hay un crecimiento por valor de **COP $451.877 MM**, como resultado de la disminución del pasivo con costo y a su vez, por la estrategia cambiaria adoptada por la compañía en su pasivo

- **Provisiones:**

La compañía presenta un crecimiento en sus provisiones por **COP $40.876 MM**, como resultado principalmente del deterioro de la cartera de tarjeta de crédito dados los efectos de mercado presentados por la coyuntura económica y la estrategia de condonaciones

- **Total Costos y Gastos:**

Se observa que la compañía viene realizando una política de control de costos y gastos, generando una reducción por valor de **COP $9.438 MM** (-8.5%). Las optimizaciones realizadas, de dan como resultado del cierre de oficinas, reducción de personal por el cierre de la colocación y la disminución de costos en varias áreas de la compañía por el cierre del producto tarjeta de crédito.

Explicado lo anterior, Juan Carlos le cedió la palabra a la doctora Catalina Kempowsky para que ella explicara lo relacionado con el comportamiento de la cartera de libranza. Para esto Catalina explicó los siguientes diagramas:









Se indica por parte de ella en cuanto a las cosechas, que estas se encuentran dentro de la tendencia en cuanto a las originadas en 2022, y recuerda que en 2021 se dispararon por fraudes en el ejército, pero el resto se encuentran dentro de lo esperado en cuanto a comportamiento de perdida.

Explicó a continuación lo relacionado con la cartera de tarjeta de crédito mediante los siguientes diagramas:










Después de la explicación dada, sobre estos esquemas, Catalina le cede la palabra a la secretaria.

A esta altura la secretaria le pregunta a los miembros de la junta directiva si estaban de acuerdo con las explicaciones dadas, no obstante quiso hacerles saber, y si así estaban de acuerdo con que, al ser estos unos estados financieros preliminares, y como la revisoría no ha cerrado su ejercicio, consideramos que en caso de haber algún ajuste, debe ser mínimo o no de impacto, por eso se le solicita a los miembros autorizar a la administración para aprobar estos ajustes para que no tengamos que realizar una próxima sesión para poder llevar a la asamblea de accionistas.

Oído lo expuesto, la Junta Directiva por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, aprueba los Estados Financieros Correspondientes Al Cierre De Ejercicio A 31 De Diciembre De 2023 Para Presentación A La Asamblea De Accionistas, junto con la solicitud hecha por la secretaria de la reunión respecto de los probables cambios mínimos a estos.

**10. PROYECCIONES**

Seguidamente sobre este punto, la secretaria le cede nuevamente la palabra a Juan Carlos para exponerlo.

Juan Carlos empieza su exposición diciendo que se tenían a continuación las condiciones en cuanto a las condiciones financieras en cuanto a los pasivos de la compañía:

| | |
|---|---|
| 1. Desembolsos | Se espera reactivar las colocaciones de Libranza desde 2024 alcanzando los COP$ 400.000 MM, con incrementos en las colocaciones anuales a razón de 30% en 2025; 20% en 2026, 18% en 2027, 15% en 2028 y 12% en 2029 |
| 2. PA Sindicado | Se espera unificar todas las obligaciones de esta facilidad en una sola obligacion a un plazo de 59 meses y que la cartera sea la fuente de pago de esta obligación |
| 3. PA Citibank | Se estima venta de la cartera de Citibank en mar/24 con lo que se espera liberar un colateral por valor de US$8,4 MM |
| 4. PA UBS | Se estima continuar amortizando la deuda con el recaudo de su cartera |
| 5. [illegible] | Se cancela en fecha contractual (ago/24) y no se asume reemplazo de esta facilidad |
| 6. Bono | Se estima realizar una quita del 25%, pago bullet de capital en feb/29. Tasa step-up: primer semestre del 4%, los tres siguientes semestres del 5% y en adelante tasa del 11% |
| 7. Crédito con accionistas | Se estima realizar amortización de la siguiente manera: USD$8,4 MM en mar/24 y pagos mensuales incrementales desde abr/24 (USD$0,10 MM) hasta feb/25 (US$1,06 MM) e iguales en adelante hasta dic/26 |
| 8. [illegible] | Se realizó el reperfilamiento de la deuda |
| 9. [illegible] | Se estima continuar amortizando la deuda con el recaudo de su cartera |
| 10. Notas | Se realizó la unificación de las dos notas vigentes con amortización a 5 años con los primeros 2 años de gracia y pagos anuales del 25% del saldo (US$8,11 MM) a partir de dic/25, con pagos de intereses trimestrales desde mar/24 del cupón del 13% |

Sobre el punto del PA Citi Bank, el doctor Hector Chávez, quiso hacer una acotación indicando que el colateral está en Ban100, y que Credivalores compraría la cartera al CITI y que el banco, posteriormente compraría con una prima, que es lo que liberaría finalmente recursos de caja en Credivalores, y que no es que el propio colateral vaya a dar liberación de caja.

Ante esta acotación, Gustavo preguntó para entender que si de esa liberación del colateral, cual sería la diferencia en valor entre la compra y la colocación, a lo cual Hector le responde que serían precisamente esos US $8.4 MM, donde el valor de la cartera es de 144 mil millones de pesos, de los cuales existen en colaterales 33 mil millones. Ese colateral ya está comprometido para vendérselo al banco. Entonces cuando el banco compre la cartera, recibiría el colateral, pero sobre el remanente que queda de la cartera de esos 144 menos el colateral que son los 27 en el caso del banco, el Banco pagará una prima que valdría a estos US $8.4 MM. Ante esto anotó que era necesario que en esta junta quedara aprobada esta operación de la forma explicada.

