**Minutes No. 261**
**Regular Meeting of the Board of Directors**
**CREDIVALORES – CREDISERVICIOS S.A.**

At two in the afternoon (2:00 p.m.) on February 28, 2024, the Board of Directors of CREDIVALORES – CREDISERVICIOS S.A. (the "Company") was virtually gathered, in a regular meeting (by teleconference) via Microsoft TEAMS App, in the city of Bogota D.C., following the Notice of Meeting issued by the Company's Legal Representative in a written communication sent to the principal members of the Board of Directors on February 15, 2024.

The following members of the Board of Directors were in attendance:

1. Jose Miguel Knoell Ferrada
2. David Seinjet Neirus
3. Gustavo Adrian Ferraro
4. Luis Maria Blaquier
5. Juan Manuel Trujillo Sanchez
6. Carlos Eduardo Meza
7. Martin Kontarovsky

## I. INITIAL STATEMENTS

a. Seven (7) of the seven (7) members of the Board of Directors (the "Directors") are participating in the meeting by teleconference, in accordance with and in compliance with the provisions of Articles 34 and 35 of the Company's Bylaws (the "Bylaws"), thereby constituting a sufficient quorum to validly deliberate and make decisions on the items on the agenda.

b. The following guests were also in attendance: Ricardo Valdes Rueda, in his capacity as the Company's Financial Advisor; Hector Augusto Chaves, in his capacity as the Company's Financial Advisor; Dr. Catalina Kempowsky, in her capacity as Advisor; Dr. Edgar Munoz, in his capacity as the Company's Legal Advisor; Dr. Javier Ledesma, representing the shareholder Lacrot Inversiones 2014 S.L.U.; Dr. Maite De Alba De Gandiaga, representing the shareholder Davalia Gestion de Activos S.L.; Juan Carlos Estupinan, in his capacity as the Company's Director of Financial Planning; Jaime Francisco Buritica Leal, in his capacity as Principal Legal Representative; and Dr. Liliana Arango Salazar, in her capacity as Alternate Legal Representative and Secretary General.

c. Alberto Hernandez attended in his capacity as proxy for Dr. Jose Miguel Knoell, whose power-of-attorney had been duly submitted to the Company's Secretary prior to the meeting.

The following agenda was presented for consideration and was unanimously approved by the members of the Board of Directors attending the meeting:

**AGENDA***
1. Quorum's verification.
2. Election of the Chair and Secretary of the Meeting.
3. Introduction to the Board of Directors.

Initial
CM

4. Presentation of the New Board of Directors.
5. Appointment of the Chair of the Board of Directors.
6. Election of the Audit Committee, as well as its Chair and Secretary.
7. Presentation and Election of the Chief Compliance Officer of SAGRILAFT and the PTEE.
8. Closure of Agencies – Business Establishments.
9. Presentation and Approval of the Financial Statements for the Fiscal Year Ended December 31, 2023, that are to be presented to the Shareholders' Meeting. (To authorize the Legal Representative to approve non-material changes).
10. Projections.
11. Authorizations and Ratifications to the Legal Representative.
    - Ratifications of the Portfolio Purchase and Sale with UBS.
    - Ratifications of the Portfolio Purchase and Sale with B100.



Initial
CM

- Background: Guarantee Agreements / Ratifications.
- Authorization to Sign the Residual Trust Agreement and any Amendments thereto.
- Authorization on the Portfolio to be Used as Collateral.
- Authorizations and Ratifications of the Forbearance Agreement, together with its Amendments and Schedules.

12. Motions and Miscellaneous.
13. Appointment of the committee responsible for drafting and approving the minutes.

* The agenda was sent out with the Notice of Meeting dated February 15, 2024; however, amendments were made to the same during this meeting, which were unanimously approved by the members of the Board of Directors in attendance.

Immediately thereafter, the meeting began, and the agenda was addressed as follows:

**1. QUORUM'S VERIFICATION**

Dr. Liliana Arango proceeded to verify the quorum and reported that seven (7) of the seven (7) members of the Board of Directors were in attendance, thus constituting the quorum required to validly deliberate and make decisions, in accordance with the Company's Bylaws.

Regarding the quorum's constitution, Dr. Arango emphasized that Alberto Hernandez attended in his capacity as proxy for Dr. Jose Miguel Knoell, whose power-of-attorney had been duly submitted to the Company's Secretary prior to the meeting.

**2. APPOINTMENT OF THE CHAIR AND SECRETARY OF THE MEETING**

Dr. Arango stated that she serves as the Secretary General of the Board of Directors and asked the Directors whether they wished for her to continue serving in such capacity for the meeting. By unanimous vote, that is, with the favorable vote of all of the Directors present at the meeting, Liliana Arango Salazar was elected as Secretary, and, being present, she accepted the appointment.

She proceeded to nominate Dr. Luis Maria Blaquier to serve as Chair of the meeting, and, by unanimous vote, that is, with the favorable vote of all of the Directors present at the meeting, Dr. Blaquier was elected to serve as Chair, and, being present, he accepted the appointment.

**3. INTRODUCTION TO THE BOARD OF DIRECTORS**

The Secretary of the meeting then addressed this matter by highlighting the importance of the Board of Directors to the Company and outlining the general rules to be established to ensure the proper and orderly conduct of these meetings.

She then outlined and explained the following rules:

Initial
CM

a. Attendance will be taken at all meetings for the purpose of calculating the quorum required for decision-making and determining whether or not a meeting may take place; which shall consist of five (5) of the seven (7) members. At any point during the meeting, the quorum shall be verified to ensure that the meeting may continue, and that a decision-making quorum is present, which shall be a simple majority.

b. If a member is unable to attend, advance notice of at least one business day prior to the meeting is recommended. A member may attend through a proxy, duly authorized and documented. The power-of-attorney must be submitted at least one business day before the meeting. The Company will provide a template for a power-of-attorney should one be requested.

c. Guests may attend with the consent of the members of the Board of Directors and may participate by taking the floor to express their opinions or views; however, they shall not have voting rights.

d. The attendees representing the General Management will be present to support the presentation of information to the Board of Directors, and the members may request such information by contacting the Company's Secretary General via email.



Initial
CM

In view of the above, the Board of Directors unanimously, that is, with 100% of the votes cast by the members present at the meeting, agreed to these rules and approved this item.

### 4. PRESENTATION OF THE NEW BOARD OF DIRECTORS

The Secretary of the meeting then gave a brief presentation to the Board of Directors, outlining the main responsibilities of this body and listing the members currently in office.

Among their responsibilities, she highlighted:

- To establish general policies for the Company. (Processes, regulations, etc.).
- To call the Shareholders' Meeting for special sessions.
- To submit to the Shareholders' Meeting, at its annual meeting, a report on the Company's economic and financial condition, recommended measures, the proposed distribution of profits or the cancellation of losses, and the establishment of special reserves. The report must comply with the provisions of paragraph 3 of Article 446 of the Commercial Code.
- To authorize the establishment of branches and agencies.
- To ensure strict compliance with statutory provisions and to implement the resolutions of the Shareholders' Meeting and the Board of Directors.
- To appoint the Company's Manager and determine his or her compensation.
- To authorize the Manager, acting on behalf of the Company, to execute or enter into any acts or agreements involving an amount in excess of 4,000 Colombian Statutory Monthly Minimum Wages (SMLMV).
- To propose candidates for the position of Statutory Auditor.
- To propose to the General Shareholders' Meeting the amount of the dividend, as well as the method and term of its payment, in accordance with regulatory and statutory provisions.
- To direct the management and general conduct of the Company's business in its best interests and to perform such other duties as may be prescribed by law and these Bylaws.
- To issue regulations governing the issuance and placement of shares other than preferred shares.
- To appoint executives to management positions within the Company.
- To perform such other duties as are entrusted to it under these Bylaws or as may be inherent in the nature of its functions.
- To appoint the Audit Committee.

And, regarding the members currently serving on the Board of Directors, she indicated who the current members were:

Initial
CM

| Row | Principal Member | Capacity | Representative of: |
|---|---|---|---|
| **1** | Jose Miguel Knoell Ferrada | Equity | Acon Colombia Consumer Finance Holdings, S.L. and Acon Consumer Finance Holdings II, S.L. |
| **2** | David Seinjet Neirus | Equity | Crediholding S.A.S. |
| **3** | Gustavo Adrian Ferraro | Equity | Lacrot Inversiones 2014, S.L.U. |
| **4** | Luis Maria Blaquier | Equity | Davalia Gestion de Activos S.L. |
| **5** | Juan Manuel Trujillo Sanchez | Independent | Independent |
| **6** | Carlos Eduardo Meza | Independent | Independent |
| **7** | Martin Kontarovsky | Independent | Independent |

Having heard the foregoing, the Board of Directors unanimously, that is, with 100% of the votes cast by the members present at the meeting, approved this matter concerning the presentation of the Board of Directors.

