**Acta No. 263**
**Reunión Ordinaria de Junta Directiva**
**CREDIVALORES – CREDISERVICIOS S.A.**

Siendo las nueve de la mañana (09:00 A.M.) del día 29 de abril de 2024, se reunió, en sesión ordinaria, la Junta Directiva de la sociedad CREDIVALORES – CREDISERVICIOS S.A. (la "Sociedad) de manera virtual (teleconferencia) a través del aplicativo TEAMS de Microsoft, en la ciudad de Bogotá D.C., previa convocatoria hecha por el Representante Legal de la Sociedad, mediante comunicación escrita enviada a los miembros principales de la Junta Directiva con la previsión estatutaria establecida en el artículo 34.

Se encontraban presentes los siguientes miembros de la Junta Directiva:

1. José Miguel Knoell Ferrada
2. David Seinjet Neirus
3. Gustavo Adrián Ferraro
4. Luis María Blaquier
5. Juan Manuel Trujillo Sánchez
6. Carlos Eduardo Meza

**I. CONSTANCIAS INICIALES**

a. Se encuentran participando, a través de teleconferencia seis (6) de los siete (7) miembros de la Junta Directiva, (los "Directores"), de acuerdo y en cumplimiento de lo dispuesto en el Artículo 34 y 35 de los estatutos de la Sociedad (los "Estatutos"), conformando así, quórum suficiente para deliberar y decidir válidamente los puntos a tratar.

b. Asistieron como invitados la doctora Catalina Kempowsky en calidad de asesora, el doctor Javier Ledesma en representación del accionista Lacrot Inversiones 2014 S.L.U., la doctora Maite De Alba De Gandiaga en representación del accionista Davalia Gestion de Activos S.L., Juan Carlos Estupiñan en calidad de director de planeación financiera de la compañía, Jaime Francisco Buritica Leal en su calidad de representante legal principal y la Doctora Liliana Arango Salazar en su calidad de representante legal suplente y secretaria general.

c. Asistió Alberto Hernandez en calidad de apoderado del doctor José Miguel Knoell, cuyo poder fue debidamente allegado a la secretaria de la compañía previo a la reunión.

Se puso a consideración el siguiente orden del día, el cual fue aprobado por unanimidad de los miembros de la Junta Directiva presentes en la reunión:

**ORDEN DEL DÍA***

1. Verificación del quórum.
2. Elección del Presidente y Secretario de la Reunión
3. Presentación y Aprobación Estados Financieros del Primer Trimestre de 2024
4. Informe de Cartera Primer Trimestre de 2024
5. Amendment.
6. Avance Negociaciones:
   - Reestructuración Bono
   - Estatus FNG
   - Avance Nomura
7. Proposiciones y Varios.
8. Nombramiento comité redactor y aprobador del acta

*El orden del día fue enviado con la convocatoria, no obstante, sufrió cambios en la presente reunión los cuales fueron aceptados unánimemente por los miembros de junta presentes.

En seguida, se dio inicio a la reunión y se desarrolló el orden del día de la siguiente manera:

## 1. VERIFICACIÓN DEL QUÓRUM

Procedió la doctora Liliana Arango a verificar el quorum e informó que se hallaban presentes seis (6) de los siete (7) miembros de la Junta Directiva, habiendo por lo tanto quórum necesario para deliberar y decidir válidamente, conforme a los Estatutos de la Sociedad.

De la conformación del quorum, la doctora Arango destacó que había asistido Alberto Hernandez en calidad de apoderado del doctor José Miguel Knoell, cuyo poder fue debidamente allegado a la secretaria de la compañía previo a la reunión.

## 2. NOMBRAMIENTO DE PRESIDENTE Y SECRETARIO DE LA REUNIÓN

La doctora Arango procedió a indicar que ella funge como secretaria general de la junta directiva, y preguntó a los directores si deseaban que ella continuara en esta calidad en la reunión. Por unanimidad, esto es con el voto favorable de la totalidad de los Directores presentes en la reunión, se eligió como como Secretaria a Liliana Arango Salazar quien estando presente aceptó dicha dignidad.

Procedió proponiendo a el doctor David Seinjet, para el cargo de presidente de esta reunión, para lo cual, por unanimidad, esto es con el voto favorable de la totalidad de los Directores presentes en la reunión, eligieron al doctor Seinjet quien estando presente aceptó dicha designación.

## 3. PRESENTACIÓN Y APROBACIÓN ESTADOS FINANCIEROS DEL PRIMER TRIMESTRE DE 2024

La secretaria de la reunión procedió a darle la palabra a Juan Carlos Estupiñan para la exposición de este punto. Sobre esto se pronunció diciendo que se tenían en exposición los resultados del primer trimestre del 2024:

