**Minutes No. 263**
**Regular Meeting of the Board of Directors**
**CREDIVALORES – CREDISERVICIOS S.A.**

At nine in the morning (9:00 a.m.) on April 29, 2024, the Board of Directors of CREDIVALORES – CREDISERVICIOS S.A. (the "Company") was virtually gathered, in a regular meeting (by teleconference) via Microsoft TEAMS App, in the city of Bogota D.C., following the Notice of Meeting issued by the Company's Legal Representative in a written communication sent to the principal members of the Board of Directors in accordance with the statutory provision set forth in Article 34.

The following members of the Board of Directors were in attendance:

1. Jose Miguel Knoell Ferrada
2. David Seinjet Neirus
3. Gustavo Adrian Ferraro
4. Luis Maria Blaquier
5. Juan Manuel Trujillo Sanchez
6. Carlos Eduardo Meza

**I. INITIAL STATEMENTS**

a. Six (6) of the seven (7) members of the Board of Directors (the "Directors") are participating in the meeting by teleconference, in accordance with and in compliance with the provisions of Articles 34 and 35 of the Company's Bylaws (the "Bylaws"), thereby constituting a sufficient quorum to validly deliberate and make decisions on the items on the agenda.

b. The following guests were also in attendance, Dr. Catalina Kempowsky, in her capacity as Advisor; Dr. Javier Ledesma, representing the shareholder Lacrot Inversiones 2014 S.L.U.; Dr. Maite De Alba De Gandiaga, representing the shareholder Davalia Gestion de Activos S.L.; Juan Carlos Estupinan, in his capacity as the Company's Director of Financial Planning; Jaime Francisco Buritica Leal, in his capacity as Principal Legal Representative; and Dr. Liliana Arango Salazar, in her capacity as Alternate Legal Representative and Secretary General.

c. Alberto Hernandez attended in his capacity as proxy for Dr. Jose Miguel Knoell, whose power-of-attorney had been duly submitted to the Company's Secretary prior to the meeting.

The following agenda was presented for consideration and was unanimously approved by the members of the Board of Directors attending the meeting:

**AGENDA***

1. Quorum's verification.
2. Election of the Chair and Secretary of the Meeting.
3. Presentation and Approval of the Financial Statements for the First Quarter of 2024.
4. First Quarter 2024 Portfolio Report.
5. Amendment.

Initial
CM

6. Negotiations Update:
    - Bond Restructuring
    - FNG Status
    - Nomura Update
7. Motions and Miscellaneous.
8. Appointment of the committee responsible for drafting and approving the minutes.

* The agenda was sent out with the Notice of Meeting; however, amendments were made to the same during this meeting, which were unanimously approved by the members of the Board of Directors in attendance.

Immediately thereafter, the meeting began, and the agenda was addressed as follows:



Initial
CM

1. **QUORUM'S VERIFICATION**

Dr. Liliana Arango proceeded to verify the quorum and reported that six (6) of the seven (7) members of the Board of Directors were in attendance, thus constituting the quorum required to validly deliberate and make decisions, in accordance with the Company's Bylaws.

Regarding the quorum's constitution, Dr. Arango emphasized that Alberto Hernandez attended in his capacity as proxy for Dr. Jose Miguel Knoell, whose power-of-attorney had been duly submitted to the Company's Secretary prior to the meeting.

2. **APPOINTMENT OF THE CHAIR AND SECRETARY OF THE MEETING**

Dr. Arango stated that she serves as the Secretary General of the Board of Directors and asked the Directors whether they wished for her to continue serving in such capacity for the meeting. By unanimous vote, that is, with the favorable vote of all of the Directors present at the meeting, Liliana Arango Salazar was elected as Secretary, and, being present, she accepted the appointment.

She proceeded to nominate Dr. David Seinjet to serve as Chair of the meeting, and, by unanimous vote, that is, with the favorable vote of all of the Directors present at the meeting, Dr. Seinjet was elected to serve as Chair, and, being present, he accepted the appointment.

3. **PRESENTATION AND APPROVAL OF THE FINANCIAL STATEMENTS FOR THE FIRST QUARTER OF 2024**

The Secretary of the meeting then gave the floor to Juan Carlos Estupinan to present this item. In this regard, he stated that the results for the first quarter of 2024 were presented as follows:

