**Acta No. 266**
**Reunión Ordinaria de Junta Directiva**
**CREDIVALORES – CREDISERVICIOS S.A.**

Siendo las ocho de la mañana (08:00 A.M.) del día 28 de agosto de 2024, se reunió, en sesión Ordinaria, la Junta Directiva de la sociedad CREDIVALORES – CREDISERVICIOS S.A. (la "Sociedad) de manera virtual (teleconferencia) a través del aplicativo TEAMS de Microsoft, en la ciudad de Bogotá D.C., previa convocatoria hecha por el Representante Legal de la Sociedad, mediante comunicación escrita enviada a los miembros principales de la Junta Directiva con la previsión estatutaria establecida en el artículo 34.

Se encontraban presentes los siguientes miembros de la Junta Directiva:

1. Gustavo Adrián Ferraro
2. Luis Maria Blaquier
3. Juan Manuel Trujillo Sánchez
4. Carlos Eduardo Meza
5. Martin Kontarovsky

**I. CONSTANCIAS INICIALES**

a. Se encuentran participando, a través de teleconferencia cinco (5) de los siete (7) miembros de la Junta Directiva, (los "Directores"), de acuerdo y en cumplimiento de lo dispuesto en el Artículo 34 y 35 de los estatutos de la Sociedad (los "Estatutos"), conformando así, quórum suficiente para deliberar y decidir válidamente los puntos a tratar.

b. Asistieron como invitados, la doctora Maite De Alba De Gandiaga en representación del accionista Davalia Gestión de Activos S.L. así como Federico Sioli, Javier Ledesma en representación del accionista Lacrot Inversiones 2014 S.L.U Juan Carlos Estupiñan en calidad de director de planeación financiera de la compañía, Jaime Francisco Buriticá Leal en su calidad de representante legal principal y la Doctora Liliana Arango Salazar en su calidad de representante legal suplente y secretaria general.

c. Asistió Federico Sioli en calidad de apoderado del doctor Martin Kontarosky

Se puso a consideración el siguiente orden del día, el cual fue aprobado por unanimidad de los miembros de la Junta Directiva presentes en la reunión:

**ORDEN DEL DÍA***

1. Verificación del quórum.
2. Elección del Presidente y Secretario de la Reunión
3. Estatus Negociaciones:
   • Proceso Nacional de Seguros
   • Vencimiento Bono FNG
4. Autorizaciones y ratificaciones al representante legal
   • Compraventas de cartera
   • Venta vehículos unidades móviles
   • Cesión de pasivo Bancien
5. Presentación y aprobación estados financieros a junio de 2024
6. Renuncia a calificación de originador y emisor local e internacional.
7. Presentación mecanismo para pago de pasivos
8. Nombramiento comité redactor y aprobador del acta

*El orden del día fue enviado con la convocatoria, no obstante, sufrió cambios en la presente reunión los cuales fueron aceptados unánimemente por los miembros de junta presentes.

En seguida, se dio inicio a la reunión y se desarrolló el orden del día de la siguiente manera:

| Día de pago | Valor |
|---|---|
| 0 | 2.000.000.000,00 |
| 30 | 250.000.000,00 |
| 60 | 250.000.000,00 |
| 90 | 250.000.000,00 |
| 120 | 3.000.000.000,00 |
| 150 | 250.000.000,00 |
| 180 | 250.000.000,00 |
| 210 | 250.000.000,00 |
| 240 | 250.000.000,00 |
| 270 | 250.000.000,00 |
| 300 | 250.000.000,00 |
| 330 | 250.000.000,00 |
| 360 | [illegible] |
| Total | 14.500.000.000,00 |

a NACIONAL DE SEGUROS S.A mediante transferencia el día que el Juzgado autorice, mediante transferencia realizada por el Banco Agrario de Colombia de los recursos embargados de los cuales se haya constituido depósito por los bancos en favor del Juzgado. NOTA: Dentro del acuerdo de pago de suspension y levantamiento de medidas de embargo se deberá autorizar por parte del juzgado para que de la plata que se encuentra embargada de Credivalores se le gire a Nacional de Seguros esta suma.

Otros:
Pagaré firmado por el saldo de la obligación por parte de Asficredito
[illegible]

Procedió la doctora Liliana Arango a verificar el quorum e informó que se hallaban presentes cinco (5) de los siete (7) miembros de la Junta Directiva, habiendo por lo tanto quórum necesario para deliberar y decidir válidamente, conforme a los Estatutos de la Sociedad.

