**Minutes No. 266**
**Regular Meeting of the Board of Directors**
**CREDIVALORES – CREDISERVICIOS S.A.**

At eight in the morning (8:00 a.m.) on August 28, 2024, the Board of Directors of CREDIVALORES – CREDISERVICIOS S.A. (the "Company") was virtually gathered, in a regular meeting (by teleconference) via Microsoft TEAMS App, in the city of Bogota D.C., following the Notice of Meeting issued by the Company's Legal Representative in a written communication sent to the principal members of the Board of Directors in accordance with the statutory provision set forth in Article 34.

The following members of the Board of Directors were in attendance:

1. Gustavo Adrian Ferraro
2. Luis Maria Blaquier
3. Juan Manuel Trujillo Sanchez
4. Carlos Eduardo Meza
5. Martin Kontarovsky

## I. INITIAL STATEMENTS

a. Five (5) of the seven (7) members of the Board of Directors (the "Directors") are participating in the meeting by teleconference, in accordance with and in compliance with the provisions of Articles 34 and 35 of the Company's Bylaws (the "Bylaws"), thereby constituting a sufficient quorum to validly deliberate and make decisions on the items on the agenda.

b. The following guests were also in attendance, Dr. Maite De Alba De Gandiaga representing the shareholder Davalia Gestion de Activos S.L.; as well as Federico Sioli, Javier Ledesma representing the shareholder Lacrot Inversiones 2014 S.L.U., Juan Carlos Estupinan, in his capacity as the Company's Director of Financial Planning; Jaime Francisco Buritica Leal, in his capacity as Principal Legal Representative; and Dr. Liliana Arango Salazar, in her capacity as Alternate Legal Representative and Secretary General.

c. Federico Sioli attended in his capacity as power-of-attorney of Dr. Martin Kontarosky.

The following agenda was presented for consideration and was unanimously approved by the members of the Board of Directors attending the meeting:

**AGENDA***

1. Quorum's verification.
2. Election of the Chair and Secretary of the Meeting.
3. Negotiations Status:
   • Process with Nacional de Seguros

Initial
CM

• FNG Bond Maturity

4. Authorizations and ratifications to the Legal Representative.
   • Portfolio Purchase and Sale
   • Sale of Mobile Units Vehicles
   • Assignment of Bancien Liability
5. Presentation and approval of the financial statements as of June 2024
6. Waiver of Local and International Originator and Issuer Credit Ratings
7. Presentation of the mechanism for the settlement of liabilities
8. Appointment of the committee responsible for drafting and approving the minutes

* The Agenda was sent out with the Notice of Meeting; however, amendments were made to the same during this meeting, which were unanimously approved by the members of the Board of Directors in attendance.

Immediately thereafter, the meeting began, and the Agenda was addressed as follows:



Initial
CM

[ILLEGIBLE CHART]

Dr. Liliana Arango proceeded to verify the quorum and reported that five (5) of the seven (7) members of the Board of Directors were in attendance, thus constituting the quorum required to validly deliberate and make decisions, in accordance with the Company's Bylaws.

Regarding the quorum's constitution, Dr. Arango emphasized that Federico Sioli attended in his capacity as proxy for Dr. Martin Kontarovsky.

## 2. APPOINTMENT OF THE CHAIR AND SECRETARY OF THE MEETING

Dr. Arango stated that she serves as the Secretary General of the Board of Directors and asked the Directors whether they wished for her to continue serving in such capacity for the meeting. By unanimous vote, that is, with the favorable vote of all of the Directors present at the meeting, Liliana Arango Salazar was elected as Secretary, and, being present, she accepted the appointment.

She proceeded to nominate Dr. Carlos Meza to serve as Chair of the meeting, and, by unanimous vote, that is, with the favorable vote of all of the Directors present at the meeting, Dr. Meza was elected to serve as Chair, and, being present, he accepted the appointment.

## 3. NEGOTIATIONS STATUS

The Secretary proceeded to address this item, clarifying that these issues had already been discussed at previous meetings.

