Bijan Amini
Avery Samet
Jeffrey Chubak
Amini LLC
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
bamini@aminillc.com
asamet@aminillc.com
jchubak@aminillc.com
Special Litigation Counsel for Plaintiff

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>CREDIVALORES - CREDISERVICIOS S.A.,<br>Debtor | Chapter 7<br><br>Case 24-10837 (DSJ) |
| SALVATORE LAMONICA solely in his capacity as Chapter 7 trustee of Credivalores - Crediservicios S.A.<br>Plaintiff<br>v.<br>BANCIEN S.A. aka Ban100 S.A. fka Banco Credifinanciera S.A., FINANZA INVERSIONES S.A., GRAMERCY FUNDS MANAGEMENT LLC, GCS COLOMBIA FINANCE LLC, GRAMERCY COLOMBIA CONSUMER LENDING HOLDINGS LLC, GUSTAVO FERRARO, GDA LUMA CAPITAL MANAGEMENT, LP, DAVALIA GESTION DE ACTIVOS S.L, LUIS BLAQUIER, ACON INVESTMENTS MANAGEMENT, LLC, ACON COLOMBIA FINANCE II, LLC and JOSÉ MIGUEL KNOELL<br>Defendants | Adv. Proc. 26-01063 (DSJ)<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**<br><br>Re: ECF #33, #36, #40, #43 |

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ........ ii

INTRODUCTION ........ 1

STATEMENT OF FACTS ........ 3

I. OWNERSHIP AND CONTROL OF THE DEBTOR AND BAN100 BY GRAMERCY, GDA LUMA AND ACON ........ 3

II. THE BONDS ........ 4

III. THE SHAREHOLDER LOAN ........ 4

IV. THE OFFERING MEMORANDUM ........ 5

V. THE REPAYMENT OF THE SHAREHOLDER LOAN ........ 6

VI. THE COMMENCEMENT OF THE BANKRUPTCY ........ 7

VII. THE POSTPETITION TRANSFERS ........ 8

ARGUMENT ........ 10

I. BAN100'S AND FINANZA'S FRCP 12(b)(2) MOTION SHOULD BE DENIED ........ 10

- A. Legal Standard ........ 10
- B. Ban100 and Finanza Have Minimum Contacts ........ 10
  - 1. Use of U.S. Bank Account for $2.7 Million Shareholder Loan Repayment ........ 10
  - 2. Effects Test ........ 12
- C. Exercising Personal Jurisdiction Over Ban100 and Finanza is Reasonable ........ 15

II. DEFENDANTS' FRCP 12(b)(6) MOTIONS SHOULD BE DENIED ........ 15

- A. Legal Standard ........ 15
- B. The Motions to Dismiss the Fiduciary Duty Claim Should be Denied ........ 16
  - 1. Directors ........ 16
  - 2. Gramercy, GDA Luma and ACON ........ 21
- C. The Motions to Dismiss the Avoidance Claims Should be Denied ........ 26
  - 1. Postpetition Transfer ........ 26
  - 2. Preference ........ 30
  - 3. Fraudulent Transfer ........ 33
  - 4. Recovery of Avoided Transfers ........ 35
- D. The Motions to Dismiss the Turnover Claim Should be Denied ........ 37

CONCLUSION ........ 38

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allou Distributors, Inc.*,,
379 B.R. 5 (Bankr. E.D.N.Y. 2007) ........ 36

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 15

*Becker v. Anglea*,
2019 WL 3060057 (E.D. Cal. July 12, 2019) ........ 37, 38

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 15, 37

*Bigelow/Diversified Secondary Partnership Fund 1990 v. Damson/Birtcher Partners*,
2001 WL 1641239 (Del. Ch. Dec. 4, 2001) ........ 22

*Calder v. Jones*,
465 U.S. 783 (1984) ........ 13

*Matter of Cavalier Homes of Georgia, Inc.*,
102 B.R. 878 (Bankr. M.D. Ga. 1989) ........ 31

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) ........ 16

*In re CIL Limited*,
582 B.R. 46 (Bankr. S.D.N.Y. 2018) ........ 10

*In re Crystal Apparel, Inc.*,
207 B.R. 406 (Bankr. S.D.N.Y. 1997). ........ 29

*In re Dewey & LeBoeuf LLP*,
518 B.R. 766 (Bankr. S.D.N.Y. 2014) ........ 35

*In re Enron Corp.*,
357 B.R. 32 (Bankr. S.D.N.Y. 2006) ........ 31

*In re Enron Corp.*,
2003 WL 1562202 (Bankr. S.D.N.Y. Mar. 21, 2003) ........ 29

*Fairfield Sentry Ltd. v. ABN AMRO (In re Fairfield Sentry Ltd.)*,
669 B.R. 690 (Bankr. S.D.N.Y. 2025) ........ 11, 12

*In re Firestar Diamond, Inc.*,
654 B.R. 836 (Bankr. S.D.N.Y. 2023) .......... 10, 15, 16

*In re GBG USA Inc.*,
666 B.R. 115 (Bankr. S.D.N.Y. 2024) .......... 12, 13, 14, 15, 22

*G.L.C. Consulting Servs. 1990 L.T.D. v. Tropicana Products, Inc.*,
2007 WL 9723898 (M.D. Fla. Nov. 19, 2007) .......... 37

*In re Gorski*,
766 F.2d 723 (2d Cir. 1985) .......... 19

*Guilbeau v. Footprint Int'l Holdco, Inc.*,
360 A.3d 288 (Del. Ch. 2026) .......... 22

*Guidry v. U.S. Tobacco Co.*,
188 F.3d 619 (5th Cir. 1999) .......... 13

*In re Hampton Hotel Investors, L.P.*,
270 B.R. 346 (Bankr. S.D.N.Y. 2001) .......... 18, 19

*In re Hansen Medical, Inc. Stockholders Litig.*,
2018 WL 3025525 (Del. Ch. June 18, 2018) .......... 23

*HBE Leasing Corp. v. Frank*,
48 F.3d 623 (2d Cir. 1995) .......... 36

*In re HMH Motor Services, Inc.*,
259 B.R. 440 (Bankr. S.D. Ga. 2000) .......... 28

*In re Hutchinson*,
5 F.3d 750 (4th Cir. 1993) .......... 19

*In re Insulfoams, Inc.*,
184 B.R. 694 (W.D. Pa. 1995) .......... 19

*In re Intermagnetics Am., Inc.*,
926 F.2d 912 (9th Cir. 1991) .......... 19

*In re J&S Properties, LLC*,
872 F.3d 138 (3d Cir. 2017) .......... 18

*In re Johns-Manville Corp.*,
60 B.R. 612 (Bankr. S.D.N.Y. 1986) .......... 26, 27

*Kayn v. Lynch Communication Systems, Inc.*,
638 A.2d 1110 (Del. 1994) .......... 22

*Licci v. Lebanese Canadian Bank*,
732 F.3d 161 (2d Cir. 2013)....................11, 13

*Michael Grecco Productions, Inc. v. RADesign, Inc.*,
112 F.4th 144 (2d Cir. 2024) ....................16

*Mullins v. TestAmerica, Inc.*,
564 F.3d 386 (5th Cir. 2009) ....................13

*In re Nelco, Ltd.*,
264 B.R. 790 (Bankr. E.D. Va. 1999)....................19

*Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
549 B.R. 56 (S.D.N.Y. 2016)....................11

*In re Omega Papier Wernshausen GmbH v. Harnischfeger Industries, Inc.*,
2001 WL 1819317 (Bankr. D. Del. 2001) ....................29

*In re Performance Nutrition, Inc.*,
239 B.R. 93 (Bankr. N.D. Tex. 1999)....................19

*Perlman v. Feldmann*,
219 F.2d 173 (2d Cir. 1955)....................23

*Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec., LLC)*,
548 B.R. 13 (Bankr. S.D.N.Y. 2016)....................35

*In re Plaza Family Partnership*,
95 B.R. 166 (E.D. Cal. 1989)....................18

*In re Pretty Girl, Inc.*,
644 B.R. 298 (Bankr. S.D.N.Y. 2022)....................30

*In re Primedia Inc. Derivative Litig.*,
910 A.2d 248 (Del. Ch. 2006)....................22

*In re RJR Nabisco, Inc. Shareholders Litig.*,
1989 WL 7036 (Del. Ch. Jan. 31, 1989)....................16

*Robbins & Co. v. A.C. Israel Enterprises, Inc.,*
1985 WL 149627 (Del. Ch. Oct. 2, 1985) ....................22, 23

*In re Sabine Oil & Gas Corp.*,
547 B.R. 503 (Bankr. S.D.N.Y. 2016)....................36

*In re Sal Caruso Cheese, Inc.*,
107 B.R. 808 (Bankr. N.D.N.Y. 1989) ....................18

*Sama v. Mullaney (In re WonderWork, Inc.)*,
611 B.R. 169 (Bankr. S.D.N.Y. 2020) ........ 31

*In re Satelco, Inc.*,
58 B.R. 781 (Bankr. N.D. Tex. 1986) ........ 37

*Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*,
403 F.3d 43 (2d Cir. 2005) ........ 33, 36

*Sheldon v. Pinto Tech. Ventures, L.P.*,
220 A.3d 245 (Del. 2019) ........ 23

*SIPC v. Bernard L. Madoff Inv. Sec. LLC*,
2023 WL 8010194 (Bankr. S.D.N.Y. Nov. 17, 2023) ........ 30

*In re Stillwater Capital Partners Inc. Litig.*,
851 F. Supp. 2d 556 (S.D.N.Y. 2012) ........ 10

*Stone v. Ritter*,
911 A.2d 362 (Del. 2006) ........ 16

*Summa Corp. v. Trans World Airlines, Inc.,*
540 A.2d 403 (Del. 1988) ........ 23

*In re Syntax-Brillian Corp.*,
2016 WL 1165634 (Bankr. D. Del. Feb. 8, 2016) ........ 34, 35

*In re Tanner Family, LLC*,
556 F.3d 1194 (11th Cir. 2009) ........ 31

*Matter of Teltronics Services, Inc.*,
29 B.R. 139 (Bankr. E.D.N.Y. 1983) ........ 33