El doctor Luis Blaquier quiso preguntar sobre los avances que se han tenido en el tema de **Nomura y Alianza,** para lo cual Jaime le respondió que Nomura es el fondeo mas importante y se ha venido

trabajando con Patricia Mora y se han agotado un par de etapas, una etapa previa en la cual ella estaba mirando el comportamiento de la cartera que hoy tiene Credivalores y que ha tenido en la historia, que es la que ella va a comprar. Nos pidió una información alrededor de cómo se comporta esa cartera, nos pidió también una información general de Credivalores, y ya nos puso sobre la mesa una línea de tiempo para cerrar el contrato, entonces, es decir, ya en este momento Nomura nos oficializó que van a hacer 100 millones de dólares. Ya vamos a entrar en una etapa de *due diligence* que debe tomar alrededor de unas 4 semanas y el resto de procesos documentales, del *term sheet*, de cierre de contratos nos va a tomar entre hoy 8 y 10 semanas, es lo que estamos esperando, sin embargo, la sensación con Nomura, si bien está *on board* con la compañía, y el *deal* va a salir, si se siente que va a unos tiempos más lentos, pues esperaban cómo termina lo de la reestructura que tenemos del bono, porque tan pronto salió el proceso de calificación que nos bajó la calificación Fitch, porque entramos en el proceso del periodo de gracia, nos comunicamos con el equipo de riesgo de ellos y pues están digamos que atentos a que ese proceso sede para seguir avanzando, no quiere decir Luis y el resto de la Junta que Nomura se va a mover, solamente cuando la operación salga, pero si digamos que ha quitaron el pie del acelerador, llamémoslo así están ahí trabajando, pero claramente todo el proceso de cierre final va a implicar una vez tengamos el cierre de la reestructura, del bono, lo propio pasa con Alianza e inclusive esta semana, antier teníamos que pagar el cupón del Fondo Nacional de Garantías y Alianza, pues está dentro de los inversionistas y tuvimos una charla sobre el tema y me manifestó que ellos también están atentos a entrar, pero vuelven y manifiestan lo mismo que una vez el bono haya sido reestructurado ellos e irían a entrar a apoyar la compañía, entonces esos son como los *Update* que tengo de esas dos líneas, una andando bien pero obviamente ambas esperando que termine el proceso del canje del bono.

Javier Ledesma quiso decir que era muy esperado todo el tema del retraso en la salida del *Exgange* iba a generar estas consecuencias, ante esto Jaime aprovechó que Javier traía ese tema a la mesa, pues estos dos últimos días se ha tenido reuniones con la calificadora, se tuvo una reunión muy difícil con nuestro revisor Fiscal Price Waterhouse, hemos tenido también llamadas con los financiadores de los PA's y estas compañías que, tanto Nomura, como inclusive acabo de venir de una reunión con el equipo de Morgan Stanley porque efectivamente cuando les contamos esto hace un par de semanas, inclusive antes, porque antes de hacer pública la noticia que el 7 de febrero pues yo me di a la tarea de contactar a cada uno de estos actores paracontarles el objetivo de la transacción porque claramente es un tema muy positivo para la compañía. Como administración, la forma ha sido enfocado el a la demora por un tema meramente regulatorio, dado que salió una nueva norma, estamos revisando todos los pasos para que esto no nos tome más tiempo en la Corte y esto nos ha tomado un par de semanas más.

Ante lo anterior Javier quiso volver a anotar que los accionistas, deben moverse, pues la actitud está generando un perjuicio a la compañía. Sobre esto Luis Blaquier quiso replicar diciendo que ellos como tal están viendo toda la documentación para estar seguros de las garantías prometidas, ante esto Javier le afirmó que los accionistas son todos y no se han puesto de acuerdo.

Seguidamente retomó la palabra Jaime, y aclaró a los accionistas que el tema del canje no podía pasarse del 7 de marzo. Nomura está esperando que lancemos el canje, ellos ya tienen claro que nosotros tenemos un comité *ad hoc* que ya hemos hecho el negocio y que esto es un tema de trámite y saben que vamos a tener 30 días de canje y alrededor de unos 60 días más para que la Corte nos lo apruebe, ellos no están esperando para comenzar a trabajar con nosotros a partir de mayo, ellos lo que están esperando es que mandemos el canje y nosotros seguimos apoyando para que en mayo tengamos la línea ya lista para hacer el primer desembolso con Nomura y va a empatar con el cierre del canje. Lo que va a pasar es que la facilidad de 100 millones de dólares y vamos a poder construir tramo por tramo, lo que se está pensando es que la estructura que tiene es que se hace una emisión privada y esa emisión privada, nosotros vamos a poder sacar *tranches* de esa emisión de los 100 millones y la idea es que en principio lo que hemos hablado es que sea de a 5 millones de dólares, entonces, cada vez que tengamos cartera de 5 millones de dólares, Nomura, nos va a fondear hasta completar el programa de los 100 millones de dólares, va a depender entonces de nuestra capacidad de colocación.

El doctor Jaime quiso también hacer una acotación respecto al **FNG**, diciendo que si bien el modelo lo que está es asumiendo que nosotros pagamos y que tenemos que salir a buscarlo, en aquí hace un par de semanas ya entablamos conversaciones y negociaciones con el Fondo Nacional de Garantías, la reunión fue con el Presidente y se le explicamos, pues todo el proceso de la compañía, el presidente lleva apenas unos 6 meses en el cargo, pues fue una oportunidad para explicarle bien qué era la compañía a qué nos dedicábamos, en qué estábamos y cuál era el apoyo que estábamos buscando por parte del fondo, le contamos todo el proceso en que estamos de perfilamiento de