**5. APPOINTMENT OF THE CHAIR OF THE BOARD OF DIRECTORS**

Thereafter, the Secretary of the meeting proceeded to address this item.



Initial
CM

In this regard, she emphasized that, pursuant to the Bylaws, the Chair of the Board of Directors is the person who holds the position of General Manager. However, there is an express prohibition under Law 964 of 2005, the Securities Market Law, which provides that when a company qualifies as an issuer, its Legal Representative may not serve as Chair of the Board of Directors; therefore, Jaime could not serve in such capacity.

In light of the foregoing, the Secretary of the meeting proposed to the attending members the possibility of appointing a person to serve in this capacity or, alternatively, appointing a Chair for each meeting.



Initial
CM

In this regard, she emphasized that, pursuant to the Bylaws, the Chair of the Board of Directors is the person who holds the position of General Manager. However, there is an express prohibition under Law 964 of 2005, the Securities Market Law, which provides that when a company qualifies as an issuer, its Legal Representative may not serve as Chair of the Board of Directors; therefore, Jaime could not serve in such capacity.

In light of the foregoing, the Secretary of the meeting proposed to the attending members the possibility of appointing a person to serve in this capacity or, alternatively, appointing a Chair for each meeting.

Considering the above, Dr. Gustavo Ferraro asked what duties the Chair was required to perform, to which the Secretary replied by explaining those duties, which included presiding over the respective meetings, sending information, issuing the Notice of Meeting, etc.

Dr. Luis Blaquier proposed that, since not all members were always present, it would be preferable to independently decide at each Board of Directors meeting, who would serve as Chair for that particular meeting, and that the position could rotate among the members.

In light of the foregoing proposal, all members attending, unanimously, that is, 100% of those present, agreed to accept it and determined that a Chair would be appointed for each meeting rather than having a permanent Chair.

This matter, as presented, was approved by the Board of Directors unanimously, that is, with 100% of the votes cast by the members present at the meeting.

### 6. ELECTION OF THE AUDIT COMMITTEE, AS WELL AS ITS CHAIR AND SECRETARY

The Secretary of the meeting continued with this item, explaining that this is a requirement applicable to us under Law 964 of 2005 in our capacity as securities issuers and, additionally, that Article 49 of the Bylaws provides for the establishment of an Audit Committee. She emphasized that, under the law, the Audit Committee must consist of all the independent members of the Board of Directors.

She also noted that, as the composition of the Board of Directors has changed, a new election of its members must be held.

She continued by stating that, following Martin Kontarovsky’s appointment as a member of the Board of Directors, it was necessary for him to also be appointed to the Audit Committee, for which purpose she proposed the following slate or composition:

| AUDIT COMMITTEE COMPOSITION | | |
|---|---|---|
| **Row** | **Principal Member** | **CAPACITY** |
| **1** | Martin Kontarovsky | Independent |
| **2** | Juan Manuel Trujillo Sanchez | Independent |
| **3** | Carlos Eduardo Meza | Independent |

Initial
CM

The Secretary of the meeting then asked the members whether, if they agreed with this composition, they could confirm Juan Manuel Trujillo and Carlos Meza in their respective roles as Chair and Secretary, or whether they wished to hold a new election.

All members unanimously, that is, with the affirmative votes of the members present, approved this composition of the Audit Committee, including the confirmation of the Chair and Secretary of the Committee.

**7. PRESENTATION AND ELECTION OF THE CHIEF COMPLIANCE OFFICER OF SAGRILAFT AND THE PTEE**

The Secretary of the meeting brought before the members of the Board of Directors the imminent need to have a Chief Compliance Officer and to likewise appoint a Compliance Officer for purposes of the Corporate Transparency and Business Ethics Program (PTEE),



Initial
CM

as required under External Circular Letter No. 100-000016 dated December 24, 2020, and External Circular Letter No. 100-000011 dated August 9, 2021, issued by the Superintendence of Companies. She also reminded the members present that this position was currently vacant, as the former officer, Yael Cristina Velazquez, had previously resigned.

She emphasized that the person who had been hired to deal with these matters was Julieth Stefanny Cadena Palencia, holder of the National Identity Card No. 1,012,393,022, and that she had extensive experience to officially serve in the position. She also indicated that all reports related to these matters, whether submitted directly or through the Legal Representative, would be shared with the Board of Directors, as well as those regarding her duties and responsibilities directly before the Superintendence of Companies.

To this end, the Chair of the meeting requests:

- Pursuant to External Circular Letter No. 100-000016 dated December 24, 2020, the appointment of a Chief Compliance Officer is mandatory for all matters related to SAGRILAFT; accordingly, it is proposed that Ms. Julieth Stefanny Cadena Palencia, holder of the National Identity Card No. 1,012,393,022, be appointed as the Compliance Officer of Credivalores for the program on the matters regarding SAGRILAFT.

  Having verified her Resumé and suitability for the position, the members of the Board of Directors unanimously decided to accept the appointment of Julieth Stefanny Cadena Palencia as Compliance Officer for SAGRILAFT matters.

- Pursuant to External Circular Letter No. 100-000011 dated August 9, 2021, the appointment of a Compliance Officer is mandatory for the PTEE; accordingly, it is proposed that Ms. Julieth Stefanny Cadena Palencia, holder of the National Identity Card No. 1,012,393,022, be appointed as the Compliance Officer of Credivalores for the program of the PTEE. It was clarified to the members of the Board of Directors that the positions of SAGRILAFT Compliance Officer and PTEE Compliance Officer are compatible, and therefore the same person may hold both positions within the same company.

  Having verified her Resumé and suitability for the position, the members of the Board of Directors unanimously decided to accept the appointment of Julieth Stefanny Cadena Palencia as Compliance Officer for the PTEE.

The foregoing item regarding the appointment of the Compliance Officer for SAGRILAFT and the PTEE was unanimously approved by all members of the Board of Directors, that is, by 100% of the Directors present at the meeting.

**8. CLOSURE OF AGENCIES – BUSINESS ESTABLISHMENTS**

The Secretary moved on to the next item on the agenda, which concerned the need to close certain agencies run by the Company.

Initial
CM

The Secretary continued with the agenda, reminding the members of the Board of Directors that, at the previous Board meeting, it had been discussed that the Company had a strategy for closing offices in light of the strengthening of its digital processes, and that these closure processes require a formal filing with the Chamber of Commerce pursuant to an order issued by the members of the Board of Directors.

She went on to say that there are 2 closures of agencies/business establishments that need to be formalized and approved by the Board of Directors.

- **CANCELLATION OF AGENCIES / BUSINESS ESTABLISHMENTS**

The Secretary of the meeting stated that the following are the offices, agencies, and/or business establishments requiring the approval of the members of the Board of Directors to order their closure and cancellation:

CONFIDENTIAL CV_GRAMERCY_00002241

Initial
CM

| DEPARTMENT | MUNICIPALITY | ESTABLISHMENT´S NAME | REGISTRATION NUMBER | ADDRESS |
|---|---|---|---|---|
| HUILA | NEIVA | CREDIVALORES NEIVA AGENCY | 198845 | Calle 21 No. 13 – 43 Local 1 |
| RISARALDA | PEREIRA | CREDIVALORES CREDISERVICIOS PEREIRA EXITO VICTORIA | 18180772 | Cra. 10 #14-71 |

The Secretary of the meeting then asked whether any of the members had any comments or questions, and then Dr. Seinjet spoke on the matter of customer service in these regions. In response, Jaime said that they are currently working on co-working strategies and other customer service channels. Dr. Seinjet suggested that the clients should be provided with clear information regarding the closure of these offices and the available customer service channels.

Having heard the foregoing, the Board of Directors unanimously, that is, with 100% of the votes cast by the members present at the meeting, approves the closure and/or cancellation of the aforementioned agencies/business establishments. Accordingly, the Legal Representative is instructed to undertake the necessary filings to register the closure or, as applicable, the order not to open the agency.