COP$ MM

| BALANCE GENERAL | mar-24 | Ppto. 1Q 2024 | Cumpl. | Δ $ | dic-23 | Δ % | Δ $ |
|---|---|---|---|---|---|---|---|
| ACTIVOS | | | | | | | |
| Efectivo y equivalentes al efectivo | 39.583 | 69.886 | 56,6% | (30.302) | 59.794 | (33,8%) | (20.211) |
| Total de activos financieros a valor razonable | 10.173 | 13.806 | 73,7% | (3.634) | 14.789 | (31,2%) | (4.617) |
| Créditos de consumo | 1.810.859 | 1.716.055 | 105,5% | 94.804 | 1.858.276 | (2,6%) | (47.416) |
| Deterioro | (480.683) | (473.231) | 101,6% | (7.452) | (455.798) | 5,5% | (24.885) |
| **Cartera total de préstamos, neto** | **1.330.176** | **1.242.824** | **107,0%** | **87.352** | **1.402.477** | **(5,2%)** | **(72.301)** |
| Cuentas por cobrar, neto | 260.459 | 257.284 | 101,2% | 3.174 | 257.284 | 1,2% | 3.174 |
| **Total Activos financieros a costo amortizado** | **1.590.635** | **1.500.108** | **106,0%** | **90.527** | **1.659.762** | **(4,2%)** | **(69.127)** |
| Inversiones en asociados y afiliados | 11.343 | 11.895 | 95,4% | (552) | 11.895 | (4,6%) | (552) |
| Inversiones en Patrimonio | 4.357 | 5.633 | 77,3% | (1.277) | 4.650 | (6,3%) | (294) |
| Activos fiscales corrientes | 42.497 | 41.476 | 102,5% | 1.021 | 41.476 | 2,5% | 1.021 |
| Activos por impuestos diferidos netos | 148.015 | 149.467 | 99,0% | (1.452) | 128.757 | 15,0% | 19.258 |
| Propiedad y equipo Total | 270 | 301 | 89,6% | (31) | 301 | -10,4% | (31) |
| Activos intangibles distintos de plusvalía, netos | 19.767 | 20.171 | 98,0% | (404) | 22.130 | (10,7%) | (2.363) |
| Total Activo | 1.866.639 | 1.812.743 | 103,0% | 53.896 | 1.943.554 | (4,0%) | (76.915) |
| PASIVOS Y PATRIMONIO | | | | | | | |
| Pasivos | | | | | | | |
| **Total de pasivos financieros a costo amortizado** | **1.532.119** | **1.279.440** | **119,7%** | **252.679** | **1.547.566** | **(1,0%)** | **(15.448)** |
| Provisiones por beneficios a los empleados | 884 | 1.054 | 83,9% | (169) | 1.054 | -16,1% | (169) |
| Otras provisiones | 2.566 | 2.932 | 87,5% | (366) | 2.932 | (12,5%) | (366) |
| Cuentas por pagar | 87.864 | 58.722 | 149,6% | 29.142 | 91.120 | -3,6% | (3.256) |
| Pasivos por impuestos corrientes | 1.756 | 1.616 | 108,7% | 141 | 1.616 | 8,7% | 141 |
| Otros pasivos | 30.609 | 233.725 | 13,1% | (203.116) | 25.560 | 19,8% | 5.049 |
| **Total de los Pasivos** | **1.655.798** | **1.577.488** | **105,0%** | **78.310** | **1.669.848** | **(0,8%)** | **(14.050)** |
| Patrimonio | | | | | | | |
| **Total de Patrimonio** | **210.840** | **235.255** | **89,6%** | **(24.416)** | **273.706** | **(23,0%)** | **(62.866)** |
| **Total de Pasivos y Patrimonio** | **1.866.638** | **1.812.743** | **103,0%** | **53.895** | **1.943.554** | **(4,0%)** | **(76.916)** |

CONFIDENTIAL

**ACTIVOS:**

**Efectivo y equivalentes de efectivo**: La diferencia por COP $30.302 MM debido a que el presupuesto incorpora la venta y pago de la obligación con Citibank se hacían en marzo y el pago a FI en abril

**Créditos de consumo**: la diferencia de COP $94.804 MM corresponden a que el presupuesto incluye la venta de cartera del Citibank (COP $109.826 MM) que se estimaba para el mes de marzo

**PASIVO:**

En el pasivo, tuvimos una desviación total de 78.000 millones que están explicadas por 252.000 millones de diferencia que tuvimos en las obligaciones financieras, tuvimos un cierre de obligaciones financieras de un billón 532.000 pesos frente a un 1.2 billones tenemos en el presupuesto la diferencia corresponde también a la venta de cartera del Citibank y a que en el presupuesto ya estamos incorporando el efecto de la quita de del bono.

La diferencia corresponde a que el modelo incorporaba la quita del bono (**COP $180.453 MM**) y la venta de la cartera del Citibank (**COP $109.826 MM**) como menor saldo de las obligaciones financiera en el mes de marzo y el efecto de la quita dentro del rubro "**Otros Pasivos**"

**PATRIMONIO:**

El Patrimonio decreció en **COP $24.416 MM** corresponde a que en el presupuesto de estimaba una pérdida en el 1Q por valor de **COP $38.462 MM** y la pérdida real alcanzó los **COP $61.229 MM** (diferencia de **COP $22.767 MM**)

Continuó explicando el estado de resultados:

COP$ MM

| ESTADO DE RESULTADOS | mar-24 | Ppto. 1Q 2024 | Cumpl. | Δ $ | mar-23 | Δ % | Δ $ |
|---|---|---|---|---|---|---|---|
| Ingresos por intereses y ventas de cartera | 47.484 | 53.432 | 88,9% | (5.948) | 79.290 | (40,1%) | (31.806) |
| Comisiones | 6.982 | 8.594 | 81,2% | (1.612) | 18.153 | (61,5%) | (11.171) |
| Costos financieros intereses | (67.924) | (83.099) | 81,7% | 15.175 | (123.166) | (44.9%) | 55.242 |
| Intereses | (51.061) | (49.032) | 104,1% | (2.029) | (71.965) | (29,0%) | 20.904 |
| Derivados | (9.561) | (33.260) | 28.7% | 23.698 | (38.393) | (75,1%) | 28.831 |
| CT Pasivos | (7.302) | (808) | 903,7% | (6.494) | (12.808) | (43,0%) | 5.506 |
| **Intereses netos** | (13.458) | (21.073) | 63,9% | 7.615 | (25.723) | (47,7%) | 12.265 |
| Gastos por provisiones Totales | (48.453) | (17.433) | 277,9% | (31.020) | (29.761) | 62,8% | (18.692) |
| **Ganancia (pérdida) por actividades de operación** | (61.910) | (38.506) | 160,8% | (23.404) | (55.484) | 11,6% | (6.427) |
| **Gastos de Empleados, Administrativos y Operativos** | | | | | | | |
| Gastos por beneficios a los empleados | (2.958) | (2.696) | 109,7% | (262) | (3.086) | (4.1%) | 128 |
| Gasto por depreciación y amortización | (1.879) | (1.581) | 118,8% | (298) | (1.579) | 19,0% | (300) |
| Gasto por depreciación de activos de derecho de uso | (529) | (378) | 140,1% | (151) | (641) | (17,4%) | 112 |
| Gastos Administrativos y Operativos | (12.781) | (17.395) | 73,5% | 4.613 | (21.219) | (39,8%) | 8.438 |
| **Total Otros Gastos** | (18.148) | (22.050) | 82,3% | 3.902 | (26.525) | (31,6%) | 8.377 |
| **Rendimientos Financieros** | | | | | | | |
| Otros ingresos | 514 | - | 0,0% | 514 | 300 | 71,4% | 214 |
| Rendimientos financieros | 112 | 1.384 | 8,1% | (1.272) | 2.284 | (95,1%) | (2.172) |
| **Total Rendimientos Financieros** | 625 | 1.384 | 45,2% | (759) | 2.583 | (75,8%) | (1.958) |
| (Costos) Financieros | (433) | - | 0,0% | (433) | (3) | 13509,0% | (430) |
| **Rendimientos financieros netos** | 192 | 1.384 | 13,9% | (1.192) | 2.580 | (92,6%) | (2.388) |
| **Ganancia, antes de impuestos** | (79.866) | (59.172) | 135,0% | (20.694) | (79.429) | 0,6% | (437) |
| Gasto por impuestos | 18.637 | 20.710 | 90,0% | (2.073) | 49.152 | (62.1%) | (30.515) |
| **Utilidad neta** | (61.229) | (38.462) | 159,2% | (22.767) | (30.276) | 102,2% | (30.953) |

**Ingreso por intereses**: la diferencia corresponde a la mayor causación esperada en el presupuesto para el producto Tarjeta de crédito y la reactivación durante el trimestre de la colocación de Libranza (desembolsos por COP $15.810 MM)

**Comisiones:** La diferencia corresponde a los ingresos que se estimaban ser recaudados derivados de la reactivación de la colocación

**Costo financiero**: Corresponde la tasa de cambio esperada en el modelo a cierre del 1Q de 2024 por valor de COP $3.950 frente a la TRM real de cierre de trimestre por valor de COP $3.842,30

**Provisiones**: La diferencia corresponde a un mayor deterioro de la cartera (COP $12.649 MM) especialmente en el producto tarjeta de crédito y un mayor gasto por condonaciones (COP $18.371 MM)

**Total Costos y Gastos**: Se observa un mejor comportamiento en el real frente al presupuesto gracias a que la compañía viene realizando una política de control de costos y gastos. Las optimizaciones realizadas, de dan como resultado del cierre de oficinas, reducción de personal por el cierre de la colocación y la disminución de costos en varias áreas de la compañía por el cierre del producto tarjeta de crédito

Explicó también sobre que se estaba esperando una perdida de 38.000 millones, debido a cierre de producto de tarjeta de crédito y otros factores, pero el real fue de 61.000 millones, por lo que asegura que estamos dentro del presupuesto del trimestre.

El doctor David quiso preguntar acerca de cómo quedaría el PyG, si no se ingresa el recorte del bono, ante esto Juan Carlos, le respondió que se tenían solo datos hasta diciembre, y ahí se daba la proyección de los 62.000 millones de perdida, entonces que iba a complementar la información con lo correspondiente de enero a marzo y con lo que se pueda pronunciar Catalina respecto de cartera y provisiones, y poder plantear estrategias para mejorar la perdida operacional. El doctor David hizo sugerencias para no gastar tanta plata respecto de la operación que genera el bono.

Ante lo anterior, la Junta Directiva por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, estuvieron de acuerdo y aprobaron los estados financieros, expuestos en este punto de *PRESENTACIÓN Y APROBACIÓN ESTADOS FINANCIEROS DEL PRIMER TRIMESTRE DE 2024*

4. **INFORME DE CARTERA PRIMER TRIMESTRE DE 2024**

A continuación, se le cedió la palabra a la doctora Catalina Kempowsky para que explicara lo relacionado con este punto diciendo que las provisiones se dividían en dos se dividen en condonaciones y deterioro, realmente las provisiones por deterioro que se hicieron en el primer trimestre fueron de 23.000 millones, de hecho, estamos un poco por debajo de lo que se hizo el año pasado en el primer trimestre. Contra lo presupuestado tenemos como una desviación de 9.000 millones de pesos contra lo presupuestado en el primer trimestre por deterioro. El año pasado no estábamos en este volumen de condonaciones y en noviembre del año pasado también se hicieron aprobaciones sobre una estrategia de condonación para poder hacer cancelaciones totales mucho más agresivas de lo que traíamos el año pasado y de lo que en realidad se había presupuestado, ahí tenemos digamos que una desviación importante, y se verá a ver cómo se ve el presupuesto o el *forecast* de lo que tenemos nosotros de deterioro para lo que queda del 2024 en términos de provisiones por deterioro.

| Cartera | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jun-24 | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Libranza | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Crediuno | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Creditoplus | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Total Cartera | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| Gasto | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jun-24 | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Libranza | $3.351 | $2.526 | $1.857 | $1.722 | $4.795 | $3.337 | $3.138 | $3.195 | $3.853 | $2.722 | $1.848 | $2.250 | $36.093 |
| Crediuno | $6.585 | $3.977 | $6.502 | $4.646 | $1.988 | $6.593 | $2.221 | $1.440 | $1.372 | $838 | $737 | $355 | $38.525 |
| Vigo | $420 | $306 | $699 | $1.217 | $1.029 | $623 | $518 | $558 | $297 | $259 | $613 | $543 | $11.533 |
| Creditoplus | $5 | $27 | $14 | $1 | $7 | $0 | $0 | $0 | $0 | $0 | $1 | $0 | $26 |
| Total Gasto | $10.552 | $7.315 | $8.995 | $7.403 | $7.396 | $10.889 | $5.877 | $5.190 | $5.582 | $5.355 | $4.364 | $2.729 | $81.552 |

Total gasto por deterioro: $81.552
Gasto primer trimestre: $26.025
Gasto proyectado segundo trimestre: $25.885

A partir del segundo semestre del 2024, el gasto de Crediuno empieza a disminuir, teniendo en cuenta el rodamiento natural de la cartera que se encuentra en Agotamiento.