Initial
CM

**COP in millions**

| **BALANCE SHEET** | Mar-24 | Budget 1Q 2024 | Comp. | Δ$ | Dec-23 | Δ% | Δ$ |
|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | |
| Cash and cash equivalents | 39,583 | 69,886 | 56.6% | (30,302) | 59,794 | (33.8%) | (20,211) |
| Total financial assets at fair value | 10,173 | 13,806 | 73.7% | (3,634) | 14,789 | (31.2%) | (4,617) |
| Consumer loans | 1,810,859 | 1,716,055 | 105.5% | 94,804 | 1,858,276 | (2.6%) | (47,416) |
| Impairment | (480,683) | (473,231) | 101.6% | (7,452) | (455,798) | 5.5% | (24,885) |
| **Total loan portfolio, net** | **1,330,176** | **1,242,824** | **107.0%** | **87,352** | **1,402,477** | **(5.2%)** | **(72,301)** |
| Accounts receivable, net | 260,459 | 257,284 | 101.2% | 3,174 | 257,284 | 1.2% | 3,174 |
| **Total financial assets at amortized cost** | **1,590,635** | **1,500,108** | **106.0%** | **90,527** | **1,659,762** | **(4.2%)** | **(69,127)** |
| Investments in associates and affiliates | 11,343 | 11,895 | 95.4% | (552) | 11,895 | (4.6%) | (552) |
| Equity investments | 4,357 | 5,633 | 77.3% | (1,277) | 4,650 | (6.3%) | (294) |
| Current tax assets | 42,497 | 41,476 | 102.5% | 1,021 | 41,476 | 2.5% | 1,021 |
| Deferred tax assets, net | 148,015 | 149,467 | 99.0% | (1,452) | 128,757 | 15.0% | 19,258 |
| Total property and equipment | 270 | 301 | 89.6% | (31) | 301 | -10.4% | (31) |
| Intangible assets other than goodwill, net | 19,767 | 20,171 | 98.0% | (404) | 22,130 | (10.7%) | (2,363) |
| **Total Assets** | **1,866,639** | **1,812,743** | **103.0%** | **53,896** | **1,943,554** | **(4.0%)** | **(76,915)** |
| | | | | | | | |
| **LIABILITIES AND EQUITY** | | | | | | | |
| **Liabilities** | | | | | | | |
| **Total financial liabilities at amortized cost** | **1,532,119** | **1,279,440** | **119.7%** | **252,679** | **1,547,566** | **(1.0%)** | **(15,448)** |
| Employee benefit provisions | 884 | 1,054 | 83.9% | (169) | 1,054 | -16.1% | (169) |
| Other provisions | 2,566 | 2,932 | 87.5% | (366) | 2,932 | (12.5%) | (366) |
| Accounts payable | 87,864 | 58,722 | 149.6% | 29,142 | 91,120 | -3.6% | (3,256) |
| Current tax liabilities | 1,756 | 1,616 | 108.7% | 141 | 1,616 | 8.7% | 141 |
| Other liabilities | 30,609 | 233,725 | 13.1% | (203.116) | 25,560 | 19.8% | 5,049 |
| **Total Liabilities** | **1,655,798** | **1,577,488** | **105.0%** | **78,310** | **1,669,848** | **(0.8%)** | **(14,050)** |
| | | | | | | | |
| **Equity** | | | | | | | |
| **Total Equity** | **210,840** | **235,255** | **89.6%** | **(24,416)** | **273,706** | **(23.0%)** | **(62,866)** |
| **Total Liabilities and Equity** | **1,866,638** | **1,812,743** | **103.0%** | **53,895** | **1,943,554** | **(4.0%)** | **(79,916)** |



Initial
CM

**ASSETS:**

**Cash and cash equivalents:** The difference of COP 30,302 million is attributable to the fact that the budget contemplated the sale and repayment of the obligation to Citibank in March, while the payment to FI was scheduled for April.

**Consumer loans:** The difference of COP 94,804 million is attributable to the fact that the budget includes the sale of the Citibank portfolio (COP 109,826 million), which was expected to take place in March.

**LIABILITIES:**

On the liabilities side, we had a total variance of 78,000 million, which is explained by a 252,000 million variance in financial obligations. We closed the period with financial obligations of COP 1.532 trillion, compared with 1.2 trillion included in the budget. The difference is also attributable to the sale of the Citibank portfolio and to the fact that the budget already incorporates the effect of the bond haircut.

The difference is attributable to the fact that the model incorporated the bond haircut **(COP 180,453 million)** and the sale of the Citibank portfolio **(COP 109,826 million)** as a reduction in the balance of financial obligations in March, as well as the effect of the haircut under the "**Other Liabilities**" line item.

**EQUITY:**

Equity decreased by **COP 24,416 million**, attributable to the fact that the budget projected a loss of **COP 38,462 million** for the first quarter, while the actual loss amounted to **COP 61,229 million**, representing a variance of **COP 22,767 million.**

He continued explaining the income statement:

COP in millions

| INCOME STATEMENT | Mar-24 | Budget 1Q 2024 | Comp. | Δ$ | Mar-23 | Δ% | Δ$ |
|---|---|---|---|---|---|---|---|
| Interest income and portfolio sales | 47,484 | 53,432 | 88.9% | (5,948) | 79,290 | (40.1%) | (31,806) |
| Commissions | 6,982 | 8,594 | 81.2% | (1,612) | 18,153 | (61.5%) | (11,171) |
| Finance costs – interest | (67,924) | (83,099) | 81.7% | 15,175 | (123,166) | (44.9%) | 55,242 |
| Interest | (51,061) | (49,032) | 104.1% | (2,029) | (71,965) | (29.0%) | 20,904 |
| Derivatives | (9,561) | (33,260) | 28.7% | 23,698 | (38,393) | (75.1%) | 28,831 |
| Current Liabilities | (7,302) | (808) | 903.7% | (6,494) | (12,808) | (43.0%) | 5,506 |
| **Net interest** | **(13,458)** | **(21,073)** | **63.9%** | **7,615** | **(25,723)** | **(47.7%)** | **12,265** |
| Total provision expense | (48,453) | (17,433) | 277.9% | (31,020) | (29,761) | 62.8% | (18,692) |
| **Operating profit (loss)** | **(61,910)** | **(38,506)** | **160.8%** | **(23,404)** | **(55,484)** | **11.6%** | **(6,427)** |
| **Employee, administrative and operating expenses** | | | | | | | |
| Employee benefit expenses | (2,958) | (2,696) | 109.7% | (262) | (3,086) | (4.1%) | 128 |
| Depreciation and amortization expense | (1,879) | (1,581) | 118.8% | (298) | (1,579) | 19.0% | (300) |
| Depreciation expense on right-of-use assets | (529) | (378) | 140.1% | (151) | (641) | (17.4%) | 112 |
| Administrative and operating expenses | (12,781) | (17,395) | 73.5% | 4,613 | (21,219) | (39.8%) | 8,438 |
| **Total Other Expenses** | **(18,148)** | **(22,050)** | **82.3%** | **3,902** | **(26,525)** | **(31.6%)** | **8,377** |
| **Financial income** | | | | | | | |
| Other income | 514 | - | 0.0% | 514 | 300 | 71.4% | 214 |
| Financial income | 112 | 1,384 | 8.1% | (1,272) | 2,284 | (95.1%) | (2,172) |
| **Total financial income** | **625** | **1,384** | **45.2%** | **(759)** | **2,583** | **(75.8%)** | **(1,958)** |
| (Finance costs) | (433) | - | 0.0% | (433) | (3) | 13509.0% | (430) |
| **Net financial income** | **192** | **1,384** | **13.9%** | **(1,192)** | **2,580** | **(92.6%)** | **(2,388)** |
| **Profit before income tax** | **(79,866)** | **(59,172)** | **135.0%** | **(20,694)** | **(79,429)** | **0.6%** | **(437)** |
| Tax expense | 18,637 | 20,710 | 90.0% | (2,073) | 49,152 | (62.1%) | (30,515) |
| **Net income** | **(61,229)** | **(38,462)** | **159.2%** | **(22,767)** | **(30,276)** | **102.2%** | **(30,953)** |



Initial CM

**Interest Income:** The difference is attributable to the higher interest accrual projected in the budget for the credit card product and the reactivation of payroll-deducted loan originations during the quarter (disbursements of COP 15,810 million).

**Commissions:** The difference is attributable to the revenue that was expected to be collected as a result of the reactivation of loan originations.

**Finance costs:** This corresponds to the exchange rate projected in the model as of the end of the first quarter of 2024, at COP 3,950, compared with the actual closing TRM for the quarter of COP 3,842.30.

**Provisions:** The difference is attributable to higher portfolio impairment charges (COP 12,649 million), particularly for the credit card product, and higher expenses related to debt forgiveness (COP 18,371 million).

**Total Costs and Expenses:** It can be seen that the actual results are better than budgeted results, reflecting the Company's ongoing cost and expense control efforts. The optimization measures implemented resulted from the closure of offices, workforce reductions following the suspension of lending activities, and cost reductions across different areas of the Company following the discontinuation of the credit card product.

He also explained that a loss of 38,000 million had been projected, due to the discontinuation of the credit card product and other factors; however, the actual loss was 61,000 million; he therefore stated that the Company remained within the budget for the quarter.

Dr. David asked how the Income Statement would look if the bond haircut were not taken into account. In response, Juan Carlos explained that only the data through December was currently available, based on which the projected loss of 62,000 million had been determined. He added that he would supplement the information with the figures for January through March, together with any input Catalina could provide regarding the portfolio and provisions, in order to develop strategies to improve the operating loss. Dr. David made suggestions on ways to reduce the amount of money spent in connection with the transaction underlying the bond.

In view of the above, the Board of Directors unanimously, that is, with 100% of the votes cast by the members present at the meeting, agreed and approved the financial statements presented under the item of the agenda *PRESENTATION AND APPROVAL OF THE FINANCIAL STATEMENTS FOR THE FIRST QUARTER OF 2024.*

## 4. FIRST QUARTER 2024 PORTFOLIO REPORT

Thereafter, Dr. Catalina Kempowsky was given the floor to explain this item. She stated that provisions were divided into two categories: debt forgiveness and impairment. In fact, impairment provisions recognized during the first quarter amounted to 23,000 million, which, in fact, was slightly below the amount recognized during the first quarter of the previous year. Compared with the budget, there was a variance of COP 9,000 million in impairment charges during the first quarter. Last year, we were not at this level of debt forgiveness; and in November of last year, approvals were granted for a debt forgiveness strategy that would allow for much more aggressive full write-offs than those implemented last year and than those actually contemplated in the budget. That's the reason, we have a significant variance in this regard, and we will need to assess how the budget or forecast for impairment for the remainder of 2024 looks, in terms of impairment provisions.



Initial CM

| Cartera | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jun-24 | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Total Cartera | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |

| Gasto | Jan-24 | Feb-24 | Mar-24 | Apr-24 | May-24 | Jun-24 | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Libranza | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Crediuno | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Vigo? | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
| Total Gasto | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | [illegible] | $81,552 |

[ILLEGIBLE CHART]

Total impairment expense: $81,552
First quarter expense: $26,325
Projected second quarter expense: $25,885

Beginning in the second half of 2024, Crediuno's expenses are expected to decrease, taking into account the natural runoff of the portfolio as it depletes.