De la conformación del quorum, la doctora Arango destacó que había asistido Federico Sioli en calidad de apoderado del doctor Martin Kontarovsky.

## 2. NOMBRAMIENTO DE PRESIDENTE Y SECRETARIO DE LA REUNIÓN

La doctora Arango procedió a indicar que ella funge como secretaria general de la junta directiva, y preguntó a los directores si deseaban que ella continuara en esta calidad en la reunión. Por unanimidad, esto es con el voto favorable de la totalidad de los Directores presentes en la reunión, se eligió como como Secretaria a Liliana Arango Salazar quien estando presente aceptó dicha dignidad.

Procedió proponiendo a el doctor Carlos Meza, para el cargo de presidente de esta reunión, para lo cual, por unanimidad, esto es con el voto favorable de la totalidad de los Directores presentes en la reunión, eligieron al doctor Meza quien estando presente aceptó dicha designación.

## 3. ESTATUS NEGOCIACIONES:

Procedió la secretaria a exponer sobre este punto, aclarando que ya se han venido exponiendo estos temas en juntas anteriores.

- **Proceso Nacional de Seguros**

Con relación a este punto expuso las condiciones del acuerdo de transacción que fueron aprobados por la junta directiva:


| Día de pago | Valor |
|---|---|
| 0 | 2.000.000.000,00 |
| 30 | 250.000.000,00 |
| 60 | 250.000.000,00 |
| 90 | 250.000.000,00 |
| 120 | 3.000.000.000,00 |
| 150 | 250.000.000,00 |
| 180 | 250.000.000,00 |
| 210 | 250.000.000,00 |
| 240 | 250.000.000,00 |
| 270 | 250.000.000,00 |
| 300 | 250.000.000,00 |
| 330 | 250.000.000,00 |
| 360 | [illegible] |
| Total | 14.500.000.000,00 |

a NACIONAL DE SEGUROS S.A mediante transferencia el día que el Juzgado autorice, mediante transferencia realizada por el Banco Agrario de Colombia de los recursos embargados de los cuales se haya constituido depósito por los bancos en favor del Juzgado. NOTA: Dentro del acuerdo de pago de suspension y levantamiento de medidas de embargo se deberá autorizar por parte del juzgado para que de la plata que se encuentra embargada de Credivalores se le gire a Nacional de Seguros esta suma.

Otros:
Pagaré firmado por el saldo de la obligación por parte de Asficredito
[illegible]


- *Tras la firma del acuerdo de transacción con Nacional de Seguros, el juzgado emitió oficio suspendiendo proceso, ordenando levantamiento medidas cautelares y ordenando entrega de títulos.*

- *En espera devolución recursos.*

Dijo también que este había sido el acuerdo que se había radicado en el juzgado y sobre el cual se había emitido oficio suspendiendo el proceso y ordenando el levantamiento de las medidas cautelares, además ordenando la entrega de títulos judiciales, se espera que al finalizar la semana

quede finiquitado todo, para tener los recursos de nuevo.

Cedió la palabra al doctor Jaime por si tenía alguna precisión adicional, a lo que el dijo que solo iba a agregar un tema, que se relaciona con el proceso de la ley 1116, y que más adelante se explicaría a detalle. Adicionó que se estaba gestionando para que el Banco Agrario nos devolviera los recursos, anotó que los juzgados se han movido rápido, y que una vez se tengan los recursos se va informar. Comentó también que, por el embargo, se alcanzaron a tomar casi 11.000 millones de pesos, y espera que una vez se produzca esta devolución se pueda honrar el primer pago con Nacional de Seguros, y que vuelvan los recaudos para los otros compromisos

- **Vencimiento Bono FNG**

Continuó con este punto la secretaria de la reunión, recordando que el pasado 26 de agosto, había acontecido el vencimiento del bono, sobre esto la compañía emitió un comunicado oficial anunciado la imposibilidad de pago y el inicio de conversaciones con bonistas y también para la reunión con los bonistas para el próximo 10 de septiembre, reunión que tuvo un proceso legal complejo para su aprobación por parte de la Superintendencia Financiera de Colombia (SFC).

Jaime anotó sobre el tema mediático que se había desprendido del Fondo Nacional de Garantías, recordó las estrategias que se habían planteado frente a la situación del FNG y que se habían comunicado en anteriores juntas.