- **Process with Nacional de Seguros**

In connection with this item, she presented the terms and conditions of the settlement agreement, which had been approved by the Board of Directors:

[ILLEGIBLE CHART]

[Note in the Chart:] to NACIONAL DE SEGUROS S.A., by wire transfer on the date authorized by the Court, the wire will be sent by Banco Agrario de Colombia using the funds subject to attachment that have been deposited by the banks for the benefit of the Court. NOTE: Under the payment agreement for the suspension and lifting of the attachment measures, the Court shall authorize the payment to Nacional de Seguros of such amount from the funds of Credivalores that are subject to the attachment.

- Following the execution of the settlement agreement with Nacional de Seguros, the Court issued an order staying the proceedings, lifting the provisional measures, and ordering the release of the certificates.

Initial
CM

- Awaiting the return of funds

She also stated that this was the agreement that had been filed with the Court, pursuant to which the Court had issued an order staying the proceedings, lifting the provisional measures, and further ordering the release of the judicial certificates. It is expected that everything will be finalized by the end of the week, so that the funds can be recovered.



Initial
CM

She gave the floor to Dr. Jaime in the event he had any additional comments or clarifications; and he stated that he would only add one point related to the proceeding under Law 1116, which would be explained in greater detail later. He added that arrangements were being made for Banco Agrario to return the funds to us. He noted that the Courts had acted promptly and that, once the funds were received, they would provide an update. He also noted that, as a result of the attachment, nearly COP 11,000 million had been seized, and expressed his expectation that, once the funds were returned, the Company would be able to make the first payment to Nacional de Seguros and resume collections to meet its other obligations.

- **FNG Bond Maturity**

The Secretary of the meeting continued with this item, noting that the bond had matured on August 26. In this regard, the Company issued an official statement announcing its inability to make the payment and the commencement of discussions with the bondholders, as well as the meeting with the bondholders scheduled for September 10, which involved a complex legal process for approval by the Superintendencia Financiera de Colombia, SFC, [Financial Superintendence of Colombia].

Jaime commented on the media coverage that had arisen in connection with the Fondo Nacional de Garantias [National Guarantee Fund], recalling the strategies that had been developed in response to the FNG situation and communicated at previous Board meetings.

Accordingly, Plan B is being activated, which involves negotiating with the bondholders with respect to the 30% debt, reaching an agreement with them, and having the FNG become a *pari passu* creditor, in which case it must be bound by the terms negotiated with the bondholders.

He also stated that discussions with the bondholders had been constructive, that they had expressed their support and willingness to continue supporting us, as they are interested in resolving the matter. He added that the purpose of the meeting was precisely to formally present all of these matters from a legal standpoint. Based on the discussions held to date, Jaime stated that the bondholders would be willing to support a restructuring involving a new five-year obligation, with a coupon equal to that of the previous obligation.

In any event, he noted that this entire process would change in light of entry into force of Law 1116, given the uncertainty as to whether the bonds are subject or not to reorganization proceedings under such Law. For the time being, the bondholders (and, on a *pari passu* basis, the FNG) will have to be restructured, but subject to validation by the Court. However, this remains a matter under legal review.

Maite asked how the confidentiality issue could be managed in order to prevent the leakage of information and avoid such issues. Jaime responded that, strictly speaking, negotiations would not be conducted with the FNG, but rather with the bondholders, with the FNG being bound on a *pari passu* basis; the negotiations and meetings with the bondholders are strictly confidential, and they are aware

Initial
CM

of this. He stated that the issue involving the FNG representative may be attributable to potential political interests and concerns regarding public exposure. With respect to Law 1116, a meeting will be held with the Superintendent of Companies to discuss the imminent filing for insolvency proceedings, ensure that they are informed, and request confidential treatment of the matter. However, the filing of the application for admission is one matter, while the actual admission to the proceedings is another, at which point all relevant information must be publicly disclosed. In the case of the application for admission, confidentiality will be requested while the application is pending, given the critical nature of the business and all of the issues that have received media coverage. In response, Maite expressed her satisfaction.