*In re Tilray, Inc. Reorg. Litig.*,
2021 WL 2199123 (Del. Ch. June 1 2021) ........ 23

*U.S. Bank N.A. ex rel. CWCapital Asset Management LLC v. Village at Lakeridge, LLC*,
583 U.S. 387 (2018) ........ 33, 34

*In re USACafes, L.P. Litigation*,
600 A.2d 43 (Del. Ch. 1991) ........ 21

*Walden v. Fiore*
571 U.S. 277 (2014) ........ 12, 13

*Wallace v. Wood*,
752 A.2d 1175 (Del. Ch. 1999) ........ 21, 22

*In re Walt Disney Co. Deriv. Litig.*,
906 A.2d 27 (Del. 2006) ........ 16

*Wolf v. Weinstein*,
372 U.S. 633 (1963) ........ 18, 19

**Statutes and Rules**

11 U.S.C. § 547 ........ 32, 33

11 U.S.C. § 548 ........ 34, 35

11 U.S.C. § 550 ........ 31, 35, 37

11 U.S.C. § 704 ........ 18

11 U.S.C. § 1106 ........ 18

Fed. R. Bankr. P. 2004 ........ 7

Fed. R. Bankr. P. 2019 ........ 14

Fed. R. Bankr. P. 7004 ........ 10

Fed. R. Bankr. P. 9013 ........ 27

Fed. R. Civ. P. 9 ........ 34

Fed. R. Civ. P. 12 ........ 10, 15, 29

Fed. R. Evid. 201 ........ 16, 32

Plaintiff Salvatore LaMonica, solely in his capacity as Chapter 7 trustee of Credivalores - Crediservicios S.A. ("Debtor"), submits this memorandum of law in opposition to the four motions to dismiss filed by the defendants in this action.

## INTRODUCTION

The well-plead allegations of the Complaint describe how the owners of the Debtor looted the Debtor of its valuable assets immediately before and during the pendency of the Debtor's Chapter 11 case. On the eve of bankruptcy, the Debtor's owners conspired to pay themselves $2.7 million, allegedly in paydown of an unsecured shareholders' loan. Then, during the bankruptcy, they transferred the Debtor's interest in tens of millions of dollars in payroll loan portfolios to a sister company that the owners similarly owned and controlled. These transfers were done with evasive, incomplete, misleading and outright false representations to this Court and the bondholders.

Central to the Complaint's allegations is the overwhelming overlap of governance, finances and ownership between the Debtor and its sister companies, Finanza/Ban100. The same three shareholders owned both companies in near identical percentages, and internally managed them in a unified, integrated manner. The three U.S.-based shareholder defendants, who together owned over 75% of both companies (and controlled even more of the voting rights), directed all of the activity complained of herein from their U.S. offices. Financial decisions for the Debtor and the sister companies were made by the shareholder firms, who exercised their control through their defendant directors on the boards.

The Complaint alleges that the controlling shareholders breached their fiduciary duties owed to the Debtor (and postpetition to the Debtor's estate) by transferring the very assets that undergirded the Debtor's prepackaged chapter 11 plan of reorganization. The Complaint also

alleges that the transfers are avoidable as either preferences, fraudulent transfers or unauthorized postpetition transfers.

Defendants' arguments against the Complaint contained in the sprawling motions to dismiss can be grouped into three general categories.

First, the two Columbian sister-entities move to dismiss under FRCP 12(b)(2) for lack of personal jurisdiction in the U.S. Specific jurisdiction exists here because the Trustee's causes of action—avoidable transfers—against these defendants arises out of their transactions within the U.S. The prepetition $2.7 million transfer was to U.S. entities, through U.S. bank accounts, using U.S. banking agents. The unauthorized postpetition payroll loan portfolio transfers removed over $40 million from a U.S. debtor in possession. All of these transactions were directed by U.S.-based persons for the benefit of U.S. entities who certainly knew of and, indeed, had initiated the bankruptcy proceeding.

Second, the defendant shareholders claim that only their employees, whom they designated to sit on the Debtor's board, can be liable for the decisions to benefit the firms at the Debtor's expense, not the firms themselves. By contrast, the defendant board members argue that they cannot be liable for transferring the assets because only their firms benefitted, not them personally. In this way, it was perfectly legal to transfer assets out of the Debtor's estate and without approval of this Court and no one need answer for it.

Third, the defendant shareholders claim that because they acted in unison to loot the Debtor, none of them can be held be liable, because none individually controlled the Debtor. Thankfully, this convenient syllogism is not the law—when controlling shareholders act in unison to breach their fiduciary obligations, they are jointly and severally liable.

The motions to dismiss should be denied. Insiders who knowingly denude a bankruptcy estate of its core, reorganization assets, are liable to the estate and should be called to answer to this Court and their victims for their actions.

## STATEMENT OF FACTS

### I. OWNERSHIP AND CONTROL OF THE DEBTOR AND BAN100 BY GRAMERCY, GDA LUMA AND ACON

The Debtor was a payroll lender and credit card issuer located in Bogota, Colombia. (Complaint ¶8.) It had four shareholders: Gramercy (42%), GDA Luma (20%), ACON (15%) and Crediholding S.A.S (20%). (Id. ¶28.) Gramercy, GDA Luma and ACON are U.S.-based private equity firms. (Id. ¶¶10, 15, 19.) They each held their equity interests through wholly-owned entities; however, all decisions were controlled entirely by these firms from their U.S. offices. (Id. ¶29.)

Each firm appointed two directors to the Debtor's board:[1]

- Gramercy appointed defendant Gustavo Ferraro, a partner in Gramercy's Greenwich office, as well as an attorney at Gramercy's Colombian law firm. (Id. ¶¶ 13-14.)
- GDA Luma appointed defendant Luis Blaquier, an associate in its New York office, as well as a Mexican national who then gave his voting proxy to a junior analyst at GDA Luma. (Id. ¶¶ 17-18.)
- ACON appointed defendant Jose Miguel Knoell, a managing partner in its Washington D.C. office as well as a Colombian national. (Id. ¶¶ 21, 22.)

The Complaint details how decisions concerning the Debtor were made by the investment teams at Gramercy, GDA Luma and ACON, and then implemented by the specific board member employees and appointees controlled by those firms. (Id. ¶34.)

---

[1] The remaining owner held just one board seat. (ECF #18 at A-85, PDF p.235 ("Pursuant to our bylaws, our board of directors must be composed of seven principal members with alternates"); ECF #1 PDF pp.6-7 (filing of Chapter 11 case approved by seven-member board).)

The Debtor's shareholders also owned and managed Ban100, owned 100% through its holding company parent, Finanza. Ban100 is registered as a Colombian bank which offered saving and investment services in the same market at Credivalores. (Id. ¶31.) The Debtor's shareholders owned Ban100 in similar percentages to the Debtor. (Id. ¶30.) The two companies were highly-integrated. For example: the Gramercy, GDA Luma and Acon directors of Ban100 would regularly attend and participate in the Debtor's board meetings and also would be included in emails about Debtor business. (Id. ¶34.) Similarly, from time to time, the Debtor's directors would even give power of attorney to the Ban100 directors to approve payroll loan sales to Ban100. (Id. E.g. Chubak Decl. Exhibit 7 PDF pp.1, 30-31.)

The defendant shareholder firms viewed their investments in the Debtor and Ban100 as a single investment and treated them as such internally. (Complaint ¶¶33, 35.) Furthermore, as discussed below, the shareholders entered into numerous transactions commingling the capital structures of the Debtor and Ban100. (Id. ¶¶ 35, 43-48.)

## II. THE BONDS

The Debtor had issued approximately $210 million in unsecured bonds under an indenture with The Bank of New York Mellon ("BNYM"), governed by New York law. (Id. ¶2.) The indenture prohibited the Debtor from selling its assets to affiliates at all relevant times hereto, absent numerous conditions, such as delivery of an officer's certificate of fairness, a board resolution or a formal opinion from an international investment bank. (Id. ¶¶37-38.) No such certificate, resolution or written fairness opinion was ever obtained for transactions with Ban100. (Id. ¶42.)

## III. THE SHAREHOLDER LOAN

In October 2022, Gramercy, GDA Luma and ACON extended a $20 million term loan to the Debtor through a complex arrangement with Finanza (Ban100's parent). (Id. ¶¶43-53.) The

three firms set up wholly-owned special purpose entities (the "Shareholder Lenders") who entered into a credit agreement with Finanza as borrower, Acquiom Agency Services, LLC ("Acquiom") as administrative agent,[2] and the Debtor as guarantor (the "Shareholder Loan"). (Id. ¶¶44-45.) The funds flowed from the Shareholder Lenders to Finanza to the Debtor, both on this initial loan and on subsequent amendments providing further fundings. (Id. ¶¶44, 47, 48.)

The Shareholder Loan was accompanied by a side letter signed by Debtor's shareholders providing how proceeds from the sale of Ban100 would be applied to the Shareholder Loan, then to another Debtor loan, then to preferred equity interests in Finanza. (Id. ¶46.)

In subsequent amendments, the Debtor granted the Shareholder Lenders (through Acquiom, their agent) a security interest in the Debtor's residual interests in the payroll loan porfolios held in certain *patrimonios autonomos* ("P.A.") trusts as collateral; however, those liens were never perfected. (Id. ¶¶49, 51.) Also, both amendments required the Debtor to sell its credit card business and required Finanza to sell Ban100. (Id. ¶50.)

Further emphasizing the strange equity-investment-based nature of the Shareholder Loan, the Debtor made just three interest payments over the life of the loan (all in 2023) and no enforcement action was taken after the loan purportedly matured in November 2023. (Id. ¶52.) In January 2024, the Shareholder Lenders caused the Debtor to enter into a 16-day "forbearance agreement" following which again no action was taken. (Id. ¶53.)