renovación, le comentamos el tema del bono y este es un personaje que viene del Ministerio de Hacienda y crédito público de Colombia es un tipo que conoce el mercado de capitales, que conoce este tipo de estructura en el mercado internacional, y cuando le contamos, pues todos los esfuerzos que ha hecho la compañía y manifestó en que efectivamente nos va a apoyar. La forma de apoyo se tiene que mirar desde el punto de vista un poco jurídico porque cuando la compañía lanzó este bono, se lanzó en la época del Covid y quien expidió realmente la garantía no fue el Fondo Nacional de Garantías, sino la estructura jurídica es de un fondo que se creó en el Ministerio de Hacienda, entonces él me dijo toda esa normatividad quedo allá, pero eso ya quedó quieto, allá ya no hay nadie, eso no hay nadie movilizando el tema, entonces él puede apoyarnos en que la garantía se pueda mover 2, 3 o 5 años pero hay que mirar si se puede mover sobre esa norma o sobre el FNG, lo cual van a analizar y hablo de que una vez cerremos la etapa de esta de este bono también mirar otras posibilidades para trabajar de forma conjunta y tener financiación con la banca, pues el manifestó la posibilidad de que otros bancos nos pudieran fondear a través de un esquema en el cual el garantice el 70% de las emisiones o de los créditos que tengamos.

Ante estas explicaciones Luis Blaquier preguntó si no quedaba algún cupón por pagar antes del vencimiento del FNG, ante esto Jaime respondió que manifestaron en la reunión que para apoyarnos teníamos que cumplir dos requisitos,uno que no podíamos estar en default porque esto ya se le salía de las manos a ellos, pero el lunes se pagó el cupón sin problema y dos, estaban solicitando una información de la compañía. También solicitaron estar haciendo mesas de trabajo semanales para una definición rápida de que se va a hacer con ellos.

Seguidamente, Jaime cedió la palabra a Hector, para que pudiera explicar un tema relacionado con la **estrategia de cobranzas.**

Tomó la palabra, y dijo que se ha venido trabajando diferentes frentes para la cobranza de UBS, con un grupo en Credivalores que no se distraiga con otros temas de gestión de riesgos porque finalmente la gran problemática de Cobranzas la tenemos en el portafolio de tarjeta de crédito. También habíamos informado en tiempos que estábamos pensando colocar una especie de recuperadora la el equipo de Cobranzas, y el 21 de febrero se hizo un piloto, continuó Catalina, y obtuvimos unos contactos con clientes que no estaban contactados y unos porcentajes de negociación más altos que los que traíamos, pues con los call center y con las casas de cobro, estamos esperando a ver qué tanto de esas negociaciones se materializan, inicialmente empezaron a trabajar 350 clientes, de los cuales al lunes de esta semana ya teníamos casi 120 negociaciones donde el 30% de esos 120 clientes eran clientes no contactados en el pasado y 70% eran clientes que en algún momento se habían contactado, pero que no habíamos logrado llegar a una negociación. Entonces se está viendo que por ahí podemos incrementar el recaudo haciéndole push con una negociación mucho más puntual hacia el cliente, menos masiva y también menos de cobranza y más de negociación, realmente ahí, por ejemplo, una llamada con cada cliente se está demorando, en promedio 25 minutos porque es una niña que es muy buena negociando y se pone más como en el papel del cliente para entenderle, que lo que le pasa, entonces le escucha todos los dolores, digamos que eso es muy importante para este perfil de cliente entonces, estamos viendo qué tanto realmente se termina materializar para poder inyectarle recursos adicionales a esta estrategia y ver cómo aceleramos por ahí, también un poco un poco el recado, ahí también. Retomó la palabra Hector diciendo que los comerciales se están presentando como Asficredito (la empresa que nos presta servicios comerciales) y no como Credivalores, para tener una mejor receptividad. otro punto es que estamos viendo y que estamos testeando con estos clientes es el nivel de condonación al que nos están pidiendo los clientes llegar para también evaluar qué tanto estamos amparados con las provisiones que tenemos ahora, qué tantas excepciones nos toca hacer porque realmente nos llegan clientes que nos proponen pagos que están fuera de nuestros parámetros de condonación y en algunos casos nos toca dejarlos ir, entonces estamos revisando puntualmente cada uno de los casos para pues poder traer la mayor cantidad, maximizar el recaudo de sus clientes, pero en algunos casos, sí nos toca hacer excepciones de condonaciones un poquitico más altas de lo que tenemos ha aprobado para no dejarlos ir, entonces ahí es como un ir y venir. Esta estrategia también fue desplegada a las casas de cobranza a finales de febrero que todos los casos de clientes que nos estuvieran proponiendo pagos diferentes al mínimo que nosotros les mandamos como en la planilla que nos los pasarán a nosotros para poder evaluarlos y no dejar ir al cliente o sea una vez cliente ha contactado, lo que se busca es cerrar negociación y pagos.

Después de las anteriores explicaciones, Juan Carlos continuó con su explicación, ahora sobre los siguientes cuadros de proyecciones:

COP$ MM

| ESTADO DE RESULTADOS | 2023 | Py 2024* | Py 2025 | Py 2026 | Py 2027 | Py 2028 | Py 2029 |
|---|---|---|---|---|---|---|---|
| Ingresos por intereses y ventas de cartera | 272.861 | 224.123 | 283.748 | 352.897 | 426.100 | 478.186 | 515.740 |
| Comisiones | 65.074 | 44.279 | 50.268 | 57.056 | 64.286 | 71.086 | 77.261 |
| Costos financieros intereses | (99.188) | (216.240) | (200.226) | (265.820) | (310.321) | (350.601) | (382.296) |
| Intereses | (251.027) | (179.748) | (196.994) | (262.588) | (307.089) | (347.369) | (379.064) |
| Derivados | 204.808 | (33.260) | - | - | - | - | - |
| CT Pasivos | (52.969) | (3.232) | (3.232) | (3.232) | (3.232) | (3.232) | (3.232) |
| **Intereses netos** | **238.747** | **52.161** | **133.790** | **144.133** | **180.065** | **198.672** | **210.706** |
| | | | | | | | |
| Gastos por provisiones Totales | (135.912) | (69.034) | (70.308) | (73.988) | (78.095) | (81.896) | (85.374) |
| **Ganancia (pérdida) por actividades de operación** | **102.835** | **(16.872)** | **63.482** | **70.145** | **191.971** | **116.776** | **125.331** |
| | | | | | | | |
| **Gastos de Empleados, Administrativos y Operativos** | | | | | | | |
| Gastos por beneficios a los empleados | (12.922) | (11.385) | (11.658) | (11.897) | (12.105) | (12.317) | (12.532) |
| Gasto por depreciación y amortización | (6.916) | (6.323) | (6.323) | (6.323) | (5.161) | (1.849) | (2.400) |
| Gasto por depreciación de activos de derecho de uso | (2.239) | (1.512) | (1.512) | (1.512) | (1.512) | (504) | - |
| Gastos Administrativos y Operativos | (80.002) | (72.234) | (70.088) | (79.841) | (89.182) | (97.318) | (104.134) |
| **Total Otros Gastos** | **(102.079)** | **(91.453)** | **(89.581)** | **(99.573)** | **(107.960)** | **(111.987)** | **(119.066)** |
| | | | | | | | |
| **Operational Net Value** | **756** | **(108.325)** | **(26.099)** | **(29.428)** | **(5.989)** | **4.788** | **6.265** |
| | | | | | | | |
| **Rendimientos Financieros** | | | | | | | |
| Otros ingresos | 1.421 | | | | | | |
| Rendimientos financieros | 6.985 | 5.257 | 4.361 | 5.030 | 6.355 | 8.029 | 9.264 |
| **Total Rendimientos Financieros** | **8.406** | **5.257** | **4.361** | **5.030** | **6.355** | **8.029** | **9.264** |
| | | | | | | | |
| (Costos) Financieros | (3) | | | | | | |
| **Rendimientos financieros netos** | **8.403** | **5.257** | **4.361** | **5.030** | **6.355** | **8.029** | **9.264** |
| | | | | | | | |
| **Ganancia, antes de impuestos** | **9.159** | **(103.068)** | **(21.737)** | **(24.398)** | **366** | **12.818** | **15.529** |
| Gasto por impuestos | (2.300) | 35.043 | 7.391 | 8.295 | (125) | (4.358) | (5.280) |
| **Utilidad neta** | **6.859** | **(68.025)** | **(14.346)** | **(16.102)** | **242** | **8.460** | **10.249** |

* Con una quita del 25% que correspondería un ingreso por valor aproximado de COP $217.402 MM, la utilidad neta de 2024 sería de COP $149.377 MM aprox.

Sobre esto, Ricardo Valdes intervino explicando que es importante mencionar, solamente que cómo se va a tener esta quita, entonces esa quita lo que va a ayudar a la compañía es a tener una estrategia de recuperación de flujo de caja y también de estabilización también de estos resultados, porque pues de acuerdo a lo que se ha negociado es que está quitava a ser para el tema de recuperación de cartera puntualmente, Entonces obviamente, estas utilidades también va a ser un resultado en el cual la compañía va a tener que tener de estrategia con el fin de no mostrar esos resultados en rojo, sino poder llegar a un equilibrio y optimizar esos resultados. Sobre esto David Seinjet preguntó cuántos desembolsos se estaban colocando en el 24, a lo que se le respondió que eran 400.000 millones

A continuación, después de unas breves explicaciones del anterior cuadro, se prosiguió a exponer el siguiente cuadro sobre flujo de caja proyectado:

COPS MM

| Directly Cash Flow | dic-24 | dic-25 | dic-26 | dic-27 | dic-28 | dic-29 |
|---|---|---|---|---|---|---|
| **Initial Cash** | **59.794** | **51.821** | **69.953** | **91.443** | **116.503** | **143.459** |
| Income Collection | 158.699 | 227.323 | 302.370 | 373.201 | 439.919 | 483.498 |
| Other Income | 5.257 | 4.361 | 5.030 | 6.355 | 8.029 | 9.264 |
| Interest Payment | -150.638 | -197.926 | -250.560 | -307.053 | -347.233 | -397.524 |
| **Net Margin** | **13.317** | **33.759** | **56.840** | **72.503** | **100.715** | **95.238** |
| **Expenses** | | | | | | |
| Wages and Salaries | -11.385 | -11.658 | -11.897 | -12.105 | -12.317 | -12.532 |
| Administrative Expenses | -72.234 | -70.088 | -79.841 | -89.182 | -97.318 | -104.134 |
| Delayed Payments to Suppliers | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Expenses** | **-83.618** | **-81.746** | **-91.738** | **-101.287** | **-109.635** | **-116.666** |
| **Net Operating Margin** | **-70.301** | **-47.987** | **-34.898** | **-28.784** | **-8.920** | **-21.428** |
| **Financing Movements** | | | | | | |
| Principal Collection | 295.754 | 208.235 | 299.170 | 428.666 | 581.685 | 701.760 |
| Disbursements | -400.000 | -520.000 | -624.000 | -736.320 | -846.768 | -948.380 |
| Principal Payments | -407.106 | -288.116 | -356.731 | -431.822 | -587.560 | -1.319.699 |
| Financing | 400.000 | 520.000 | 624.000 | 736.320 | 846.768 | 948.380 |
| Other Financing | 186.680 | 146.000 | 118.950 | 62.000 | 46.750 | 666.000 |
| Ban100 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investments | 0 | 0 | -5.000 | -5.000 | -5.000 | -5.000 |
| Other Balance Movements | -13.000 | 0 | 0 | 0 | 0 | 0 |
| **Total Financing Movements** | **62.328** | **66.119** | **56.389** | **53.844** | **35.875** | **43.061** |
| **Monthly Movements** | **-7.973** | **18.132** | **21.490** | **25.060** | **26.956** | **21.633** |
| Liberación Caja UBS | 0 | 0 | 0 | 0 | 0 | 0 |
| **Monthly Movements** | **-7.973** | **18.132** | **21.490** | **25.060** | **26.956** | **21.633** |
| **Final Cash** | **51.821** | **69.953** | **91.443** | **116.503** | **143.459** | **165.091** |
| **Restricted Cash** | **51.792** | **69.781** | **91.400** | **116.459** | **143.411** | **157.253** |
| CDT as collateral | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash Collateral on Citi and Sindicated Facilities | 8.812 | 8.812 | 8.812 | 8.812 | 8.812 | 8.812 |
| Montly Collection | 42.980 | 60.969 | 82.588 | 107.647 | 134.599 | 148.441 |