9. **PRESENTATION AND APPROVAL OF THE FINANCIAL STATEMENTS FOR THE FISCAL YEAR ENDED DECEMBER 31, 2023, THAT ARE TO BE PRESENTED TO THE SHAREHOLDERS' MEETING. (TO AUTHORIZE THE LEGAL REPRESENTATIVE TO APPROVE NON-MATERIAL CHANGES).**

Moving on to the next item on the agenda, the Secretary gave the floor to Juan Carlos Estupinan to explain this matter.

Juan Carlos went on to explain the following table:

Initial
CM

**COP in millions**

| **BALANCE SHEET** | Dec-22 | Dec-23 | Δ% | Δ$ |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents | 273,052 | 59,794 | (78.1%) | -213,258 |
| Total financial assets at fair value | 104,940 | 19,440 | (81.5%) | -85,499 |
| Consumer loans | 2,005,440 | 1,858,276 | (7.3%) | -147,164 |
| Impairment | -372,608 | -455,798 | 22.3% | -83,190 |
| **Total loan portfolio, net** | **1,632,831** | **1,402,478** | **(14.1%)** | **-230,354** |
| Accounts receivable, net | 320,129 | 257,284 | (19.6%) | -62,845 |
| **Total financial assets at amortized cost** | **1,952,961** | **1,659,762** | **(15.0%)** | **-293,199** |
| Investments in associates and affiliates | 14,945 | 11,895 | (20.4%) | -3,050 |
| Current tax assets | 32,012 | 41,476 | 29.6% | 9,463 |
| Deferred tax assets, net | 157,736 | 128,756 | (18.4%) | -28,979 |
| Total property and equipment | 2,194 | 9,590 | 337.1% | 7,396 |
| Intangible assets other than goodwill, net | 39,852 | 12,841 | (67.8%) | -27,011 |
| **Total Assets** | **2,577,692** | **1,943,554** | **(24.6%)** | **-634,138** |

| **LIABILITIES AND EQUITY** | | | | |
|---|---|---|---|---|
| **Liabilities** | | | | |
| **Total financial liabilities at amortized cost** | **2,536,407** | **1,547,566** | **(39.0%)** | **-988,840** |
| Employee benefit provisions | 1,053 | 1,054 | 0.0% | 0 |
| Other provisions | 3,028 | 2,932 | (3.2%) | -96 |
| Accounts payable | 51,892 | 91,120 | 75.6% | 39,229 |
| Current tax liabilities | 1,698 | 1,616 | (4.8%) | -82 |
| Other liabilities | 40,057 | 25,560 | (36.2%) | -14,497 |
| **Total Liabilities** | **2,634,134** | **1,669,848** | **(36.6%)** | **-964,287** |

| **Equity** | | | | |
|---|---|---|---|---|
| **Total Equity** | **-56,443** | **273,706** | **-584.9%** | **330,149** |
| **Total Liabilities and Equity** | **2,577,691** | **1,943,554** | **(24.6%)** | **-634,137** |



Initial
CM

He made the following comments on the balance sheet shown above:

**Assets:**

- Throughout 2023, there has been a decline in Cash and Cash Equivalents (COP 213,258 million) due to payments being made towards the Company's different outstanding obligations.
- Likewise, the portfolio decreased by 7.3% (COP 147,164 million) as a result of the reduction in new loan originations, the portfolio sales carried out by the Company during the year to date, and the natural amortization of the portfolio.

**Liabilities:**

As for liabilities, a reduction of COP 964,287 million was recorded, attributable to a foreign exchange difference of COP 204,808 million and the payment of financial obligations, particularly the repurchase of the bond carried out during the first half of the year, in the amount of COP 267,067 million, as well as principal payments made to various structures, among which the following stand out:

- **UBS PA:** USD 63.3 million / COP 241,977 million
- **Syndicated PA:** USD 22.8 million / COP 87,278 million
- **Citibank PA:** USD 15.4 million / COP 58,692 million
- **ECP Program Notes:** USD 7.5 million / COP 28,649 million

[Translator's Note: PA stands for Autonomous Trust]

**Equity:**

Equity increased by COP 330,149 million due to the capitalization received during the first half of the year, as well as the positive results recorded by the Company during the reported period.

Next, Juan Carlos explained the following income statement table:

Initial
CM

**COP in millions**

| **INCOME STATEMENT** | Dec-22 | Dec-23 | Δ% | Δ$ |
|---|---|---|---|---|
| Revenue | 399,895 | 337,935 | (15.5%) | (61,960) |
| Finance costs – interest | (613,025) | (99,188) | (83.8%) | 513,837 |
| Interest | (270,634) | (251,027) | (7.2%) | 19,607 |
| Derivatives | (310,516) | 284,808 | -166.0% | 515,324 |
| Current Liabilities | (31,875) | (52,959) | 66.2% | (21,094) |
| **Net interest** | **(213,130)** | **238,747** | **-212.0%** | **451,877** |
| | | | | |
| Total provision expense | (95,036) | (115,912) | 43.0% | (40,876) |
| **Operating profit (loss)** | **(308,166)** | **102,835** | **-133.4%** | **411,001** |
| | | | | |
| **Employee, administrative and operating expenses** | | | | |
| Employee benefit expenses | (14,358) | (12,922) | (10.0%) | 1,436 |
| Depreciation and amortization expense | (6,222) | (6,916) | 11.2% | (694) |
| Depreciation expense on right-of-use assets | (2,056) | (2,239) | 8.9% | (183) |
| Administrative and operating expenses | (88,881) | (80,002) | (10.0%) | 8,879 |
| **Total Other Expenses** | **(111,516)** | **(102,079)** | **(8.5%)** | **9,438** |
| | | | | |
| **Operating net (loss) income** | **(419,683)** | **756** | **-100.2%** | **420,439** |
| | | | | |
| **Financial income** | | | | |
| Other income | 2,122 | 1,421 | (33.1%) | (702) |
| Financial income | 7,565 | 6,985 | (7.7%) | (580) |
| **Total financial income** | **9,688** | **8,406** | **(13.2%)** | **(1,282)** |
| | | | | |
| (Finance costs) | (9) | (3) | (66.1%) | 6 |
| **Net financial income** | **9,678** | **8,403** | **(13.2%)** | **(1,276)** |
| | | | | |
| **Profit before income tax** | **(410,004)** | **9,159** | **-102.2%** | **419,163** |
| Tax expense | 107,545 | (2,300) | -102.1% | (109,845) |
| **Net income** | **(302,459)** | **6,859** | **-102.3%** | **309,315** |

On the above, he made the following important comments:



Initial CM

**Profits for the year:**

The Company reported a positive result as of December 2023 of **COP 6,859 million**, recovering from the loss reported during the same period in 2022. This result was generated by:

- **Net interest:**

There was an increase of **COP 451,877 million**, resulting from the decrease in interest-bearing liabilities and, in turn, from the foreign exchange strategy adopted by the Company with respect to its liabilities.

- **Provisions:**

The Company reported an increase of **COP 40,876 million** in its provisions, primarily as a result of the impairment of the credit card portfolio due to market effects arising from the prevailing economic conditions and the debt forgiveness strategy.

- **Total Costs and Expenses:**

It can be seen that the Company has been implementing a policy of cost and expenditure control, resulting in a reduction of **COP 9,438 million** (-8.5%). The optimization measures implemented resulted from the closure of offices, workforce reductions following the suspension of lending activities, and cost reductions across different areas of the Company following the discontinuation of the credit card product.

Having explained the foregoing, Juan Carlos gave the floor to Dr. Catalina Kempowsky, so she can explain the performance of the payroll-deducted lending portfolio. To this end, Catalina explained the following charts:

**Loan Portfolio Balance and 60+ DPD Ratio**






Initial
CM

**Provision Coverage Ratio (%)**




**60+ DPD Vintage Analysis**




She indicated that, with respect to the vintages, they are within the expected trend for loans originated in 2022, and also noted that, in 2021, delinquency levels spiked due to fraud within the military; however, the remaining vintages are within the expected loss performance range.

She then explained the credit card portfolio using the following charts:



Initial
CM

## Loan Portfolio Balance and 60+ DPD Ratio




## Origination by Risk Level




Initial
CM

**Provision Coverage Ratio (%)**




Following the explanation of these charts, Catalina gave the floor to the Secretary.