Explicó el anterior cuadro, indicando además que la parte verde significa el gasto ejecutado hasta el momento. Se proyecta un gasto alto en el segundo trimestre respecto a lo que tuvimos en el primer trimestre, más o menos, estamos proyectando 25.000 millones, esto en parte, tiene un deterioro fuerte en crediuno por el marchitamiento de la cartera ya, termina de salir lo bueno, mucha de esa cartera ya está en su curso natural de rodamiento, que pues estas son proyecciones, pero que con las estrategias que estamos teniendo de cobranzas, que son super agresivas, esperamos que este gasto sea inferior aquí estamos poniendo como el escenario ha sido de lo que esperamos tener de gasto y a partir del segundo semestre el nivel de gasto de Crediuno empieza a disminuir, esto porque las provisiones o el modelo va llegando a su a su límite, o sea la cartera llega a su límite en rodamiento en términos de gasto y cada vez el gasto va siendo inferior.

Libranza se mantiene relativamente constante dentro del gasto y dentro del rodamiento de la cartera, también porque pues si empezamos ya a desembolsar, esto va a ser inferior, pero tenemos también un componente importante de gasto, por crecimiento, que no, no es un impacto muy alto, pero si también de lo que nos queda, de lo que no está operando y que se nos empieza a rodar.

Esta la proyección que tenemos, nosotros desde el Riesgo estamos proyectando un gasto en el año de cerca de los 80.000 millones de pesos, esto es un escenario de deterioro ácido preferimos traer un deterioro ácido porque, pues obviamente esperamos que todas las estrategias de cobranza que estamos ejecutando funcionen.

Informó también sobre las estrategias y que esperaba que se materializaran para junio, así como también sobre la inclusión de unas casas de cobranzas nuevas que están trayendo información adicional del cliente y que puede que eso mejore el recaudo. También menciono que se ha incrementado el número de clientes negociados frente al año pasado debido a las estrategias como plazo para pagos de obligaciones que conlleva menos dinero recaudado, pero mejores hábitos de pago. Mencionó el nombre de *Liquity* que es la nueva casa de cobranzas con sus estrategias de presión a los clientes, y se espera que las cosechas en junio mejoren. Habló sobre las problemáticas que se tuvieron en recaudo por semana santa y como se viene recuperando, y que la idea al final es generar el mayor recaudo en el menor periodo de tiempo, para poder cerrar la obligación con UBS.

Ante esto Javier Ledesma quiso preguntar si había posibilidad de descargar una cantidad considerable de cartera MPL que están en patrimonio autónomo, en alguna casa de cobranzas. Ante esto Catalina respondió aclarando sobre el apetito de esa cartera, y dijo que era baja y se frenó una estrategia que se hizo el año pasado. No obstante, el mercado tiene sobreoferta de este tipo de cartera lo que conlleva a bajo costo y menor apetito, sin embargo, con la estrategia actual se espera que funcione mucho más. Javier Ledesma le preguntó acerca de la el estimado de cantidad de recaudo en un periodo de 4 semanas, y de si era posible que se recaudaran cerca de 7 mil millones, a lo que Catalina le respondió que el mínimo iba a ser de 6 mil millones según lo estimado. Explicó también lo difícil del recaudo debido a que, ante el bloqueo de cupos y utilizaciones, los clientes dejaban de pagar pues ya no era prioridad hacerlo ante un producto que no podían usar, pero que estaba optimista ante esta cifra.

El doctor Seinjet también quiso decir y proponer que en otra junta o una reunión hablar especificamente sobre la estrategia de cobranza y la estrategia de la cartera en recuperación, abrir el cuadro de gestión con la cartera: la cartera Corriente, la cartera administrativa y la cartera que está en recuperación. Catalina dijo que esta información ya la tenía, y que en la próxima reunión se podría hablar de esto a más detalle.

Seguidamente explico estos cuadros, respecto de las condonaciones realizadas en Crediuno en el primer trimestre de 2024:

ENERO

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Total general | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

FEBRERO

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Total general | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

MARZO

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Total general | | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

**Total condonaciones crediuno por $17,627 en un Saldo Total de $28,445**

Aclaró y explicó sobre la problemática de la aplicación de pagos, y que muchos de estos valores se deben a esta aplicación, pues no se están yendo propiamente a capital, sino a otros rubros que sí se podrían condonar, pero son temas operativos que se están intentando solucionar.

Para recapitular las reuniones planteadas, Jaime quiso resumirlas en una para mirar el tema de activar a Credivalores, , y dos, mirar estas en estos temas que acaban de salir de cobranzas. La primera para esta semana y la segunda para la otra. Y después de esto, traer en consenso a la junta. Ante esta propuesta todos los miembros de la junta presentes estuvieron de acuerdo de manera unánime.

Oído lo expuesto, la Junta Directiva por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, aprueba este punto sobre el informe de cartera primer trimestre de 2024.

5. **AMENDMENT**

A continuación, la secretaria de la reunión procedió a ceder la palabra al doctor Jaime Buriticá para exponer este punto.