She explained the preceding table, noting that the green section represents the expenses incurred to date. A high level of expense is projected for the second quarter compared with the first quarter. We are projecting approximately 25,000 million. This is partly attributable to significant impairment at Crediuno due to the runoff of the portfolio, as the better-performing portion of the portfolio has already run off and a significant portion of the remaining portfolio is now following its natural runoff cycle. These are, of course, projections; however, given the highly aggressive collection strategies we are implementing, we expect this expense to be lower. The scenario presented here reflects the level of expense we currently expect. Beginning in the second half of the year, Crediuno's expense level is expected to decrease as provisions, or the model, is approaching their limit, meaning that the portfolio reaches its maximum level of runoff-related expense and the expense progressively decreases.

Payroll-deducted loans remain relatively stable in terms of expenses and portfolio runoff. This is also because, if we begin making new disbursements, this expense will be lower. However, we also have a significant expense component attributable to growth, which is not a major impact but also reflects the portion of the portfolio that is left, that is not currently performing and that is beginning to run off.

This is the projection we currently have. From a Risk perspective, we are projecting annual impairment expenses of approximately COP 80,000 million. This represents a conservative impairment scenario, as we prefer to use a conservative impairment assumption because, obviously, we expect all of the collection strategies we are implementing to be effective.

She also provided information on the strategies, which she expected to be implemented by June, as well as on the addition of new collection agencies that are obtaining additional information about the customers, which could improve collections. She also mentioned that the number of customers with whom payment arrangements had been negotiated had increased compared with the previous year, as a result of strategies such as extending payment terms for obligations, which results in lower collections but better payment habits. She mentioned *Liquity*, the new collection agency, and its strategies for pressuring customers to make payments; she expects collections from the June vintages to improve. She discussed the collection challenges experienced during Holy

Initial CM

Week and the subsequent recovery, noting that the ultimate goal is to maximize collections within the shortest possible period in order to pay off the obligation to UBS.

In response, Javier Ledesma asked whether it would be possible to transfer a significant portion of the MPL portfolio held in an Autonomous Trust to a collection agency. Catalina then answered and explained that there was limited appetite for that portfolio and stated that a strategy implemented the previous year had been put on hold. Nevertheless, the market is oversupplied with this type of portfolio, resulting in lower pricing and reduced appetite. However, under the current strategy, it is expected to perform much better. Javier Ledesma asked about the estimated amount of collections over a four-week period and whether it would be possible to collect approximately 7,000 million. Catalina responded that, based on the estimate, the minimum amount would be 6,000 million. She also explained the challenges associated with collections, noting that, following the suspension of credit limits and utilization, customers stopped making payments because paying was no longer a priority for a product they could no longer use. Nevertheless, she remained optimistic about achieving this amount.



Initial
CM




Dr. Seinjet also proposed that, at another Board of Director's meeting or a separate meeting, they should specifically discuss this collection strategy and the strategy for the portfolio under recovery, including a management report breaking down the portfolio into current, administrative, and recovery portfolios. Catalina stated that she already had this information and that it could be discussed in greater detail at the next meeting.

Thereafter, she explained these tables regarding the debt forgiveness granted by Crediuno during the first quarter of 2024:

JANUARY



FEBRUARY



MARCH



[ILLEGIBLE CHART]

**Total Crediuno Debt Forgiveness: $17,627, out of a Total Balance of $28,445**

She clarified and explained the issues related to the application of payments, noting that many of these amounts are attributable to the way payments are being applied, as they are not being allocated directly to principal but rather to other items that could be subject to debt forgiveness. However, these are operational issues that the Company is working to resolve.

To recap the proposed meetings, Jaime suggested consolidating them into one meeting to discuss, first, the activation of Credivalores and, second, the matters related to collections that had just been raised. The first meeting would be held this week and the second one the following week. Thereafter, the matters would be brought before the Board of Directors for consensus. In response to this proposal, all members of the Board of Directors in attendance unanimously agreed.

Having heard the foregoing, the Board of Directors unanimously, that is, with 100% of the votes cast by the members present at the meeting, approved this matter concerning the first quarter 2024 portfolio report.

Initial
CM

**5. AMENDMENT**

Thereafter, the Secretary of the meeting gave the floor to Dr. Jaime Buritica to present this item.

He explained that this item concerned the bond restructuring process. He indicated that, in order to proceed with the filing with the court, a requirement is that all of the Company's debts be current and in good standing. This is the reason for the amendment, because when the Forbearance was executed, certain payments and payment dates were established that had to be met with respect to the obligations for which Credivalores is the guarantor of the financing provided to Finanza Inversiones. And, since the portfolio sale from Citi to Ban100 that was required to be completed could not be made within the agreed-upon timeframe, it is necessary to bring the Forbearance back into compliance, and the attorneys are therefore requesting that an Amendment be executed. Thereafter, he explained the following table and made the following request:



Initial
CM

Authorization is requested to execute the amendment to the March 2024 Forbearance, based on the following reasons:

1. The sale of the Citibank portfolio will not take place in accordance with the dates originally stipulated.
2. No payments to related parties may be made while the Company is subject to the filing.