Por lo cual, se activa el plan B, que es sentarse con los bonistas en la deuda del 30%, lograr un acuerdo con ellos, y legalmente el FNG se convierte en acreedor *pari passu*, y se debe acoger a lo negociado con los bonistas.

También dice que, en conversaciones con los bonistas, hay un buen ambiente con ellos, han apoyado y quieren apoyar, pues les interesa salir del tema, y el objetivo de la reunión es precisamente contarle de manera legal todo esto. De lo que se ha podido conversar, dice Jaime, que ellos estarían dispuestos a apoyar una reestructura, una nueva obligación a 5 años, con el cupón igual al anterior.

De todas formas, quiso decir, que todo este proceso iba a tener un cambio de cara a la entrada a ley 1116 puesto que existe la duda en si los bonos son o no son sujetos a una reorganización bajo esta ley. Por lo pronto se tendrá que reestructurar a los bonistas (y *pari passu* al FNG), pero haciendo una validación ante el juez, pero pues es un tema aun de estudio legal.

Maité preguntó cómo se podría manejar el tema de confidencialidad, por el tema de la filtración de noticias y evitar este tema. Jaime le respondió que como tal no se negocia como tal con el FNG, y se negocia con los bonistas, y *pari passu* queda atado el FNG, las negociaciones y reuniones con los bonistas son absolutamente privadas, y ellos son conscientes de esto. Dijo que el tema con el personaje del FNG quizás se deba a que posiblemente haya intereses políticos y de exposición. Frente al tema de la ley 1116, se sostendrá una reunión con el superintendente de sociedades para hablar del inminente *filing* al proceso de insolvencia, y que ellos estén enterados, y solicitar un manejo de confidencialidad. Pero pues una cosa es la solicitud de admisión, y otra cosa la admisión propiamente dicha, donde si se debe revelar públicamente todo. En el caso de la solicitud de admisión se va a solicitar (mientras se admite) la confidencialidad por la criticidad del negocio y por todos los temas que han aparecido en medios. Ante esto, Maité quedó satisfecha.

Gustavo Ferraro quiso que le explicaran un tema de tiempos, que no había entendido en una reunión previa, frente al proceso de la 1116 y el proceso del Chapter 11 en los Estados Unidos. Jaime le explicó cual era el procedimiento y consecuencias de la solicitud de admisión junto con los beneficios, como el no pago de obligaciones financieras, y los pasivos reorganizables. También dijo que se va a solicitar que se pueda hacer este proceso de admisión los mas pronto posible, para no generar tantos problemas frente el proceso en los Estados Unidos. Jaime le explicó a Gustavo otras vicisitudes resaltando que la idea es que la Superintendencia de Sociedades no emprenda acciones administrativas sobre la compañía para enviarlo a insolvencia, sino poder hacerlo de manera propia. La secretaria de la reunión detallo un par de beneficios y prohibiciones, con ley en mano, sobre la solicitud de admisión a la ley 1116, sobre esto Gustavo preguntó sobre la posibilidad de que me impusieran otro embargo, a lo que la secretaria le explicó lo que debía suceder.

4. **AUTORIZACIONES Y RATIFICACIONES AL REPRESENTANTE LEGAL**

Procedió la secretaria sobre este punto, a lo que dijo que eran temas que ya se habían venido comentando pero que era necesario dar precisión a las autorizaciones:

• **Compraventas de cartera**

Sobre este punto dijo que se quería dar más precisión a las autorizaciones respecto de las compraventas de cartera que se ha hecho por parte de Ban100 S.A a Credivalores, entonces se solicita autorizar y ratificar:

- Autorizar y ratificar Firma de Contrato de compraventa de cartera de Credivalores-Crediservicios S.A. a Banco Bancien S.A del 09 de febrero de 2024, por un valor de **COP$12.023.954.423 (DOCE MIL VEINTITRÉS MILLONES NOVECIENTOS CINCUENTA Y CUATRO MIL CUATROCIENTOS VEINTITRÉS PESOS M/CTE)**

- Autorizar y ratificar Firma de Contrato de compraventa de cartera de Credivalores-Crediservicios S.A. a Banco Bancien S.A del 30 de julio de 2024, por un valor de **COP$48.665.929.994 (CUARENTA Y OCHO MIL SEISCIENTOS SESENTA Y CINCO MILLONES NOVECIENTOS VEINTINUEVE MIL NOVECIENTOS NOVENTA Y CUATRO PESOS M/CTE)**