Gustavo Ferraro asked for clarification regarding the timeline, which he had not fully understood during a previous meeting, concerning the proceedings under Law 1116 and the Chapter 11 proceedings in the United States. Jaime explained the procedure and consequences of the application for admission, as well as its benefits, including the suspension of payments on financial obligations and the liabilities subject to reorganization. He also stated that it would be requested that the admission process be completed as soon as possible in order to avoid creating additional complications in connection with the proceedings in the United States. Jaime explained other considerations to Gustavo, emphasizing that the goal is for the Superintendence of Companies not to initiate administrative proceedings against the Company to place it into insolvency proceedings, but rather for the Company to initiate them voluntarily. The Secretary of the meeting outlined several benefits and restrictions, reading from the Law 1116, regarding the application for admission. In this regard, Gustavo asked whether another attachment could be imposed on the Company, to which the Secretary explained what to expect with the proceedings.



Initial
CM

## 4. AUTHORIZATIONS AND RATIFICATIONS TO THE LEGAL REPRESENTATIVE

The Secretary proceeded to address this item, stating that these matters had already been discussed previously, but that it was necessary to clarify the scope of the authorizations:

- **Portfolio Purchase and Sale**

With respect to this item, she stated that greater specificity was needed regarding the authorizations for the portfolio purchase and sale transactions entered into between Ban100 S.A. and Credivalores. Accordingly, approval and ratification are requested for the following:

– Authorize and ratify the execution of the Portfolio Purchase and Sale Agreement between Credivalores–Crediservicios S.A. and Banco Bancien S.A., dated February 9, 2024, for the amount of **COP 12,023,954,423 (TWELVE BILLION TWENTY-THREE MILLION NINE HUNDRED FIFTY-FOUR THOUSAND FOUR HUNDRED TWENTY-THREE COLOMBIAN PESOS).**

– Authorize and ratify the execution of the Portfolio Purchase and Sale Agreement between Credivalores–Crediservicios S.A. and Banco Bancien S.A., dated July 30, 2024, for the amount of **COP 48,665,929,994 (FORTY-EIGHT BILLION SIX HUNDRED SIXTY-FIVE MILLION NINE HUNDRED TWENTY-NINE THOUSAND NINE HUNDRED NINETY-FOUR COLOMBIAN PESOS).**

The authorizations and ratifications granted to the Legal Representative, approved unanimously by 100% of the members of the Board of Directors present, include, without limitation, the following activities:

**FIRST:** Negotiate, execute, and deliver all documentation required to document the Transaction, including all agreements, documents, instruments, certifications and, in general, comply with all formalities that may be required, and take any and all actions related to the purpose of such authorization, including the execution of guarantee arrangements and securities.

**SECOND:** Determine, together with his advisors, all financial, operational, logistical, and legal terms and conditions of the Transactions, in each case within the framework of the applicable law.

- **Sale of Mobile Units Vehicles**

The Secretary proceeded to address this item, indicating that the Company has been in the process of winding down its physical sales operations for some time, and that these mobile units, which are vehicles, constitute another sales channel that is no longer being used; and she further noted that there is a management agreement in place for these mobile units, for which payments are being made.

Initial
CM

The authorization consists of closing this sales channel and selling the corresponding mobile units; and the Secretary stated that, for this purpose, a sale or offer could be made to the employees, as has been done in the past. The amount falls within the authority of the Legal Representative; however, because this involves a sales channel, the matter is being brought before the Board of Directors so that the Board is informed of and may authorize the closure of this sales channel and the sale of the vehicles.

In light of the decision to discontinue the Mobile Offices as a brand positioning and sales support channel, it is proposed that the five available vehicles be sold.

[ILLEGIBLE CHART]



Initial
CM

Luis Blaquier asked whether the mobile units could be sold to Banco B100 so that, in some manner, the sale proceeds could be applied as an offset against the debt owed by CV to such financial institution; and Jaime responded that he would review whether this would be feasible in light of Law 1116 and would consult with the bank.