## IV. THE OFFERING MEMORANDUM

In February 2024, the Debtor missed an interest payment due on the bonds. (Id. ¶54.) On March 7, 2024, the Debtor commenced solicitation of votes on what would become, when approved by the bondholders, the Debtor's prepackaged Chapter 11 plan of reorganization and

[2] Acquiom is a Colorado limited liability company.

distributed an accompanying memorandum to bondholders. (ECF #18, "Offering Memorandum".) The Debtor proposed issuing the existing bondholders new, replacement bonds in a reduced principal amount but now fully secured by a first lien on the Debtor's payroll loan portfolios held outside P.A. trusts and a second lien on the Debtor's residual interest in one such trust. (Id. ¶55.) The Debtor stressed that from their issuance the new bonds would continuously be fully secured. (Id. See ECF #18 at 54, PDF p.61.[3])

The same day, but undisclosed in the Offering Memorandum, the Debtor entered into "an amended and restated forbearance agreement" on the Shareholder Loan. (Complaint ¶56.) In this document, Finanza purported to agree pay down the full amount of the Shareholder Loan, with $8.5 million due in April 2024, and with the Debtor guaranteeing all such repayments. (Id.) Finanza and the Debtor also agreed to pay over $1 million in legal fees to the (primarily U.S.) counsel for the Shareholder Lenders. (Id. ¶57.) At the same time, the Debtor entered yet into another forbearance agreement whereby the Debtor paid the legal fees of yet another Gramercy entity ($50,000) to Latham & Watkins, counsel for Gramercy Colombia Finance LLC, a Delaware entity. (Id. ¶58.)

## V. THE REPAYMENT OF THE SHAREHOLDER LOAN

On April 5, 2024, two days after the Debtor confirmed that bondholders had approved the Plan, the Debtor's board authorized the commencement of the Chapter 11 bankruptcy. (Id. ¶61). However, the shareholders held back the bankruptcy filing. (Id. ¶62). Instead, on April 29, 2024, the shareholders caused the Debtor to enter into a transaction whereby:

- The Debtor would transfer payroll loan portfolios to Ban100;

[3] The Offering Memorandum failed to disclose any junior lien held by the Shareholder Lenders, the sale of the Debtor's credit card business or that the Debtor had ceased originating payroll loans. (Id.)

- Ban100 would owe the Debtor a “sales premium” of $2.7 million; and
- Ban100 would pay that $2.7 million to Finanza which would pay it to the Shareholder Lenders in paydown of the Shareholder Loan.

(Id. ¶62.) Finanza had no entitlement to this “sales premium.” (Id. ¶63.) This transfer was never disclosed to the Court, and none of the defendant shareholders were able to produce documentation concerning the payroll loan transfer in FRBP 2004 discovery. (Id. ¶64.) Nor do the Debtor’s board minutes reveal the value of the payroll loan portfolios transferred. (Id.)

On May 3, 2024, Finanza paid the $2.7 million to Acquiom. (Id. ¶65.) On May 8, 2024, Acquiom distributed the funds to the Shareholder Lenders: $1.2 million to GCS; $1.4 million to Davalia and over $.1 million to ACON Colombia Finance II. (Id. ¶66.) This payment was not required by the transaction documents, as at the same April 29, 2024 meeting the board approved an amendment to the forbearance agreement that deferred the $8.7 million in payment obligations due April-May 2024 until after the Chapter 11 case concluded. (Id. ¶67. See Chubak Decl. Exhibit PDF pp.11-13.) On May 15, 2024, the Debtor and the Shareholder Lenders executed that amendment. (Complaint ¶68.) The next day, May 16, 20924, the Debtor filed for bankruptcy in this Court. (Id. ¶69.)

## VI. THE COMMENCEMENT OF THE BANKRUPTCY

With voting having already taken place, the Debtor moved with the filing of its petition to approve the Offering Memorandum as the disclosure statement and to schedule a confirmation hearing. (Id. ¶70.) The Debtor, with the knowledge of the shareholder defendants, submitted a first day declaration (ECF #4) describing its business, financial condition and prepackaged plan. (Id. ¶73.) The first day declaration did not disclose the transfer of the payroll loan portfolios to Ban100, nor the $2.7 million to the Shareholder Lenders. (Id. ¶74.) It did however, make several

cryptic and misleading disclosures about the Shareholder Loan and Ban100 which seemed designed to obfuscate the underlying facts. (Id. ¶¶74-76.)

## VII. THE POSTPETITION TRANSFERS

On June 18, 2024, the Debtor threatened its Colombian government-backed financial guarantor that it would commence a Colombian bankruptcy if the guarantor did not agree to restructure local bonds scheduled to mature in August. (Id. ¶78.) On June 27, 2024, one week before the confirmation hearing, the Debtor transferred payroll loan portfolios having a value of around $1 million to Ban100. (Id. ¶79.) The Trustee has uncovered no consideration paid for these assets and no order of this Court authorized their sale. (Id.)

On July 3, 2024, the Court confirmed the Chapter 11 plan. Pursuant to its terms, the plan would go effective when professional fees were paid and the new bonds (secured by payroll loan portfolios, as discussed above) were issued. (Id. ¶81.) On July 11, 2024, the Colombian guarantor informed the Debtor that it would not agree to restructure the local bonds. (Id. ¶82.)

On July 30, 2024, the Debtor transferred $7.8 million in payroll loan portfolios to Ban 100. No cash was transferred to the Debtor and Ban100 purported to exercise setoff rights against the Debtor in exchange. (Id. ¶83. See Chubak Decl. Exhibit 15 PDF p.6.) The setoff, purportedly based on a retroactively modified prepetition sale does not appear legitimate and clearly lacks mutuality with post-petition transactions.[4] (Id. ¶¶84-85.) This Court entered no order approving this transaction, which purported to transfer assets that were supposed to be collateral for the new bonds. Adding insult to injury, the Debtor's records indicate that this transaction fully liquidated

[4] The setoff seems to be justified as follows: In August 2023, Ban100 purchased the Debtor's credit card business for $15 million. Two months later, the parties retroactively reduced the purchase price to $2.7 million, thus leaving Ban100 as having o*verpaid* the Debtor by about $12 million. (Id. ¶84.)

the P.A. trust to which Citibank was lender ("Citibank Trust"), which it had represented to this Court had a value of $46 million, with $26 million of secured debt. (Id. ¶86 describing ECF #4 Schedule 2 PDF p.38.)

On July 31, 2024, the Debtor transferred $12 million in payroll loan portfolios not held in a P.A. trust to Ban100 (the new bonds were supposed to hold a first lien on these portfolios under the plan). The Debtor's board minutes do not reference any consideration paid for these assets and the Debtor's monthly operating reports reveal only $1.2 million in portfolio sale income during this time. (Id. ¶87.) This Court did not approve this transaction.

On August 28, 2024, the Debtor's board purported to ratify the July 31st transfer and a prepetition February 9, 2024 transfer to Ban100 for $3.2 million. This Court did not approve these transactions. (Id. ¶88).

The Debtor's 2024 financial statements reveal that it transferred payroll loans of $42.3 million to Ban100 in calendar year 2024, considerably more than identified in the Debtor's board minutes and the disclosures made to this Court. (Id. ¶90. See Chubak Decl. Exhibit 13 PDF p.41.) Finally, the Debtor made recurring undisclosed payments to Ban100 for operating costs between July 3, 2024 (the day of confirmation) and June 16, 2025. (Complaint ¶91). Defendant GDA Luma claims in its papers (without proof) that these represented commissions due Ban100 under a prepetition licensing agreement. (ECF #41 at 9, 22.) Nevertheless, these related-party transfers were clearly not ordinary course, never disclosed in monthly operating reports and never authorized by this Court. (Complaint ¶92.)

## ARGUMENT

### I. BAN100'S AND FINANZA'S FRCP 12(b)(2) MOTION SHOULD BE DENIED

#### A. Legal Standard

The inquiry on a FRCP 12(b)(2) motion concerns minimum contacts with the U.S. as a whole under FRBP 7004(f) and whether the exercise of jurisdiction is reasonable under the circumstances. *In re CIL Limited*, 582 B.R. 46, 57 (Bankr. S.D.N.Y. 2018).

"To survive a Rule 12(b)(2) motion at the pleading stage … a plaintiff need only make a prima facie showing that jurisdiction exists." *In re Firestar Diamond, Inc.*, 654 B.R. 836, 897-98 (Bankr. S.D.N.Y. 2023).

"To do so, a plaintiff must rely on its own affidavits and supporting materials to make the prima facie showing and is required to include factual allegations that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id.* at 898.

"A court is permitted to consider materials outside of the pleadings and all allegations are construed in the light most favorable to the plaintiff. *In re Stillwater Capital Partners Inc. Litig.*, 851 F. Supp. 2d 556, 566-67 (S.D.N.Y. 2012). Doubts are resolved in the plaintiff's favor, notwithstanding a controverting assertion by the moving parties." *Id.*

#### B. Ban100 and Finanza Have Minimum Contacts

1. <u>Use of U.S. Bank Account for $2.7 Million Shareholder Loan Repayment</u>

The Complaint alleges personal jurisdiction based on Ban100's having transferred sales premium it owed the Debtor to the Shareholder Lenders through Finanza and the U.S. bank account of their administrative agent. (Complaint ¶¶27, 62-63.)

Ban100 and Finanza argue (ECF #34 at 7-8) this does not establish personal jurisdiction because they "did not control the routing of funds" and use of a U.S. account to paydown the Shareholder Loan was "incidental rather than integral" to the transaction, not "purposeful,

deliberate and recurring", and the resulting claims do not "bear an articulable nexus to that specific use".

That is provably false. With each borrowing under the Shareholder Loan, on October 25, 2022 (Complaint ¶¶43-44), February 3, 2023 and March 15, 2023 (id. ¶¶47-48), Finanza executed a funding authorization letter (Chubak Decl. Exhibits 2-4) acknowledging the administrative agent banked at Citizens Bank and that loans the Shareholder Lenders were extending would flow through said account to Finanza. Finanza could have negotiated to use a different administrative agent, perhaps one that used a non-U.S. bank account, but did not do so. The funding authorization letters show Finanza and in turn its subsidiary Ban100 knew exactly how funds would be flowing as between Finanza and the Shareholder Lenders and further confirm funds had flowed through the same U.S. bank account on multiple prior occasions. Naturally, that same bank account was used (Chubak Decl. Exhibit 18 PDF pp.3, 5, 7-9) to remit payment back to the Shareholder Lenders through the administrative agent.