Después de unas explicaciones y preguntas hechas por parte de los miembros de junta y por parte de la administración de la compañía, los miembros decidieron llevar a cabo otra sesión más enfocada y con menos personas para hablar del tema de números, y todos estuvieron de acuerdo.

Ante lo anterior, y especialmente sobre los temas explicados del PA Citibank, de Nomura, del FNG y de la estrategia de cobranzas, la secretaria de la reunión solicitó a los señores miembros de la junta directiva para que aprobaran estas operaciones junto con toda la documentación que se deba suscribir o gestionar.

La doctora Maité quiso adicionar a esta autorización que también se modificara la presentación para que plasmara estas condiciones.

La junta directiva después de la anterior propuesta y las explicaciones tomó nota y emitió la siguiente aprobación sobre lo solicitado, y además da las siguientes ordenes:

1. Se aprueba y se autoriza la solicitud hecha. Los directores presentes de manera unánime, es decir con el voto favorable del 100% de los miembros de junta asistentes a la reunión ordenan a la administración y al representante legal para, pero sin limitarse, negociar, estudiar, firmar toda la documentación, incluyendo garantías, requerida para realizar la operación correspondiente al PA Citibank de la manera expuesta, incluida la modificación a la presentación propuesta por la doctora Maite.

2. Se aprueba y se autoriza la solicitud hecha. Los directores presentes de manera unánime,

es decir con el voto favorable del 100% de los miembros de junta asistentes a la reunión ordenan a la administración y al representante legal para, pero sin limitarse, negociar, estudiar, firmar toda la documentación, incluyendo garantías, requerida para realizar la operación correspondiente a Nomura de la manera expuesta.

3. Se aprueba y se autoriza la solicitud hecha. Los directores presentes de manera unánime, es decir con el voto favorable del 100% de los miembros de junta asistentes a la reunión ordenan a la administración y al representante legal para, pero sin limitarse, negociar, estudiar, firmar toda la documentación, incluyendo garantías, requerida para realizar la operación correspondiente al FNG de la manera expuesta.

4. Se aprueba y se autoriza la solicitud hecha. Los directores presentes de manera unánime, es decir con el voto favorable del 100% de los miembros de junta asistentes a la reunión ordenan a la administración y al representante legal para, pero sin limitarse, negociar, estudiar, firmar toda la documentación, incluyendo garantías, requerida para realizar la operación correspondiente a la estrategia de cobranzas de la manera expuesta.

Después de las anteriores aprobaciones y órdenes a la administración y al representante legal, la junta directiva aprobó este punto sobre proyecciones por unanimidad, incluidos los mandatos, es decir con el voto favorable del 100% de los miembros de junta asistentes a la reunión.

**11. AUTORIZACIONES Y RATIFICACIONES AL REPRESENTANTE LEGAL**

La secretaria de la reunión continuó indicando acerca de este punto, que era necesario hacer unas autorizaciones y ratificaciones al representante legal, unas operaciones de compraventa y aclaró esto hace parte del giro ordinario del negocio, como se ha hecho recurrentemente.

**A) Compraventas de Cartera**

- **Ratificaciones Compraventa de Pagarés con UBS**

Sobre esta compraventa, se aclaró por parte de la secretaria que de acuerdo con la operación aprobada por los acreedores de la estructura UBS y conforme a lo establecido en el contrato de fiducia del P.A CREDIVALORES UBS GRAMERCY-15209 "Venta de Activos Permitida", el día 9 de febrero de 2024 se realizó la siguiente operación

- Compra de Credivalores a UBS de 4.333 pagarés con corte 08 de febrero por valor de $11.592.165.172,80 (contrato de compraventa /endoso pagarés a favor de CV)

- **Ratificaciones Compraventa de Activos con B100**

Sobre esta compraventa la secretaria de la reunión continuó indicando acerca de este punto que se había hecho una venta de estos activos de la siguiente forma:

- Venta de activos a Ban100 por valor de $ 12.023.954.423 contrato de compraventa /endoso pagarés a favor de Ban100). Con la siguiente liquidación de la operación:

| Concepto | Valor |
|---|---|
| Capital | 11.558.109.120 |
| Intereses | 340.045.474 |
| Cargos Fijos | 125.905.145 |
| Saldos a favor de clientes | - 105.316 |
| Total | 12.023.954.423 |
| | |
| % Prima sobre Capital | 25% |
| Valor Prima | 2.889.527.280 |

Oída la anterior propuesta referente a la rarificación y autorización al representante legal para la firma y demás actuaciones sobre las operaciones de compraventa tanto para UBS como para BAN100 y los contratos mediante los cuales se instrumentalizaron dichas compraventas, la junta directiva tomó nota y aprobó por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, la autorización y ratificación de las operaciones hechas por el Representante Legal.

**B) Garantías FI: Antecedentes Contratos de Garantía**

Seguidamente la secretaria de la reunión procedió a explicar sobre unas operaciones/contratos de garantía que se han realizado de cara a las operaciones de crédito con los accionistas y para este punto, se solicitó a nuestro asesor legal, que es la persona que nos ha venido asesorando e instrumentalizando estas operaciones, para que pusiera a los miembros y asistentes en contexto de estos documentos que se firmaron y algunos cuales están pendientes de firma, incluidas algunas modificaciones a algunos que ya estaban firmados.