Initial
CM

At this point, the Secretary asked the members of the Board of Directors whether they agreed with the explanations provided. However, she further noted that, since these were preliminary financial statements and the external auditor had not yet completed its review, any adjustments that might be required were expected to be minimal and not materially significant; accordingly, the members of the Board were asked to authorize Management to approve any such adjustments, so that it would not be necessary to hold a subsequent meeting before presenting the financial statements to the Shareholders' Meeting.

Having heard the foregoing, the Board of Directors unanimously, that is, with 100% of the votes cast by the members present at the meeting, approved the Financial Statements for the year ended December 31, 2023, for presentation to the Shareholders' Meeting, together with the request made by the Secretary during the meeting regarding any potential minor adjustments thereto.

**10. PROJECTIONS**

Thereafter, with respect to this matter, the Secretary once again gave the floor to Juan Carlos to present it.

Juan Carlos began his presentation by stating that the following were the terms and conditions applicable to the Company's financial liabilities:

| | |
|---|---|
| 1. Disbursements | The Company expects to resume payroll-deducted loan originations beginning in 2024, reaching COP 400,000 million, with annual increases in originations of 30% in 2025, 20% in 2026, 18% in 2027, 15% in 2028, and 12% in 2029. |
| 2. Syndicated PA | It is expected that all obligations under this facility will be consolidated into a single obligation with a 59-month term, with the loan portfolio serving as the source of repayment for such obligation. |
| 3. Citibank PA | The sale of the Citibank portfolio is estimated to take place in March 2024, which is expected to release the collateral with a value of USD 8.4 million. |
| 4. UBS PA | It is expected that the debt will continue to be amortized using collections from the loan portfolio. |
| 5. FNG | It is to be cancelled on the contractual date (Aug/24) and no replacement for this facility is to be provided. |
| 6. Bond | A 25% debt reduction is expected, with an [illegible] principal payment due in Feb/29. Step-up rate: 4% for the first six months, 5% for the following three six-month periods, and 11% thereafter. |
| 7. Loan from shareholders | The debt is expected to be amortized as follows: USD 8.4 million in Mar/24, followed by incremental monthly payments from Apr/24 (USD 0.10 million) through Feb/25 (USD 1.06 million), with equal payments thereafter through Dec/26. |
| 8. [illegible] | The debt was restructured. |
| 9. [illegible] | It is expected that the debt will continue to be amortized using collections from the loan portfolio. |
| 10. Notes | The two outstanding notes were consolidated into a single five-year amortizing facility, with the first two years as a grace period and annual payments equal to 25% of the (USD 8.11 million) balance beginning in Dec/25, with quarterly interest payments beginning in Mar/24 at a coupon rate of [illegible]. |

Initial
CM

Regarding the Citi Bank PA item, Dr. Hector Chavez made a clarification, noting that the collateral is held with Ban100, and that Credivalores would purchase the portfolio from CITI, and the bank would subsequently repurchase the portfolio at a premium, which would ultimately release cash resources to Credivalores, and that the cash release would not result directly from the collateral itself.

Following this clarification, Gustavo asked for further understanding as to what the difference in value would be between the purchase and the subsequent placement resulting from the release of the collateral. Hector replied that it would precisely be the USD 8.4 million, noting that the value of the portfolio is COP 144 billion, of which COP 33 billion is held as collateral. That collateral has already been committed for sale to the bank. Accordingly, when the bank purchases the portfolio, it would receive the collateral; however, with respect to the remaining portion of the portfolio, of the 144 less the collateral, which amounts to 27 in the case of the bank, the Bank would pay a premium amounting to USD 8.4 million. In light of this, he noted that it was necessary for the Board of Directors to approve this transaction in the terms described above.

Dr. Luis Blaquier asked about the progress made regarding **Nomura and Alianza**. Jaime responded that Nomura is the most important source of funding and that they have been working with Patricia Mora.



Initial CM

A couple of stages have already been completed, including an initial stage during which she reviewed the performance of the portfolio that Credivalores currently holds and has held historically, which is the portfolio she will purchase. She asked us for information regarding the performance of that portfolio, she also requested general information about Credivalores and has now put a timeline on the table for closing the agreement; in other words, at this point, Nomura has officially confirmed that they will provide USD 100 million. We are now entering a due diligence stage, which is expected to take approximately four weeks, and the remaining documentation process, including the term sheet and execution of the agreements, is expected to take approximately eight to ten weeks from today. That is what we are currently expecting. However, while Nomura is on board with the Company and the deal is expected to move forward, there is a sense that the process is moving at a slower pace. They were waiting to see how the restructuring of the bond would be resolved; because, as soon as the rating process resulted in a downgrade by Fitch and we entered the grace period, we contacted their risk team, and they have been, let's say, monitoring the situation closely while awaiting the outcome of that process before continuing to move forward. This does not mean, Luis and the rest of the Board, that Nomura will only proceed once the transaction is completed; rather, they have simply taken their foot off the accelerator, so to speak. They are still working on the transaction, but clearly, the final closing process will depend on the completion of the bond restructuring. The same applies to Alianza. In fact, this week, the day before yesterday, we were due to make a coupon payment to the Fondo Nacional de Garantias [National Guarantees Fund], and Alianza is one of the investors, and we had a conversation with them regarding this matter, and they indicated that they are also monitoring the situation and remain interested in coming in; but, once again said the same, that once the bond has been restructured, they would move forward with their investment to support the Company. So, those are the updates I have regarding these two funding lines, one is progressing well, but obviously, both are waiting for the bond exchange process to be completed.

Javier Ledesma noted that the delay in the completion of the Exchange was expected to have these consequences. In response, Jaime took the opportunity, given that Javier had raised the issue, to explain that over the past two days they had held meetings with the rating agency and had a very difficult meeting with our statutory auditor, Price Waterhouse. We have also had calls with the PA financiers and with companies such as Nomura. In fact, I just came from a meeting with the Morgan Stanley team because, when we informed them about this a couple of weeks ago, and even earlier, I had taken it upon myself to contact each of these parties before the news was made public on February 7 to explain the purpose of the transaction, because it is clearly a very positive matter for the Company. As Management, our approach has been to attribute the delay to a purely regulatory matter; since a new regulation was issued, and we are reviewing all the necessary steps to ensure that this does not result in additional time being required by the Court, and this has caused the process to take a couple of additional weeks.

In light of the foregoing, Javier reiterated that the shareholders need to take action, as their current approach is causing harm to the Company. Regarding this, Luis Blaquier responded that they are reviewing all the documentation to ensure that they are comfortable with the guarantees provided, and in response, Javier stated that all of the shareholders are involved and that they have not yet reached an agreement.

Jaime then resumed speaking and clarified to the shareholders that the bond exchange process could not extend beyond March 7. Nomura is waiting for us to launch the bond exchange. They already understand that we have an ad hoc committee in place, that the transaction has already been agreed upon, and that this is essentially a procedural matter; and they also know that we will have a 30-day exchange period, followed by approximately another 60 days for the Court to approve it. They are not waiting until May to begin working with us. Rather, they are waiting for us to launch the exchange, and we are continuing to work toward having the financing line ready

Initial
CM

by May so that the first disbursement from Nomura can be made, which will coincide with the closing of the exchange. What will happen is that the USD 100 million facility will be drawn down on a tranche-by-tranche basis. What has been thought is that the structure currently being contemplated involves a private issuance, and from that private issuance we will be able to draw tranches against the USD 100 million commitment. The idea, based on what we have discussed so far, is for each tranche to be USD 5 million; then, each time we have a loan portfolio of USD 5 million, Nomura will provide the funding, until the USD 100 million program is fully completed. This will therefore depend on our origination capacity.

Dr. Jaime also made a clarification regarding the **FNG**, stating that the current model is assuming that we will make the payments and then we need to seek the funds, but we initiated discussions and negotiations with the Fondo Nacional de Garantias a couple of weeks ago. The meeting was with its President, and we explained the Company's entire process to him. Since he has only been in office for approximately six months, the meeting was an opportunity to provide him with a thorough overview of the Company, what we do, our current situation, and the support we are seeking from the Fund.