Explicó que este punto es sobre el proceso de reestructura del bono. Indicó que para salir al *filing* ante la corte se pide como requisito es que todas las deudas de la compañía deben estar limpias. Es por esto la razón del *amendment* pues cuando se hizo el *forbearance* se estipularon unos pagos y unas fechas que se tenían que cumplir frente a estos pagos sobre los cuales Credivalores es garante del crédito de finanza inversiones, y dado que la venta de cartera que teníamos que hacer del Citi a Ban100 no se logró hacer en los tiempos que teníamos estipulados, es necesario volver a limpiar el *forbearance* y los abogados estánpues solicitando hacer un *amendment*. Seguidamente explicó el siguiente cuadro solicitando lo siguiente:

Se solicita autorización para suscribir la enmienda al *forbearance* de marzo de 2024, se justifica en las siguientes causas:

1. La venta de cartera del Citibank no se dará de acuerdo con las fechas inicialmente estipuladas
2. Cualquier pago a partes relacionadas no se podrá realizar durante el tiempo que la compañía esté en *filling*

| Calendario | Adelantamiento (Forbearance) | Enmienda |
|---|---|---|
| inicial | $8.400.000 en la fecha que ocurra primero entre (x) 15 de abril de 2024, y (y) dos (2) días hábiles previos a la fecha en que la Oferta de Canje se consume. | Dos días después de la fecha efectiva del Plan se pagara el mayor entre (x) $8,700,000 y (y)las ganancias de la venta de la cartera mantenida en Citibank menos los montos adeudados más US$ 300.000 |
| 30 de abril de 2024 | 100,000 | 0 |
| 31 de mayo de 2024 | 200,000 | 0 |
| 30 de junio de 2024 | 300,000 | 300,000 |
| 31 de julio de 2024 | 400,000 | 400,000 |
| 31 de agosto de 2024 | 500,000 | 500,000 |
| 30 de septiembre de 2024 | 600,000 | 600,000 |
| 31 de octubre de 2024 | 700,000 | 700,000 |
| 30 de noviembre de 2024 | 800,000 | 800,000 |
| 31 de diciembre de 2024 | 900,000 | 900,000 |
| 31 de enero de 2025 | 1,000,000 | 1,000,000 |
| 28 de febrero de 2025 | El menor entre (x) $1.060,000, y (y) el capital de los préstamos vigentes en febrero 28 de 2025 y el último día hábil de cada mes hasta que los préstamos se paguen en su totalidad. | El menor entre (x) $1,060,000, y (y) el capital de los préstamos vigentes en febrero 28 de 2025 y el último día hábil de cada mes hasta que los préstamos se paguen en su totalidad. |

Explicó también sobre cual era el calendario inicial de pagos y que es lo que busca la enmienda para cumplir con los pagos. Es también de aclarar que hay alrededor de esto, la transacción la primera etapa de venta del CITI se dio la semana pasada, aunque la titularización por parte del Banco se está haciendo el 2 de mayo por temas de solvencia, el banco efectuó un anticipo por concepto de la prima que teníamos en esta negociación y esos recursos ya fueron colocados a disposición de Finanza Inversiones para hacer los pagos a los prestamistas. La segunda etapa, que es muy importante, se va a dar en la época que estemos en *filing* en la Corte de Nueva York entonces, los pagos que resulten de esta transacción que tengan que realizarse a partes relacionadas en que seria para el caso propio nuestro de Credivalores a Finanza Inversiones, no se pueden dar porque generarían un riesgo alto ante la Corte porque este tipo de pagos genera algún tipo de molestia en los bonistas y podría generar inquietud alrededor del juez y nos pondrían en riesgo la transacción.

Continuó explicando que básicamente esta enmienda busca que, de darse la transacción, la ultima etapa que se tiene de venta del CITI, dichos recursos quedarán en Credivalores y se harán dos días hábiles después de que la Corte que ya falle a favor nuestro la reestructura del bono, entonces esto es lo que estamos trayendo aquí para para efectos de autorización por parte de la junta Directiva.

La junta directiva después de la anterior propuesta y las explicaciones tomó nota y emitió la siguiente aprobación sobre lo solicitado, y además da las siguientes ordenes:

1. Se aprueba y se autoriza la solicitud hecha relacionada con la suscrición de un *amendment* al *forbearance*. Los directores presentes de manera unánime, es decir con el voto favorable del 100% de los miembros de junta asistentes a la reunión ordenan a la administración y al representante legal para, pero sin limitarse, negociar, estudiar, firmar toda la documentación, incluyendo garantías, requerida para realizar y llevar a cabo la suscripción de este documento la manera expuesta.

Después de las anteriores aprobaciones y órdenes a la administración y al representante legal, la junta directiva aprobó este punto sobre el *amendment*, incluidos los mandatos, es decir con el voto favorable del 100% de los miembros de junta asistentes a la reunión.

**6. AVANCE NEGOCIACIONES**

La secretaria de la reunión continuó indicando acerca de este punto del orden del día, que es un resumen sobre el avance en las negociaciones, que está adelantando la compañía que se la va a presentar, pues el gerente general

Tomó la palabra el doctor Jaime:

- **Reestructuración Bono**

Sobre la reestructuración del bono, aclaro que si bien ya se ha venido contando a la junta directiva sobre este aspecto, se considera que es mejor dejarlo documentado, y en especial sobre las etapas:

| Etapa #1 | Etapa #2 | Etapa #3 | Etapa #4 | Etapa #5 |
|---|---|---|---|---|
| Estrategia<br>(15/dic/23 a 15/ene/24) | Negociación Comité Ad Hoc<br>(15/ene/24 a 31/ene/24) | Preparación y lanzamiento Canje + Prepack<br>(07/feb/24 a 07/mar/24) | Cierre y resultados prepack<br>(05/abr/24) | Filing<br>(21/mar/24 al 12/abr/24) |
| • BCP: Dealer Manager<br>• DF King: Bondholder ID<br>• B&M: Asesor Legal Internacional<br>• MA Legal: Asesor Legal Local | • Análisis Financiero de Propuestas<br>• Negociaciones Comité Ad Hoc<br>• Preparación Documentación<br>• Due Dilligence<br>• Forberance Agreements UBS - FI - Sindicado<br><br>✓ Se capitaliza el cupon de feb/24<br>✓ Quita del 25%<br>✓ Pago bullet de capital en feb/29<br>✓ Tasa step-up: primer semestre del 4%, los tres siguientes semestres del 9% y en adelante tasa del 11% | • Asesores<br>• CSC - Agente de Notificaciones DMA<br>• EPIQ - Agente de Información e Intercambio/Agente de Votación<br>• BoNY - Trustee<br><br>✓ Waiver con UBS<br>✓ Forberance con FI<br>✓ Waiver con PA Sindicado | Class A: Old Notes Claim<br>Category — Amount<br>Total amount voting — $90.272.700,00<br>Amount accepting plan — $73.351.079,65<br>Amount rejecting plan — $16.921.620,35<br>Voters accepting — 123<br>Voters rejecting — 5<br>Percent amount accepting — 81,25%<br>Percent amount rejecting — 18,75%<br>Percent voters accepting — 96,09%<br>Percent voters rejecting — 3,91% | • Preparación Documentación Prepack<br>• FTI - Asesores Financieros<br>• B&M - Asesores Legales<br>• EPIQ - Agente de Notificación y Peticiones<br><br>✓ Se encuentra en stand by por pago de honorarios a asesores financieros y jurídicos |

Aclaró que estamos en la etapa numero 4 y explicó brevemente lo que aconteció en las anteriores etapas, explico sobre el existo de las votaciones y las vicisitudes que se tuvieron en la etapa 3.

Sobre esta cuarta etapa se pronunció diciendo que estamos en el proceso, y que teníamos que entablar un proceso de preparar la compañía para ir al *filing* y teníamos que contratar una compañía que se llama FTI, que es la que manejaba toda la información financiera de la compañía y que durante el tiempo que estemos en *filing*, que se estima que sea alrededor de entre 4 máximo 6 semanas, ellos van a ser los ojos del juez desde la perspectiva financiera de Credivalores en particular, lo que va a tener mucho más énfasis está compañía es enel manejo de la caja y hay que tener claro para para para para la junta Directiva y los invitados, es que una vez hagamos el *filing* cualquier pago que haga la compañía tiene que venir autorizado por el juez en Nueva York, es decir, los pagos no se pueden hacer distintos a los que se indique en los documentos que se llaman *motion*, el juez los aprueba y solo así se generan los pagos. De efectuar un pago por fuera de esas autorizaciones, pues llevará a la compañía a un *free fall*, por lo que hay que tener mucho cuidado

FTI se encargó de levantar toda esa información, construir todos los *motion* y esa actividad la terminamos el 12 de abril. Ya están todos los documentos para ir al *filing*, pero lo que ha detenido es el tema de los pagos que se tienen que hacer a quienes han trabajado para nosotros como legales en la transacción de os agentes de pago, porque según los abogados, las normas de conflictos de interés en capitulo 11, quienes lo representan a uno en la transacción no pueden ser acreedores. Esto ha generado discrepancias con Baker McKenzie a pesar de los acercamientos, y quieren los pagos antes del *filing*.

Ante lo anterior, Javier Ledesma le dijo a Jaime que quería que todo lo que se vaya a comunicar con los abogados y que ellos comuniquen lo dejen por escrito y que queria entender el *Budget* que queda de *chapter* 11, para que también lo coloquen por escrito, y que sea algo que realmente se necesite aprobar en junta.

Gustavo Ferraro también intervino preguntando a Jaime cuando se iban a realizar este *filing*. Ante esto Jaime le respondió que estábamos pendientes de recibir unos pagos y unos recursos provenientes de impuestos. En conclusión, dice, que esta semana deberíamos estar saliendo al *filing* y se van a a hacer unos ajustes para hacerlo lo más pronto posible.

Gustavo quedó satisfecho y volvió al tema de Baker McKenzie preguntando cual era el estatus con esta firma. Jaime le responde: Con Baker, lo que quedamos con ellos es que ya de aquí a futuro aplica lo que yo había firmado contractualmente con ellos, que es una vez se presente la factura, Teníamos 60 días de pago. No obstante Javier Ledesma replicó para que Jaime explicara bien el tema sobre los pagos a esta firma, pues se están presentando problemas enormes con el tema de los pagos, como se había explicado anteriormente. Le solicitó, nuevamente, que cualquier comunicación que tuvieran ellos con nosotros lo enviaran firmado, puesto que hay versiones u opiniones de otras firmas de abogados que indican que lo que dice Baker, no es tan apegado a la realidad de conformidad con la ley americana. Gustavo Ferraro también se pronunció apoyando estas direcciones de Javier, para que todo lo que haga la firma sea informado y por escrito y firmado.

Después de esto, hubo una breve discusión entre Gustavo y Luis Blaquier sobre el tema de los abogados, para el entendimiento de la problemática presentada, de nuevo, con los abogados.

Luis Blaquier propuso un par de ideas para el tema del pago a los abogados, de los cuales una de ellas se descartó porque ya se había intentado, ante lo cual la segunda idea, consistente en pagar, pero con la condición de que hasta el *filing* no haya costo adicional y que si ellos proponen un costo que haya un GAP y que lo pongan por escrito. A lo que Jaime asintió y dijo que se iba a poner en esa tarea.