| Schedule | Forbearance | Amendment |
|---|---|---|
| Initially | $8,400,000 on the earlier date of (x) April 15, 2024, and (y) two (2) Business Days prior to the date on which the Exchange Offer is consummated. | Two days after the Effective Date of the Plan, the greater of (x) $8,700,000 and (y) the proceeds from the sale of the portfolio held at Citibank, less the amounts owed, plus USD 300,000, shall be paid. |
| April 30, 2024 | 100,000 | 0 |
| May 31, 2024 | 200,000 | 0 |
| June 30, 2024 | 300,000 | 300,000 |
| July 31, 2024 | 400,000 | 400,000 |
| August 31, 2024 | 500,000 | 500,000 |
| September 30, 2024 | 600,000 | 600,000 |
| October 31, 2024 | 700,000 | 700,000 |
| November 30, 2024 | 800,000 | 800,000 |
| December 31, 2024 | 900,000 | 900,000 |
| January 31, 2025 | 1,000,000 | 1,000,000 |
| February 28, 2025 | The lesser of (x) $1,060,000 and (y) the principal amount of the loans outstanding as of February 28, 2025, and on the last Business Day of each month thereafter until the loans are paid in full. | The lesser of (x) $1,060,000 and (y) the principal amount of the loans outstanding as of February 28, 2025, and on the last Business Day of each month thereafter until the loans are paid in full. |

He also explained which was the original payment schedule and what the amendment seeks to accomplish in order to comply with the required payments. He also clarified that, in connection with this transaction, the first stage of the sale of the CITI portfolio took place the previous week. Although the securitization by the Bank is scheduled to take place on May 2 for solvency-related reasons, the Bank made an advance payment of the premium contemplated under this transaction, and those funds have already been made available to Finanza Inversiones to make payments to the lenders. The second stage, which is very important, will take place while the Company is in the filing process before the New York court. Accordingly, any payments arising from this transaction that would otherwise be made to related parties, specifically, in our case, from Credivalores to Finanza Inversiones, cannot be made because they would create significant risk before the Court; because this type of payment could cause concern among the bondholders and potentially raise concerns with the judge, thereby putting the transaction at risk.

He continued explaining that, essentially, the purpose of this amendment is to provide that, if the transaction takes place, the proceeds from the final stage of the CITI portfolio sale will remain with Credivalores and will be paid two business days after the Court issues a favorable ruling on the bond restructuring. This is what is being presented to the Board of Directors for approval.

Following the foregoing proposal and explanations, the Board of Directors took note thereof and issued the following approval with respect to the matters requested, and further issued the following instructions:

Initial
CM

1. The request regarding the execution of an amendment to the Forbearance is hereby approved and authorized. The directors present, unanimously, that is, with the favorable vote of 100% of the members of the Board of Directors in attendance at the meeting, instructed Management and the Legal Representative to, without limitation, negotiate, review, and execute all documentation, including any required guarantees, necessary to carry out the execution of this document in the manner described above.

Following the foregoing approvals and instructions to Management and the Legal Representative, the Board of Directors unanimously approved this item regarding the Amendment, including the mandates, with the favorable vote of 100% of the members of the Board of Directors in attendance at the meeting.

**6. NEGOTIATIONS UPDATE**



Initial
CM

The Secretary of the meeting continued by addressing this item on the agenda, which consisted of a summary of the progress of the negotiations being conducted by the Company and to be presented by the General Manager.

Dr. Jaime took the floor:

- **Bond Restructuring**

Regarding the bond restructuring, he clarified that, although the Board of Directors had already been kept informed of this matter, it was considered preferable to document it in the minutes, particularly with respect to the various stages:

| Stage #1 | Stage #2 | Stage #3 | Stage #4 | Stage #5 |
|---|---|---|---|---|
| Strategy (Dec/15/23 to Jan/15/24) | Ad Hoc Committee Negotiations (Jan/15/24 to Jan/31/24) | Preparation and Launch of Exchange Offer + Prepack (Feb/07/24 to Mar/07/24) | Closing and Results of the Prepack (Apr/05/24) | Filing (Mar/21/24 to Apr/12/24) |
| [ILLEGIBLE] | [ILLEGIBLE] | [ILLEGIBLE] | [ILLEGIBLE] | [ILLEGIBLE] |

He clarified that the Company is currently at Stage 4 and briefly explained what had taken place during the previous stages, including the successful outcome of the voting process and the challenges encountered during Stage 3.

Regarding this fourth stage, he explained that the Company is currently in the process, and that we had to go through the process of preparing the Company for the filing and that it was necessary to engage a firm called FTI, which would oversee the Company's financial information, and that during the filing process, which is expected to last approximately four to six weeks at most, FTI will serve as the judge's eyes from a financial perspective, particularly with respect to Credivalores. The Company's cash management will be a key area of focus for FTI. He further emphasized to the Board of Directors and the other attendees that, once the filing is made, any payment made by the Company must be authorized by the judge in New York. In other words, payments may not be made other than those specified in the documents known as motions, which must be approved by the judge before any such payments can be made. If a payment were to be made outside of those authorizations, it could place the Company into a free-fall process, so great care must be exercised.