Las autorizaciones y ratificaciones al representante legal, aprobadas por el 100% de los miembros presentes de la junta directiva, es decir de manera unánime incluyen, pero sin limitarse a, las siguientes actividades:

**PRIMERO:** Negocie, suscriba y otorgue toda aquella documentación que sea requerida para documentar la Operación, incluyendo todos los contratos, documentos, actos, certificaciones y en general, cumpla con todas las formalidades que puedan ser requeridas, y realice cualesquiera y todos los actos relacionados con el propósito de dicha autorización, incluyendo la firma de estructuras de garantía y títulos valores.

**SEGUNDO:** Determine, en conjunto con sus asesores, todos los términos y condiciones financieras, operativas, logísticas y legales de las Operaciones, todo dentro del marco de la ley aplicable.

• **Venta vehículos unidades móviles**

Procedió la secretaria sobre este punto indicando que, se viene desde hace un tiempo con el proceso de cierre de ventas físicas, y estas unidades móviles, que son vehículos, son otro canal de venta que no se está usando y existe un contrato de administración de estas unidades móviles que se está pagando.

La autorización consiste en el cierre de este canal de venta y la correspondiente venta de estas unidades móviles, para lo cual, dice la secretaria, se podría hacer un proceso de venta u ofrecimiento a los empleados, cosa que se ha hecho en el pasado. El valor esta dentro de las atribuciones del representante, pero al tratarse de un canal de venta, se trae a colación a junta para que sepan y autoricen sobre este cierre y venta de vehículos:

Ante la decisión de finalizar las Oficinas Móviles como canal de posicionamiento de marca y apoyo comercial, se propone realizar la venta de los 5 vehículos disponibles.

SITUACIÓN

5 Vehículos [illegible]

ACCIONES

- Realizar venta de los 5 vehículos [illegible]
- Valor aprox. de venta [illegible]
- Oferta de venta [illegible]

Luis Blaquier participó preguntando si esta venta de unidades móviles podía hacerse al banco B100 para que de alguna forma hubiera una compensación frente a la deuda que tiene CV frente a esta entidad financiera, a lo cual Jaime le dijo que lo iba a revisar a ver si era posible, de cara a la 1116 y consultando al banco.

**La junta directiva aprobó este punto por unanimidad de los miembros presentes. Las autorizaciones al representante legal fueron aprobadas por el 100% de los miembros presentes de la junta directiva, es decir de manera unánime y de la forma en la cual fue expuesto.**

- **Cesión de pasivo Bancien**

Sobre este punto anotó que es un pasivo que se tiene con el Banco Ban100 S.A., que consiste en una cuenta por pagar por 10.500 millones de pesos, y se tiene entendido que se han realizado conversaciones para que Finanza-Inversiones pueda adquirir ese pasivo. En este momento, con los abogados se esta instrumentalizando la forma correcta de hacer este procedimiento de cesión de este pasivo.

Jaime participó, indicando que se esta haciendo esta solicitud puesto que, como las autorizaciones que se pretenden en este punto, superan loa autorizado estatutariamente al representante legal, sea la junta directiva la que de el aval de llevar a cabo esta cesión. Anotó también, y recordó que esto es producto de una obligación que se tiene con Ban100 producto de la compensación de la tarjeta de crédito CrediUno con Visa y que oscila alrededor de 10.000 millones de pesos, lo que se pretende entonces es la cesión de esta obligación con Finanza-Inversiones. Este tipo de transacción no tiene algún efecto de cara a la ley 1116, pues no genera un mayor beneficio o da una mejora la condición de acreedor, simplemente se cede el pasivo.

Juan Trujillo, preguntó por qué la cesión, y a que título es la cesión. Jaime le explico que en el momento Credivalores tiene una obligación con B100, derivada de un contrato de hace varios años para el tema de compensación de tarjeta de crédito. Credivalores por esta razón le adeuda alrededor de 10.000 millones de pesos. Con esto y por el tema de que Credivalores tiene un proceso de entrada a ley 1116, haría que el impacto a el banco en sus provisiones, lo que ha hecho el banco es cederle a Finanza Inversiones esta obligación para no tenerla y por lo tanto no tener provisiones derivadas de la entrada eventual de Credivalores a proceso de 1116.