**<u>The Board of Directors unanimously approved this item, with the affirmative vote of all members present. The authorizations granted to the Legal Representative were approved unanimously, representing 100% of the votes of the members of the Board of Directors present, in the manner set forth above.</u>**

- **<u>Assignment of Bancien Liability</u>**

With respect to this item, she noted that it relates to a liability owed to Banco Ban100 S.A., consisting of an account payable in the amount of COP 10,500 million, and that, as understood, discussions have been held for Finanza-Inversiones to acquire such liability. At this time, the attorneys are working on documenting the appropriate structure for the assignment of this liability.

Jaime added that this request is being made because the authorizations contemplated in this item exceed the authority granted to the Legal Representative in the Bylaws. Accordingly, the matter is being brought before the Board of Directors for its approval to proceed with the assignment of this liability. He also noted and recalled that this resulted from an obligation owed to Ban100 arising from the settlement of the CrediUno credit card transactions with Visa, in an amount of approximately COP 10,000 million. Accordingly, the intention is to assign this obligation to Finanza-Inversiones. This type of transaction has no effect with respect to Law 1116, as it does not provide any additional benefit or improve the creditor's position; it merely involves the assignment of the liability.

Juan Trujillo asked why the assignment was being made and on what basis the assignment would be made. Jaime explained that Credivalores currently has an obligation to B100 arising from an agreement entered into several years ago concerning the settlement of credit card transactions. For this reason, Credivalores owes B100 approximately COP 10,000 million. In light of this, and because Credivalores is in the process of seeking admission to proceedings under Law 1116, the situation would have an impact on the Bank's provisions. Accordingly, the Bank has assigned this obligation to Finanza-Inversiones so that it no longer holds such obligation and, consequently, would not be required to recognize provisions arising from Credivalores' potential admission to proceedings under Law 1116.

Luis Blaquier also asked whether it would be possible to assign collaterals in connection with the assignment. Jaime responded that this would not be possible because, during the suspect period, the Superintendence of Companies would review any guarantees to determine whether they had been granted to favor any particular creditor, in which case it could set aside the transaction and declare it null or ineffective.

Initial
CM

Gustavo Ferraro intervened, noting that he considered the assignment favorable because it does not result in any creditor receiving preferential treatment and provides greater flexibility by having a creditor that is not a bank, as there would not be the ongoing pressure to recognize provisions.

**The Board of Directors unanimously approved this item, with the affirmative vote of all members present. The authorizations granted to the Legal Representative were approved unanimously, representing 100% of the votes of the members of the Board of Directors present, in the manner set forth above.**

### 5. PRESENTATION AND APPROVAL OF THE FINANCIAL STATEMENTS AS OF JUNE 2024

With respect to this item, it was noted that the financial statements had been circulated prior to the meeting and were therefore available for review, including as part of the presentation for this Board of Directors meeting.

This item is for informational purposes only and therefore does not require approval by the members of the Board of Directors. Accordingly, Jaime indicated that the meeting could proceed to the next item on the agenda.



Initial
CM

## 6. WAIVER OF LOCAL AND INTERNATIONAL ORIGINATOR AND ISSUER CREDIT RATINGS

With respect to this item, the Secretary indicated that the contractual relationships with the credit rating agencies had been terminated, as they had originally been engaged to meet certain market requirements. She noted that these were contracts that could be terminated at any time. These rating agencies had caused certain issues due to the downgrades in the Company's ratings, and, given that the Company is not legally or contractually required to continue with these rating processes, the contractual relationships with the rating agencies were terminated.

Jaime took the floor, explaining that Fitch was the credit rating agency, while BRC rated the originator. At that time, the rating was already approaching its expiration, and discussions were underway regarding whether the Company was interested in renewing the rating process. This was discussed with legal counsel to determine whether the Company was required to maintain such ratings, and none of the credit facilities imposes a requirement to maintain either a local or international credit rating. Accordingly, maintaining these ratings would result in additional costs for the Company, and the Company is not required to maintain them. In addition, the downgrades in the ratings were generating negative attention each time the Company was rated.