In *Arcapita*, personal jurisdiction was found to exist over foreign entities based on their having designated New York correspondent bank accounts to receive funds from the debtor:

> The Banks' deliberate choice to utilize the New York correspondent bank system, are United States contacts attributable to them. Additionally, the [preference claims] arise out of or relate to the Banks' contacts with the forum … [As] in *Licci*, the Banks deliberately chose to effectuate the Placements by directing the transfer of millions of dollars through New York. The exercise of jurisdiction over the Banks for a cause of action that relates to those transfers is constitutional.

*Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 69-70 (S.D.N.Y. 2016). *See also id.* n.18 ("Because Tadhamon directed the wire transfers to a specifically designated New York account for its own advantage, the receipt of the funds in New York is a 'contact' properly attributed to Tadhamon"); *Fairfield Sentry Ltd. v. ABN AMRO (In re Fairfield Sentry Ltd.)*, 669 B.R. 690, 710 (Bankr. S.D.N.Y. 2025) ("the selection and repeated use

of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts”).

The same result should apply here, not just as to Finanza which made the transfer but also as to Ban100 which transmitted the subject funds to Finanza and was involved in this transaction from the outset, as reflected in the February 28 and April 29, 2024 board minutes. (Chubak Decl. Exhibit 7 (“February 28, 2024 Board Minutes”), Exhibit 9 (“April 29, 2024 Board Minutes”).) The former discuss the subject sale of payroll loan portfolios (February 28, 2024 Board Minutes PDF pp.20-21, 28, discussion of Citibank) and reflect that the meeting was attended not only by most of Ban100’s board (Javier Ledesma of Gramercy, Maite Stebelski of GDA Luma and Alberto Hernandez of ACON (Complaint ¶¶34, 129), with the latter having been given the voting proxy of ACON-appointed Debtor director (id. ¶21) Jose Miguel Knoell) (February 28, 2024 Board Minutes PDF pp.1, 3), but its President Hector Chaves (id. PDF p.1), who participated as financial advisor[5] to the Debtor. The latter minutes reflect unanimous board approval of the manner in which Ban100 would channel the $2.7 million in sale premium to the Shareholder Lenders through Finanza and the administrative agent. (April 29, 2024 Board Minutes PDF pp.11-13.) That board meeting was likewise attended by the same three Ban100 directors, with Mr. Knoell again having again given Mr. Hernandez his voting proxy. (Id. PDF p.1.)

2. Effects Test

Ban100 argues (ECF #34 at 8) knowingly transacting with a debtor in possession does not establish personal jurisdiction under *Walden v. Fiore*, 571 U.S. 277, 284 (2014).

However, here minimum contacts is based on “more than knowledge” of the Debtor’s having filed bankruptcy. Rather, it is based on “‘contact’ with the U.S. forum that the defendant

[5] Mr. Chaves was formerly the Debtor’s CFO. (Chubak Decl. Exhibit 1 at 148.)

has created through its own activities, as required by *Walden*." *In re GBG USA Inc.*, 666 B.R. 115, 134 (Bankr. S.D.N.Y. 2024).

Under the "effects" test articulated in *Calder v. Jones*, 465 U.S. 783 (1984), "an act done outside the state [here, outside the U.S.] that has consequences or effects within the state will suffice as a basis for jurisdiction in a suit arising from those consequences if the effects are seriously harmful and were intended or highly likely to follow from the nonresident defendant's conduct." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 400-01 (5th Cir. 2009) (citing *Guidry v. U.S. Tobacco Co.*, 188 F.3d 619, 628 (5th Cir. 1999)). Stated differently, minimum contacts are satisfied based on foreign transactions "so long as the conduct had effects in the United States and so long as the defendant 'expressly aimed' its conduct at the United States." *GBG*, 666 B.R. at 133 (quoting *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 173 (2d Cir. 2013)). "Precipitating and directing" an avoidable transfer can qualify. *Id.* at 135, 138. (collecting cases).

This standard is clearly satisfied. Ban100 "precipitated" the $2.7 million transfer of Debtor funds (dictionary definition is to make or cause something to happen) by advancing same to Finanza. In addition, the Complaint alleges (¶11, 16, 20), and the April 29, 2024 Board Minutes show (PDF pp.11-13), that the entire purpose of the payment was to deliver Debtor cash to U.S. entities, the Shareholder Lenders, in advance of the Debtor's bankruptcy. Thus, in in making the transfer, Ban100 "expressly aimed" to transfer the funds to the U.S. recipients.

Ban100 also knew full well of the effect that said transfer, and the transfer of payroll loan portfolios, would have on creditors. It knew the purpose of the prepackaged bankruptcy was to restructure the BNYM bonds. As noted above, Ban100's President and three directors attended the February 28, 2024 board meeting at which the restructuring was discussed. The minutes state how Mr. Chaves participated in a presentation (February 28, 2024 Board Meeting PDF pp.20-21) on the bond exchange and the sale of payroll loan portfolios in the Citibank Trust. They were also

privy to the board discussion (id. PDF p.39) of how under the Shareholder Loan forbearance agreement "Credivalores is allowed to file the pre-pack with the New York court". The same Ban100 directors also attended the April 28, 2024 board meeting which involved substantial discussion of the "Bond Restructuring" (Apri 29, 2024 Board Minutes PDF p.14) and gave an estimated timetable for various stages to complete same. Those stages included negotiations with an ad hoc group (Amended FRBP 2019 statement at ECF #129 Exhibit A) that includes U.S. holders e.g. Sandglass Capital (second largest holder listed). BNYM is of course a U.S. creditor that was entitled to and did file proofs of claim (Claim #4, #5) on behalf of all bondholders.[6] Thus, Ban100 clearly knew that U.S. creditors would be affected by the subject transfers, in that the Debtor would have that much less value from which to repay bonds, especially as its credit card division had been sold off and the Debtor was no longer writing new payroll loans or credit card debt. (Complaint ¶36.)

As in *GBG*, 666 B.R. at 136-37, "[t]he alleged conduct unquestionably was directed at the United States … the effects of the conduct were experienced in the United States (the whole point was to transfer [property] to the detriment of GBG's US creditors), the effects of the conduct were experienced in the United States (the alleged fraudulent transfers happened here to the alleged detriment of creditors located here), and the Defendants are alleged to have been aware that the transfers were being made at a time, and under circumstances, that made them [avoidable]. This is sufficient to support an exercise of personal jurisdiction."[7]

---

[6] A copy of the indenture is attached to Claim #1. § 6.09 authorized BNYM to file proofs of claim.

[7] Declining jurisdiction over Ban100 under these circumstances would send the message that it is acceptable for a foreign affiliate of a foreign debtor in possession, both under common control, to loot the estate through unauthorized postpetition transactions because minimum contacts requirements preclude recourse.

### C. Exercising Personal Jurisdiction Over Ban100 and Finanza is Reasonable

Exercising personal jurisdiction over Ban100 and Finanza is reasonable because the primary claims asserted here are avoidance claims under the Bankruptcy Code, to recover transfers by a debtor in possession or prepetition debtor, and no evidence has been shown "that those claims could even be pursued in any other forum." *GBG*, 666 B.R. at 138. Indeed, said defendants argue an avoidance judgment would be denied recognition in Colombia (ECF #34 at 14) on public policy grounds. "The United States has the predominant interest in enforcing its [avoidance] laws." *Id.* While "[t]here may be some inconvenience to the Defendants that will be associated with litigation in the United States", they participated in the offending transactions with knowledge of the U.S. connections and effects as described above. Therefore, "[a]ny burdens that they might experience are warranted, and are matters that they reasonably ought to have anticipated." *Id.*

That the Debtor's "center of main interests" is in Colombia (ECF #34 at 12) is irrelevant. This is not, and never was, a Chapter 15 case.

That BNYM filed a claim (ECF #34 at 13 & Exhibit 1) in the Colombian liquidation proceeding is also irrelevant. The Colombian liquidator and Chapter 7 trustee are both capable of making distributions to bondholders by paying over cash proceeds of property of their respective estates (including litigation claims) to BNYM.

## II. DEFENDANTS' FRCP 12(b)(6) MOTIONS SHOULD BE DENIED

### A. Legal Standard

A FRCP 12(b)(6) motion tests the legal sufficiency of a claim for relief. On such motion, courts consider whether the "well-pleaded factual allegations," assumed to be true, "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (claim has facial plausibility when the court may reasonably infer that the defendant is liable for the misconduct alleged). In reviewing such motion,

the court must accept as true all factual allegations in the complaint, drawing all reasonable inferences in plaintiff's favor. *Firestar Diamond, Inc.*, 654 B.R. at 863.

Courts may also consider documents integral to or relied upon in the complaint, even if not attached or incorporated by reference, and facts of which judicial notice may be taken under FRE 201. *Michael Grecco Productions, Inc. v. RADesign, Inc.*, 112 F.4th 144, 148 n.1 (2d Cir. 2024). To be considered integral to a complaint, the plaintiff must have actual notice of the extraneous information and relied upon the documents in framing the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 & n.3 (2d Cir. 2002).