Procedió el doctor Edgar Muñoz a explicar.

- **Antecedentes Contratos de Garantía /Ratificaciones**

i) **Garantía Mobiliaria sobre derechos fiduciarios de Segundo Grado Citi (Firma del 10-marzo-2023):** Sobre este punto el doctor Muñoz explicó este contrato, del cual se desprendieron las siguientes características y generalidades:

<u>Monto Máximo Cubierto por la Garantía:</u>

✓ USD 65.000.000 (más los intereses y otros cargos aplicables).

<u>Vigencia de la Garantía:</u>

✓ 12 meses, contados a partir de la fecha en que la garantía sea registrada en el Registro de Garantías Mobiliarias.

<u>Bienes dados en Garantía en segundo grado</u>:

✓ Todos los derechos fiduciarios, presentes o futuros, de Credivalores – Crediservicios S.A. que se deriven del contrato de fiducia mercantil de garantía y fuente de pago, celebrado inicialmente el 31 de enero de 2022 entre Fiduciaria Bancolombia S.A. Sociedad Fiduciaria en calidad de fiduciaria, Citibank Colombia S.A., en calidad de acreedor garantizado y and Credivalores - Crediservicios S.A..

ii) **Garantía Mobiliaria sobre derechos fiduciarios de Segundo Grado UBS (Firma del 10-marzo-2023):** Sobre este punto el doctor Muñoz explicó este contrato, del cual se desprendieron las siguientes características y generalidades:

Monto Máximo Cubierto por la Garantía:

- ✓ USD 65.000.000 (más los intereses y otros cargos aplicables).

Vigencia de la Garantía:

- ✓ 12 meses, contados a partir de la fecha en que la garantía sea registrada en el Registro de Garantías Mobiliarias.

Bienes dados en Garantía en segundo grado:

- ✓ Todos los derechos fiduciarios, presentes o futuros, de Credivalores – Crediservicios S.A. que se deriven del contrato de fiducia mercantil de garantía y fuente de pago, celebrado inicialmente el 13 de mayo de 2023 entre Fiduciaria Bancolombia S.A. Sociedad Fiduciaria en calidad de fiduciaria, Fiduciaria Bancolombia S.A. Sociedad Fiduciaria, en calidad de agente de garantías en representación de las partes garantizadas y Credivalores - Crediservicios S.A.

Sobre estos contratos, se solicita la autorización y ratificación de estos contratos/operaciones.

Oida la anterior propuesta referente a la rarificación y autorización al representante legal para la firma y demás actuaciones sobre los contratos/operaciones de garantía, la junta directiva tomó nota y aprobó por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, la autorización y ratificación de las operaciones hechas por el Representante Legal.

- **Autorización Firma Contrato de *Fiducia de Remanentes*, así como sus Modificaciones:** A propósito de este contrato el doctor Muñoz procedió a indicar a los miembros de la junta y asistentes las vicisitudes del contrato, indicando la necesidad de autoriza la firma de este. Las características que explicó fueron las siguientes:

  Monto Máximo Cubierto por la Garantía:

  - ✓ USD 65.000.000 (más los intereses y otros cargos aplicables).

  Vigencia de la Garantía:

  - ✓ 12 meses, contados a partir de la fecha en que la garantía sea registrada en el Registro de Garantías Mobiliarias.

  Bienes dados en Garantía en segundo grado:

  - ✓ Remanentes de las fiducias existentes derivados de los flujos de caja o de efectivo, una vez se hubieren cubierto las acreencias de primer grado, o se hubieren realizado, restituciones de aportes y entregados excedentes de caja, de acuerdo con los términos de dichas Fiducias.
  - ✓ Solo harán parte de este Fideicomiso del Citi los flujos de caja o de efectivo derivados de dicha fiducia que resultaren después de la atención a los beneficiarios de dicho contrato y del cumplimiento de la Compraventa de Derechos Fiduciarios.

Oída la anterior propuesta referente a la autorización al representante legal para la firma y demás actuaciones sobre los contratos/operaciones de Fiducia de Remanentes, así como sus modificaciones, la junta directiva tomó nota y aprobó por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, la autorización al Representante Legal para la firma y demás actuaciones necesarias inherentes a esto para la completa consecución.

- **Autorización Cartera para Entregar en Garantía.** Sobre esta autorización el doctor Muñoz explico que, sobre él anterior contrato explicado de fiducia de remanentes, incluye una cartera de Credivalores que se va a entregar en garantía, de primer grado. La cartera que está en el balance de la compañía y el otro es lo una, pues unos remanentes que tiene la compañía en un Patrimonios Autonomos de una cartera que se

utilizó para un crédito con Systemgroup que ese, ese, esa esa, es un es una cartera, la cual es una prenda de segundo grado.

Los beneficiarios de estas garantías van a ser los prestamistas del *Term Loan*.

El siguiente cuadro muestra la cartera que se estaría entregando en el contrato de garantías:

| | | | | |
|---|---|---|---|---|
| **Cartera propia - First lien** | **0** | **41.261.842.251** | **15.251.494.091** | **56.513.336.343** |
| VIGENTE | 0 | 34.521.582.413 | 7.991.044.518 | 42.512.626.931 |
| 30 | | 6.740.259.838 | 4 933.570.963 | 11.673.830.801 |
| 60 | | | 2.326.878.610 | 2.326.878.610 |
| **Cartera Systemgroup - Second lien** | **9.257.466** | **11.632.523.429** | **78.428.627.818** | **90.070.408.713** |
| VIGENTE | | 7.419.380.051 | 11.080.266.832 | 18.499.646.883 |
| 30 | | 464.246.386 | 486.308.739 | 950.555.125 |
| 60 | | 158.059.363 | 12.051.298 | 170.110.661 |
| 90 | | 89.421.545 | 16.935.492 | 106.357.037 |
| 120 | | 97.135.494 | 46.013.338 | 143.148.832 |
| 150 | | 62.477.500 | 26.750.351 | 89.227.851 |
| 180 | | 84.777.875 | 18.516.490 | 103.294.365 |
| 210 | | 178.893.522 | 2.172.845.469 | 2.351.738.991 |
| 240 | | 367.435.238 | 2.354.716.569 | 2.722.151.806 |
| 270 | | 465.263.962 | 2.300.860.492 | 2.766.124.453 |
| 300 | | 434.237.026 | 1.869.002.250 | 2.303.239.276 |
| 330 | | 457.399.410 | 2.589.426.688 | 3.046.826.098 |
| 360 | | 561.815.365 | 780.568.798 | 1.342.384.163 |
| 361-720 | | 791.980.694 | 27.944.529.559 | 28.736.510.253 |
| > 720 | 9.257.466 | | 26.729.835.455 | 26.739.092.921 |
| Total general | 9.257.466 | 52.894.365.680 | 93.680.121.909 | 146.583.745.056 |

Oída la anterior propuesta referente a la autorización al representante legal para la firma y demás actuaciones sobre los contratos/operaciones para Entregar en Garantia de conformidad con lo explicado, la junta directiva tomó nota y aprobó por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, la autorización al Representante Legal para la firma y demás actuaciones necesarias inherentes a esto para la completa consecución.

- **Autorizaciones y Ratificaciones *Forbearance Agreement* así como sus Modificaciones Y Anexos**

A) ***Forbearance Agreement*: Firmado el 15 de enero de 2024 – Ratificación:** A continuación, el doctor Edgar procedió a explicar esta operación sobre la cual se solicita una ratificación sobre el contrato firmado el 15 de enero de 2024, cuyo objetivo principal era la regularización de incumplimientos que ha tenido la compañía sobre el *Term Loan*.

Entonces se pronunció:

Los principales temas del *Forbearance Agreement* ("FA") que se firmó el pasado 15 de enero son los siguientes:

✓ **Sección 2 – Reconocimientos (*ackowledgements*).**

- Sección 2.1 – Establece el reconocimiento de los montos cuyo pago se incumplió, de acuerdo con el Schedule II;

- Sección 2.2 – El acuerdo lista una serie de eventos en el Schedule I como Incumplimientos y Eventos de Incumplimiento del *Term Loan* ("TL"). Todos estos eventos de incumplimiento se reconocen por los *Loan Parties* con la firma del FA. Esto es relevante en la medida en que se reconoce el incumplimiento de esas obligaciones listadas allí, y si bien permite su suspensión temporal, lo hace solo durante el término del acuerdo (*Forbearance Period*);

✓ **Sección 3 – Abstención (*Forbearance*)**

- Sección 3.1(a) – Esta sección establece el acuerdo de los *Lenders* de no ejecutar sus remedios por un tiempo que irá hasta la primera de cualquiera de las siguientes fechas (*Forbearance Period*):
  - 31 de enero de 2024 (la cual se puede extender por acuerdo entre los *Lenders*);
  - La ocurrencia de otros Incumplimientos o Eventos de Incumplimiento no previstos en el Schedule I;
  - Inicio de acciones de ejecución o de litigios materiales o de cualquier remedio en contra de cualquiera de los *Loan Parties*;
  - Incumplimiento de los R&W hechos en el contrato
  - Sección 3.1(b) – Se reconoce que los EoD incluidos en el Schedule I son eventos de incumplimiento accionables que no se ejecutan en este momento por el FA, **y se reconoce la aplicación de la tasa de incumplimiento (*Default Rate*) durante todo el tiempo que perdure el incumplimiento**. El cálculo de la tasa se vendrá haciendo con base en el *Adjusted Term* SOFR como se venía haciendo antes de la maduración del crédito.
  - Secciones 3.2 y 3.3 – Reconocen que el FA no implica una renuncia a los remedios de los Lenders y que, después del término del FA, se pueden ejecutar.

✓ **Sección 4 – Acuerdos (*Agreements*)** – En esta sección se incluyen los acuerdos del *Borrower* (FI), del *Guarantor* (CV) o de los *Loan Parties* (CV y FI), y dentro de estos se incluyen los siguientes:

- Sección 4.1 – *Consent fee y exit fee* – Se incluye un fee por el acuerdo en el que los *Loan Parties* se obligan a pagar a los *Lenders*, pro-rata de los Compromisos (*Commitments*), adicionando al principal pro-rata a través de todos los Compromisos (*Commitments*) que se encuentran vigentes de la siguiente manera: ***"(a) a consent fee in an aggregate principal amount equal to U.S.$2,012,203.19 and (b) an exit fee in an aggregate principal amount equal to U.S.$2,012,203.19***."
- Sección 4.2 – Fees y honorarios – Pago de honorarios y gastos por parte de los *Loan Parties*, lo que incluye los honorarios de STB, GPA, y los prestamistas y sus respectivos asesores.
- Sección 4.4 – Obligaciones de reportes y de información – En la Sección 4.4 se incluyen una serie de obligaciones de reporte de información que tienen que empezar a cumplirse a partir del 19 de enero de 2024, es decir, a partir del viernes. Dicha información debe ser monitoreada por un Agente de Monitoreo, que debe pagar el *Borrower* (FI). Este compromiso obliga a los *Loan Parties* a enviar una serie de información al Agente de Monitoreo.
- Sección 4.5 – Otros acuerdos
  - **No hacer *restricted payments*** – El acuerdo extiende los Pagos Restringidos (dividendos, distribuciones, etc.) **a las subsidiarias del *Borrower*, es decir, las subsidiarias de FI (incluyendo Ban100, en este caso, porque puede llegar a considerarse como una *Subsidiary* bajo el TL)**. La obligación en *el Second* ARCA de no hacer Pagos Restringidos está en la Sección 7.05 de ese contrato, y solo limita a los *Loan Parties* (FI y CV, no a sus subsidiarias).
  - **Pago de los honorarios** – El *Borrower* debe pagar a más tardar el 31 de enero de 2024 los honorarios de los *Lenders* y sus asesores.