Initial
CM

We explained the entire process we are currently undertaking in terms of debt reprofiling and renewal, and we also discussed the bond. He is someone who comes from Colombia's Ministry of Finance and Public Credit and has extensive knowledge of the capital markets, as well as this type of structure in international markets, and after we explained all the efforts the Company has undertaken, he indicated that they would indeed support us. The form of support needs to be considered from a somewhat legal perspective because, when the Company issued this bond, it was during the COVID-19 period, and the entity that actually provided the guarantee was not the Fondo Nacional de Garantias, but rather a legal entity that was a fund established within the Ministry of Finance. He explained that all of the regulations governing that structure remained there, but the process has since been put on hold and there is no one there currently managing or moving it forward; and that, he could support us in extending the term of the guarantee by two, three, or five years, but we need to determine whether this can be done under the existing regulations or whether it would have to be done through the FNG. They will analyze this matter. He also mentioned that, once we complete the restructuring of this bond, we should explore other opportunities to work together and obtain financing from banks. He indicated that it may be possible for other banks to provide financing under a structure whereby the FNG would guarantee 70% of the issuances or loans we obtain.

In light of these explanations, Luis Blaquier asked whether there was still a coupon payment due before the FNG maturity date. Jaime responded that, during the meeting, they had indicated that two requirements had to be met in order for them to support us. First, we could not be in default, as that would be beyond their ability to address. However, the coupon payment was made on Monday without any issues. Second, they were requesting certain information from the Company. They also requested that weekly working sessions be held to reach a prompt decision on how to proceed with them.

Jaime then handed over to Hector so that he could explain a matter relating to the **debt collection strategy**.

He took the floor and stated that they have been working on different fronts regarding the collection of the UBS portfolio, with a team at Credivalores dedicated exclusively to this matter and not distracted by other risk management activities, since the main challenge facing the Collections' function is ultimately the credit card portfolio. We had also previously indicated that we were considering adding a specialized recovery team to the Collections group. Catalina continued by explaining that a pilot was conducted on February 21, and we obtained contacts with customers who had not previously been reached, as well as higher negotiation rates than those we had been achieving through call centers and collection agencies. We are now waiting to see how many of those negotiated arrangements are finally made. Initially, the team began working with 350 customers. By Monday of this week, we had already reached nearly 120 negotiated arrangements, and 30% of those 120, involved customers who had not been contacted previously, while 70% involved customers who had been contacted at some point but with whom we had been unable to reach a negotiated arrangement. It appears that we may be able to increase collections by taking a more targeted approach, with a much more individualized negotiation with each customer; less mass-oriented and less focused on traditional collections, and more focused on negotiation. For example, each call with a customer is currently taking approximately 25 minutes on average because the representative is very effective at negotiating and puts herself in the customer's shoes to better understand their situation. She listens to their concerns and challenges, which is particularly important for this customer profile. We are therefore assessing how much of these negotiations ultimately materialize so that we can allocate additional resources to this strategy and determine how we can accelerate collections through this approach as well. Hector then took the floor and stated that the sales representatives are introducing themselves as being from Asficredito (the company that provides commercial services to us), rather than as representatives

Initial
CM

of Credivalores, in order to achieve better customer receptivity. Another point we are reviewing and testing with these customers is the level of debt forgiveness they are requesting. We are also assessing the extent to which these requests are covered by the provisions we currently have and how many exceptions we may need to make; in fact, we are receiving proposals from customers for payments that fall outside our approved debt forgiveness parameters, and in some cases, we have to let those customers go. We are therefore reviewing each case individually in order to have more collections, to maximize collections from these customers. However, in some cases, we may need to make exceptions and approve slightly higher levels of debt forgiveness than currently authorized in order to avoid losing the customer; so, it is a matter of balancing these considerations. This strategy was also rolled out to the collection agencies at the end of February; that all cases in which customers were proposing payments different from the minimum amount we had provided in the spreadsheet were to be referred back to us for evaluation, so that we would not lose the customer. In other words, once a customer has been contacted, the goal is to close the negotiation and secure a payment.

Following the foregoing explanations, Juan Carlos continued his presentation, this time addressing the following projection charts:



Initial
CM

**COP in millions**

| INCOME STATEMENT | 2023 | Proj. 2024* | Proj. 2025 | Proj. 2026 | Proj. 2027 | Proj. 2028 | Proj. 2029 |
|---|---|---|---|---|---|---|---|
| Interest income and portfolio sales | 272,861 | 224,123 | 283,745 | 352,897 | 426,100 | 478,186 | 515,740 |
| Commissions | 65,074 | 44,279 | 50,268 | 57,056 | 64,286 | 71,086 | 77,261 |
| Finance costs – interest | (99,188) | (216,240) | (200,226) | (265,820) | (310,321) | (350,601) | (382,296) |
| Interest | (251,027) | (179,748) | (196,994) | (262,588) | (307,089) | (347,369) | (379,064) |
| Derivatives | 204,808 | (33,260) | - | - | - | - | - |
| Current Liabilities | (52,969) | (3,232) | (3,232) | (3,232) | (3,232) | (3,232) | (3,232) |
| **Net interest** | **238,747** | **52,161** | **133,790** | **144,133** | **180,065** | **198,672** | **210,706** |
| | | | | | | | |
| Total provision expense | (135,912) | (69,034) | (70,308) | (73,988) | (78,095) | (81,896) | (85,374) |
| **Operating profit (loss)** | **102,835** | **(16,872)** | **63,482** | **70,145** | **101,971** | **116,776** | **125,331** |
| | | | | | | | |
| **Employee, administrative and operating expenses** | | | | | | | |
| Employee benefit expenses | (12,922) | (11,385) | (11,658) | (11,897) | (12,105) | (12,317) | (12,532) |
| Depreciation and amortization expense | (6,916) | (6,323) | (6,323) | (6,323) | (5,161) | (1,849) | (2,400) |
| Depreciation expense on right-of-use assets | (2,239) | (1,512) | (1,512) | (1,512) | (1,512) | (504) | - |
| Administrative and operating expenses | (80,002) | (72,234) | (70,088) | (79,841) | (89,182) | (97,318) | (104,134) |
| **Total Other Expenses** | **(102,079)** | **(91,453)** | **(89,581)** | **(99,573)** | **(107,960)** | **(111,987)** | **(119,066)** |
| | | | | | | | |
| **Operational Net Value** | **756** | **(108,325)** | **(26,099)** | **(29,428)** | **(5,989)** | **4,788** | **6,265** |
| | | | | | | | |
| **Financial income** | | | | | | | |
| Other income | 1,421 | | | | | | |
| Financial income | 6,985 | 5,257 | 4,361 | 5,030 | 6,355 | 8,029 | 9,264 |
| **Total financial income** | **8,406** | **5,257** | **4,361** | **5,030** | **6,355** | **8,029** | **9,264** |
| | | | | | | | |
| (Finance costs) | (3) | | | | | | |
| **Net financial income** | **8,403** | **5,257** | **4,361** | **5,030** | **6,355** | **8,029** | **9,264** |
| | | | | | | | |
| **Profit before income tax** | **9,159** | **(103,068)** | **(21,737)** | **(24,398)** | **366** | **12,818** | **15,529** |
| Tax expense | (2,300) | 35,043 | 7,391 | 8,295 | (125) | (4,358) | (5,280) |
| **Net income** | **6,859** | **(68,025)** | **(14,346)** | **(16,102)** | **242** | **8,460** | **10,249** |

* With a 25% debt reduction, corresponding to an estimated income of approximately COP 217,402 million, 2024 net income would be approximately COP 149,377 million.

Regarding this matter, Ricardo Valdes intervened to explain that it is important to note that, given the debt reduction, then this debt reduction will help the Company implement a cash flow recovery strategy and stabilize its financial results. This is because, according to the terms negotiated, the debt reduction will specifically be applied to the recovery of the loan portfolio. Accordingly, these profits will also need to be incorporated into the Company's strategy to avoid reporting losses and instead achieve a balanced position and optimize its financial results. Regarding this matter, David Seinjet asked how many disbursements were expected to be made in 2024, to which he was told that the amount was COP 400,000 million.