- **Estatus FNG**

Procedió Jaime a explicar este tema, diciendo que las noticias no eran tan buenas pues e habían entablado conversaciones con el presidente con el fondo, manifestándole la necesidad e que nos apoyara con el proceso de ampliar la garantía del bono a otro plazo igual de alrededor de 3 años inclusive a 5 años. El estuvo atento a todas las explicaciones y dijo que lo que menos se quería es que hubiera un default y menos que este se produjera por la falta de apoyo del fondo, por lo que dice Jaime que el presidente le manifestó que existían dos caminos, pero primero explicó que la estructura de la garantía del bono y su creación proviene de un fondo llamado Fome, el cual pertenece principalmente al Ministerio de Hacienda, es decir, en ultimas la garantía es de ellos. Dice Jaime que el presidente le manifestó que, si jurídicamente era viable otorgar un plazo de 3 o 5 años, desde el FNG, lo podría hacer sin autorización de la junta directiva y sería lo mas fácil. La otra opción, en caso de que esta primera opción no se pudiera, entonces si tocaba acudir a la junta directiva del FNG para autorizar esta transacción.

No obstante, continua Jaime, al revisarlo por parte de ellos, se encontró que el Fome ya cerró, entonces cualquier operación sobre este fondo, no se puede dar, por lo que se optó con la segunda opción, y se manifestó que podría haber un traspié por que si la junta directiva del FNG aprueba esta reestructura entonces ellos serian los directos responsables de la garantía a futuro para con Credivalores. Efectivamente la junta le dice que no, y no aprobaron sacar el tema.

Se han sostenido reuniones con ellos, dice Jaime, explicándoles que ante este panorama nos veríamos avocados a un no pago pues por que están cortadas todas las fuentes de financiación. A lo que el 26 de agosto se presentaría inminentemente un default. La rección de ellos, continua Jaime fue de nervios, a lo que ellos propusieron algunos puntos, pero que ya se habían hecho y no había mas capacidad de los accionistas. Por lo que dice Jaime que necesitamos otro mecanismo, igual ellos tienen que evaluarlo, pues somos el ticket mas grande que tienen y por como Credivalores tiene su nicho de mercado en la parte baja de la pirámide tratando de hacer inclusión financiera.

Después de esta explicación Jaime manifestó que se deben acudir a otras instancias aún más altas, a lo cual hubo diversas explicaciones por parte de los directivos, en especial de David Seinjet, Gustavo Ferraro y Carlos Meza. Se le sugirió a la administración seguir insistiendo sobre la no posibilidad de pago y que la única alternativa es restructurar el plazo.

- **Avance Nomura**

El doctor Jaime quiso pasar al tema de Nomura y sobre la propuesta y el proceso de avance en la negociación que se va a arrancar con ellos.

Jaime le cedió la palabra a Juan Carlos para que diera mas detalle al asunto. Ante esto juan explicó las condiciones que esta pidiendo Nomura, y procedió a exponer el siguiente cuadro, también indicando lo que nosotros les estamos solicitando a ellos, para modificar:

| | Propuesta Nomura | Propuesta Credivalores (preliminar) |
|---|---|---|
| Capital de trabajo | Requeríamos un capital inicial de Credivalores para poder originar lo correspondiente al primer mes | |
| Colateral | El correspondiente para lograr una amortización a 48 meses. Esta rondando entre el 20% y el 25% | Sin Colateral, dado el colateral de caja que se está construyendo con la cuenta de reserva |
| [illegible] | USD $100.000.000 / COP $295.000 MM (Fx $3.950) | |
| Plazo | Promedio total de los tramos desembolsados = 46 meses | Promedio total de los tramos desembolsados aprox. = 68 a 72 meses por estructura de amortización |
| Tasa | Primer tramo: 17,80% EA / 1,48% MV<br>Siguientes tramos: SOFR+5<br>A partir del segundo tramo los desembolsos en cada tramo se unen y se promedian sus tasas de colocación | |
| [illegible] | Del recaudo mensual de la cartera se pagan: fees, gastos varios, intereses de mora, intereses corrientes, mantenimiento de la reserva, capital | |
| [illegible] | 2% sobre el total del monto de la facilidad (USD $2 MM) Pagaderos: 1% a la firma del contrato y el 1% restante sobre cada tramo desembolsado | Lo propuesto por Nomura pero será descontado del monto desembolsado.<br>Para CV un 1,5% anual como Fee de Administración |
| [illegible] | 1,5 veces la cuota de K+I del siguiente mes | 1,2 veces la cuota de K+I del siguiente mes |
| Prepago | Al recibir prepagos equivalentes al 3% del saldo de la obligación ya que con menor periodicidad se incurre en gastos al deshacer las coberturas | |
| Excesos de caja | La estructura no permite reclamar excesos de caja hasta completar el pago completo de la obligación | Liberación de caja, siempre y cuando se haya cumplido la prelación de pagos y la construcción del colateral |

Explico la facilidad, pero con la condición de que no nos van a dar capital inicial, capital de trabajo, para iniciar el desembolso, El modelo que ellos proponen es que nos van comprando a nosotros tramos de colocaciones que ya tengamos operando a nosotros y nos las van comprando hasta agotar esos 100 millones de dólares. Tendríamos que como Credivalores conseguir esos recursos para iniciar la colocación.

Explicó también lo relacionado con el colateral. Explicó también que Ellos nos están pidiendo que el plazo de esa obligación sea amortizada 48 meses, pero la manera en que ellos están pidiendo que se les amortice ese crédito de la cascada de pagos es que la cuota que se recaude de las libranzas, que nosotros coloquemos en sea la fuente de pago, y que de ahí se descuenten todos los gastos de la de la facilidad que luego se descuente una comisión de administración, que nosotros podemos tomar para nosotros, que estamos proponiendo sea el 1.5% anual, que sería un ingreso, pues para Credivalores, luego se descuentan ellos sus intereses y por último se descuentan ellos el capital con esa forma de amortización, la facilidad de ellos nos estaría pagando en 48 meses que ellos piden sino se estaría pagando entre 68 y 72 meses, entonces nos piden que le coloquemos un colateral para que se acelere la amortización y podamos llegar a esos 48 meses en promedio, de la facilidad.

También explicó la tasa, y las vicisitudes, la cual podría ser reevaluada. Lo mismo con el tema de la amortización, como ya se ha explicado.