FTI was responsible for gathering all of that information and preparing all of the motions, and we completed that process on April 12. All of the documents required for the filing are now ready. However, the process has been delayed due to the payments that need to be made to the legal professionals who have worked with us on the transaction with the paying agents; because, according to the attorneys, under the conflict-of-interest rules applicable to Chapter 11, professionals representing a party in the transaction cannot be creditors of that party. This has resulted in disagreements with Baker McKenzie despite the efforts made to reach an understanding, and they are requesting that the payments be made before the filing.

In response, Javier Ledesma told Jaime that he wanted all communications with the attorneys, as well as any communications from the attorneys, to be documented in writing; and that he also wanted to understand the

Initial
CM

remaining Budget on the Chapter 11 and have it documented in writing, so that any matters requiring approval by the Board of Directors could be clearly identified.



Initial
CM

Gustavo Ferraro also intervened, asking Jaime when the filing would take place. In response, Jaime explained that they were waiting to receive certain payments and funds related to tax matters. In conclusion, he stated that the Company should be proceeding with the filing this week and that certain adjustments would be made to complete the process as soon as possible.

Gustavo was satisfied and returned to the matter of Baker McKenzie, asking about the status of the engagement with the firm. Jaime answered: With Baker, we agreed with them that, going forward, the contractual terms previously agreed with them would apply, under which we have 60 days to make the payment after an invoice is submitted. Nevertheless, Javier Ledesma asked Jaime to provide a detailed explanation regarding the payments to this firm, as significant issues were arising in connection with these payments, as previously explained. He again requested that any communications between the Company and the attorneys, be provided in writing and signed, since there are positions and opinions from other law firms indicating that Baker's interpretation is not entirely consistent with applicable U.S. law. Gustavo Ferraro also spoke in support of Javier's directives, requesting that everything undertaken by the firm be reported and documented in writing and signed.

Thereafter, Gustavo and Luis Blaquier had a brief discussion regarding the attorneys, to better understand the issues that had arisen with the attorneys once again.

Luis Blaquier proposed a couple of ideas regarding the payment of the attorneys' fees. One of them was discarded because it had already been attempted. And the second proposal was to make the payment, subject to the condition that no additional fees would be incurred until the filing; and if the attorneys proposed any additional fees, there would need to be a gap, which they would be required to document in writing. Jaime agreed and stated that he would take care of it.

- **FNG Status**

Jaime proceeded to explain this matter, stating that the news was not particularly good, as discussions had been initiated with the fund's president to convey the need for the fund to support us in the process of extending the term of the bond guarantee for another similar period of approximately three years, and potentially up to five years. The president listened carefully to all the explanations and stated that the last thing he wanted was for a default to occur, particularly one resulting from the fund's lack of support. Jaime therefore explained that the president had indicated that there were two possible paths forward. First, however, he explained that the structure and establishment of the bond guarantee originated with a fund called FOME, which is primarily owned by the Ministry of Finance; ultimately, therefore, the guarantee is provided by the Ministry of Finance. Jaime stated that the president had indicated that, if it were legally feasible for the FNG to grant a three- or five-year extension, it could do so without approval from the Board of Directors, which would be the simplest option. The other option, if the first option were not feasible, would be to seek approval from the FNG's Board of Directors to authorize the transaction.

Nevertheless, Jaime continued, upon review by the FNG, it was determined that FOME had already been closed, meaning that no transaction involving that fund could be carried out; and, accordingly, the second option was pursued. It was noted, however, that this could present a potential obstacle because, if the FNG's Board of Directors approved the restructuring, the FNG would thereafter become directly responsible for the guarantee

Initial

CM

provided to Credivalores in the future.  Indeed, the Board told him no, and they did not approve bringing the matter for consideration.

Jaime stated that meetings had been held with them, explaining that, under these circumstances, the Company would be forced to default because all sources of financing had been cut off. Accordingly, a default was expected to occur imminently on August 26. Jaime continued, stating that their reaction was one of concern; and they proposed several alternatives, but these had already been pursued, and the shareholders had no further capacity. Jaime stated that the Company therefore needed to explore another mechanism. He added that they would also need to evaluate the situation, given that Credivalores represents their largest exposure and that the Company serves a market niche at the lower end of the economic pyramid, seeking to promote financial inclusion.

Following this explanation, Jaime stated that the matter would need to be escalated to even higher authorities. Various comments were then made by the directors, particularly David Seinjet, Gustavo Ferraro, and Carlos Meza. Management was advised to continue emphasizing that payment was not possible and that the only alternative was to restructure the term.



Initial
CM

- **Nomura Update**

Dr. Jaime then moved on to the matter of Nomura, including the proposal and the progress of the negotiations that were about to commence with them.