Luis Blaquier también partición preguntando que, si era posible asignar colaterales a la cesión, a lo que Jaime le respondió que no era posible, pues en el periodo de sospecha, las Supersociedades va a revisar cualquier tipo de garantías para ver si se otorgaron para favorecer a algún acreedor en especial a lo cual esta entidad lo podría retrotraer, y podría declarar nulo o ineficaz.

Gustavo Ferraro, participó, puntualizando que le parecía buena la cesión pues no se dan mejores posiciones a un acreedor, y da una mejor flexibilidad tener a este acreedor que no sea un banco, pues no va a estar la presión constante de tener que provisionar.

**La junta directiva aprobó este punto por unanimidad de los miembros presentes. Las autorizaciones al representante legal fueron aprobadas por el 100% de los miembros presentes de la junta directiva, es decir de manera unánime y de la forma en la cual fue expuesto.**

## 5. PRESENTACIÓN YA PROBACIÓN ESTADOS FINANCIEROS A JUNIO DE 2024

Sobre este punto, se informa que los estados financieros fueron enviados con anterioridad a la reunión, por lo cual pueden apreciarlos incluso en la presentación de la presente junta.

El presente punto, es meramente informativo, por lo cual no necesita aprobación por parte de los miembros de la junta directiva. Por lo cual Jaime indica que se puede proceder al siguiente punto del orden del día.

6. **RENUNCIA A CALIFICACIÓN DE ORIGINADOR Y EMISOR LOCAL E INTERNACIONAL.**

Sobre este punto la secretaria indicó que se habían terminado las relaciones contractuales con las calificadoras de riesgo, las cuales se habían hecho o contratado en su momento por unas necesidades del mercado. Anotó que son contratos que en cualquier momento se podían terminar. Estas calificadoras trajeron inconvenientes por la baja en las calificaciones, y en el entendido de que no estamos obligados a continuar con ellos ni legal ni contractualmente con estos procesos de calificación, se dio terminación contractual con las calificadoras.

Jaime tomó la palabra diciendo que Fitch era la calificadora de crédito, y BRC que califica la originadora, para esta época se estaba ya venciendo la calificación y se estaban sosteniendo negociaciones de si la compañía estaba en interés de renovar el proceso. Esto se consultó con los abogados de si teníamos obligación al respecto de mantenerlos y en ninguna de las facilidades de crédito existe la obligación de calificación ni nacional ni internacional. Entonces mantenerlos significa costos adicionales para la compañía y tampoco estamos obligados, además del factor de las bajas en la calificación lo que nos estaba generando ruidos cada que calificaban.

El punto se trata de informarles sobre esta situación.

7. **PRESENTACIÓN MECANISMO PARA PAGO DE PASIVOS**

Seguidamente, la secretaria procedió sobre este punto destacando básicamente que era la solicitud que va a realizar la compañía al proceso de insolvencia, un proceso de reestructuración. Señaló, a partir de los slides de presentación, además, cual es la historia que llevó a la compañía a la crisis financiera.

Sin embargo, Jaime quiso acortar el tema, indicando que la historia de todas formas la podían ellos visualizar en las presentaciones que se les van a enviar o que ellos pueden solicitar. Quiso decir también que básicamente lo que se busca en este punto del orden del día, es explicar que para el *filing* para el cual nos estamos preparando para este viernes, la compañía le demuestra a la Superintendencia de Sociedades el por qué está invocando 1116 y se llama la historia de la crisis y pues contamos lo que ya se ha contado, porque esta es una historia que ya se le ha dicho a la Superintendencia de Sociedades, los aspectos que llevaron a la situación actual desde los efectos locales derivados de la crisis del COVID 19, de las altas tasas de interés, la inflación, lo que eso derivó obviamente, en la cartera nuestra de tarjeta de crédito, el aumento de las provisiones, el no pago se cuenta también todo el proceso internacional mexicano que hace que se cierren las líneas de financiación para la compañía, se les cuenta que a pesar de que a pesar de eso, pues, entran de capitalizaciones, entra en líneas de liquidez, es un poco la explicación de todo lo que aconteció para la crisis, y se esta justificando la entrada a este mecanismo en dos sentidos: el primero el tema del no pago en lo relacionado al FNG, se justifica también con el embargo que nos hizo Nacional de Seguros.