The purpose of this item is to inform the Board of Directors of this situation.

## 7. PRESENTATION OF THE MECHANISM FOR THE SETTLEMENT OF LIABILITIES

Thereafter, the Secretary proceeded to address this item, emphasizing that it essentially concerned the application that the Company would submit in connection with the insolvency proceedings, as part of a restructuring process. She also outlined, based on the presentation slides, the history of events that led the Company to its financial distress.

However, Jaime suggested shortening the discussion, noting that this history could in any event be reviewed in the presentation materials that would be provided to them or that they could request. He also explained that, essentially, the purpose of this item in the agenda is to explain that, in connection with the filing for which the Company is preparing to submit this Friday, the Company will demonstrate to the Superintendence of Companies why it is seeking relief under Law 1116; and this is referred to as the history of the crisis, and narrates all the events that have already been told, and this have already been presented to the Superintendence of Companies, including the factors that led to the Company's current situation, such as the local effects of the COVID-19 crisis, high interest rates, and inflation, and the resulting impact on our credit card portfolio, including the increase in provisions and payment defaults. It will also explain the international situation involving Mexico, which resulted in the closure of financing lines available to the Company. It will also explain that, despite these circumstances, the Company received capital contributions and obtained liquidity facilities. In essence, this is an explanation of the events that led to the financial crisis, and the Company is justifying its filing under

Initial
CM

this mechanism on two grounds: first, the nonpayment relating to the FNG; and second, the attachment imposed on the Company by Nacional de Seguros.

These two events are important because, generally speaking, the Company does not have any payment defaults that are more than 90 days past due; however, the filing is justified based on these two significant events. This would constitute the preamble to the application to be submitted to the Superintendence of Companies.

He then gave the floor to the Secretary, who stated that the filing would be made this Friday; however, the Company had limited time to prepare a more comprehensive presentation in support of the application.

Given the expedited nature of the filing, it is expected that the Superintendence of Companies will request that the Company supplement the filing or provide additional information. In the meantime, we must wait, as the admission process may take between one and four months, although the timeframe is indeterminate. The purpose of this item on the agenda is also to expedite the Company's position with respect to its creditors and the other restructuring processes in which the Company is involved.

She went on to outline the following timeline:



Initial
CM

**Reorganization Proceedings: timeline**

[ILLEGIBLE CHART]

A law firm was engaged for this process (the shareholders are already familiar with this firm): HB LEGAL, the fees fall within Management's authority to engage legal counsel. The documentation will be made available to the members of the Board of Directors.

Once the Company is admitted to the proceedings, a Promoter is appointed to oversee the process. The Promoter is typically the Legal Representative; however, the Superintendence of Companies may appoint an external Promoter.

Jaime believes that, given the importance and size of the Company's proposed reorganization, the Superintendence of Companies may approve the admission promptly. The reason for making the filing this Friday is to ensure that the information submitted reflects the Company's financial position as of the end of July. If the filing is not made this Friday, the information would have to be prepared based on a month-end closing as of August, which would mean additional time would be required to prepare the application.

Liliana added some of the potential developments involving certain creditors and the positions they might take with respect to the reorganization. Jaime also noted that the corporate body authorized to approve the Company's entry into proceedings under Law 1116 is the Shareholders' Meeting. Nevertheless, all of these matters were brought before the Board of Directors for informational purposes; and he further noted that a Shareholders' Meeting had been called for 9:00 a.m. today to seek the shareholders' approval.

**8. APPOINTMENT OF THE COMMITTEE RESPONSIBLE FOR DRAFTING AND APPROVING THE MINUTES**

The Secretary of the meeting stated that the agenda had been completed and asked whether any of the members present had any comments or remarks to make and whether the meeting could be adjourned.

In response, none of the members of the Board of Directors in attendance had any comments to make.