**B. The Motions to Dismiss the Fiduciary Duty Claim Should be Denied**

1. <u>Directors</u>

(i) Bad Faith/Loyalty

Each director defendant moved to dismiss the fiduciary duty claim on the ground of failure to plead self-dealing and failure to plead breach of the duty of care; however, none addressed the duty of good faith, generally considered a subsidiary element of the duty of loyalty. *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

It has long been recognized "the universe of fiduciary misconduct is not limited to either disloyalty in the classic sense … or gross negligence." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 66 (Del. 2006). *Disney* held "failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation." *Id. See also In re RJR Nabisco, Inc. Shareholders Litig.*, 1989 WL 7036 (Del. Ch. Jan. 31, 1989) (business judgment rule would not protect "fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

Here, the Complaint alleges board approval of multiple transactions reflecting prioritization of the interests of the Shareholder Lenders and Ban100 over those of the Debtor. The Complaint alleges (¶¶62-66), and the April 29, 2024 Board Minutes show (PDF pp.11-13) that the Debtor's board unanimously approved Finanza advancing $2.7 million in Debtor sales premium to the Shareholder Lenders eve-of-bankruptcy, despite approval of a forbearance amendment at the same meeting deferring said payment obligation until after bankruptcy. The Complaint also alleges that the July 31, 2024 transfer of payroll loan portfolios to Ban100 was ratified by the Board at the August 28, 2024 meeting, with no consideration recited in the minutes or reflected in the monthly operating report (id. ¶¶87-88), and with said transaction being just one day after another high-value payroll loan portfolio transfer to Ban100 for which the purported consideration was satisfied through the exercise of nonmutual setoff rights in violation of the automatic stay (id. ¶¶83-86). The motions offer no business justification for such board approvals, and there is no way to explain same other than the Debtor's board prioritizing the interests of Ban100 over the Debtor, by transferring the Debtor's assets to affiliates in advance of the Colombian insolvency proceeding.

Insofar as the directors argue (e.g. ECF #41 at 23) that the Complaint engages in group pleading by alleging board approval without identifying which specific directors approved which specific transactions, the respective directors are identified in the minutes submitted herewith. The April 29, 2024 Board Minutes (at PDF pp.11-13) reflect that the $2.7 million transfer was approved by Messrs. Ferraro, Blaquier and Knoell (id. PDF p.1), with Mr. Hernandez voting as the latter's proxy (id. PDF p.3) with an additional vote coming from Gramercy's attorney (Complaint ¶14), Mr. Trujillo-Sanchez, who is alleged (id. ¶34) to be Gramercy's agent. The August 28, 2024 minutes (referenced at Complaint ¶¶87-88, Chubak Decl. Exhibit 11) reflect board approval by Messrs. Ferraro and Blaquier (id. PDF p.1), with additional votes coming from Mr. Trujillo-

Sanchez and Mr. Kontarovsky, who the minutes show (id.) gave his voting proxy to Federico Sioli, alleged to be (Complaint ¶¶18, 34) a GDA Luma analyst.

(ii) Federal Common Law Duty to Preserve Estate Property

The director defendants do not address the Federal common law duty to preserve estate property either, and instead argue (e.g. ECF #37 at 15, #41 at 18) no such duty exists apart from fiduciary duties under state law.

That is wrong. "The concept of the debtor-in-possession as a fiduciary of the estate, the creditors and the Court, stems from its assumption of the rights and powers of a trustee and extends to a corporation's officer, director, shareholder or managing employee where the facts disclose control and/or management." *In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 816-17 (Bankr. N.D.N.Y. 1989) (citing *Wolf v. Weinstein*, 372 U.S. 633, 649-53 (1963)). "As a fiduciary, the debtor is obligated to protect and conserve property in its possession, as well as to provide voluntary and honest disclosure of financial information—a reasonable '*quid pro quo*' for its temporary relief from substantial financial obligations." *Id.*

The duty "to protect and conserve property" of the estate is consistent with the statutory duty to "be accountable for all property received" under 11 U.S.C. § 704(a)(2), made applicable by 11 U.S.C. § 1106(a)(1), § 1107(a). *In re J&S Properties, LLC*, 872 F.3d 138, 144 (3d Cir. 2017) ("There is no dispute" that such statutory duties "include protecting and preserving the Estate Property"); *In re Plaza Family Partnership*, 95 B.R. 166, 172 (E.D. Cal. 1989) ("debtor-in-possession … has the duty to protect and conserve property in its possession for the benefit of creditors").

"In practice these fiduciary responsibilities fall not upon the inanimate corporation, but upon the officers and managing employees who must conduct the Debtor's affairs under the surveillance of the court." *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 361 n.35 (Bankr.

S.D.N.Y. 2001) (quoting *Wolf*, 372 U.S. at 649-50). That is because "[t]he willingness to leave a debtor in possession is based on the assumption that officers and employees of the debtor can be depended upon to carry out the fiduciary responsibilities of a trustee." *In re Insulfoams, Inc.*, 184 B.R. 694, 703 (W.D. Pa. 1995). *See also In re Intermagnetics Am., Inc.*, 926 F.2d 912, 917 (9th Cir. 1991) ("Officers of a debtor in possession are officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties").

"This principle has been extended to include directors of a debtor-in-possession. They have essentially the same fiduciary responsibilities to creditors as does a trustee for a debtor that is **out** of possession." *Insulfoams*, 184 B.R. at 703 (emphasis in original). *See also In re Performance Nutrition, Inc.*, 239 B.R. 93, 111 (Bankr. N.D. Tex. 1999) (similar).

Liability may result from both negligent as well as intentional failure to preserve estate property. *In re Nelco, Ltd.*, 264 B.R. 790, 811 (Bankr. E.D. Va. 1999) ("an officer or director of the debtor in possession may be held personally liable for the losses suffered by the debtor when the officer acts willfully and deliberately, disregarding the estate's best interests"); *In re Gorski*, 766 F.2d 723, 727 (2d Cir. 1985) ("Liability may attach as the result of negligent, as well as knowing or intentional breaches" of duty to preserve estate property); *In re Hutchinson*, 5 F.3d 750, 758 (4th Cir. 1993) (remanding for determination of whether the trustee failed to preserve estate property, by failing to take steps to prevent removal of property from estate after having been placed on notice property was being taken). Directors may therefore be held liable not only for board-ratified transactions but transactions that should have been prevented by them that served

to deplete the estate, including other payroll loan portfolio transactions (Complaint ¶90) and cash transfers to Ban100 (id. ¶91) for "operating costs".[8]

The Complaint alleges intentional conduct as shown above, including by the board-approved prepetition transfer to Shareholder Lenders and postpetition transfers to Ban100. To the extent the Complaint somehow fails to adequately plead intentional conduct, negligent conduct is plainly alleged by the various large-dollar payroll loan portfolio transactions happening beneath the noses of the respective directors, somehow accelerating after the Colombian guarantor rejected the Debtor's proposal to restructure local bonds coming due within two months necessitating commencement of a Colombian insolvency proceeding, as well as the unauthorized direct payments to Ban100 which it states were under a prepetition contract.

(iii) Duty to Act with Diligence of Prudent Businessperson

Colombian law requires directors to "act in good faith, with loyalty and with the diligence of a prudent businessperson." (ECF #37 at 8; see also Chubak Decl. Exhibit 24 Art. 23 (*con la diligencia de un buen hombre de negocios*).[9]) In the event of breach, Colombian law (id. Art. 24) imposes liability for damages caused by intentional conduct (*dolo*) or negligence (*culpa*). Therefore, the same transactions that give rise to a breach of the duty of good faith (board-ratified

[8] GDA Luma and Mr. Blaquier claim the direct payments to Ban100 for "operating costs" were recurring monthly payments "related to commissions [of around $5,000/month] for the right to use the Visa brand until the Credit Card Business is fully offloaded to Ban100", that were disclosed in the cash management motion. (ECF #41 at 22.) Putting aside that the subject payments are not monthly, and often exceed $5,000, they were not authorized either by the interim (ECF #38) or final (ECF #70) cash management orders, and at best the reason for such payments presents fact questions.

[9] The director defendants dispute application of Colombian law (ECF #37 at 15 n.7, #41 at 17 n.5) but do not explain what other law could possibly apply. Their claim that Colombian law is consistent with U.S. law is wrong, as a gross negligence standard applies to duty of care claims under U.S. law whereas under Colombian law the standard is simple negligence.

transactions) and breach of the Federal common law duty to preserve estate property (i.e. other postpetition transactions, including those without fair consideration, whether intentional or negligent) give rise to claims for breach of the duty to act with the diligence of a prudent businessperson.

The Complaint adequately pleads facts to support an inference that is imprudent for directors to authorize a $2.7 million payment to insiders under the Shareholder Loan on the eve-of-bankruptcy that is not due until after the Chapter 11 case concludes; and that it is imprudent to authorize postpetition payroll loan transfers to Ban100 for noncash consideration (setoff) or no consideration, or direct, unauthorized payments to Ban100, which it states were made under a prepetition contract (ECF #41 at 9, 22), particularly in light of the directors having been advised prepetition (April 29, 2024 Board Minutes PDF p.12), that "[n]o payments to related parties may be made while the Company is subject to the filing" i.e. in bankruptcy.

2. Gramercy, GDA Luma and ACON

The motions to dismiss the fiduciary duty claims against Gramercy, GDA Luma and ACON for not adequately pleading control (ECF #37 at 10-13, #41 at 1-17, #44 at 7-11) should also be denied.

*In re USACafes, L.P. Litigation*, 600 A.2d 43, 48 (Del. Ch. 1991) held "[o]ne who controls property of another may not, without implied or express agreement, intentionally use that property in a way that benefits the holder of the control to the detriment of the property or its beneficial owner." The court reached this result by applying fiduciary concepts from trust law, and denied a motion to dismiss on that basis, finding the complaint had alleged "facts which if true establish that the director defendants … participated in breach of … duties by the General Partner." *Id.* at 49. *See also Wallace v. Wood*, 752 A.2d 1175, 1182 (Del. Ch. 1999) (denying motion to dismiss fiduciary duty claim against "Affiliates and Parents" because "plaintiffs allege adequate specific

facts to support their claim that … Affiliates and Parents utilized Partnership assets which they controlled to enrich themselves at the expense of the Limited Partners"); *Bigelow/Diversified Secondary Partnership Fund 1990 v. Damson/Birtcher Partners*, 2001 WL 1641239, at *8 (Del. Ch. Dec. 4, 2001) ("While mere ownership—either direct or indirect—of the general partner does not result in the establishment of a fiduciary relationship, those affiliates of a general partner who exercise control over the partnership's property may find themselves owing fiduciary duties to both the partnership and its limited partners").