- ✓ **Sección 5 – Condiciones precedentes.** Se establecen algunas condiciones precedentes para que el acuerdo sea efectivo, dentro de las cuales se encuentra

  - Firma del contrato por todas las partes;
  - La entrega al agente administrativo de una proyección de los flujos de efectivo del *Borrower* y sus subsidiarias;
  - Ausencia de eventos de incumplimiento, distintos a los previstos en el Schedule I;
  - Veracidad de las R&W (se debe tener en cuenta que dentro de estas está las autorizaciones corporativas – JD o AGA -);
  - La contratación del agente de monitoreo por parte del *Borrower*;
  - Pago de fees y gastos del agente administrativo y sus asesores.

**B) *Forbearance Agreement*: Modificado que se está negociando – Para aprobación, dado que no se ha firmado**

Seguidamente el abogado, continuó explicando sobre las modificaciones que se estaban surtiendo sobre el *Forbearance Agreement* las cuales necesitaban aprobación por parte de la junta directiva para el representante, dado que aún no se habían firmado. Los principales temas que se quieren incorporar en el FA (en el que seria un *Amended & Restated Forbearance and Waiver Agreement*, de cara al intercambio de notas, son los siguientes:

- Se incluye la referencia al intercambio de notas bajo Reg. S / Rule 144A en las consideraciones del contrato
- Se extiende el término de "perdón" o "abstención" hasta el 31 de marzo de 2024 (*Forbearance Period*)
- Se incluye un *waiver* (Section 4) de la Sección 7.01(b) del Contrato de Crédito con los accionistas (el *Term Loan*) para que Credivalores pueda constituir la garantía sobre la cartera que se requiere para el intercambio de notas
- En el Schedule I, que es el que lista los eventos de incumplimiento que se "perdonan", se incluye la (i) Section 8.01(e)(A), que hace referencia al incumplimiento cruzado que se generó por el no pago del cupón bajo la emisión; (ii) la Section 8.01(f) sobre procedimientos de insolvencia, para que Credivalores pueda hacer el registro del pre-pack ante la corte de NY; y (iii) se incluye como parte de los eventos del incumplimiento bajo la Section 8.01(g) el que no se hubiere pagado el cupón
- Se actualizan los valores de los montos adeudados en el Schedule II a la fecha
- Se incluye un Schedule III, que actualmente está en blanco, para que Credivalores describa la cartera que va a otorgar como garantía en el intercambio de notas

Oída la anterior propuesta referente a la ratificación y autorización al representante legal para la firma y demás actuaciones sobre los contratos/operaciones referentes al *Forbearance Agreement* junto con las modificaciones, la junta directiva tomó nota y aprobó por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, la ratificación de la firma del *Forbearance Agreement* y la autorización para firmar y llevar a cabo todas las actuaciones necesarias para las modificaciones que deba surtir este acuerdo de conformidad con lo expuesto.

**12. PROPOSICIONES Y VARIOS.**

A la altura de este punto de la reunión la secretaria de la reunión preguntó a los miembros de la junta directiva y demás asistentes si tenían algún tema adicional que quisieran tratar.

Los señores miembros de la junta directiva ante esto comentaron que no tenían mas temas o asuntos distintos que quisieran discutir.

**13. DESIGNACIÓN COMITÉ REDACTOR Y APROBADOR DEL ACTA**

La secretaria de la reunión indicó que, se había agotado el orden del día y preguntó si alguno de los miembros asistentes tenia algún comentario o acotación que hacer y que si se le podía dar cierre a la reunión.

Ante lo anterior ninguno de los miembros de la junta directiva presente tuvo algún comentario que hacer.

Seguidamente la representante legal de la sociedad procedió a dar constancia sobre la continuidad del quorum deliberativo y decisorio durante toda la reunión de principio a fin, de conformidad con el Decreto 398 de 2020, y que, en este sentido, se podía dar cierre de la reunión de junta directiva.

Seguidamente cuestionó a los miembros si estaban de acuerdo con que siguiera con la dinámica del comité redactor y aprobador del acta conformado por presidente y secretario de la reunión, para lo cual todos los miembros presentes estuvieron de acuerdo.

Ante la propuesta, todos los miembros de la junta directiva estuvieron de acuerdo y lo aprueban de manera unánime, es decir, con el voto favorable del cien por ciento (100%) de los miembros presentes.

Después de lo anterior la secretaria de la reunión se pronunció diciendo que evacuado el orden del día y todas las consideraciones de todos los miembros, daba cierre a la reunión ordinaria de la junta directiva, agradeció a todos por su asistencia y dijo que cualquier información que requieran al respecto, se estaría remitiendo vía correo electrónico.

Agotado el orden del día y agradeciendo a los señores directores por su participación, siendo las cuatro de la tarde (04:00 P.M.) se dio por terminada la reunión ordinaria de la Junta Directiva.

**El Presidente,**

FIRMADO________
Luis Maria Blaquier

**La Secretaria,**

FIRMADO____________
Liliana Arango Salazar

**La Representante Legal**

FIRMADO_____
Liliana Arango Salazar

** La presente acta fue aprobada por el comité redactor y aprobador del acta que fue designado en dicha reunión. Se aclara, además, que dicho comité estuvo designado y conformado por el presidente y secretario de la reunión, es decir por el doctor Luis María Blaquier y la doctora Liliana Arango respectivamente.

La presente copia certificada es fiel copia del acta que reposa en los libros de la Sociedad.

**LILIANA ARANGO SALAZAR**
**La secretaria**