Next, following a brief explanation of the foregoing chart, the presentation continued with the following chart on projected cash flow:



Initial CM

**COP in millions**

| Directly Cash Flow | Dec-24 | Dec-25 | Dec-26 | Dec-27 | Dec-28 | Dec-29 |
|---|---|---|---|---|---|---|
| **Initial Cas** | **59,794** | **51,821** | **69,953** | **91,443** | **116,503** | **143,459** |
| | | | | | | |
| Income Collection | 158,699 | 227,323 | 302,370 | 373,201 | 439,919 | 483,498 |
| Other Income | 5,257 | 4,361 | 5,030 | 6,355 | 8,029 | 9,264 |
| Interest Payment | -150,638 | -197,926 | -250,560 | -307,053 | -347,233 | -397,524 |
| **Net Margin** | **13,317** | **33,759** | **56,840** | **72,503** | **100,715** | **95,238** |
| | | | | | | |
| **Expenses** | | | | | | |
| Wages and Salaries | -11,385 | -11,658 | -11,897 | -12,105 | -12,317 | -12,532 |
| Administrative Expenses | -72,234 | -70,088 | -79,841 | -89,182 | -97,318 | -104,134 |
| Delayed Payments to Suppliers | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Expenses** | **-83,618** | **-81,746** | **-91,738** | **-101,287** | **-109,635** | **-116,666** |
| **Net Operating Margin** | **-70,301** | **-47,987** | **-34,898** | **-28,784** | **-8,920** | **-21,428** |
| | | | | | | |
| **Financing Movements** | | | | | | |
| Principal Collection | 295,754 | 208,235 | 299,170 | 428,666 | 581,685 | 701,760 |
| Disbursements | -400,000 | -520,000 | -624,000 | -736,320 | -846,768 | -948,380 |
| Principal Payments | -407,106 | -288,116 | -356,731 | -431,822 | -587,560 | -1,319,699 |
| Financing | 400,000 | 520,000 | 624,000 | 736,320 | 846,768 | 948,380 |
| Other Financing | 186,680 | 146,000 | 118,950 | 62,000 | 46,750 | 666,000 |
| Ban100 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investments | 0 | 0 | -5,000 | -5,000 | -5,000 | -5,000 |
| Other Balance Movements | -13,000 | 0 | 0 | 0 | 0 | 0 |
| **Total Financing Movements** | **62,328** | **66,119** | **56,389** | **53,844** | **35,875** | **43,061** |
| | | | | | | |
| **Monthly Movements** | **-7,973** | **18,132** | **21,490** | **25,060** | **26,956** | **21,633** |
| UBS Cash Release | 0 | 0 | 0 | 0 | 0 | 0 |
| **Monthly Movements** | **-7,973** | **18,132** | **21,490** | **25,060** | **26,956** | **21,633** |
| | | | | | | |
| **Final Cash** | **51,821** | **69,953** | **91,443** | **116,503** | **143,459** | **165,091** |
| | | | | | | |
| **Restricted Cash** | **51,792** | **69,781** | **91,400** | **116,459** | **143,411** | **157,253** |
| DCT as collateral | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash Collateral on Citi and Sindicated Facilities | 8,812 | 8,812 | 8,812 | 8,812 | 8,812 | 8,812 |
| Monthly Collection | 42,980 | 60,969 | 82,588 | 107,647 | 134,599 | 148,441 |

Following explanations and questions from the members of the Board of Directors and Management of the Company, the members agreed to hold another session, with a smaller group and a more focused agenda, to discuss the financial figures. All members agreed to this.

In light of the foregoing, and particularly with respect to the matters discussed regarding the Citibank PA, Nomura, the FNG, and the collections strategy, the Secretary of the meeting requested that the members of the Board of Directors approve these transactions, together with all documentation required to be executed or processed.

Initial
CM

Dr. Maite also requested that, as part of this authorization, the presentation be amended to reflect these terms and conditions.

Following the foregoing proposal and explanations, the Board of Directors took note thereof and issued the following approval with respect to the matters requested, and further issued the following instructions:

1. The request was approved and authorized. The directors present, unanimously, that is, with the favorable vote of 100% of the members of the Board of Directors in attendance at the meeting, instructed Management and the Legal Representative to, without limitation, negotiate, review, and execute all documentation, including any required guarantees, necessary to carry out the transaction relating to the Citibank PA in the manner described above, including the amendment to the presentation proposed by Dr. Maite.



Initial
CM

2. The request was approved and authorized. The directors present, unanimously, that is, with the favorable vote of 100% of the members of the Board of Directors in attendance at the meeting, instructed Management and the Legal Representative to, without limitation, negotiate, review, and execute all documentation, including any required guarantees, necessary to carry out the transaction relating to Nomura in the manner described above.

3. The request was approved and authorized. The directors present, unanimously, that is, with the favorable vote of 100% of the members of the Board of Directors in attendance at the meeting, instructed Management and the Legal Representative to, without limitation, negotiate, review, and execute all documentation, including any required guarantees, necessary to carry out the transaction relating to the FNG in the manner described above.

4. The request was approved and authorized. The directors present, unanimously, that is, with the favorable vote of 100% of the members of the Board of Directors in attendance at the meeting, instructed Management and the Legal Representative to, without limitation, negotiate, review, and execute all documentation, including any required guarantees, necessary to carry out the transaction relating to the debt collection strategy in the manner described above.

Following the foregoing approvals and instructions to Management and the Legal Representative, the Board of Directors unanimously approved this item regarding the projections, including the mandates, with the favorable vote of 100% of the members of the Board of Directors in attendance at the meeting.

**11. AUTHORIZATIONS AND RATIFICATIONS TO THE LEGAL REPRESENTATIVE**

The Secretary of the meeting continued by stating that, with respect to this matter, it was necessary to grant certain authorizations and ratifications to the Legal Representative in connection with certain purchase and sale transactions, and she clarified that these transactions are part of the Company's regular course of business and have been carried out on a recurring basis.

**A) Portfolio Purchase and Sale**

- **Ratification of the Purchase and Sale of Promissory Notes with UBS**

Regarding this purchase and sale transaction, the Secretary clarified that, in accordance with the transaction approved by the creditors of the UBS structure and pursuant to the provisions of the trust agreement for PA CREDIVALORES UBS GRAMERCY-15209 under the "Permitted Asset Sale" provision, the following transaction was carried out on February 9, 2024:

– Purchase by Credivalores from UBS of 4,333 promissory notes as of February 8, for a total amount of COP 11,592,165,172.80 (purchase and sale agreement / endorsement of the promissory notes in favor of CV).

Initial
CM

- **Ratifications of the Assets Purchase and Sale with B100**

Regarding this purchase and sale, the Secretary of the meeting went on to state, in relation to this point, that these assets were sold as follows:

- Sale of assets to Ban100 for a total amount of COP 12,023,954,423 (purchase and sale agreement / endorsement of the promissory notes in favor of Ban100). With the following settlement of the transaction:



Initial
CM

| Concept | Value |
| --- | --- |
| Principal | 11,558,109,120 |
| Interest | 340,045,474 |
| Fixed charges | 125,905,145 |
| Customer credit balances | 105,316 |
| Total | 12,023,954,423 |
| | |
| Premium as a % of principal | 25% |
| Premium Amount | 2,889,527,280 |

Having heard the foregoing proposal regarding the ratification and authorization of the Legal Representative to execute and take all other actions in connection with the purchase and sale transactions involving UBS and BAN100, as well as the agreements documenting such transactions, the Board of Directors took note thereof and unanimously approved, with 100% of the votes of the members present at the meeting, the authorization and ratification of the transactions carried out by the Legal Representative.

**B) FI Guarantees: Background of the Guarantee Agreements**

Next, the Secretary of the meeting proceeded to explain certain guarantee transactions and agreements that had been entered into in connection with credit transactions with the shareholders, and for this item, our legal counsel, who has been advising us and documenting these transactions, was asked to provide the members and attendees with the necessary context regarding the documents that had been executed, as well as those that remained pending execution, including certain amendments to agreements that had already been executed.

Dr. Edgar Munoz proceeded to explain.

- **Background of the Guarantee Agreements / Ratifications**

i) **Security Interest over Citi Second-Rank Fiduciary Rights (Executed on March 10, 2023):** Regarding this matter, Dr. Munoz explained the agreement, from which the following key features and general terms were identified:

Maximum Amount Covered by the Guarantee:

✓ USD 65,000,000 (plus applicable interest and other charges).

Term of the Guarantee:

✓ 12 months, commencing on the date on which the security interest is registered with the Movable Collateral Registry.

Assets Subject to a Second-Rank Security Interest:

✓ All present and future fiduciary rights of Credivalores – Crediservicios S.A. arising from the commercial trust agreement for security and source of payment purposes, initially entered into

Initial
CM

on January 31, 2022, by and among Fiduciaria Bancolombia S.A. Sociedad Fiduciaria, in its capacity as trustee; Citibank Colombia S.A., in its capacity as secured creditor; and Credivalores – Crediservicios S.A.