Para concluir Jaime quiso decir que la propuesta que nos trae Nomura a la mesa es una propuesta, como ellos lo dicen, de construcción de cartera que en la primera etapa que es donde hacemos todo el proceso de desembolsos que nos podemos tomar alrededor de unos 10 meses, donde desembolsamos los 100 millones, la compañía recibe en flujo de caja de neto para la compañía entre el aval y la administración de la cartera, alrededor de unos 27.000 millones de pesos durante ese lapso de los de los primeros 10 meses, de ahí en adelante, mientras cumplimos los 48 meses para pagar la facilidad de allá en adelante lo único que podemos tener de flujo de caja positivo es el tema de la administración de cartera, que no son más de 500 millones de pesos, digamos que en términos

generales esa es la estructura, nos facilitaría traernos el aval de pero digamos que los próximos 2 o 3 años no vamos a tener ningún tipo de marginación y es ahí donde tenemos que mirar un poco con todas las cosas que nos está planteando ella de qué forma podemos traer algo más de caja y eliminar, sobre todo el tener el capital, el tener la obligación de ponerle un 20% adicional de cartera.

Jaime procedió a preguntar si había alguna inquietud al respecto, ante esto el doctor David intervino para que le aclaran un par de puntos sobre esta explicación y le sugirió a la administración correr un modelo con mayor aval y menor tasa, a lo que Juan Carlos asintió y dijo que así lo iba a hacer. Seguidamente el doctor David preguntó acerca del desembolso, por el modelo de originación, acumulación y compra por parte de ellos. Jaime respondió que la transacción sería, para que no nos genere *withholding tax* y no se nos vuelva a costosa la transacción, va a haber una emisión de un bono, un *private placement*, después podemos hacer utilizaciones sobre ese bono de 5 millones de dólares, este bono lo emite el patrimonio autónomo y es una emisión privada. David sugirió sobre esta explicación que sobre los llamados de 20 mil millones de cartera construida (para iniciar el desembolso), no se hagan sobre ese monto, sino por 10 mil millones, pues es más fácil conseguir ese monto. Jaime y Juan Carlos asintieron y dijeron que se encargarían de eso.

El doctor David también quiso preguntar sobre el tema de Alianza, a lo que Jaime le dijo que no ha pasado nada, y que están esperando a que salgamos de la reestructura del bono. Y agregó que estamos trabajando en aumentar el cupo con Fiducoomeva, es un cupo de 9500 millones de pesos. A lo que David le dijo que con el cupo si se lleva a 10 mil, se podría utilizar para hacer funcionar Nomura, ante esto Jaime dijo le explicó ya se han hecho las gestiones correspondientes y que se le había pasado la propuesta a Fiducoomeva y que la próxima semana lo iban a llevar a su comité de crédito, incluso proponiendo que el fondo madurador diera un cupo de 30 mil millones.

No hubo mas comentarios por parte de los directores.

Oído lo expuesto con los tres anteriores subpuntos sobre las negociaciones, esto es Nomura, FNG y la reestructura del bono, la Junta Directiva por unanimidad, es decir con el 100% de votos de los miembros presentes en la reunión, aprueba este punto.

## 7. PROPOSICIONES Y VARIOS.

A la altura de este punto de la reunión la secretaria de la reunión preguntó a los miembros de la junta directiva y demás asistentes si tenían algún tema adicional que quisieran tratar.

Los señores miembros de la junta directiva ante esto comentaron que no tenían mas temas o asuntos distintos que quisieran discutir.

## 8. DESIGNACIÓN COMITÉ REDACTOR Y APROBADOR DEL ACTA

La secretaria de la reunión indicó que, se había agotado el orden del día y preguntó si alguno de los miembros asistentes tenía algún comentario o acotación que hacer y que si se le podía dar cierre a la reunión.

Ante lo anterior ninguno de los miembros de la junta directiva presente tuvo algún comentario que hacer.

Seguidamente la representante legal de la sociedad procedió a dar constancia sobre la continuidad del quorum deliberativo y decisorio durante toda la reunión de principio a fin, de conformidad con el Decreto 398 de 2020, y que, en este sentido, se podía dar cierre de la reunión de junta directiva.

Seguidamente cuestionó a los miembros si estaban de acuerdo con que siguiera con la dinámica del comité redactor y aprobador del acta conformado por presidente y secretario de la reunión, para lo cual todos los miembros presentes estuvieron de acuerdo.

Ante la propuesta, todos los miembros de la junta directiva estuvieron de acuerdo y lo aprueban de manera unánime, es decir, con el voto favorable del cien por ciento (100%) de los miembros presentes.

Después de lo anterior la secretaria de la reunión se pronunció diciendo que evacuado el orden del día y todas las consideraciones de todos los miembros, daba cierre a la reunión ordinaria de la junta

directiva, agradeció a todos por su asistencia y dijo que cualquier información que requieran al respecto, se estaría remitiendo vía correo electrónico.

Agotado el orden del día y agradeciendo a los señores directores por su participación, siendo las once de la mañana (11:00 A.M.) se dio por terminada la reunión ordinaria de la Junta Directiva.

| **El Presidente,** | **La Secretaria,** |
|---|---|
| FIRMADO________<br>David Seinjet Neirus | FIRMADO____________<br>Liliana Arango Salazar |

**La Representante Legal**

FIRMADO_____
Liliana Arango Salazar

** La presente acta fue aprobada por el comité redactor y aprobador del acta que fue designado en dicha reunión. Se aclara, además, que dicho comité estuvo designado y conformado por el presidente y secretario de la reunión, es decir por el doctor David Seinjet Neirus y la doctora Liliana Arango respectivamente.

La presente copia certificada es fiel copia del acta que reposa en los libros de la Sociedad.

**LILIANA ARANGO SALAZAR**
**La secretaria**