Jaime gave the floor to Juan Carlos to provide further details on the matter. In response, Juan explained the terms and conditions requested by Nomura and then presented the following table, also indicating the changes that the Company is requesting from Nomura:



| | Propuesta Nomura | Propuesta Credivalores (preliminar) |
|---|---|---|
| Capital de trabajo | Requerimos un capital inicial de Credivalores para poder originar lo correspondiente al primer mes | |
| Colateral | El correspondiente para lograr una amortización a 48 meses. Esta rondando entre el 20% y el 25% | Sin Colateral, dado el colateral de caja que se está construyendo con la cuenta de reserva |
| Monto total de la facilidad | USD $100.000.000 / COP $395.000 MM (Fx $3,950) | |
| Plazo | Promedio total de los tramos desembolsados = 48 meses | Promedio total de los tramos desembolsados aprox.= 66 a 72 meses por estructura de amortización |
| Tasa | Primer tramo: 17,50% EA / 1,48% MV<br>Siguientes tramos: SOFR+8<br>A partir del segundo tramo los desembolsos en cada tramo se unen y se promedian sus tasas de colocación | |
| [illegible] | Del recaudo mensual de la cartera se pagan: fees, gastos varios, intereses de mora, intereses corrientes, mantenimiento de la reserva, capital | |
| [illegible] | 2% sobre el total del monto de la facilidad (USD $2 MM) Pagaderos: 1% a la firma del contrato y el 1% restante sobre cada tramo desembolsado | Lo propuesto por Nomura pero será descontado del monto desembolsado.<br>Para CV un 1,5% anual como Fee de Administración |
| Cuenta de reserva | 1,5 veces la cuota de K+I del siguiente mes | 1,2 veces la cuota de K+I del siguiente mes |
| Prepagos | Al recibir prepagos equivalentes al 2% del saldo de la obligación ya que con menor periodicidad se incurre en gastos al deshacer las coberturas | |
| Excesos de Caja | La estructura no permite reclamar excesos de caja hasta completar el pago completo de la obligación | Liberación de caja, siempre y cuando se haya cumplido la prelación de pagos y la construcción del colateral |

[ILLEGIBLE CHART]

He explained the facility, but noted that it would be subject to the condition that no initial capital or working capital would be provided to fund the initial disbursements. The model they are proposing is for them to purchase from us tranches of originations that are already on our books and operating, continuing to purchase such tranches until the full USD 100 million has been reached. We would have, as Credivalores to secure the necessary funding to initiate the loan originations.

He also explained the issues relating to the collateral. He also explained that they are requesting that the obligation be amortized over a 48-month term; but, the way they are requesting this loan to be amortized is in a loan payment waterfall that would use the collections from the payroll-deducted loans originated by us as the source of repayment. And from those collections, all expenses associated with the facility would first be deducted, then the administration fee would also be deducted, that we would retain, and we are proposing that this fee be 1.5% per annum, which would constitute revenue for Credivalores. Their interest would then be deducted, and lastly by repayment of principal. Under this amortization structure, the facility would not be repaid within the 48 months they are requesting; rather, it would be repaid over approximately 68 to 72 months. Accordingly, they are requiring us to provide a collateral to accelerate the amortization and enable the facility to be repaid within an average of 48 months.

Initial
CM

He also explained the interest rate and the various considerations surrounding it, noting that it could be reassessed. The same applies to the amortization, as previously explained.

In conclusion, Jaime stated that the proposal being presented by Nomura is, in their words, a portfolio-building proposal. That during the first stage, which consists of the entire disbursement process and is expected to take approximately 10 months, the Company would disburse the full 100 million, and during those first 10 months, the Company would receive approximately COP 27,000 million in net cash flow from the guarantee fee and portfolio administration fees. Thereafter, during the period required to repay the facility over the 48-month term, the only positive cash flow the Company would generate would come from portfolio administration fees, which would amount to no more than approximately COP 500 million. He explained that, in general terms, this is the proposed structure. It would allow the Company to obtain the guarantee facility; however, over the next two or three years, the Company would not generate any meaningful margin; and therefore, the Company needs to assess, in light of all the matters being proposed by Nomura, how it could generate additional cash flow and, above all, eliminate the requirement to contribute capital and the obligation to provide an additional 20% of the portfolio as collateral.

CONFIDENTIAL CV_GRAMERCY_00002327

Initial CM

Jaime then asked whether there were any questions or concerns regarding the matter. In response, Dr. David intervened and asked for clarification on a couple of points regarding the explanation. He also suggested that Management run a model based on a higher guarantee and a lower interest rate, to which Juan Carlos agreed and stated that he would do so. Thereafter, Dr. David asked about the disbursement process under the proposed model of origination, accumulation, and subsequent purchase by Nomura. Jaime responded that, in order to avoid withholding tax and prevent the transaction from becoming unduly costly, the transaction would involve the issuance of a bond through a private placement. Thereafter, we could make drawdowns against the USD 5 million bond. The bond would be issued by the Autonomous Trust as a private placement. Based on this explanation, David suggested that the drawdowns involving 20,000 million of the built portfolio, required to initiate the disbursements, should instead be made in amounts of 10,000 million, as this amount would be easier to secure. Jaime and Juan Carlos agreed and stated that they would take care of it.

Dr. David also asked about the matter concerning Alianza. Jaime responded that there had been no developments and that they were waiting for the bond restructuring process to be completed. He added that we are working to increase the facility limit with Fiducoomeva, which is currently a limit of COP 9,500 million. David noted that, if the facility limit were increased to 10,000, it could be used to support the launch of the Nomura facility. In response, Jaime explained that the necessary steps had already been taken and that the proposal had been submitted to Fiducoomeva, and the proposal would be presented to Fiducoomeva's credit committee the following week, including a proposal for the maturing fund to provide a facility limit of 30,000 million.