Estos dos hechos son importantes, pues en términos generales, la compañía no tiene procesos de incumplimiento que supere los 90 días, pero se justifica con estos dos hechos relevantes. Este sería el preámbulo para solicitarle a la Supersociedades.

Cedió la palabra a la secretaria y ella dijo que se va a ser el *filing* este viernes, no obstante, se tuvo poco tiempo, por esto mismo, para preparar una presentación mas amplia de esta solicitud.

Como es una salida tan rápida, se espera que esta Superintendencia nos requiera para que subsanemos o suministremos mas información. En el entretanto debemos esperar, pues es el tiempo de admisión puede ser entre 1 a 4 meses, aunque pues es indeterminado. El objetivo, también de este punto del orden es dar celeridad a la posición que se debe tener frente a los acreedores y otros procesos de reestructuración que tiene la compañía.

Procedió a explicar la siguiente línea de tiempo:




Para este proceso se contrató a una firma de abogados (los accionistas ya saben de esta firma): HB LEGAL, los honorarios esta dentro de las facultades de la administración para contratar. La documentación estará a disposición de los miembros de junta directiva.

Una vez admitidos, se nombra un promotor para que realice el proceso, normalmente es el representante legal, pero la Supersociedades puede designar a un promotor externo.

Jaime cree que por la importancia y el tamaño de lo que se pretende reorganizar, la Superintendencia pueda que admita rápido. El hecho de que se haga este viernes es para que la información se vaya con cierre de julio, de no hacerlo este viernes tocaría armar la información con cierre de agosto, y esto significaria mas tiempo para hacer la solicitud.

Liliana adicionó alguna de las cosas que podrían pasar frente a algunos acreedores y las posiciones que podrían tomar de cara a la reorganización, Jaime también comentó que el órgano que autoriza la entrada a 1116, es la asamblea de accionistas, no obstante, de manera informativa se trajo todo esto a la junta directiva, y anotó que a las 9 am del día de hoy, se citó a una asamblea de accionistas para solicitar la aprobación.

### 8. DESIGNACIÓN COMITÉ REDACTOR Y APROBADOR DEL ACTA

La secretaria de la reunión indicó que, se había agotado el orden del día y preguntó si alguno de los miembros asistentes tenía algún comentario o acotación que hacer y que si se le podía dar cierre a la reunión.

Ante lo anterior ninguno de los miembros de la junta directiva presente tuvo algún comentario que hacer.

Seguidamente la representante legal de la sociedad procedió a dar constancia sobre la continuidad del quorum deliberativo y decisorio durante toda la reunión de principio a fin, de conformidad con el Decreto 398 de 2020, y que, en este sentido, se podía dar cierre de la reunión de junta directiva.

Seguidamente cuestionó a los miembros si estaban de acuerdo con que siguiera con la dinámica del comité redactor y aprobador del acta conformado por presidente y secretario de la reunión, para lo cual todos los miembros presentes estuvieron de acuerdo.

Ante la propuesta, todos los miembros de la junta directiva estuvieron de acuerdo y lo aprueban de manera unánime, es decir, con el voto favorable del cien por ciento (100%) de los miembros presentes.

Después de lo anterior la secretaria de la reunión se pronunció diciendo que evacuado el orden del día y todas las consideraciones de todos los miembros, daba cierre a la reunión ordinaria de la junta directiva, agradeció a todos por su asistencia y dijo que cualquier información que requieran al respecto, se estaría remitiendo vía correo electrónico.

Agotado el orden del día y agradeciendo a los señores directores por su participación, siendo las ocho y cincuenta y cinco de la mañana (08:55 A.M.) se dio por terminada la reunión ordinaria de la Junta Directiva.

**El Presidente,**

FIRMADO________
Carlos Meza

**La Secretaria,**

FIRMADO____________
Liliana Arango Salazar

**La Representante Legal**

FIRMADO_____
Liliana Arango Salazar

** La presente acta fue aprobada por el comité redactor y aprobador del acta que fue designado en dicha reunión. Se aclara, además, que dicho comité estuvo designado y conformado por el presidente y secretario de la reunión, es decir por el doctor Carlos Meza y la doctora Liliana Arango respectivamente.

La presente copia certificada es fiel copia del acta que reposa en los libros de la Sociedad.

**LILIANA ARANGO SALAZAR**
**La secretaria**