Thereafter, the Legal Representative of the Company stated for the record that the deliberative and decision-making quorum had been maintained throughout the meeting, from beginning to end, in accordance with Decree 398 of 2020, and that, accordingly, the meeting of the Board of Directors could be adjourned.

Initial
CM

After that, she asked the members whether they agreed that they should proceed with the process of having a Drafting Committee preparing and approving the minutes, to be carried out by the Chair and Secretary of the meeting, to which all members present agreed.



Initial
CM

In response to the proposal, all members of the Board of Directors agreed and unanimously approved it, representing the affirmative vote of one hundred percent (100%) of the members present.

Thereafter, the Secretary of the meeting stated that, having completed the agenda and addressed all matters raised by the members, she declared the regular meeting of the Board of Directors adjourned. She thanked everyone for their attendance and stated that any information requested in connection therewith would be provided by email.

The agenda having been completed, and with thanks to the directors for their participation, the regular meeting of the Board of Directors was adjourned at eight fifty-five in the morning (08:55 a.m.)

**The Chair,**
SIGNED __________
Carlos Meza

**The Secretary,**
SIGNED __________
Liliana Arango Salazar

**The Legal Representative**
SIGNED __________
Liliana Arango Salazar

** These minutes were approved by the committee designated at such meeting to draft and approve the minutes. It is further clarified that such committee was appointed and comprised of the Chair and Secretary of the meeting, namely, Dr. Carlos Meza and Dr. Liliana Arango, respectively.

This certified copy is a true and accurate copy of the minutes recorded in the Company's corporate books.

**[SIGNATURE]**
**LILIANA ARANGO SALAZAR**
**The Secretary**



Initial
CM

**CERTIFICATE OF TRANSLATION**

I, Claudia Marquez, am over the age of 18, competent to translate from Spanish into English, and certify that the translation of the above document is true and accurate (including any stamps or seals) to the best of my abilities. I understand that if any part of the translation is intentionally false, I will be subject to punishment.

Document: Minutes No. 266 - Regular Meeting of the Board of Directors – CREDIVALORES – CREDISERVICIOS S.A.

Translator: Claudia Marquez
Big Way Offices LLC (dba Big Way Translations)
Dunedin, Fl 34698
E-mail: bigwaytranslations@gmail.com
Phone: +1-727-2834625
Date: September 23, 2026

Signature:

Signed by:
Claudia Marquez
43704F9B067B488...

Claudia Marquez
Spanish-English Translator
bigwaytranslations.com

The undersigned is a Spanish-English Public Interpreter, Resolution No. 061, Ministry of People's Power for Interior Relations, Justice and Peace, Official Gazette 42,108 dated April 16, 2021, of the Bolivarian Republic of Venezuela.

The undersigned is a Certified Translator English into Spanish by the American Translators Association (ATA), Certificate Number 554420.

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 48660F56-5564-86CA-83F4-A05BD57224F1 | | Status: Completed |
| Subject: Complete with Docusign: Minuta 266_eng.pdf | | |
| Source Envelope: | | |
| Document Pages: 16 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 15 | Claudia Marquez |
| AutoNav: Disabled | | bigwaytranslations@gmail.com |
| EnvelopeId Stamping: Disabled | | IP Address: 38.27.127.36 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>9/23/2026 5:12:02 PM | Holder: Claudia Marquez<br>bigwaytranslations@gmail.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Claudia Marquez<br>bigwaytranslations@gmail.com<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Pre-selected Style<br>Using IP Address: 38.27.127.36 | Sent: 9/23/2026 5:13:04 PM<br>Viewed: 9/23/2026 5:13:09 PM<br>Signed: 9/23/2026 5:18:16 PM<br>Freeform Signing |

**Electronic Record and Signature Disclosure:**
Not Offered via Docusign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 9/23/2026 5:13:04 PM |
| Certified Delivered | Security Checked | 9/23/2026 5:13:09 PM |
| Signing Complete | Security Checked | 9/23/2026 5:18:16 PM |
| Completed | Security Checked | 9/23/2026 5:18:16 PM |

| Payment Events | Status | Timestamps |
|---|---|---|