These principles have been extended to the private equity context. *E.g. In re Primedia Inc. Derivative Litig.*, 910 A.2d 248, 258 & n.26 (Del. Ch. 2006) (citing *Wallace*) ("to survive a motion to dismiss, they must allege … actual control of Primedia's corporate conduct … the plaintiffs need not demonstrate that KKR oversaw the day-to-day operations of Primedia. Allegations of control over the particular transaction at issue are enough"; "the facts clearly support a reasonable inference that KKR exerted actual control over Primedia during the course of the preferred stock redemptions").

Courts recognize that control may be held by a person that does not own a majority of outstanding stock. *Guilbeau v. Footprint Int'l Holdco, Inc.*, 360 A.3d 288, 312 (Del. Ch. 2026) (quoting *Kayn v. Lynch Communication Systems, Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994)) ("a defendant without majority control could still be a fiduciary if the defendant exercised 'control over the business affairs of the corporation'"); *GBG*, 666 B.R. at 137 ("Defendants argue that they were merely 'minority' shareholders of GBGH because they owned less than 50% of the outstanding GBGH shares, and that as a matter of law this somehow negates the contention that they 'controlled' GBGH and GBG. However, the Amended Complaint alleges … actual control"). *See also Robbins & Co. v. A.C. Israel Enterprises, Inc.,* 1985 WL 149627, at *5 (Del. Ch. Oct. 2, 1985) ("This Court and others have recognized that substantial minority interests ranging from

20% to 40% often provide the holder with working control", and going on to find post-trial that a 31% stockholder exercised control); *Summa Corp. v. Trans World Airlines, Inc.,* 540 A.2d 403, 404-05 (Del. 1988) (40% stockholder had "working control"); *Perlman v. Feldmann*, 219 F.2d 173, 174 n.1 (2d Cir. 1955) (33% ownership "gave working control").

Courts also recognize that control may be held by a group. To plead control group liability, a plaintiff need only allege that the members "are connected in some legally significant way … to work together toward a shared goal … there must be some indication of an actual agreement, although it need not be formal or written." *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251-52 (Del. 2019) (cleaned up). "[P]arallel interests" together with other facts alleged "can support a reasonable … inference that a control group existed." *In re Hansen Medical, Inc. Stockholders Litig.*, 2018 WL 3025525, at *5 (Del. Ch. June 18, 2018). *E.g. In re Tilray, Inc. Reorg. Litig.*, 2021 WL 2199123, at *11 (Del. Ch. June 1 2021) (denying motion to dismiss fiduciary duty claim against individual defendants who owned Privateer, which in turn controlled Tilray; "concurrence of interests … unique to [defendants]" in addition to certain "plus factors" was enough to adequately plead control group liability).

Here, the Complaint alleges the investment advisers, which are identified as the shareholders of the Debtor and Ban100 (Complaint ¶¶28, 30), whose partners/employees they designated as directors (id. ¶¶13, 17, 21) and which viewed their holdings in both as a single investment (id. ¶¶27, 33) used their control of the Debtor to transfer value at the Debtor to their affiliates (id. ¶1), specifically the Shareholder Lenders and Ban100. With regard to control/governance, the Complaint alleges:

- Decisions were made at the investment advisor level and communicated to the employees and representatives designated to serve on the Board. For example, Mr. Ferraro would regularly confer with Robert Koenigsberger, the founder and Chief Investment Officer of Gramercy about material business decisions for the Debtor; and Gabriel de Alba the founder and managing partner of GDA Luma

was similarly consulted on business decisions for the Debtor. The Debtor's directors regularly included other members of the investment team at Gramercy, GDA Luma and ACON on emails concerning Debtor decisions, including Ban100 directors Javier Ledesma (of Gramercy), Maite Stebelski (GDA Luma) and Alberto Hernandez (ACON). For the crucial August 28, 2024 Board meeting … the putative GDA Luma-appointed "independent" board member Mr. Kontarovsky gave a power of attorney to a junior analyst at GDA Luma to among other things approve payroll loan portfolio sales to Ban100.

- The Gramercy, GDA Luma and ACON directors of Ban100/Finanza would regularly attend and participate in the Debtor's Board meetings and were from time to time also given power of attorney by the Debtor directors selected by them to among other things approve payroll loan portfolio sales to Ban100.
- Between the Gramercy, GDA Luma and ACON partners/employees on the Debtor's Board and the other directors which they selected and which voted in the manner they directed, whether because they are attorney/agent for one of them (Mr. Trujillo Sanchez) or because they gave power of attorney right back to them (Mr. Kontarovsky), Gramercy, GDA Luma and ACON directly controlled the Board of the Debtor.
- Using that control, Gramercy, GDA Luma and ACON caused their respective directors to vote for all of the Board decisions described herein.

(Id. ¶34.)

Contrary to the investment adviser's arguments, these allegations reflect managerial involvement that goes well beyond consultation with colleagues (ECF #37 at 12, #41 at 3, 14) about business decisions and provides examples of direct participation by the respective investment advisers. Insofar as they argue the Complaint does not plead the specific transactions in which investment adviser personnel were involved, the April 29, 2024 Board Minutes (referenced in Complaint ¶¶64, 125) reflect Mr. Ledesma, acting on behalf of Gramercy directing the Debtor's CEO how to collect particular portfolios and how to manage Baker McKenzie, and obtaining outside legal advice to second-guess that of Baker McKenzie. (April 29, 2024 Board Minutes PDF pp.9, 14-16.) They also reflect Mr. Hernandez, of ACON, also a Ban100 director, voting as director on all matters on the agenda, on account of the power of attorney Mr. Knoell

granted him. Such matters include payment of Debtor sales premium held by Ban100 to the Shareholder Lenders through Finanza, the amendment to the Shareholder Loan forbearance agreement and negotiations with the Colombian guarantor concerning local bonds and the exchange offer. (Id. PDF pp.12-16, 20.[10])

The Complaint also adequately pleads they operated as a control group with the common goal of transferring value away from the Debtor and towards their other affiliates in the lead-up, and during the bankruptcy, particularly following Colombian guarantor refusal to defer maturity of the local bonds. Parallel interests are alleged by virtue of their being co-lenders under the Shareholder Loan (id. ¶¶45, 66) and co-owners of Ban100 (id. ¶¶28, 30), all of whom viewed their interests in the Debtor and Ban100 (id. ¶¶27, 33) as a single economic unit. The Complaint pleads multiple agreements in furtherance of their goal of realizing on the Shareholder Loans or equity in Ban100, including: a transaction whereby GDA Luma exchanged $57 million in bonds issued by the Debtor, and GDA Luma and Gramercy exchanged claims for outstanding interests due under the Shareholder Loan into equity positions in Ban100 (id. ¶35), Shareholder Loan amendments granting security interests in the Debtor's residual interests in trusts and requiring the sale of Ban100 (id. ¶¶49-50), a side letter to the Shareholder Loan that carved up Ban100 sale proceeds amongst themselves, to the exclusion of the Debtor's founder and co-shareholder at Ban100 (id. ¶46) and a forbearance agreement requiring the Debtor to repay $8.5 million towards the Shareholder Loan by April 2024 (id. ¶56), plus attorneys' fees.

---

[10] The February 28, 2024 Board Minutes submitted in opposition to Ban100's motion also reflect managerial involvement by Mr. Ledesma (id. PDF p.22) and Ms. Stebelski (id. PDF p.28), including with respect to the sale of payroll loan portfolios from the Citibank Trust to Ban100, and again Mr. Hernandez voting upon all matters on the agenda with power of attorney from Mr. Knoell.

### C. The Motions to Dismiss the Avoidance Claims Should be Denied

1. Postpetition Transfer

(i) Payroll Loan Portfolio Sale Transactions

The Complaint alleged that the vertical test is not satisfied as to postpetition payroll loan portfolio sale transactions, because the bond indenture prohibited such transactions, and that prepetition creditors had no reason to believe such sales were occurring because they were not disclosed as required. (Complaint ¶¶37-39, 42, 123.)

Ban100 argues that prepetition payroll loan portfolio sales to Ban100 satisfy the vertical test because the Complaint (at ¶40) alleges the Debtor regularly sold payroll loan portfolios to Ban100 prepetition in spite of the affiliate transaction covenant, and the "hypothetical creditor" (*In re Roth American, Inc.*, 975 F.2d 949, 953 (3d Cir. 1992) contemplated by the test would expect that practice to continue. (ECF #34 at 26.)

This argument fails. The vertical dimension test considers "from the vantage point of a hypothetical creditor … whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit." *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

The Debtor was engaged in the business of extending payroll loans and credit card debt with funds borrowed from capital markets. Ban100 does not explain how any lender would possibly learn that the Debtor was selling payroll loan portfolios to Ban100. How was this conveyed to the public, or creditor body, or any creditor listed (ECF #1 PDF p.17) in the 20 largest unsecured creditors list?[11] The logical "hypothetical creditor" to consider when applying the

[11] The original bond offering memorandum states that "in order to fund growth, we may sell portion of our originated payroll loan portfolio … Purchasers of loans have included … Credifinanciera, among others" (Chubak Decl. Exhibit 1 at 133) but the Complaint alleges (¶¶37-

vertical dimension test is BNYM, which holds the largest claim on the 20 largest unsecured creditors list and is the only creditor to have filed a prepetition claim herein, excluding individual bondholders. The Complaint alleges the Debtor breached the covenant designed to elicit disclosure of payroll loan portfolio sale transactions, which covenant it and BNYM agreed to "when [it] decided to extend credit." *Johns-Manville*, 60 B.R. at 616.

With regard to postpetition payroll loan portfolio sales, Ban100's argument is that such transactions satisfy the vertical test because the Debtor's CEO stated in the first day declaration such transactions would continue. (ECF #34 at 26 (citing ECF #4 ¶50(c).)

This argument likewise fails. At the outset, the first day declaration is not a reasonable way of conveying to creditors that large-dollar insider transactions were happening postpetition. It is not the type of disclosure called for by the subject covenant, and was mailed/emailed to BNYM, but not any other bondholders, together with a slew of first day motions and confirmation documents. (ECF #30.) No FRBP 9013(a) request for relief to enter into affiliate transactions was made by the first day declaration, separate and apart from the first day motions, and no such relief was granted at the first day hearing.