**ii) Security Interest over UBS Second-Rank Fiduciary Rights (Executed on March 10, 2023):** Regarding this matter, Dr. Munoz explained the agreement, from which the following key features and general terms were identified:



Initial
CM

Maximum Amount Covered by the Guarantee:

✓ USD 65,000,000 (plus applicable interest and other charges).

Term of the Guarantee:

✓ 12 months, commencing on the date on which the security interest is registered with the Movable Collateral Registry.

Assets Subject to a Second-Rank Security Interest:

✓ All present and future fiduciary rights of Credivalores – Crediservicios S.A. arising from the commercial trust agreement for security and source of payment purposes, initially entered into on May 13, 2023, by and among Fiduciaria Bancolombia S.A. Sociedad Fiduciaria, in its capacity as trustee; Fiduciaria Bancolombia S.A. Sociedad Fiduciaria, in its capacity as security agent on behalf of the secured parties, and Credivalores – Crediservicios S.A.

With respect to these agreements, the authorization and ratification of such agreements and transactions is hereby requested.

Having heard the foregoing proposal regarding the ratification and authorization of the Legal Representative to execute and take all other actions in connection with the guarantee contracts/transactions, the Board of Directors took note thereof and unanimously approved, with 100% of the votes of the members present at the meeting, the authorization and ratification of the transactions carried out by the Legal Representative.

- **Authorization to Sign the Residual Trust Agreement and any Amendments thereto:** With respect to this agreement, Dr. Munoz proceeded to explain to the members of the Board of Directors and the attendees the various aspects of the agreement, noting the need to authorize its execution. The characteristics explained were as follows:

Maximum Amount Covered by the Guarantee:

✓ USD 65,000,000 (plus applicable interest and other charges).

Term of the Guarantee:

✓ 12 months, commencing on the date on which the security interest is registered with the Movable Collateral Registry.

Assets Subject to a Second-Rank Security Interest:

✓ Residual amounts from the existing trusts arising from cash flows or cash receipts, once the first-ranking claims have been paid, or once contributions have been returned and cash surpluses have been distributed, in accordance with the terms of such trusts.

Initial
CM

- ✓ On the Citi Trust, only the cash flows or the cash derived from such trust that remain after satisfying the beneficiaries of such trust agreement and fulfilling the Purchase and Sale of Trust Rights shall be part of such trust.

Having heard the foregoing proposal regarding the authorization of the Legal Representative to execute and take all other actions in connection with the contracts/transactions involving Residual Trusts, as well as amendments thereto, the Board of Directors took note thereof and unanimously approved, with 100% of the votes of the members present at the meeting, the authorization of the Legal Representative to execute the same and take any other actions necessary in connection therewith to fully accomplish the foregoing.

- **Authorization on the Portfolio to be Used as Collateral.** Regarding this authorization, Dr. Muñoz explained that the previously described Residual Trust agreement includes a portfolio from Credivalores that will be pledged as first-ranking collateral. The portfolio is recorded on the Company's balance sheet, and the other consists of certain residual assets held by the Company in Autonomous Trusts, arising from a portfolio that was used to secure a loan with Systemgroup; and that, that portfolio is subject to a second-ranking collateral.



Initial
CM

The beneficiaries of these guarantees will be the lenders under the Term Loan.

The following table shows the portfolio that would be provided as collateral under the security agreement:

| **[ILLEGIBLE]** | | | | |
|---|---|---|---|---|
| **Own Portfolio – First Lien** | **0** | **41,261,842,251** | **15,251,494,091** | **56,513,336,343** |
| CURRENT | 0 | 34,521,582,413 | 7,991,044,518 | 42,512,626,931 |
| 30 | | 6,740,259,838 | 4,933,570,963 | 11,673,830,801 |
| 60 | | | 2,326,878,610 | 2,326,878,610 |
| **Systemgroup Portfolio – Second Lien** | **9,257,466** | **11,632,523,429** | **78,428,627,818** | **90,070,408,713** |
| CURRENT | | 7,419,380,051 | 11,080,266,832 | 18,499,646,883 |
| 30 | | 464,246,386 | 486,308,739 | 950,555,125 |
| 60 | | 158,059,363 | 12,051,298 | 170,110,661 |
| 90 | | 89,421,545 | 16,935,492 | 106,357,037 |
| 120 | | 97,135,494 | 46,013,338 | 143,148,832 |
| 150 | | 62,422,500 | 26,750,351 | 89,227,851 |
| 180 | | 84,777,875 | 18,516,490 | 103,294,365 |
| 210 | | 178,893,522 | 2,122,845,469 | 2,351,738,991 |
| 240 | | 367,435,238 | 2,354,716,569 | 2,722,151,806 |
| 270 | | 465,263,962 | 2,300,860,492 | 2,766,124,453 |
| 300 | | 434,237,026 | 1,869,002,250 | 2,303,239,276 |
| 330 | | 457,399,410 | 2,589,426,688 | 3,046,826,098 |
| 360 | | 561,815,365 | 780,568,798 | 1,342,384,163 |
| 361-720 | | 791,980,694 | 27,944,529,559 | 28,736,510,253 |
| >720 | 9,257,466 | | 26,729,835,455 | 26,739,092,921 |
| **Grand Total** | **9,257,466** | **52,894,365,680** | **93,680,121,909** | **146,583,745,056** |

Having heard the foregoing proposal regarding the authorization of the Legal Representative to execute and take all other actions in connection with the contracts/transactions to be pledged as collateral, as explained above, the Board of Directors took note thereof and unanimously approved, with 100% of the votes of the members present at the meeting, the authorization of the Legal Representative to execute the same and take any other actions necessary in connection therewith to fully accomplish the foregoing.

- **Authorizations and Ratifications of the Forbearance Agreement, together with its Amendments and Schedules**

**A) Forbearance Agreement: Signed on January 15, 2024 – Ratification:** Thereafter, Dr. Edgar proceeded to explain this transaction, for which ratification of the agreement executed on January 15, 2024, is being requested. The principal purpose of the agreement was to remedy the Company's defaults under the Term Loan.

He then stated:

The main terms of the Forbearance Agreement ("FA") that was executed on January 15 are as follows:

Initial
CM

- ✓ **Section 2 – Acknowledgments.**

  - Section 2.1 – Sets out the acknowledgment of amounts that were not paid when due, in accordance with Schedule II;

  - Section 2.2 – The agreement lists a series of events in the Schedule I as Defaults and Events of Default under the Term Loan (“TL”). All of these Events of Default are acknowledged by the Loan Parties upon execution of the FA. This is relevant because the failure to comply with the obligations listed therein is acknowledged and, although the agreement permits a temporary suspension of enforcement, such suspension applies only during the term of the agreement (the “Forbearance Period”);



Initial
CM

✓ **Section 3 – Forbearance**

- Section 3.1(a) – This section sets forth the Lenders' agreement to refrain from exercising their remedies for a period ending on the earliest of any of the following dates (the "Forbearance Period"):

    - January 31, 2024 (which may be extended by agreement among the Lenders);

    - The occurrence of any other Defaults or Events of Default not set forth in Schedule I;

    - The commencement of any enforcement action, material litigation, or the exercise of any other remedy against any of the Loan Parties;

    - Breach of the R&W made in the agreement;

    - Section 3.1(b) – It is acknowledged that the EoDs included in Schedule I constitute actionable Events of Default with respect to which the Lenders are currently refraining from exercising their remedies pursuant to the FA, **and it is acknowledged that the Default Rate shall apply throughout the entire period during which such defaults remain outstanding.** The Default Rate shall continue to be calculated based on the Adjusted Term SOFR, as it was prior to the maturity of the loan.

    - Sections 3.2 and 3.3 – Acknowledge that the FA does not constitute a waiver of the Lenders' remedies and that, upon expiration of the FA, such remedies may be exercised.

✓ **Section 4 – Agreements** – This section sets forth the agreements of the Borrower (FI), the Guarantor (CV), and the Loan Parties (CV and FI), which include the following:

- Section 4.1 – Consent Fee and Exit Fee – This section provides for fees payable by the Loan Parties to the Lenders in consideration for the agreement, pro rata based on the Commitments, which are added to the principal on a pro rata basis across all outstanding Commitments, as follows: ***"(a) a consent fee in an aggregate principal amount equal to U.S.$2,012,203.19 and (b) an exit fee in an aggregate principal amount equal to U.S.$2,012,203.19."***

- Section 4.2 – Legal Fees and Expenses – Payment by the Loan Parties of legal fees and expenses, including those of STB, GPA, the Lenders, and their respective advisors.