There were no further comments from the directors.

Having heard the foregoing regarding the three preceding sub-items concerning the negotiations, namely, Nomura, the FNG, and the bond restructuring, the Board of Directors unanimously approved this item, representing 100% of the votes of the members present at the meeting.

## 7. MOTIONS AND MISCELLANEOUS

At this point in the meeting, the Secretary of the meeting asked the members of the Board of Directors and the other attendees whether they had any additional matters they wished to discuss.

In response, the members of the Board of Directors stated that they had no further matters or other business they wished to discuss.

## 8. APPOINTMENT OF THE COMMITTEE RESPONSIBLE FOR DRAFTING AND APPROVING THE MINUTES

The Secretary of the meeting stated that the agenda had been completed and asked whether any of the members present had any comments or remarks to make and whether the meeting could be adjourned.

In response, none of the members of the Board of Directors in attendance had any comments to make.

Thereafter, the Legal Representative of the Company stated for the record that the deliberative and decision-making quorum had been maintained throughout the meeting, from beginning to end, in accordance with Decree 398 of 2020, and that, accordingly, the meeting of the Board of Directors could be adjourned.

Initial
CM

After that, she asked the members whether they agreed that they should proceed with the process of having a Drafting Committee preparing and approving the minutes, to be carried out by the Chair and Secretary of the meeting, to which all members present agreed.

In response to the proposal, all members of the Board of Directors agreed and unanimously approved it, representing the affirmative vote of one hundred percent (100%) of the members present.

Thereafter, the Secretary of the meeting stated that, having completed the agenda and addressed all matters raised by the members, she declared the regular meeting of the Board of Directors adjourned. She thanked everyone for their attendance and stated that any information requested in connection therewith would be provided by email.



Initial
CM

The agenda having been completed, and with thanks to the directors for their participation, the regular meeting of the Board of Directors was adjourned at eleven in the morning (11:00 a.m.)

| | |
|---|---|
| **The Chair,** | **The Secretary,** |
| SIGNED __________ | SIGNED __________ |
| David Seinjet Neirus | Liliana Arango Salazar |

**The Legal Representative**
SIGNED __________
Liliana Arango Salazar

** These minutes were approved by the committee designated at such meeting to draft and approve the minutes. It is further clarified that such committee was appointed and comprised of the Chair and Secretary of the meeting, namely, Dr. David Seinjet Neirus and Dr. Liliana Arango, respectively.

This certified copy is a true and accurate copy of the minutes recorded in the Company's corporate books.

**[SIGNATURE]**
**LILIANA ARANGO SALAZAR**
**The Secretary**



Initial
CM

**CERTIFICATE OF TRANSLATION**

I, Claudia Marquez, am over the age of 18, competent to translate from Spanish into English, and certify that the translation of the above document is true and accurate (including any stamps or seals) to the best of my abilities. I understand that if any part of the translation is intentionally false, I will be subject to punishment.

Document: Minutes No. 263 - Regular Meeting of the Board of Directors – CREDIVALORES – CREDISERVICIOS S.A.

Translator: Claudia Marquez
Big Way Offices LLC (dba Big Way Translations)
Dunedin, Fl 34698
E-mail: bigwaytranslations@gmail.com
Phone: +1-727-2834625
Date: September 14, 2026

Signature:

Signed by:
Claudia Marquez
43704F9B067B488...

Claudia Marquez
Spanish-English Translator
bigwaytranslations.com

The undersigned is a Spanish-English Public Interpreter, Resolution No. 061, Ministry of People's Power for Interior Relations, Justice and Peace, Official Gazette 42,108 dated April 16, 2021, of the Bolivarian Republic of Venezuela.

The undersigned is a Certified Translator English into Spanish by the American Translators Association (ATA), Certificate Number 554420.

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: BE94A0BD-84E7-8217-81BD-E881CB7481A5 | | Status: Completed |
| Subject: Complete with Docusign: 2024-04-29 Mins (#263) EN.pdf | | |
| Source Envelope: | | |
| Document Pages: 23 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 22 | Claudia Marquez |
| AutoNav: Disabled | | bigwaytranslations@gmail.com |
| EnvelopeId Stamping: Disabled | | IP Address: 38.27.127.36 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>9/14/2026 4:35:21 AM | Holder: Claudia Marquez<br>bigwaytranslations@gmail.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Claudia Marquez<br>bigwaytranslations@gmail.com<br>Security Level: Email, Account Authentication (None) | Signed by:<br>Claudia Marquez<br>43704F9B067B488...<br><br>Signature Adoption: Pre-selected Style<br>Using IP Address: 38.27.127.36 | Sent: 9/14/2026 4:35:32 AM<br>Viewed: 9/14/2026 4:35:42 AM<br>Signed: 9/14/2026 4:38:27 AM<br>Freeform Signing |

**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/14/2026 4:35:32 AM |
| Certified Delivered | Security Checked | 9/14/2026 4:35:42 AM |
| Signing Complete | Security Checked | 9/14/2026 4:38:27 AM |
| Completed | Security Checked | 9/14/2026 4:38:27 AM |

| Payment Events | Status | Timestamps |
|---|---|---|