More to the point, the subject postpetition transactions are large-dollar insider ones in a case where no schedules or statements of financial affairs were ever filed and no committee was appointed. Under these circumstances, Ban100's assumption Court authorization for postpetition payroll loan portfolio sale transactions was not required is quite bold:

---

39) that the accompanying indenture included a covenant prohibiting such sales (absent information concerning fairness of same, which was never provided) when the credit rating falls below investment grade, which was triggered by 2022. A substantially identical statement is in the offering memorandum for the replacement bonds (ECF #18 A-74 PDF p.224) but the replacement bond indenture did not modify this covenant in any material respect. (Compare id. at 72-73 PDF pp.80-81 with original indenture § 3.17.)

> [N]o hypothetical creditor would reasonably expect a Debtor-in-possession with fiduciary duties to conceal the existence and substance of transactions involving hundreds of thousands of dollars and scores of estate assets from the Court, the United States Trustee and the creditor body, especially when they were conducted with an insider. I find that these pre-conversion … transactions fail both the horizontal and vertical dimension tests and were not made in the ordinary course of business. Therefore, notice, a hearing, and Court approval were mandatory pre-requisites to the transfer[s] … Accordingly, I hold that the proven post-petition, pre-conversion [transfers] are recoverable by the Trustee.

*In re HMH Motor Services, Inc.*, 259 B.R. 440, 560 (Bankr. S.D. Ga. 2000). The same principle should apply here, where the postpetition insider transaction amounts are orders of magnitude greater.

Ban100 also argues that "The Cash Management Orders Expressly Authorized Debtor's Transactions with Ban100" (ECF #34 at 27) but does not explain what paragraph(s) of the orders authorized same. That the cash management motion sought permission to "Continue Related Party Transactions [with Ban100] in the Ordinary Course" (ECF #6 ¶56) does not change that such relief was not actually provided in the resulting orders. ¶12 of the interim order (ECF #38), requiring the Debtor to "continue to maintain records with respect to all transfers of cash so that all transactions (including Related Party Transactions) may be readily ascertained, traced …" did not give advance authorization to consummate the subject insider transactions, and in any event that paragraph was omitted entirely from the final order entered June 12, 2024 (ECF #70) which superseded the interim order.

No explanation is provided as to how the cash management orders authorized nonmutual setoff (ECF #34 at 28), or where the same was disclosed.

The Complaint alleged that the horizontal dimension test is not satisfied as to postpetition payroll loan portfolio sale transactions, because the secondary market for such loans was frozen during 2024. (Complaint ¶122.)

Ban100 argues that the test "considers whether portfolio sales are ordinary in the industry, which they are, and the withdrawal of other buyers makes it more reasonable to continue selling to the established counterparty." (ECF #34 at 25.)

This argument fails. The horizontal test concerns whether "the transaction is of the sort commonly undertaken by companies in that industry." *In re Crystal Apparel, Inc.*, 207 B.R. 406, 409 (Bankr. S.D.N.Y. 1997). It calls for "an industry-wide comparative analysis of the debtor's business to other similar businesses and requires considering whether such other businesses would engage in the proposed transaction as ordinary business." *In re Enron Corp.*, 2003 WL 1562202, at *16 (Bankr. S.D.N.Y. Mar. 21, 2003). It is an inherently factual inquiry, not properly determined on an FRCP 12 motion. *In re Omega Papier Wernshausen GmbH v. Harnischfeger Industries, Inc.*, 2001 WL 1819317, at *3 (Bankr. D. Del. 2001) ("Omega … argu[es] whether these postpetition letters were transactions in the ordinary course of business is a question of fact which cannot be decided in a Rule 12(c) motion. I agree.").

Lastly, as to Ban100's argument that the February 9, 2024 payroll loan portfolio sale transaction (Complaint ¶¶88-89, 114) cannot be avoided as a postpetition transfer, what would the reason for its postpetition ratification unless the transaction were not complete until the board had approved same? Ban100 does not address this, and instead claims without explanation that the transaction was completed February 9, 2024.

(ii) Cash Payments for "Operating Costs"

Ban100 makes no effort to argue that that the cash payments for "operating costs" satisfy the horizontal or vertical test. Its sole argument is that the cash management orders "authorized … each of the 'operating cost' payments challenged by the Trustee," (ECF #34 at 28.) That is false. Neither the interim (ECF #38) nor the final (ECF #70) cash management order authorized such payments.

Ban100 otherwise claims "operating costs" were for consideration (ECF #34 at 4) but does not explain how the Complaint admits same. The Complaint citations (¶¶62, 65, 91-92, 97, 128) do not admit consideration was given. Rather, the Complaint alleges that the board knew it was wrongful to make insider payments in bankruptcy. (Id. ¶125, citing April 29, 2024 Board Minutes PDF pp.12-13 ("the attorneys are therefore requesting that an Amendment be executed [because] [n]o payments to related parties may be made while the Company is subject to the filing"; insider payments "would create significant risk before the Court").)

2. Preference

As noted above, Finanza and the Shareholder Lenders take conflicting positions on the $2.7 million payment, with Finanza arguing the Complaint pleads a mere conduit defense such that no antecedent debt is alleged to have been paid (ECF #34 at 16), and the Shareholder Lenders arguing (ECF #37 at 19) the Debtor's interest in the subject funds was extinguished when it paid Finanza on account of Finanza's loan of the Shareholder Loan proceeds to the Debtor.

Both are wrong. The Complaint specifically alleges Finanza received sales premium "on account of its loan of Shareholder Loan proceeds to the Debtor" (Complaint ¶105.) In addition, putting aside that the mere conduit defense is a "fact-intensive inquiry, which is best undertaken after the opposing party has an opportunity to conduct discovery" (*SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 2023 WL 8010194, at *5 (Bankr. S.D.N.Y. Nov. 17, 2023) (internal quotations and citations omitted)), the mere conduit defense does not apply to insider transfers. *In re Pretty Girl, Inc.*, 644 B.R. 298, 311 (Bankr. S.D.N.Y. 2022) ("As a matter of policy, the mere conduit defense exists to prevent liability for those parties merely handling funds but who lack the control to do with them what they wish. *In re Finley Kumble*, 130 F.3d at 56. It would be inappropriate to

extend the defense here where Mr. Nigri owned and controlled not only the Debtor but all the entities involved in these transfers").[12]

The Shareholder Lenders also argue "once the sales premium was paid to Finanza, the Debtor's property interest was extinguished" (ECF #37 at 19) such that Debtor funds were not used to pay an antecedent debt owed to the Shareholder Lenders.

However, this ignores that the Finanza transfer satisfied Debtor guaranty obligations on their loan to Finanza, and that 11 U.S.C. § 550(a)(2) permits recovery from subsequent transferees. To this, the Shareholder Lenders' argument is that this is not antecedent debt because the guaranty had not been called upon. (ECF #37 at 20.) However, the antecedent debt arose when the guaranty was made. *Matter of Cavalier Homes of Georgia, Inc.*, 102 B.R. 878, 887 (Bankr. M.D. Ga. 1989) (citations omitted) ("AmSouth Bank's contingent claim against the Debtor arose when Debtor executed the guaranty agreement on December 29, 1983. Debtor incurred a debt to AmSouth Bank by virtue of the agreement. The debt is an antecedent debt because it was incurred before the transfers were made in 1985 and 1986."). "To conclude otherwise would be inconsistent with Congress's intent, made clear from the Code's broad definition of 'debt,' that 'all legal obligations of the debtor, no matter how remote or contingent … be dealt with in the bankruptcy case.'" *In re Tanner Family, LLC*, 556 F.3d 1194, 1197 (11th Cir. 2009) (citing *Cavalier Homes*). *See also In re Enron Corp.*, 357 B.R. 32, 46 (Bankr. S.D.N.Y. 2006) (endorsing the "expansive interpretation of 'antecedent debt' [that] can be found in … *Cavalier Homes*").

[12] Contrary to Finanza's argument (ECF #34 at 16), the allegation that "Finanza had no entitlement, contractual or otherwise, to the sales premium" (Complaint ¶63) held by Ban100 does not defeat the antecedent debt element, as the Complaint alleges (id. ¶¶62, 98, 103, 105) Finanza received the subject funds regardless of its contractual entitlement.

With regard to 11 U.S.C. § 547(b)(5), Finanza (ECF #34 at 19) and the Shareholder Lenders (ECF #37 at 21-22, #41 at 25-26) argue that this element is not pleaded because "the Complaint fails to allege anything about Debtor's finances from which to abstract a hypothetical liquidation analysis—a fatal omission. *See WonderWork*, 611 B.R. at 213-214."

*WonderWork*, however, held "[o]rdinarily, a trustee satisfies this prong of the preference analysis [11 U.S.C. § 547(b)(5)] by showing that the debtor was insolvent on the petition date." Here, the Complaint alleged insolvency from and after 2023, based on the offering memorandum having admitted negative equity value as of December 31, 2022 (Complaint ¶109, citing ECF #18 at A-28 PDF p.178.) The Complaint also alleged the Debtor was not paying interest due on the Shareholder Loan as it became due, after having ceased payroll loan and credit card originations. (Complaint ¶¶36, 52.)

Unlike in *WonderWork*, here the liquidation analysis (ECF #78 Exhibit D), which "is based upon the Debtor's unaudited balance sheet as of March 31, 2024 … and upon projections developed by the Debtor for certain assets to reflect various probable offsets or adjustments deemed to be a more accurate predictor of value in a liquidation scenario", and which the Court may take judicial notice of under FRE 201, also reflects insolvency, with unsecured creditors projected to recover 21.92%-38.38%. *Wonderwork* denied the motion to dismiss on the ground that the complaint and an examiner's report which the Court took judicial notice of included facts indicating the movant would receive less than a full recovery in a hypothetical Chapter 7 case. The instant motion should be denied as well.

Finanza otherwise argues the preference claim fails because veil piercing requirements are not satisfied. (ECF #34 at 17.) But Finanza does not explain what veil piercing has to do with preference elements. The preference claim is not premised on veil piercing.