- Section 4.4 – Reporting and Information Obligations – Section 4.4 sets forth a series of reporting and information obligations that must be complied with beginning January 19, 2024, that is, beginning Friday. Such information must be monitored by a Monitoring Agent, whose fees shall be paid by the Borrower (FI). This undertaking requires the Loan Parties to provide certain information to the Monitoring Agent.

Initial
CM

- <u>Section 4.5 – Other agreements</u>

    - **<u>No Restricted Payments</u>** – The agreement extends the prohibition on Restricted Payments (including dividends, distributions, etc.) **<u>to the Borrower's subsidiaries, i.e., FI's subsidiaries, (including Ban100, in this case, as it could potentially be deemed a Subsidiary under the TL)</u>**. The obligation under the Second ARCA not to make Restricted Payments is set forth in Section 7.05 thereof and applies only to the Loan Parties (FI and CV), and not to their subsidiaries.

    - **<u>Payment of Fees</u>** – The Borrower shall pay the fees of the Lenders and their advisors no later than January 31, 2024.



Initial
CM

✓ **Section 5 – Conditions Precedent.** Certain conditions precedent must be satisfied for the agreement to become effective, including the following:

- Signing of the agreement by all parties;
- The delivery to the Administrative Agent of a cash flow projection for the Borrower and its subsidiaries;
- Absence of any Events of Default other than those set forth in Schedule I;
- Accuracy of the R&W, including, among others, the corporate authorizations (Board of Directors or General Shareholders' Meeting);
- The appointment of the Monitoring Agent by the Borrower;
- Payment of the legal fees and expenses of the Administrative Agent and its advisors.

**B) Forbearance Agreement: Amendment currently under negotiation – For approval, as it has not yet been executed**

Thereafter, the attorney continued explaining the amendments to the Forbearance Agreement that were being negotiated and required approval by the Board of Directors to authorize the representative to execute them, as they had not yet been executed. The main terms to be incorporated into the FA (which would become an Amended & Restated Forbearance and Waiver Agreement), in connection with the exchange of notes, are as follows:

- A reference to the exchange of notes under Regulation S / Rule 144A is included in the recitals of the agreement.
- The "forbearance" period is extended through March 31, 2024 (the "Forbearance Period").
- A waiver is included in Section 4 of Section 7.01(b) of the Credit Agreement with the shareholders (the Term Loan), so Credivalores is allowed to pledge the portfolio as the collateral required for the exchange of notes.
- The Schedule I, which lists the Events of Default being "forgiven," includes: (i) Section 8.01(e)(A), which refers to the cross-default arising from the failure to pay the coupon under the issuance; (ii) Section 8.01(f), relating to insolvency proceedings, so Credivalores is allowed to file the pre-pack with the New York court; and (iii) as part of the Events of Default under Section 8.01(g), the failure to pay the coupon in included.
- The amounts outstanding set forth in Schedule II are updated as of the date hereof.
- A Schedule III is included, which is currently blank, for Credivalores to describe the portfolio to be pledged as collateral in connection with the exchange of notes.

Initial CM

Having heard the foregoing proposal regarding the ratification and authorization of the Legal Representative to execute and take all other actions in connection with the contracts/transactions with respect to the Forbearance Agreement and the amendments thereto, the Board of Directors took note thereof and unanimously approved, with 100% of the votes of the members present at the meeting, the ratification of the execution of the Forbearance Agreement and the authorization to execute the amendments thereto and take all actions necessary in connection therewith, in accordance with the foregoing.

**12. MOTIONS AND MISCELLANEOUS**

At this point in the meeting, the Secretary of the meeting asked the members of the Board of Directors and the other attendees whether they had any additional matters they wished to discuss.



Initial
CM

In response, the members of the Board of Directors stated that they had no further matters or other business they wished to discuss.

### 13. APPOINTMENT OF THE COMMITTEE RESPONSIBLE FOR DRAFTING AND APPROVING THE MINUTES

The Secretary of the meeting stated that the agenda had been completed and asked whether any of the members present had any comments or remarks to make and whether the meeting could be adjourned.

In response, none of the members of the Board of Directors in attendance had any comments to make.

Thereafter, the Legal Representative of the Company stated for the record that the deliberative and decision-making quorum had been maintained throughout the meeting, from beginning to end, in accordance with Decree 398 of 2020, and that, accordingly, the meeting of the Board of Directors could be adjourned.

After that, she asked the members whether they agreed that they should proceed with the process of having a Drafting Committee preparing and approving the minutes, to be carried out by the Chair and Secretary of the meeting, to which all members present agreed.

In response to the proposal, all members of the Board of Directors agreed and unanimously approved it, representing the affirmative vote of one hundred percent (100%) of the members present.

Thereafter, the Secretary of the meeting stated that, having completed the agenda and addressed all matters raised by the members, she declared the regular meeting of the Board of Directors adjourned. She thanked everyone for their attendance and stated that any information requested in connection therewith would be provided by email.

The agenda having been completed, and with thanks to the directors for their participation, the regular meeting of the Board of Directors was adjourned at four in the afternoon (4:00 p.m.)

**The Chair,**
SIGNED __________
Luis Maria Blaquier

**The Secretary,**
SIGNED __________
Liliana Arango Salazar

**The Legal Representative**
SIGNED __________
Liliana Arango Salazar

Initial
CM

** These minutes were approved by the committee designated at such meeting to draft and approve the minutes. It is further clarified that such committee was appointed and comprised of the Chair and Secretary of the meeting, namely, Dr. Luis Maria Blaquier and Dr. Liliana Arango, respectively.

This certified copy is a true and accurate copy of the minutes recorded in the Company's corporate books.

**[SIGNATURE]**
**LILIANA ARANGO SALAZAR**
**The Secretary**



Initial
CM

**CERTIFICATE OF TRANSLATION**

I, Claudia Marquez, am over the age of 18, competent to translate from Spanish into English, and certify that the translation of the above document is true and accurate (including any stamps or seals) to the best of my abilities. I understand that if any part of the translation is intentionally false, I will be subject to punishment.

Document: Minutes No. 261 - Regular Meeting of the Board of Directors – CREDIVALORES – CREDISERVICIOS S.A.

Translator: Claudia Marquez
Big Way Offices LLC (dba Big Way Translations)
Dunedin, Fl 34698
E-mail: bigwaytranslations@gmail.com
Phone: +1-727-2834625
Date: September 14, 2026

Signature:

Signed by:
Claudia Marquez
43704F9B067B488...

Claudia Marquez
Spanish-English Translator
bigwaytranslations.com

The undersigned is a Spanish-English Public Interpreter, Resolution No. 061, Ministry of People's Power for Interior Relations, Justice and Peace, Official Gazette 42,108 dated April 16, 2021, of the Bolivarian Republic of Venezuela.

The undersigned is a Certified Translator English into Spanish by the American Translators Association (ATA), Certificate Number 554420.

# Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 0A5402FF-7B3D-8B54-805C-64427448AF8F | | Status: Completed |
| Subject: Complete with Docusign: 2024-02-28 Mins (#261) EN.pdf | | |
| Source Envelope: | | |
| Document Pages: 43 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 42 | Claudia Marquez |
| AutoNav: Disabled | | bigwaytranslations@gmail.com |
| EnvelopeId Stamping: Disabled | | IP Address: 38.27.127.36 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>9/14/2026 4:29:21 AM | Holder: Claudia Marquez<br>bigwaytranslations@gmail.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Claudia Marquez<br>bigwaytranslations@gmail.com<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Pre-selected Style<br>Using IP Address: 38.27.127.36 | Sent: 9/14/2026 4:29:45 AM<br>Viewed: 9/14/2026 4:29:56 AM<br>Signed: 9/14/2026 4:34:38 AM<br>Freeform Signing |

**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/14/2026 4:29:45 AM |
| Certified Delivered | Security Checked | 9/14/2026 4:29:56 AM |
| Signing Complete | Security Checked | 9/14/2026 4:34:38 AM |
| Completed | Security Checked | 9/14/2026 4:34:38 AM |

| Payment Events | Status | Timestamps |
|---|---|---|