Lastly, Gramercy Colombia argues the Complaint does not adequately plead a preference as to the $50,000 payment (described in Complaint ¶58) the Debtor made to Latham & Watkins under the forbearance agreement relating to another P.A. trust because it "does not identify what portion of the $50,000 was supposedly attributable to Gramercy Colombia as opposed to the other lenders" (ECF #37 at 20.) But relative attribution has no bearing on any 11 U.S.C. § 547(b) element. At best, it is a fact question not properly determined on this motion.

3. Fraudulent Transfer

Ban100 argues the fraudulent claim based on the February 9, 2024 payroll loan portfolio sale transaction (Complaint ¶114) should be dismissed because allegations "that the price 'was not negotiated,' that the portfolios 'were not market tested or even offered for sale to anyone else,' and that Ban100 'is an insider' … are insufficient to plead a lack of reasonably equivalent value", and reasonably equivalent value exists because it is an "arm's-length transaction between a willing buyer and a willing seller." (ECF #34 at 20.)

However, lack of negotiation or market testing and insider status are non-conclusory facts supporting the allegation that reasonably equivalent value is lacking. Reasonably equivalent value is not presumed with respect to insider transfers. *Sharp Int'l Corp. v. State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005). *See also Matter of Teltronics Services, Inc.*, 29 B.R. 139, 169 (Bankr. E.D.N.Y. 1983) ("If the objectant comes forward with sufficient substantiations of misconduct on the part of the insider … the burden will shift to the insider to establish that each of his challenged transactions with the debtor had all the earmarks of an arm's length bargain"). Ban100's argument that the transaction was for "marketplace value" (ECF #34 at 20) is a matter outside the pleading not properly considered on this motion. Same for its claim that "value [was] reached in the context of an arm's length transaction." "[I]nsider status inherently presumes that transactions are not conducted at arm's length." *U.S. Bank N.A. ex rel.*

*CWCapital Asset Management LLC v. Village at Lakeridge, LLC*, 583 U.S. 387, 404 (2018) (Sotomayor, J., concurring).

The Shareholder Lenders argue that the fraudulent transfer claim is not pleaded with the requisite particularity, and that the "one-sentence effort to plead actual fraud falls woefully short of the Rule 9(b) standard." (ECF #37 at 23, citing Complaint ¶117; see also ECF #41 at 29-30 (similar).)

This argument which focuses exclusively on ¶117 fails to consider that the Complaint as a whole is replete with badges of fraud, including: insider status (Complaint ¶¶28, 30); that payment was not even due when made (id. ¶¶67-68) because a forbearance deferred payment to shareholders; and the Debtor's financial condition at the time of payment (id. ¶109). As to the badge of fraud concerning the "general chronology of the event and transactions under inquiry", the April 29, 2024 Board Minutes show (PDF pp.11-13) that payment timing was dictated by the Debtor's attorneys having advised it could not be made in bankruptcy ("No payments to related parties may be made while the Company is subject to the filing") and concerns about consequences if that advice were to be disregarded ("any payments arising from this transaction that would otherwise be made to related parties, specifically, in our case, from Credivalores to Finanza Inversiones, cannot be made [postpetition] because they would create significant risk before the Court; because this type of payment could cause concern among the bondholders and potentially raise concerns with the judge, thereby putting the transaction [prepackaged Chapter 11 plan] at risk" ). These same badges apply to Finanza's transfer of the $2.7 million to the Shareholder Lenders.

The argument of Ban100 (ECF #34 at 22) and the Shareholder Lenders (ECF #37 at 26) that the Complaint pleads an 11 U.S.C. § 548(c) defense as to the $2.7 million payment is meritless. Value and good faith present fact questions not properly decided on this motion. Courts regularly

decline to consider 11 U.S.C. § 548(c) at the pleading stage. *In re Syntax-Brillian Corp.*, 2016 WL 1165634, at *3 (Bankr. D. Del. Feb. 8, 2016) (collecting cases). In addition, insider transactions are generally considered to be lacking in good faith. *In re Dewey & LeBoeuf LLP*, 518 B.R. 766, 792 (Bankr. S.D.N.Y. 2014).

4. Recovery of Avoided Transfers

The Shareholder Lenders' argument, that they cannot be sued for preference or fraudulent transfer as to the $2.7 million (e.g. ECF #37 at 23, #41 at 26-27) because the Debtor's interest in such property was extinguished on its getting paid to Finanza, ignores that 11 U.S.C. § 550(a)(2) permits recovery from subsequent transferees.

"To plead a subsequent transfer claim, the Trustee must plead that the initial transfer is avoidable, and the defendant is a subsequent transferee of that initial transfer." *Picard v. Legacy Capital Ltd. (In re Bernard L. Madoff Inv. Sec., LLC)*, 548 B.R. 13, 35 (Bankr. S.D.N.Y. 2016). That is pleaded here, as shown above.

The Shareholder Lenders also argue (ECF #37 at 28, #41 at 34) that said payment is unavoidable under 11 U.S.C. § 550(b)(1).

This argument fails for two reasons. The requirements of 11 U.S.C. § 550(b)(1) are not pleaded. As noted above (discussion of 11 U.S.C. § 548(c)), the Complaint does not plead value and good faith as to these payments. Also, the board minutes show the Shareholder Lenders did not take "without knowledge of the voidability of the transfer". Each Shareholder Lender was represented at the February 28, 2024 and April 29, 2024 board meetings, by the directors Gramercy, GDA Luma and ACON designated for the Debtor and Ban100. The minutes of those meetings reflect that they were advised concerning the bond restructuring and "prepack", and were specifically told that the subject payments would be made to them eve-of-bankruptcy to avoid

judicial scrutiny that would result if made in bankruptcy. (February 28, 2024 Board Minutes PDF pp.20-23, April 29, 2024 Board Minutes PDF pp.11-16.)

This argument also ignores that the Shareholder Lenders are considered initial transferees under the step-transaction doctrine which permits collapsing of multiple transactions that occur as part of an integrated plan. *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 537, 540 (Bankr. S.D.N.Y. 2016) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635-36 (2d Cir. 1995) (discussing doctrine); *In re Allou Distributors, Inc.*, 379 B.R. 5 (Bankr. E.D.N.Y. 2007) (rejecting movants' argument that "'collapsing' may not be used in order to convert a 'subsequent transferee into an 'initial transferee'").

Both conditions for collapsing are alleged. The first "is that the transactions, taken as a whole, diminish the value of the debtor's estate and are marked by either a transfer made by the debtor for less than fair consideration or a transfer made by the debtor with actual fraudulent intent." *Id.* at 21-22. Here, the Complaint alleges that absent the transactions, Ban100 would have been required to pay the $2.7 million to the Debtor. (Complaint ¶62.) The Complaint also alleges badges of fraud and lack of consideration, discussed above. *See also Sharp*, 403 F.3d at 54 (citing *HBE Leasing*, 48 F.3d at 634 (fair consideration requires good faith, with insider transfers considered to be lacking in good faith). The second is that "the party from whom recovery is sought had actual or constructive knowledge of the entire scheme that renders the transfer fraudulent." This is not only alleged (Complaint ¶62), as noted above, Gramercy, GDA Luma and ACON participated in board meetings concerning the scheme.

The Shareholder Lenders argue they are not transferees (e.g. ECF #37 at 28) because they did not exercise dominion or control before receiving payment. That is irrelevant where dominion and control are acknowledged upon receipt of payment. In any event, the mere conduit defense does not apply to insider transfers and is not properly considered on a motion to dismiss.

Lastly, the Shareholder Lenders argue that they are not initial or subsequent transferees as to the attorneys' fees that the Debtor paid directly to law firms. (ECF #37 at 27.) This ignores that 11 U.S.C. § 550(a)(1) permits recovery not just from "the initial transferee" but also from "the entity for whose benefit such transfer was made." The Complaint alleges the $50,000 payment to Latham & Watkins under Gramercy Colombia's forbearance agreement (Complaint ¶58) was done for its benefit (id. ¶135), and Schedule IV attorneys' fee payments under the Shareholder Lenders' forbearance agreement (id. ¶57) was made for their benefit.

**D. The Motions to Dismiss the Turnover Claim Should be Denied**

Ban100 argues that the turnover claim, which seeks to collect the purchase price under the July 30, 2024 payroll loan portfolio sale transaction to Ban100, that Ban100 paid for through the exercise of nonmutual setoff rights without stay relief, should be denied (ECF #34 at 33-34) because the transaction did not give rise to a matured debt. However, if the setoff is void ab initio on account of its being a stay violation, that debt remains due and payable.

Ban100 otherwise argues turnover cannot be premised on an automatic stay/setoff dispute, but cites no authority to that effect. The sole decision cited, *In re Satelco, Inc.*, 58 B.R. 781, 789 (Bankr. N.D. Tex. 1986), does not address obligations outstanding due to a stay violation. Even if this "claim is a disguised setoff and stay" one, dismissal should still be denied as labels assigned to claims are not binding or controlling in determining whether a valid claim has been pleaded. *Twombly* held labels do not state the claim; rather, it is the facts alleged which do. *See also G.L.C. Consulting Servs. 1990 L.T.D. v. Tropicana Products, Inc.*, 2007 WL 9723898 (M.D. Fla. Nov. 19, 2007) ("Regardless of the proper title of the claim, Plaintiffs have adequately pled the elements, and therefore, Tropicana's motion to dismiss … is denied"); *Becker v. Anglea*, 2019 WL 3060057, at *1 (E.D. Cal. July 12, 2019) ("courts should look past a potentially, legally errant or ambiguous title of a claim if the … material makes clear what the claim really comprises").

## CONCLUSION

The motions should be denied.

Dated: New York, NY
October 30, 2026

Amini LLC

/s/ Jeffrey Chubak
Bijan Amini
Avery Samet
Jeffrey Chubak
131 West 35th Street
12th Floor
New York, NY 10001
(212) 490-4700
bamini@aminillc.com
asamet@aminillc.com
jchubak@aminillc.com
Special Litigation Counsel for Plaintiff